# 22-1745

IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔒𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE SECOND CIRCUIT

Tyrone Holmes,

*Plaintiff-Appellant,*

*-against-*

Apple Inc., Amazon.com, LLC, CheckPoint Fluidic Systems International, Ltd.,

*Defendant-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
JUDGE RONNIE ABRAMS

## DEFENDANT-APPELLEES' SUPPLEMENTAL APPENDIX
### Volume 1 of 2 (Pages SA0001 – SA0278)

HANNAH Y. CHANOINE
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York  10036-6537
Telephone: (212) 326-2000

DAVID R. EBERHART
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
Telephone: (415) 984-8700

BRANDON C. AMASH
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900

*Attorneys for Defendant-Appellee Apple Inc.*

BRIAN GRAIFMAN
BORAH, GOLDSTEIN, ALTSCHULER,
    NAHINS & GOIDEL, P.C.
377 Broadway, 6th Floor
New York, New York 10013
(212) 431-1300

*Attorneys for Defendant-Appellee
    Checkpoint Fluidic Systems
    International, Ltd.*

MICHAEL JOHN GOETTIG
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st
    Floor
New York, New York 10020
(212) 489-8230

*Attorneys for Defendant-Appellee
    Amazon.com, LLC*

# TABLE OF CONTENTS

**Volume 1**

*Page(s)*

Plaintiff-Appellant Tyrone Holmes's Notice of
Appeal, dated July 26, 2022 (Doc. 164) ............................ SA0001 – SA0002

Memorandum Opinion and Order Denying Plaintiff-
Appellant Tyrone Holmes's Motion to Vacate
Judgment, dated June 27, 2022 (Doc. 163) ........................ SA0003 – SA0008

Plaintiff-Appellant Tyrone Holmes's Complaint,
dated June 16, 2017 (Doc. 1) ............................................. SA0009 – SA0043

Affidavit as to "Timeline of Events" and Contacts
with New York in Support of Defendant-
Appellee CheckPoint Fluidic Systems International,
Ltd.'s Motion to Dismiss, dated October 9, 2017
(Doc. 50) ............................................................................ SA0044 – SA0045

Affidavit as to the "Laptop", "FedEx" and "Kaseya"
in Support of Defendant-Appellee CheckPoint
Fluidic Systems International, Ltd.'s Motion to
Dismiss, dated October 9, 2017 (Doc. 51) ......................... SA0046 – SA0050

Exhibit F to Affidavit as to the "Laptop", "FedEx"
and "Kaseya" in Support of Defendant-Appellee
CheckPoint Fluidic Systems International, Ltd.'s
Motion to Dismiss, dated October 9, 2017
(Doc. 51-6) ........................................................................ SA0051 – SA0057

Memorandum of Law of Defendant-Appellee
CheckPoint Fluidic Systems International, Ltd.
in Support of Motion to Dismiss For Lack of
Personal Jurisdiction, dated October 9, 2017
(Doc. 52) ............................................................................ SA0058 – SA0069

Defendant-Appellee Amazon.com, LLC's Notice of
Motion for Entry of Judgment, dated February
12, 2018 (Doc. 91) ............................................................. SA0070 – SA0074

i

*Page(s)*

Memorandum of Law in Support of Defendant-
Appellee Amazon.com, LLC's Motion for Entry
of Judgment and to Dismiss the Complaint, dated
February 12, 2018 (Doc. 92) .............................................. SA0075 – SA0104

Declaration of Michael Goettig in Support of
Defendant-Appellee Amazon.com, LLC's
Motion for Entry of Judgment, dated February
12, 2018 (Doc. 93) ............................................................. SA0105 – SA0214

Declaration of Jesse Jensen in Support of Defendant-
Appellee Amazon.com, LLC's Motion for
Entry of Judgment, dated February 12, 2018
(Doc. 94) ............................................................................ SA0215 – SA0237

Affidavit as to "Timeline of Events" in Support of
Defendant-Appellee Amazon.com, LLC's
Motion for Entry of Judgment, dated February
12, 2018 (Doc. 95) ............................................................. SA0238 – SA0248

Affidavit as to the "Laptop", "FedEx" and "Kaseya"
in Support of Defendant-Appellee Amazon.com,
LLC's Motion for Entry of Judgment, dated
February 12, 2018 (Doc. 96) .............................................. SA0249 – SA0276

Notice of Defendant-Appellee Apple Inc.'s Motion for
Judgment on the Pleadings or, in the
Alternative, Summary Judgment, dated February
12, 2018 (Doc. 97) ............................................................. SA0277 – SA0278

**Volume 2**

Memorandum of Law in Support of Defendant-Appellee
Apple Inc.'s Motion for Judgment on the
Pleadings or, in the Alternative, Summary
Judgment, dated February 12, 2018 (Doc. 98) ................... SA0279 – SA0307

Defendant-Appellee Amazon.com, LLC's Local Rule
56.1 Statement, dated February 12, 2018 (Doc.
100) ..................................................................................... SA0308 – SA0311

ii

*Page(s)*

Plaintiff-Appellant Tyrone Holmes's Memorandum of
 Law in Opposition to Defendants' Motions for
 Judgment, dated March 12, 2018 (Doc. 105) .................... SA0312 – SA0323

Defendant-Appellee Amazon.com LLC's Reply
 Memorandum of Law in Further Support of
 Motion for Entry of Judgment and to Dismiss
 Complaint, dated May 10, 2018 (Doc. 114) ...................... SA0324 – SA0337

Opinion and Order Granting Defendants' Motions,
 dated July 23, 2018 (Doc. 121) ......................................... SA0338 – SA0366

Judgment, dated July 24, 2018 (Doc. 122) .................................... SA0367

Plaintiff-Appellant Tyrone Holmes's Notice of
 Appeal of Judgment, dated August 22, 2018
 (Doc. 124) ...................................................................................... SA0368

Summary Order Affirming Judgment, dated December
 9, 2019 (Doc. 127) ............................................................. SA0369 – SA0378

Mandate, dated January 6, 2020 (Doc. 135) ................................. SA0379 – SA0388

Defendant-Appellee CheckPoint Fluidic Systems
 International, Ltd.'s Statement of Costs, dated
 January 22, 2020 (Doc. 136) ............................................................. SA0389

Defendant-Appellee Amazon.com, LLC's Notice of
 Motion for Attorneys' Fees and Costs, dated
 February 3, 2020 (Doc. 131) ............................................. SA0390 – SA0391

Plaintiff-Appellant Tyrone Holmes's "Motion for Relief
 from Judgment" or "Rule 60 Motion for Relief from
 Judgment; Objections to Bill of Costs, dated May
 11, 2020 (Doc. 144) ........................................................... SA0392 – SA0395

Order Denying Plaintiff-Appellant Tyrone Holmes's
 Rule 60(b) Motion, dated May 15, 2020 (Doc. 145).......... SA0396 – SA0398

*Page(s)*

Letter from Clerk of Court, dated January 21, 2022
(Doc. 146) ............................................................ SA0399 – SA0400

Plaintiff-Appellant Tyrone Holmes's Motion to Vacate
Judgment, dated February 4, 2022 (Doc. 148) .................. SA0401 – SA0402

Plaintiff-Appellant Tyrone Holmes's Declaration in
Support of Motion to Vacate Judgment, dated
February 4, 2022 (Doc. 148-1) ........................................ SA0403 – SA0448

Exhibits to Plaintiff-Appellant Tyrone Holmes's
Declaration in Support of Motion to Vacate
Judgment, dated February 4, 2022 (Doc.
148-2) .................................................................. SA0449 – SA0455

Defendant-Appellee CheckPoint Fluidic Systems
International, Ltd.'s Opposition to Motion to
Vacate Judgment, dated February 16, 2022
(Doc. 152-1) .......................................................... SA0456 – SA0458

Defendant-Appellee Apple Inc.'s Opposition to
Motion to Vacate Judgment, dated March 4,
2022 (Doc. 159) ...................................................... SA0459 – SA0475

Declaration of Hannah Y. Chanoine in Support of
Defendant-Appellee Apple Inc.'s Opposition to
Motion to Vacate Judgment, dated March 4,
2022 (Doc. 160) ...................................................... SA0476 – SA0478

Exhibit A to Declaration of Hannah Y. Chanoine in
Support of Defendant-Appellee Apple Inc.'s
Opposition to Motion to Vacate Judgment,
dated March 4, 2022 (Doc. 160-1) .................................. SA0479 – SA0500

iv

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

TYRONE HOLMES,                                          No. 17-cv-4557-ER

                                        Plaintiff,

        -against-                                      **NOTICE OF APPEAL**

APPLE INC.,
AMAZON.COM, LLC, and
CHECKPOINT FLUIDIC SYSTEMS
INTERNATIONAL, LTD.,

                                        Defendants.
-------------------------------------------------------------------X

**NOTICE** is hereby given that the following party, plaintiff, TYRONE HOLMES,
in the above-named case, appeals to the United States Court of Appeals for the Second Circuit
from the Order of Judge Ronnie Abrams entered June 27, 2022 denying plaintiff's Motion to
Vacate the judgment of Judge Edgardo Ramos entered on June 27 2021 that: denied plaintiff's
motion to amend the complaint to add FedEx as a party; that denied plaintiff's motion for
discovery; that granted defendant, Checkpoint's, motion to dismiss for lack of Jurisdiction;that
granted defendant, Amazon's, motion for summary judgment; that granted Amazon's, motion
for judgment on the pleadings; and that granted defendant's, Apple's, motion for judgment on
the pleadings.

Dated: New York, New York                /s/_____
July 26, 2021                            Tyrone Holmes,
                                         Pro se Plantiff
                                         1465 Hammersley Ave.
                                         Bronx, NY 10469
                                         (646) 701-4069

**SA0001**

tymax@mac.com

| | USDC-SDNY |
|---|---|
| | **DOCUMENT** |
| | **ELECTRONICALLY FILED** |
| | **DOC#:** |
| | **DATE FILED:** 06/27/2022 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TYRONE HOLMES,

                    Plaintiff,

          v.

APPLE INC., AMAZON.COM, LLC, and
CHECKPOINT FLUIDIC SYSTEMS
INTERNATIONAL, LTD.,

                    Defendants.

17-CV-4557 (RA)

MEMORANDUM
OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Tyrone Holmes, proceeding *pro se*,[1] filed this action in 2017 against Apple Inc.,

Amazon.com, LLC, and Checkpoint Fluidic Systems International, Ltd. (collectively,

"Defendants") alleging various contract and tort claims.  Holmes' claims stemmed from his

purchase of an Apple laptop from Amazon: he asserted that the laptop was not new as advertised,

but instead had previously been owned by Checkpoint, who had installed tracking software on the

laptop, and that after Checkpoint had shipped the laptop to Dubai it went missing in transit.

Holmes alleged that Amazon then sold the laptop to him, at which point Checkpoint used the

tracking software to track it to Holmes and his wife, from whom the New York City Police

Department recovered the computer.

On July 23, 2018, District Judge Ramos issued an opinion and order granting Checkpoint's

motion to dismiss for lack of jurisdiction; granting Apple's motion for entry of judgment on the

pleadings; and granting Amazon summary judgment on all claims except for one, on which

judgment was entered against Amazon in the amount of $2,351.00.  Judge Ramos also denied

---

[1] Holmes was represented by Alex Antzoulatos from May 10, 2018 to May 29, 2018 and by Robert Leino from August 21, 2018 to April 3, 2020.

**SA0003**

Plaintiff's motion to amend his complaint.  Plaintiff appealed, and the Second Circuit affirmed Judge Ramos' ruling in full on *de novo* review.  The Circuit's mandate issued on January 6, 2020.

Two years after the mandate had issued and the case had closed, Judge Ramos disclosed that it had been brought to his attention that, "well after the case was filed but while he still presided over the case, he owned stock in Apple Inc."  *See* January 21, 2022 Clerk of Court Letter. According to Judge Ramos, his ownership of that stock "neither affected nor impacted his decisions" in the case.  *See id.*  That said, Judge Ramos recognized in the disclosure letter that his stock ownership might have required recusal under the Code of Conduct for United States Judges. *See id.*  According to Judge Ramos' 2019 financial disclosure report, his Apple stock was an inherited investment with a total value of $15,000 or less, and he had gained $1,000 or less in income from that stock during 2019.  *See* Chanoine Dec. Ex. A.

In response to this disclosure, Plaintiff has moved to vacate the judgment against him.  He asserts that Judge Ramos' financial stake in Apple rendered him biased (or, at the very least, created the appearance of impartiality) and thus required his disqualification.  *See* 28 U.S.C. § 455(a) ("Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.").  Plaintiff also seeks relief from judgment on the ground that Amazon's counsel committed fraud on the court by representing to the Circuit panel during oral argument that there were two computers at issue in this case.  For the following reasons, Plaintiff's motion is denied.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 60(b) provides that a court may relieve a party from a final judgment for the following reasons: "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time

to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief."  Rule 60(b)(6) is a "catch-all provision" that is "properly invoked only when there are extraordinary circumstances justifying relief, when the judgment may work an extreme and undue hardship, and when the asserted grounds for relief are not recognized in clauses (1)-(5) of the Rule." *Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 143 (2d Cir. 2020).[2] "Motions under Rule 60(b) are addressed to the sound discretion of the district court and are generally granted only upon a showing of exceptional circumstances." *Mendell ex rel. Viacom, Inc. v. Gollust*, 909 F.2d 724, 731 (2d Cir. 1990).  "The burden of proof on a Rule 60(b) motion is on the party seeking relief from the earlier judgment or order," *In re Gildan Activewear, Inc. Sec. Litig.,* No. 08-CV-5048 (HB), 2009 WL 4544287, at *2 (S.D.N.Y. Dec. 4, 2009), who "has an onerous standard to meet," *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001).

Federal Rule of Civil Procedure 60(d)(3) provides that, notwithstanding the limitations of Rule 60(b), a court has the power to "set aside a judgment for fraud on the court."  To state a claim for relief under Rule 60(d)(3), a litigant must allege a "fraud on the court" that "seriously affects the integrity of the normal process of adjudication."  *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir. 1988).  In other words, the rule "embraces only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." *Hadges v.*

---

[2] Unless otherwise noted, case quotations omit all internal citations, quotation marks, alterations, and footnotes.

*Yonkers Racing Corp.*, 48 F.3d 1320, 1325 (2d Cir. 1995).  A plaintiff must also show that such relief is necessary "to prevent a grave miscarriage of justice."  *United States v. Beggerly*, 524 U.S. 38, 47 (1998).

Because Plaintiff is currently proceeding *pro se*, the Court interprets his filings to "raise the strongest arguments that they suggest."  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

## DISCUSSION

The Court assumes the parties' familiarity with the underlying facts and procedural history of this case.

Reviewing Plaintiff's claims with the special solicitude due to *pro se* pleadings, the Court finds that Plaintiff has not shown that he is entitled to relief under any prong of Rule 60, because any error that may possibly have resulted from Judge Ramos' failure to recuse himself is rendered harmless by the Circuit's *de novo* affirmance.  *See Faulkner v. National Geographic Enters., Inc.*, 409 F.3d 26, 42 n.10 (2d Cir. 2005) (holding that "[g]iven [that court's] disposition of the Faulkner appellants' claims, [the district court's] denial of the recusal motion was at most harmless error as to them"); *accord Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 490 (1st Cir. 1989) ("Since we have independently confirmed the correctness of the lower court's decision, the judge's refusal to recuse himself was, at worst, harmless error."); *see also Paddington Partners v. Bouchard*, 34 F.3d 1132, 1144 (2d Cir. 1994) (describing Rule 60's baseline "requirement of the judgment's not having been affirmed on appeal").  In other words, that Plaintiff's claims "received a full review by an impartial panel," *Williamson v. Indiana Univ.*, 345 F.3d 459, 465 (7th Cir. 2003), ameliorates any concerns about Judge Ramos' financial stake in Apple impacting his July 23, 2018 opinion, or about public confidence in an unbiased judiciary.

4

**SA0006**

Plaintiff attempts to cast doubt on the validity of the Second Circuit's affirmance by arguing that Amazon committed fraud on the court during oral argument, tainting the Circuit's decision and justifying relief from its ruling. He specifically takes issue with Amazon's counsel's statement during argument that "[t]here are two computers" at issue in this case. Reply MOL at 7. But Amazon's statement simply reflected its position throughout this litigation that the laptop it delivered to Holmes is a different laptop from the one recovered by the NYPD that contained Checkpoint's tracking software—a position that Judge Ramos agreed with in granting Amazon's summary judgment motion. *See* July 23, 2018 opinion at 26-28 (finding no genuine dispute of fact that "the laptop [Amazon] shipped to Holmes was not CheckPoint's laptop, but was a different computer altogether"). Amazon's maintaining its successful theory of the case on appeal does not constitute fraud on the court—to the contrary, it "is exactly what is expected in the normal adversary process." *King v. First Am. Investigations, Inc.*, 287 F.3d 91, 95-96 (2d Cir. 2002) (per curiam) (concluding that a plaintiff doing "no more than complain[ing] that the defendants disputed his version of the law and facts" was "insufficient to state a claim for fraud on the court"). Nor can fraud on the court occur where, as here, "[P]laintiff was afforded an opportunity for fair litigation of the dispute, because fraud on the court occurs only where the fraud seriously affects the integrity of the normal process of adjudication." *Weldon v. United States*, 845 F. Supp. 72, 82 (N.D.N.Y. 1994), *aff'd*, 70 F.3d 1 (2d Cir. 1995) (citing *Gleason*, 860 F.2d at 559).[3]

---

[3] Plaintiff also contends that Amazon's statement is inconsistent with Apple's representation at oral argument that "as far . . . as Apple is concerned, there was one shipment, of one computer, to Amazon." Reply MOL at 7. This theory suffers from two flaws. First, a defendant's position may be inconsistent with that of its co-defendant without being fraudulent. Second, Apple's and Amazon's statements are not necessarily inconsistent with one another: it could be the case that Apple shipped only one computer to Amazon *and* that the computer with the Checkpoint software is different from the computer Amazon shipped to Holmes.

Finally, Plaintiff characterizes as fraudulent CheckPoint's "reporting a computer as stolen, knowing that was not true, and falsely and fraudulently accusing Plaintiff of the theft." Reply Dec. to Apple's MOL at 7. But this allegation describes events that occurred prior to this litigation, not statements that were made to any court.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion to vacate is denied.  The Clerk of Court is respectfully directed to terminate the motion at docket 150 and mail a copy of this Order to Plaintiff.

SO ORDERED.

Dated:   June 27, 2022
         New York, New York

_____
Hon. Ronnie Abrams
United States District Judge

**JUDGE RAMOS**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 17 CV 4557

-------------------------------------------------------------------X

TYRONE HOLMES,

                                Plaintiff,

      - against -

APPLE INC.,
AMAZON.COM, LLC, and
CHECKPOINT FLUIDIC SYSTEMS
INTERNATIONAL, LTD.,

No. 17-cv-

**COMPLAINT**

                           Defendants.        JURY TRIAL DEMANDED

-------------------------------------------------------------------X

      PLEASE TAKE NOTICE, that Plaintiff Pro Se, Tyrone Holmes, respectfully alleges as follows:

## PARTIES AND JURISDICTION

1.    The United States District Court has jurisdiction over this matter based upon diversity of citizenship, pursuant to 28 U.S.C. § 1332, as this matter is a dispute between the plaintiff, a citizen of New York, and defendants: APPLE INC., a California corporation; AMAZON.COM, LLC, a Delaware limited liability company; and CHECKPOINT FLUIDIC SYSTEMS INTERNATIONAL, LTD., a Texas partnership. Additionally, the amount in controversy exceeds seventy-five thousand ($75,000.00) dollars, exclusive of interest and costs.

2.    Plaintiff, TYRONE HOLMES, is a natural person who currently resides, and at all times material hereto resided, in the County of Bronx, State of New York.

3.    Defendant is APPLE, INC., doing business at 1 Infinite Loop, Cupertino, CA 95014, and incorporated in the state of California.

4.    That at all times hereinafter mentioned, Defendant, APPLE INC., was and is a foreign

corporation duly authorized to conduct business within the State of New York.

5.      That at all times hereinafter mentioned, Defendant, APPLE, INC., maintained an office and/or owned real property within the State of New York.

6.      That at all times hereinafter mentioned, Defendant, APPLE, INC., solicited, conducted and derived substantial business from within the State of New York.

7.      Defendant is AMAZON.COM, LLC, doing business at 410 Terry Ave. North, Seattle, WA 98109-5210, and formed as an LLC in the state of Delaware.

8.      That at all times hereinafter mentioned, Defendant, AMAZON.COM, LLC, was and is a foreign limited liability company duly authorized to conduct business within the State of New York.

9.      That at all times hereinafter mentioned, Defendant, AMAZON.COM, LLC, maintained an office and/or owned real property within the State of New York.

10.    That at all times hereinafter mentioned, Defendant, AMAZON.COM, LLC, solicited, conducted and derived substantial business from within the State of New York.

11.    Defendant is CHECKPOINT FLUIDIC SYSTEMS INTERNATIONAL, LTD., doing business at 21356 Marion Ln., Mandeville, LA 70471, and formed as a partnership in the State of Texas.

12.    That at all times hereinafter mentioned, Defendant, CHECKPOINT FLUIDIC SYSTEMS INTERNATIONAL, LTD., was and is a foreign limited liability partnership duly authorized to conduct business within the State of New York.

13.    That at all times hereinafter mentioned, Defendant, CHECKPOINT FLUIDIC SYSTEMS INTERNATIONAL, LTD., maintained an office and/or owned real property within the State of New York.

14.    That at all times hereinafter mentioned, Defendant, CHECKPOINT FLUIDIC

SYSTEMS INTERNATIONAL, LTD., solicited, conducted and derived substantial

business from within the State of New York.


## INTRODUCTORY STATEMENT

Plaintiff, Tyrone Holmes, is and was an innocent purchaser of a laptop computer,

advertised as brand new and made and sold by Apple, the largest computer company in

the world, to Amazon, one of the largest companies in the word, which then sold it to

plaintiff. Plaintiff Holmes had every expectation, at law and otherwise, that the

consumer product he purchased was new and defect-free. It proved to be on the

contrary, a pre-owned machine, owned by a Louisiana pump company who was upon

information and belief, a contractor for the government of the United States of

America, Department of Defense. It also became known upon information and belief

that the prior owner of the laptop, Apple and/or Checkpoint Fluidic Systems

International, installed surveillance, tracking, and management information software,

capable of tracking oil drilling, oil well output, oil refining output, oil pipeline

transportation as well as the whereabouts of any user of the laptop and other statistics

important to the Department of Defense and/or the oil industry for exploring, drilling,

refining, and transporting, especially in connection with oil production and refining

activity in the Arab Gulf states.  Upon information and belief, the laptop was not meant

to be released from the company, and as a result of the computer leaving its custody

and into the chain of commerce, Plaintiff was caused to suffer injury from a series of

bizarre events: 1. The company used the surveillance software to track Tyrone Holmes,

in New York City; 2. the company reported the plaintiff's operation of the computer as

a theft to the NYPD; 3. NYPD aggressively and zealously hunted down the plaintiff,

threatened him with arrest even though no criminal complaint was filed, no affidavit

was signed, and no DOD, FBI or Justice Dept. investigation occurred for this interstate

matter involving the federal government. As a result of this bizarre fact pattern and an

NYPD's detective's threats and harassment, Plaintiff, a church pastor with no criminal

record, was caused to suffer, and continues to suffer from extreme stress and emotional

trauma related to this incident and suffers mental stress, anguish, and anxiety on a

daily basis.   Also as a result of the aforementioned series of events Plaintiff was also

caused to suffer immeasurable damage to his personal and professional reputation,

damage to his personal and professional relationships and loss of business

opportunities. Plaintiff still has not been reimbursed for the subject device.

## **FACTS**

15.   Upon information and belief, Defendant, APPLE, INC., is and at all times material

hereto was a manufacturer of electronics, computers, and related products.

16.   Upon information and belief, Defendant, APPLE, INC., does market and at all times

material hereto has marketed electronics, computers, and related products throughout

the United States and internationally.

17.   Defendant, APPLE, INC., has gained favorable reputation in the field of

manufacturing and supplying electronics, computers and related products.

18.   Upon information and belief, Defendant, AMAZON.COM LLC, is and at all times

material hereto was a retailer of electronics, computers, and related products.

19.   Upon information and belief, Defendant, AMAZON.COM LLC, does market and at all

times material hereto has marketed electronics, computers, and related products
throughout the United States and internationally.

20.  Defendant, AMAZON.COM LLC, has gained favorable reputation in the field of
selling and supplying electronics, computers and related products.

21.  On or about June 22, 2016, Plaintiff, TYRONE HOLMES, through Defendant,
AMAZON.COM, LLC, purchased an Apple Macbook Pro MJLQ2LL/A 15-inch
Laptop with Serial Number C02RQ1T3G8WN advertised as "brand new"
manufactured by Defendant, APPLE, INC., and Plaintiff purchased an AppleCare
Protection Plan for the aforementioned Apple Macbook Pro. (A printed screen shot of
the purchased computer as advertised and purchase confirmation is annexed hereto as
Exhibit A and made part hereof.)

22.  Plaintiff, TYRONE HOLMES, paid valuable consideration for the aforementioned
Apple Macbook Pro and AppleCare Protection Plan. The aforementioned Apple
Macbook Pro Computer and AppleCare Protection Plan shall hereinafter be referred to
as the "Defective Products".

23.  In soliciting and selling the Defective Products to Plaintiff, TYRONE HOLMES,
Defendant, APPLE, INC., made various representations to the Plaintiff concerning the
Defective Products including but not limited to the following:

a.   The products were new.

b.   The products were free from all defects.

c.   The products contained no spyware or malware.

d.   Plaintiffs would not be kept under surveillance as a result of purchasing the
products.

24.   In soliciting and selling the Defective Products to Plaintiff, TYRONE HOLMES,

Defendant, AMAZON.COM LLC, made various representations to the Plaintiff

concerning the Defective Products including but not limited to the following:

a.   The products were new.

b.   The products were free from all defects.

c.   The products contained no spyware or malware.

d.   Plaintiffs would not be kept under surveillance as a result of purchasing the

products.

25.   Defendant, APPLE, INC., represented to Plaintiff, TYRONE HOLMES, that

Defendant, APPLE, INC., was a leader and had a favorable reputation in the

electronics, computers and other related product industries. In purchasing the

Defective Products, Plaintiff relied extensively upon the favorable reputation of

Defendant, APPLE, INC.

26.   In soliciting the sale of the Defective Product, APPLE, INC., and/or its agents, and

representatives distributed advertising and/or marketing materials, designed to attract

the Plaintiff to purchase the Defective Products. In purchasing the Defective Products,

Plaintiff relied extensively upon said advertising and/or marketing materials.

27.   Defendant, APPLE, INC., represented to plaintiff that it would stand behind its

electronics, computers and related products if they failed to perform or were otherwise

defective.

28.   Defendant, AMAZON.COM LLC, represented to Plaintiff, TYRONE HOLMES, that

Defendant, AMAZON.COM LLC, was a leader and had a favorable reputation in the

electronics, computers and other related product industries. In purchasing the

Defective Products, Plaintiff relied extensively upon the favorable reputation of

Defendant, AMAZON.COM LLC.

29.    In soliciting the sale of the Defective Product, AMAZON.COM LLC, and/or its agents,

and representatives distributed advertising and/or marketing materials, designed to

attract the Plaintiff to purchase the Defective Products. In purchasing the Defective

Products, Plaintiff relied extensively upon said advertising and/or marketing materials.

30.    Defendant, AMAZON.COM LLC, represented to plaintiff that it would stand behind

its electronics, computers and related products if they failed to perform or were

otherwise defective.

31.    Plaintiff, in reliance on the above representations, purchased, for valuable

consideration, the Defective Products.

32.    Plaintiff, in reliance upon the above representations, paid a premium for the Defective

Products in that Plaintiff paid more for the Defective Products than he otherwise would

have paid, but for the aforementioned representations.

33.    On or about June 23, 2016, following the purchase of the Defective Products through

Defendant, AMAZON, LLC'S website, the Defective Products were delivered to the

Plaintiff's residence.

34.    Upon information and belief, on or about September 8, 2016, Detective Rodrigo

Caballero of the New York City Police Department Central Investigations Division,

along with several other plain clothes officers, arrived at Plaintiff's residence.

35.    Upon information and belief Detective Caballero spoke with Plaintiff's neighbors and

inquired about Plaintiff's whereabouts.

36.    On or about September 9, 2016, Detective Rodrigo Caballero telephoned Plaintiff and

inform him that he was in possession of a Macbook computer containing sensitive

government spy software belonging to the Department of Defense, and that that he

along with other officers were in front of Plaintiff's residence for the purpose of

retrieving the subject device.

37.    On or about September 9, 2016, Plaintiff explained to Detective Caballero that he was

not at home but rather was in the midst of performing at a funeral service and could

not assist the officer at that time.

38.    On or about September 10, 2016, Detective Rodrigo Caballero again contacted

Plaintiff demanding the return of the aforementioned Macbook Computer. Plaintiff

informed Detective Caballero that he was not in possession of the computer because he

had given it to his estranged wife, whose whereabouts were unknown to him.

39.    On or about September 10, 2016 through on or about September 12, 2016, Plaintiff

continued to receive phone calls from Detective Caballero demanding the return of the

computer and threatened Plaintiff with arrest if Plaintiff did not comply with his

demands.

40.    On or about September 12, 2016, due to the increasingly threatening nature of the

communications from Detective Caballero, Plaintiff retained counsel.

41.    Upon information and belief, on or about September 12, 2016, Plaintiff's counsel

spoke by phone with Detective Caballero, and was informed that the Detective worked

for the Central Investigations Division of the New York Police Department, and that

the computer purchased by Plaintiff belonged to Defendant, CHECKPOINT FLUIDIC

SYSTEMS INTERNATIONAL, LTD., a U.S. Department of Defense Contractor.

42.    Upon information and belief, on or about September 12, 2016, Detective Caballero

informed Plaintiff's counsel that the Defective Products contained sensitive

surveillance software and that the computer as outfitted and designed, was intended to

be shipped to Dubai.

43. Upon information and belief, on or about September 12, 2016, the Detective concluded

his conversation with Plaintiff's counsel by stating to Plaintiff's counsel that if

necessary, he had the authority to arrest the Plaintiff, if the device was not returned.

44. Upon information and belief on or about September 12, 2016, in response to Plaintiff's

counsel's demand for verification of the Detective's allegations, Plaintiff's counsel

received an email from Detective Caballero containing a letter from, Vice President of

Operations for Defendant, CHECKPOINT FLUIDIC SYSTEMS INTERNATIONAL,

LTD. The letter informed Plaintiff's counsel that Defendant's security department had

tracked the subject device since leaving its facility and has ascertained information

proving that Plaintiff was in possession of its equipment. (Letter from Checkpoint

Pumps & Systems is annexed hereto as Exhibit B and made part hereof).

45. Upon information and belief, the correspondence from Defendant, CHECKPOINT

FLUIDIC SYSTEMS INTERNATIONAL, LTD., further stated that it would not

pursue legal action only if the subject equipment was returned immediately, in its

original condition, complete with all original parts and pieces.

46. The correspondence indicated that as a further condition, Defendant, CHECKPOINT

FLUIDIC SYSTEMS INTERNATIONAL, LTD., required that the matter only be

resolved through Detective Caballero of the NYPD and that Plaintiff's counsel

withhold Defendant, CHECKPOINT FLUIDIC SYSTEMS INTERNATIONAL, LTD.,

identity from Plaintiff.

47.  On September 13, at Plaintiff's counsel's request, Detective Caballero emailed Plaintiff's counsel confirmation of the make model and serial number of subject computer as the one purchased by Plaintiff. A printed screen shot of the purchased computer is annexed hereto as Exhibit C and made part hereof).

48.  Upon information and belief, from on or about, September 12, 2016 through on or about, September 21, 2016, Plaintiff's counsel continued to communicate with Detective Caballero regarding the location of the subject device, each time to Plaintiff's dismay, relaying the sum and substance of the communications to Plaintiff including the threats by law enforcement to arrest plaintiff.

49.  From on or about, September 12, 2016 through on or about, September 21, 2016, under the threat of arrest, Plaintiff attempted to communicate with his estranged wife via phone and email to facilitate the return of the computer and thereby avoid arrest.

50.  Upon information and belief, on or about, September 21, 2016, Plaintiff's counsel instructed Detective Caballero via email that Plaintiff, had who had no criminal history, acquired the computer through legal means and that he had done all he can to assist the NYPD with its return. Plaintiff's counsel concluded by advising the Detective to refrain from contacting the Plaintiff any further.

51.  Upon information and belief, on or about, September 21, 2016, Plaintiff's attorney was instructed by Detective Caballero via email that Detective Caballero was going to proceed with an arrest of the Plaintiff for the crime of Criminal Possession of Stolen Property in the 4th Degree, and that Plaintiff must surrender to the 047 precinct on September 22, 2016 at 1:00 PM. (Copy of email regarding Plaintiff's arrest is annexed hereto as Exhibit D and made part hereof).

52. Criminal Possession of Stolen Property in the 4th Degree in the State of New York is a Class E Felony carrying a penalty of up to four years in State Prison.

53. Upon information and belief, on or about September 21, 2016, Plaintiff's counsel spoke and negotiated with Detective Caballero an extension to Plaintiff's time to surrender from September 22, 2016 at 1:00 PM until September 26, 2016, based on Plaintiff's promise to attempt to make further efforts to locate his estranged wife and persuade her to return the device.

54. On or about September 22, 2016, Plaintiff under the threat of arrest, hired a private investigator to locate his estranged wife, who he believed was in possession of the subject device.

55. Upon information and belief, on or about September 26, 2016, Plaintiff's counsel negotiated another extension of Plaintiff's time by which he was to surrender to authorities, by informing the detective that Plaintiff had hired a private investigator and that the investigator had located his estranged wife.

56. Upon information and belief, on or about September 27, 2016, Plaintiff's counsel spoke with Detective Caballero and informed him that Plaintiff was attempting to negotiate the return of the subject device by transporting his wife's sister up from Atlantic City, NJ to visit with his wife on October 1, 2016 and persuade her to return the computer.

57. Upon information and belief, by providing this information Plaintiff's Counsel negotiated another extension to Plaintiff's time to surrender until after October 1, 2016.

58. Upon information and belief, on or about October 2, 2016 Plaintiff's wife's sister

informed Plaintiff's counsel that after meeting with plaintiff's wife, Plaintiff's wife's

sister confirmed that the subject device was in a storage unit controlled by Plaintiff 's

wife, but that she remained despondent and refused to cooperate in the item's return.

59. Upon information and belief, on or about October 3, 2016, Plaintiff's counsel informed

the detective that the computer was in storage and agreed to accompany the detective

to visit Plaintiff's wife and persuade her to cooperate in returning the subject device.

60. Upon information and belief, on or about October 3, 2016, Plaintiff's counsel met with

Detective Caballero and his Partner at the 047 Precinct, 300 Gold Street, Brooklyn,

NY.

61. Upon information and belief, on or about October 3, 2016, upon meeting with

Detective Caballero and his partner, Plaintiff's Counsel accompanied Detective

Caballero and his partner in an unmarked NYPD cruiser to 19 west 130 Street, New

York, NY 10037 where Plaintiff's wife was residing.

62. Upon information and belief, on or about October 3, 2016, after being threatened with

arrest, Plaintiff's wife agreed to accompany Plaintiff's counsel; Detective Caballero

and Detective Caballero's partner to Chelsea Mini Storage Chelsea Mini Storage

located at 626 West 28th St. New York, NY, and retrieve the subject device.

63. Upon information and belief, at no time during Plaintiff's counsel's communications

with Detective Caballero, was Plaintiff's counsel ever informed of, or provided with

any evidence of any wrongdoing or criminal activity on the part of the Plaintiff.

64. Upon information and belief, the threat of arrest by all accounts was based on solely on

Plaintiffs possession of the device, Defendant, CHECKPOINT FLUIDIC SYSTEMS

INTERNATIONAL, LTD., and or the New York City Police department's urgent need

for its return.

65. Upon information and belief, upon retrieving the subject device, detective Caballero signed and provided for Plaintiff's attorney a receipt indicating such receipt. (Receipt is annexed hereto as Exhibit E and made part hereof).

66. As a result of the events which are the subject of this complaint, Plaintiff missed critical employment opportunities and was unable to fulfill many contractual obligations and responsibilities.

67. Upon information and belief, at all times prior to Plaintiff's purchase of the Defective Products, Defendants knew or should have known that the Defective Products were, in fact, defective.

68. Upon information and belief, at all times after Plaintiff's purchased the Defective Products, but before Plaintiff was contacted by the New York City Police Department, Defendants knew or should have known that the Defective Products were, in fact, defective.

69. At all times material hereto, Defendants failed to notify Plaintiff of the defective nature of the Defective Products.

70. At all times material hereto, Defendants concealed material information, including but not limited to the defective nature of the Defective Products, from the Plaintiff.

71. Defendants' failure to notify the Plaintiff and concealment regarding the defective nature of the Defective Products prevented Plaintiff from making informed decisions with respect to the purchase of the Defective Products and prevented and frustrated measures which could and would have been made by Plaintiff to mitigate his damages.

72. The Defective Products purchased by the plaintiff did not perform as intended and/or

represented.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANTS, APPLE, INC., AND AMAZON.COM, LLC, FOR BREACH OF CONTRACT

73. Plaintiff repeats and re-alleges each and every allegation as previously set forth herein.

74. On or about June 22, 2016, Defendants, APPLE, INC. and AMAZON.COM, LLC, contracted to provide Plaintiff, for valuable consideration, a suitable brand new Apple Macbook Pro MJLQ2LL/A 15-inch Laptop, free from defects, and to deliver said Laptop to the Plaintiff's residence.

75. Plaintiff performed all contractual obligations on his part to be performed.

76. Defendants, APPLE, INC. and AMAZON.COM, LLC, manufactured, sold and/or delivered, the aforementioned Apple Macbook Pro MJLQ2LL/A 15-inch Laptop, in a defective manner, such that the supposedly brand new computer contained sensitive spy software, installed by Defendant, CHECKPOINT FLUIDIC SYSTEMS INTERNATIONAL, LTD., allowing Defendants to track Plaintiff's activities for several months.

77. Defendants, APPLE, INC. and AMAZON.COM, LLC's, defective performance constitutes a material breach of the Agreements.

78. Defendants, APPLE, INC. and AMAZON.COM, LLC's, further breached their contract by refusing to act in good faith and deal fairly with the Plaintiff and in otherwise breaching the various duties owed to the Plaintiff by the Defendants.

79. As a direct and proximate result of Defendants breach, Plaintiff has been caused to suffer damages in excess of seventy-five thousand dollars ($75,000.00).

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS, APPLE, INC., AND AMAZON.COM, LLC, FOR BREACH OF EXPRESS WARRANTY

80. Plaintiff repeats and re-alleges each and every allegation as previously set forth herein.

81.  Defendants, APPLE INC and AMAZON.COM, LLC, warranted and represented the Plaintiff, that among other things, the Defective Products were brand-new, that said Defective Products were free from any and all spy software capable of tracking Plaintiff's activities, and that Defendants, APPLE, INC. and AMAZON.COM, LLC, had good and marketable title to the Defective Products.

82.  Plaintiff relied upon the aforesaid express warranty and representations by Defendants, APPLE, INC. and AMAZON.COM, LLC, and would not have purchased the Defective Products but for the express warranty and representations.

83.  Contrary to Defendants, APPLE, INC. and AMAZON.COM, LLC, express warranty and representations, the Defective Products were defective, in that, among other things, the aforementioned Apple Macbook Pro MJLQ2LL/A 15-inch Laptop was not brand-new, the aforementioned Apple Macbook Pro MJLQ2LL/A 15-inch Laptop contained spy software capable of tracking Plaintiff's activities, and the Defendants, APPLE, INC. and AMAZON.COM, LLC, did not have marketable title to the Defective Products.

84.  Within a reasonable time after Plaintiff learned of the aforementioned breaches by Defendants, APPLE, INC. and AMAZON.COM, LLC, plaintiff notified Defendants of the breaches of the express warranty.

85.  Despite notice and demand duly made, Defendants failed and/or refused to repair or replace the Defective Products.

86.  Due to Defendants, APPLE, INC. and AMAZON.COM, LLC's, breach of the express warranty, Plaintiff has been damaged in an amount in excess of seventy-five thousand dollars ($75,000.00).

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANTS, APPLE, INC., AND AMAZON.COM, LLC, FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

87.  Plaintiff repeats and re-alleges each and every allegation as previously set forth herein.

88.  At all times material hereto, Defendants, APPLE, INC. and AMAZON.COM, LLC, were merchants with respect to the manufacture and/or sale of electronics, computers, and related products they manufactured and sold to Plaintiff. Defendants, APPLE, INC. and AMAZON.COM, LLC, impliedly warranted that the Defective Products sold to the Plaintiff were merchantable, i.e., fit for the ordinary purposes for which such electronics, computers, and related products are generally used.

89.  The Defective Products were defective in that they improperly contained spy software capable of tracking all of Plaintiff's activities, and have caused Plaintiff to suffer damages. Defendants, APPLE, INC. and AMAZON.COM, LLC's, sale of the Defective Products to Plaintiff constitutes a breach of the implied warranty of merchantability.

90.  Despite notice and demand duly made, Defendants, APPLE, INC. and AMAZON.COM, LLC, failed to comply with its obligations under the implied warranty of merchantability in that it has failed and/or refused to replace the Defective Products, or to otherwise pay amounts required to remedy the condition caused by the Defective Products. Such failures and/or refusals constitute a further breach by Defendants, APPLE, INC. and AMAZON.COM, LLC.

91.  Due to Defendants, APPLE INC and AMAZON.COM, LLC, breach of the implied warranty of merchantability, Plaintiff has been damaged in excess of seventy-five thousand dollars ($75,000.00).

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS, APPLE, INC., AMAZON.COM, LLC AND CHECKPOINT FLUIDIC SYSTEMS INT'L, FOR NEGLIGENCE

92.   Plaintiff repeats and re-alleges each and every allegation as previously set forth herein.

93.   At all times material hereto, Defendants had a duty to provide Plaintiff with a brand-

new Macbook Pro MJLQ2LL/A 15-inch Laptop, which did not contain spy software

capable of tracking Plaintiff's activities, to not track Plaintiff's activities over the

course of several months, to provide Plaintiff with a computer to which Defendants

had good and marketable title, and to not have plaintiff harassed by the New York City

Police Department as result of the purchase of the aforementioned Macbook Pro

MJLQ2LL/A 15-inch Laptop.

94.   Defendants, APPLE, INC., AMAZON.COM, LLC and CHECKPOINT FLUIDIC

SYSTEMS INTERNATIONAL, LTD., wrongfully provided the plaintiff with a

computer that was not reasonably safe and/or which permitted plaintiff's activities to

be tracked over several months, and permitted plaintiff to be harassed by the New York

City Police Department over the course of several months.

95.   Defendants, APPLE, INC., AMAZON.COM, LLC and CHECKPOINT FLUIDIC

SYSTEMS INTERNATIONAL, LTD., were negligent in designing, manufacturing,

advertising, selling, controlling, formulating, distributing, and in failing to warn the

plaintiff of the quality and characteristic of the Defective Products which made them

unsafe and/or unsuitable for use.

96.   As a direct and proximate result of APPLE, INC., AMAZON.COM, LLC AND

CHECKPOINT FLUIDIC SYSTEMS INTERNATIONAL, LTD.'s, negligence, the

plaintiff sustained, continues to sustain, and will sustain substantial direct and/or

consequential damages in excess of seventy-five thousand dollars ($75,000.00).

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANTS, APPLE, INC., AND AMAZON.COM, LLC, FOR STRICT LIABILITY

97.  Plaintiff repeats and re alleges each and every allegation as previously set forth herein.

98.  Upon information and belief, Defendant, APPLE, INC., is a merchant in the business of manufacturing and selling electronics, computers, and related products.

99.  Upon information and belief, Defendant, AMAZON.COM, LLC, is a merchant in the business of selling electronics, computers, and related products.

100.  The Defective Products sold to Plaintiff were expected to and did reach plaintiff without substantial change in the condition in which they were sold.

101.  The Defective Products sold by AMAZON.COM, LLC and APPLE, INC., to plaintiff, were in a defective condition unreasonably dangerous to the plaintiff.

102.  The defects in the Defective Products sold to plaintiff caused plaintiff's movements to be tracked over the course of several months, and caused plaintiff to be threatened with arrest over the course of several months.

103.  As a direct and proximate result of the defective condition of the Defective Products, plaintiff sustained, continues to sustain, and will sustain substantial direct and/or consequential damages in excess of seventy-five thousand dollars ($75,000.00).

## AS AND FOR A SIXTH CAUSE OF ACTION AGAINST DEFENDANTS, APPLE, INC. AND AMAZON.COM, LLC, FOR FRAUDULENT CONCEALMENT

104.  Plaintiff repeats and re-alleges each and every allegation as previously set forth herein.

105.  At all relevant times, Defendant, APPLE, INC., had full knowledge of the defects in the Defective Products sold to plaintiff.

106.  At all relevant times, Defendant, AMAZON.COM, LLC, had full knowledge of the

defects in the Defective Products sold to plaintiff.

107. At all relevant times, plaintiff did not know and did not have reason to know of the
defects in the Defective Products sold to plaintiff by Defendants, APPLE, INC. and
AMAZON.COM, LLC.

108. At all relevant times, Defendants, APPLE, INC. and AMAZON.COM, LLC, failed to
notify plaintiff of the defects in the Defective Products it sold to Plaintiff.

109. Defendants, APPLE, INC. and AMAZON.COM, LLC, had the duty to supply plaintiff
with fair, objective information regarding the Defective Products sold to plaintiff by
Defendants, APPLE, INC. and AMAZON.COM, LLC.

110. Upon information and belief, Defendants, APPLE, INC. and AMAZON.COM, LLC,
had undertaken active measures to conceal the defective nature of the Defective
Products from plaintiff.

111. Upon information and belief, Defendants, APPLE, INC. and AMAZON.COM, LLC,
had taken active measures to conceal the plaintiff's claims against Defendants, APPLE,
INC. and AMAZON.COM, LLC, including, but not necessarily limited to, having the
New York City Police Department confiscate the Defective Products from plaintiff.

112. Defendants, APPLE, INC. and AMAZON.COM, LLC, concealment as aforesaid
prevented and frustrated measures which could and would have been made by plaintiff
to mitigate damages.

113. As a result of these actions by Defendants, APPLE, INC. and AMAZON.COM, LLC,
plaintiff has acted to his detriment in that, among other things, he did not commence
suit against Defendants prior to this time.

114. As a direct and proximate result of the defective condition of the Defective Products,

plaintiff sustained, continues to sustain, and will sustain substantial direct and/or

consequential damages in excess of seventy-five thousand dollars ($75,000.00).

**AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS, APPLE, INC. AND AMAZON.COM, LLC, FOR FRAUD IN THE INDUCEMENT AND MISRPRESENTATION**

115. Plaintiff repeats and re-alleges each and every allegation as previously set forth herein.

116. Defendants, APPLE, INC. and AMAZON.COM, LLC, knew, or in the exercise of due

care should have known, that the above representations of past and/or existing facts

made to plaintiff were false, untrue and/or misleading and/or made such

representations as affirmations of which it had knowledge. Said representations, in

fact, were false.

117. Defendants, APPLE, INC. and AMAZON.COM, LLC, knew or in the exercise of due

care should have known, that plaintiff would rely upon such misrepresentations in

purchasing the Defective Products. Alternatively, Defendants, APPLE, INC. and

AMAZON.COM, LLC, made such representations under such circumstances that

plaintiff would be justified in acting in reliance thereon.

118. Defendants, APPLE, INC. and AMAZON.COM, LLC, failure to notify and

concealment from plaintiff of the defective nature of the Defective Products prior to

plaintiff's purchase of the Defective Products prevented the plaintiff from making

informed business decisions. If the plaintiff was aware that the Defective Products

were defective, he would not have purchased said Defective Products.

119. Plaintiff justifiably relied to plaintiff's detriment upon the above fraudulent and/or

negligent misrepresentations and as a direct and proximate result thereof has sustained

and continue to sustain direct and/or consequential damages in excess of seventy-five

thousand dollars ($75,000.00).

**AS AND FOR AN EIGHTH CAUSE OF ACTION AGAINST DEFENDANTS, APPLE, INC., AND AMAZON.COM, LLC, FOR FALSE ADVERTISING AND UNFAIR BUSINESS PRACTICE**

120.  Plaintiff repeats and re-alleges each and every allegation as previously set forth herein.

121.  Defendants, APPLE, INC. and AMAZON.COM, LLC, violated NY General Business Law §§ 349 et seq., by, among other things, disseminating advertisements which contained materially untrue, deceptive and/or misleading misrepresentations, and by engaging in practices which were designed and/or had the capacity to deceive the plaintiff, regarding the characteristics of Defendants electronics, computers, and related products.

122.  As a direct and proximate result of Defendants', APPLE, INC.'s and AMAZON.COM, LLC's, violation of NY General Business Law §§ 349, et seq.,  plaintiffs have sustained and continue to sustain direct and/or consequential damages in excess of seventy-five thousand dollars ($75,000.00).

123.  That by reason of the foregoing, the Plaintiff has suffered damages and requests an award of money damages in a sum in excess of seventy-five thousand dollars ($75,000.00).

124.  WHEREFORE, Plaintiff demands that judgment be entered in his favor and against the Defendants, and that damages in a sum in excess of seventy-five thousand dollars ($75,000.00 be awarded, together with interest, costs and disbursements of this action, and any other relief this Court deems just and proper.

Dated:    Bronx, New York

          May 16, 2017

By: _____

     TYRONE HOLMES

    Plaintiff, Pro Se

                        1465 Hammersley Avenue

                        Bronx, NY 10469

EXHIBIT A



NEW & INTERESTING FINDS ON AMAZON EXPLORE

amazon Prime | Computers | Prime Video Instant streaming of movies and TV shows | Start streaming

Departments | Browsing History | Tyrone's Amazon.com | Today's Deals | Gift Cards & Registry | Sell | Help | Hello, Tyrone Account & Lists | Orders | Prime | 0 Cart

Computers | Laptops | Tablets | Desktops | Monitors | Computer Accessories | PC Components | PC Gaming | All Electronics

Electronics › Computers & Accessories › Computers & Tablets › Laptops › Traditional Laptops

You purchased this item on June 22, 2016.
Style: **15.4-Inch** | Size: **256 GB** | View this order

Roll over image to zoom in

# Apple Macbook Pro MJLQ2LL/A 15-inch Laptop (2.2 GHz Intel Core i7 Processor, 16GB RAM, 256 GB SSD, Mac OS X)

by Apple
1,146 customer reviews | 921 answered questions

**Note:** This item is only available from third-party sellers (see all offers).

Available from these sellers.

Style: **15.4-Inch**
13.3-Inch | 13.3-Inch + Mouse | **15.4-Inch** | 15.4-Inch + Mouse

Size: **256 GB**
**256 GB** | 512 GB

- 2.2GHz quad-core Intel Core i7
- Turbo Boost up to 3.4GHz
- 16GB 1600MHz memory
- 256GB PCIe-based flash storage
- Intel Iris Pro Graphics

› See more product details

Used & new (26) from $1,212.00 + $8.99 shipping

Report incorrect product information.

There is a newer model of this item:
Apple MacBook Pro MLW72LL/A 15.4-inch Laptop with Touch Bar (2.6GHz quad-core Intel Core i7, 256GB Retina Display), Silver
$2,249.00
(125)
In Stock.

Amazon's Choice
**Amazon is taking the guesswork out of shopping.**
Find computer products that fit your needs. Learn more

Share 570+ Shares
See All Buying Options
Add to List
Have one to sell? Sell on Amazon

Microsoft Office 365 Home | 1-year subscription, 5 users, PC/Mac Downl...
1,502
$99.00
Ad feedback

Frequently Bought Together

Total price: $1,924.98
Add all three to Cart
Add all three to List

Amazon.com - Order 114-4339387-0045844                                                    9/16/16, 9:43 AM

# amazon.com

## Final Details for Order #114-4339387-0045844
### Print this page for your records.

**Order Placed:** June 22, 2016
**Amazon.com order number:** 114-4339387-0045844
**Order Total: $2,351.12**

## Shipped on June 22, 2016

| Items Ordered | Price |
|---|---|
| 1 of: *AppleCare Protection Plan for Mac Laptops 15 Inches and Above (NEWEST VERSION)*<br>Sold by: Amazon.com LLC | $345.50 |

Condition: New

**Shipping Address:**
Tyrone Holmes
1465 HAMMERSLEY AVE OUTSIDE RV
BRONX, NY 10469-3024
United States

| | |
|---|---|
| Item(s) Subtotal: | $345.50 |
| Shipping & Handling: | $3.99 |
| | ----- |
| Total before tax: | $349.49 |
| Sales Tax: | $31.01 |
| | ----- |

**Shipping Speed:**
One-Day Shipping

**Total for This Shipment: $380.50**
-----

## Shipped on June 22, 2016

| Items Ordered | Price |
|---|---|
| 1 of: *Apple Macbook Pro MJLQ2LL/A 15-inch Laptop (2.2 GHz Intel Core i7 Processor, 16GB RAM, 256 GB Hard Drive, Mac OS X)*<br>Sold by: Amazon.com LLC | $1,799.99 |

Condition: New

**Shipping Address:**
Tyrone Holmes
1465 HAMMERSLEY AVE OUTSIDE RV
BRONX, NY 10469-3024
United States

| | |
|---|---|
| Item(s) Subtotal: | $1,799.99 |
| Shipping & Handling: | $9.99 |
| | ----- |
| Total before tax: | $1,809.98 |
| Sales Tax: | $160.64 |
| | ----- |

**Shipping Speed:**
One-Day Shipping

**Total for This Shipment: $1,970.62**
-----

## Payment information

**Payment Method:**

## SA0033

Amazon.com - Order 114-4339387-0045844                                    9/16/16, 9:43 AM

Visa | Last digits: 5528

**Billing address**
TYRONE HOLMES
4457 PARK AVE
BRONX, NY 10457
United States

**Credit Card transactions**

Item(s) Subtotal:  $2,145.49
Shipping & Handling:     $13.98
-----
Total before tax:  $2,159.47
Estimated tax to be collected:    $191.65
-----
**Grand Total:$2,351.12**

Visa ending in 5528: June 22, 2016: $1,970.62
Visa ending in 5528: June 22, 2016:   $380.50

To view the status of your order, return to <u>Order Summary</u>.

<u>Conditions of Use</u> | <u>Privacy Notice</u> © 1996-2016, Amazon.com, Inc. or its affiliates

**SA0034**

EXHIBIT B



**CHECKPOINT**
PUMPS & SYSTEMS
www.cppumps.com

**Mandeville, US**
21356 Marion Lane
Mandeville, LA 70471 USA
+1 (800) 847-PUMP (7867)

**Aberdeen, UK**
Unit C2/C3
Lombard Centre Kirkhill Place
Dyce, Aberdeen AB21 0GU Scotland
+ 44 (0)1224 775205

**Dubai, UAE**
Jebel Ali Free Zone
PO Box 262131 Dubai, UAE
+971 (50) 240 4737

**Singapore**
tel: +65 6261 7687
fax: +65 6261 7686

September 12, 2016

Mr. Garfin
Counsel for Mr. Tyrone Holmes

Dear Mr. Garfin,

Please be advised that our Information Security department has ascertained information proving that your client is in possession of our equipment. This equipment has been tracked since leaving our facility. We have legally collected ample information to prove that your client is in possession of property belonging to CheckPoint Fluidic Systems International. If this equipment is returned immediately, in its original condition complete with all original parts and pieces, we will not move further to pursue legal action. I have no knowledge or interest in identifying your client or learning further about the details, which put him in possession of our equipment.

As a further condition of this agreement, I would require this matter be resolved through our mutual contact at the NYPD, Detective Rodrigo Caballero. I see no reason for your client, Mr. Holmes, to have any knowledge of our organization or its employees. To conclude our arrangement, please certify that our organization and staff shall remain anonymous to your client.

Regards,

Bobbi Jo Bridges
VP Operations

**SA0036**

EXHIBIT C

From: **Jeff Garfin** garfinlaw@gmail.com
Subject: Fwd: serial #
  Date: September 13, 2016 at 4:35 PM
    To: Tyrone Holmes tymax@me.com

Jeffrey D. Garfin, Esq.
Law Offices of Jeffrey D. Garfin, LLC
*Licensed to Practice in NY, CT & MA
    718-360-4660

Brooklyn Office:
1811 Quentin Road, Suite 1H
Brooklyn, NY 11229

Queens Office
136-20 38th Avenue, Suite 3-G
Flushing, NY 11354

---------- Forwarded message ----------
From: **CABALLERO, RODRIGO** <RODRIGO.CABALLERO@nypd.org>
Date: Tue, Sep 13, 2016 at 4.34 PM
Subject: serial #
To: Jeff Garfin <garfinlaw@gmail.com>

Apple Macbook Pro MJLQ2LL/A 15-inch Laptop (2.2 GHz Intel Core i7 Processor, 16GB RAM, 256 GB Hard Drive, Mac OS X)

Serial number: C02RQ1T3G8WN


**Detective Rodrigo Caballero**

**Central Investigation Devision**

**300 Gold St**

**Brooklyn, NY  11201**

**Office (718) 330-8763**

**Fax     (718) 330-3050**

**Email rodrigo.caballero@nypd.org**

EXHIBIT D

**From:** **Haqq Islam** a.haqq.islam@gmail.com
**Subject:** Re: Tyrone Holmes
**Date:** September 21, 2016 at 3:57 PM
**To:** Tyrone Holmes tymax@mac.com
**Cc:** LaVaba Mallison lavaba@gmail.com

This is CRAZY!!!!

Sent from my iPhone

On Sep 21, 2016, at 2:57 PM, Tyrone Holmes <tymax@mac.com> wrote:


Begin forwarded message:

**From:** Jeff Garfin <garfinlaw@gmail.com>
**Subject: Fwd: Tyrone Holmes**
**Date:** September 21, 2016 at 2:52:36 PM EDT
**To:** Ty Max <tymax@mac.com>, Robert Leino <rgleino@leinolaw.com>, Nicholas Kaizer <nkaizer@landklaw.com>


Jeffrey D. Garfin, Esq.
Law Offices of Jeffrey D. Garfin, LLC
*Licensed to Practice in NY, CT & MA
        718-360-4660

Brooklyn Office:
1811 Quentin Road, Suite 1H
Brooklyn, NY 11229

Queens Office
136-20 38th Avenue, Suite 3-G
Flushing, NY 11354


---------- Forwarded message ----------
From: **CABALLERO, RODRIGO** <RODRIGO.CABALLERO@nypd.org>
Date: Wed, Sep 21, 2016 at 2:15 PM
Subject: RE: Tyrone Holmes
To: Jeff Garfin <garfinlaw@gmail.com>


Good afternoon Mr. Garfin, I'm going to proceed with an arrest for CPSP 4th.   Please have your client surrender to the 047 pct tomorrow at 1PM.  Thank you, Det. Caballero.


**From:** Jeff Garfin [mailto:garfinlaw@gmail.com]
**Sent:** Wednesday, September 21, 2016 12:44 PM
**To:** CABALLERO, RODRIGO <RODRIGO.CABALLERO@nypd.org>
**Cc:** Robert Leino <rgleino@leinolaw.com>; Nicholas Kaizer <nkaizer@landklaw.com>
**Subject:** Tyrone Holmes


Dear Detective Caballero,


Please see attached.


Jeffrey D. Garfin, Esq.

**SA0040**

Law Offices of Jeffrey D. Garfin, LLC
*Licensed to Practice in NY, CT & MA
    718-360-4660

Brooklyn Office:

1811 Quentin Road, Suite 1H
Brooklyn, NY 11229

Queens Office
136-20 38th Avenue, Suite 3-G
Flushing, NY 11354

EXHIBIT E

## LAW OFFICES OF JEFFREY D. GARFIN, LLC

1811 Quentin Rd., Suite 1H                                   136-20 38th Ave, Suite 3G
Brooklyn, NY 11229                                          Flushing, NY 11354
Tel:   718 360-4660                                         (By Appointment only)
Fax:   718-504-7982                                         Tel:718-889-6396
garfinlaw@gmail.com

*Licensed to practice in NY, CT & MA*

I, Detective Rodrigo Caballero acting with complete authority of the New York City Police Department and any and all Prosecutorial agencies under which it may be acting, upon receipt of one Apple Computer, Apple Macbook Pro MJLQ2LL/A 15-inch Laptop Serial number: C02RQ1T3G8WN which upon information and belief has been found to contain sensitive proprietary information and software belonging to a third party, hereby release Tyrone Holmes and his successors, assigns, associates of any criminal prosecution, claim, demand, cause of action whatsoever relating to the acquisition, possession or alleged possession of this device by Mr. Holmes or any friend, associate, or members of Mr. Holmes' family.

_____                    10/4/16
Rodrigo Caballero
Central Investigations Division
New York City Police Department
300 Gold Street
Brooklyn, NY 11201

*Received on 10/4/16*
*@ 7:30 P.M.*
*loc: Chelsey Mini-Storage*
*626 W 28 St. NYC*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

TYRONE HOLMES                                              17 – CV - 4557

VS.                                                        JUDGE RAMOS

CHECKPOINT FLUIDIC SYSTEMS ET AL

Filed:_____                               _____
                                                          Deputy Clerk

**AFFIDAVIT AS TO "TIMELINE OF EVENTS" AND CONTACTS WITH NEW YORK**

STATE OF LOUISIANA

PARISH OF ST. TAMMANY

PERSONALLY CAME AND APPEARED, Bobbi Jo Bridges, who after being duly sworn, did
depose and state:

That affiant is one of three Vice-Presidents of Checkpoint Fluidic Systems International, Ltd.
(hereinafter "CheckPoint" since 2015, and

That affiant is personally and professionally familiar with any and all business conducted by, on
behalf of and through CheckPoint at all times concerning this litigation and laptop matters with
Tyrone Holmes, and

That affiant adopts, in full, the affidavits of Ruston Mahony (dated October 4, 2017) and Andrew
Elliott (dated October 4, 2017), and

That after a review of the file and associated pleadings, at all times material hereto and to the
best of affiant's knowledge and belief, below is the chronological timeline of events related to
the laptop computer in question:

06/02/2016    MacBook Pro (MBP) purchased from Amazon **by** CheckPoint – order number
              105-5281827-6691444 – Apple Macbook Pro MJLQ2LL/A 15-inch laptop, Serial
              Number C02RQ1T3G8WN.

06/07/2016    Laptop configured with standard software suite, including Kaseya Agent.

06/07/2016    Asset sticker attached "Property of CheckPoint Pumps" on bottom of computer
              before pick-up by FedEx and Laptop boxed and shipped via FedEx, intended
              destination: Dubai, UAE. Tracking number: 776466222796.

**SA0044**

06/15/2016    Checkpoint contacted FedEx for assistance with lost package

06/23/2016    CheckPoint is noticed that laptop was online via Kaseya console.

07/28/2016    CheckPoint contacted Chris Patteson – Director of IT for FedEx – for assistance

08/01/2016    **Kenneth Meyer** – Security Team Member for FedEx – **initiated telephone call to CheckPoint.**  Checkpoint for Kaseya information

08/02/2016    **FedEx**/Security Team Member Kenneth Meyer **filed a theft report** with Kenner Police Department – Report: H-80071-16

08/18/2016    **Detective Ralph Cilento (with NYPD)** as referred by Kenneth Meyer (with FedEx) and Sgt. Jeffrey Adams (with Kenner Police Department) to CheckPoint - NYPD **initiated direct contact** with CheckPoint

08/19/2016    **NYPD** Investigator/Detective Rodrigo "Rico" **Caballero initiated direct contact** with CheckPoint

10/11/2016    NYPD Caballero shipped laptop to CheckPoint

10/17/2016    CheckPoint received laptop with "Property of CheckPoint Pumps" sticker still in place on the bottom of the computer *as originally placed*.

Bobbi Jo (Vice-President) CheckPoint Fluidic Systems
International, Ltd.

Sworn to and subscribed before me,
this 4th day of October, 2017

Robert A. Barnett LSBA #2778
Notary Public for Life

**SA0045**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

TYRONE HOLMES                                                    17 – CV - 4557

VS.                                                                      JUDGE RAMOS

CHECKPOINT FLUIDIC SYSTEMS ET AL

Filed:_____                          _____
                                                                   Deputy Clerk

### **AFFIDAVIT AS TO THE "LAPTOP", "FEDEX" AND "KASEYA"**

STATE OF LOUISIANA

PARISH OF ST. TAMMANY

PERSONALLY CAME AND APPEARED, Ruston Mahony, who after being duly sworn, did depose and state:

That affiant is the Information Technology Officer ("IT Officer") of Checkpoint Fluidic Systems International, Ltd. (hereinafter "CheckPoint") since 2011, and

That affiant is personally and professionally familiar with any and all information and technology affairs conducted by, on behalf of and through CheckPoint at all times, and

That after a review of the file and associated pleadings, at all times material hereto and to the best of affiant's knowledge and belief, below is the history of events related to the laptop computer (hereinafter "laptop") in question, and

"THE LAPTOP"

That affiant is the administrator of all computer equipment at CheckPoint at all times material hereto, including the "laptop", and

That with respect to the laptop in question, affiant selected and placed the purchase order of the laptop, and

That on June 2, 2016, the MacBook Pro (MBP) was purchased from Amazon by CheckPoint – order number 105-5281827-6691444 – Apple MacBook Pro MJLQ2LL/A 15-inch laptop, Serial Number C02RQ1T3G8WN. See Exhibit "A", and

That the laptop was delivered directly from Amazon to CheckPoint on or about June 7, 2016, and

That affiant took or is aware of the following actions:

- received the laptop in its original shipment box from Amazon on June 6, 2016
- opened the original shipment box, removed plastic "shrink wrap" as originally applied by Apple and removed laptop from the box to examine the laptop
- turned on and activated the laptop
- the computer name was established and installed as "Ewens-MBP.home" (indicating that the computer was, in fact, the laptop to send to Ewen Bremner in Dubai, UAE.)
- installed standard software suite including Microsoft Office for Mac, Microsoft Remote Desktop Client, Kaseya Agent and antivirus software
- attached asset sticker "Property of CheckPoint Pumps" on bottom of computer before pick-up by FedEx
- took a photograph of the asset sticker after placement on laptop (See Exhibit "B")
- placed the laptop into original Apple packaging and Amazon shipping box for shipment to Dubai
- did not "bubble wrap" nor "shrink wrap" the laptop or any packaging in the shipping box
- delivered package to CheckPoint shipping clerk who contacted FedEx for pick-up services
- shipping clerk released the laptop for shipment to FedEx on June 7, 2016
- boxed and shipped via FedEx, intended destination: Dubai, UAE. Tracking number: 776466222796.  See Exhibit "C"

"KASEYA"

That affiant installed, on June 7, 2016, "Kaseya Essentials Bundle Agent" on the laptop, and

That CheckPoint subscribes to the "Kaseya Essentials Bundle" – a cloud-based computer systems and asset management tool.  The software requires a locally-installed agent on each computer it manages.  This agent gives affiant, as the CheckPoint administrator, the ability, through the cloud-based administrative console, to remotely manage each connected agent computer including remote control, remote file access, hardware and software auditing, anti-virus protection, and automated patch management.

That the Kaseya console also provides to affiant, as the administrator, all information for each asset, including but not limited to the laptop involved in this matter.  Included in that information is the computer manufacturer, product name (model) and version, and serial number of the computer.

That Kaseya also reports the current public IP address of the connected agent or the most recent public IP address of a disconnected agent and

That the Kaseya default view of the console shows which agents are connected to the management server and which are 'off-line', and

That as a result of this litigation, affiant has made a search of CheckPoint computer equipment and finds no computer activity use or user from within the State of New York since the laptop was returned to Checkpoint, and

"FEDEX"

That on June 7, 2016, with affiant's consent, a CheckPoint shipping clerk contacted FedEx for pick-up shipment to Dubai, and

That FedEx picked up the laptop (see Exhibit "C"), and

That the laptop shipment was lost in transit and that affiant reported the missing FedEx shipment to FedEx on June 15, 2016 (See Exhibit "D"), and

That between June 15 and June 23, 2016, CheckPoint was not involved FedEx's own internal investigation of 'missing' or 'lost' packages.

"KASEYA" NOTIFICATION

That on the evening of June 23, 2016, affiant was configuring a new MacBook to replace the laptop lost in shipping by FedEx, and

That when affiant logged in to the Kaseya console to install the agent on the new computer, affiant noticed that the missing agent was 'on-line' at that time on June 23, 2016, and

That affiant then immediately prepared and sent himself a screenshot of the agent information window from the new computer at 6:30 pm. (see attachment "E"), and

That affiant immediately reported to CheckPoint Operations personnel that the laptop was 'on-line', and

That immediately, affiant initiated a Google search on the public IP address shown in the Kaseya console, and

That the IP address was registered to "Optimum Online" and indicated service in Bronx, NY, and

That in addition to the public IP address, Kaseya reported the current user as "Stephanie Scott" with the computer name "Ewens-MBP.home" (indicating that the computer was, in fact, the laptop purchased to send to Ewen Bremner in Dubai, UAE.), and

That affiant immediately created an alert in the Kaseya console to notify affiant, via email, when and if the laptop was online, and

That thereafter, affiant was able to confirm several IP addresses indicating the approximate locations of the computer when it was connected to the Internet, and

That affiant collected information from the laptop that would assist or help to identify the user, location and hopeful recovery of the laptop for use to FedEx support personnel, and

### "FEDEX" AND THE NEW YORK POLICE DEPARTMENT

That on July 28, 2016, CheckPoint contacted Chris Patteson (IT Director, FedEx) for update, and

That on August 1, 2016, FedEx Kenneth Meyer (Security Team Member for FedEx) initiated a telephone call to CheckPoint about Kaseya information, and

That on August 2, 2016, FedEx, through Security Team Member Kenneth Meyer, initiated and directly filed a theft report with City of Kenner Police Department – Report: H-80071-16 (See attached attachment "F"), all without CheckPoint involvement, and

That upon information and belief and without action by CheckPoint, on or about August 16, 2016, Kenner Police Department (through Sgt. Jeffrey Adams) directly contacted New York Police Department ("NYPD"), and

That on August 18, 2016, Detective Ralph Cilento (with NYPD) as referred by Kenneth Meyer (with FedEx) and Sgt. Jeffrey Adams (with Kenner Police Department) initiates and directly contacted CheckPoint, and

That on August 18, 2016, NYPD Investigator/Detective Rodrigo "Rico" Caballero initiated and directly contacted CheckPoint about its own NYPD investigation, and

That CheckPoint did not initiate nor make direct initial contact with the New York Police Department ("NYPD"), and

That CheckPoint was not involved in any contact, discussions, meetings, investigations or arrangements with NYPD and Mr. Holmes.

### "LAPTOP" WAS RETURNED

That on or about October 17, 2016, affiant was the recipient of the laptop returned to CheckPoint by NYPD (attachment "G"), and

That the same laptop purchased by CheckPoint on June 2, 2016 was returned by NYPD directly to CheckPoint, and

The laptop was received with the same "CheckPoint" ownership sticker/label as placed by affiant on June 7, 2016 (see attachment "H"), and

That affiant confirmed that it was the same laptop with the same serial number and same user name, and

That upon the return of the laptop, affiant evaluated the condition of the computer/laptop hardware and software, determined that the laptop was in working order, and created a new login profile for CheckPoint.

Ruston Mahony
Information Technology Manager, CheckPoint

Sworn to and subscribed before me,
Notary public, this 4th day of October, 2017

Robert A. Barnett #2778

Exhibit "A" – Purchase Order - Serial Number C02RQ1T3G8WN
Exhibit "B" - asset sticker "Property of CheckPoint Pumps"
Exhibit "C" - tracking number: 776466222796
Exhibit "D" - FedEx history
Exhibit "E" – screenshot
Exhibit "F" – Kenner Police Department – Report: H-80071-16
Exhibit "G" - October 17, 2016/NYPD
Exhibit "H"- asset sticker "Property of CheckPoint"

Wednesday, October 4, 2017 at 12:13:39 PM Central Daylight Time

**Subject:** 776466222796-Checkpoint Missing Mac
**Date:** Tuesday, August 2, 2016 at 12:10:51 PM Central Daylight Time
**From:** Kenneth Meyer
**To:** Rusty Mahony
**CC:** David Twiford, John McCaffrey, Laurie High

A theft report was just filed with Kenner Police Department(Kenner, LA)

Police report-H-80071-16
Ofc. Charles Donovan.

Kenner Police Detective Bureau may be reaching out to Rusty Mahony for further details and to coordinate ping location.

FEDEX EV-939489

Thanks,

Ken

Kenneth A. Meyer
FedEx Express
200 Crofton Road
Kenner, LA 70062
C-504-458-7955
O-504-472-3321

**From:** Rusty Mahony [mailto:rusty@cppumps.com]
**Sent:** Monday, August 01, 2016 2:42 PM
**To:** Kenneth Meyer
**Subject:** Photos

Here are the photos I sent in the first message.  I resized them to keep the message size low but have the originals if higher resolution is necessary.

Thanks again,

**Rusty Mahony**
IT Manager

**CheckPoint Pumps & Systems**®
21356 Marion Lane | Mandeville, LA 70471
Direct +1 985.246.3142 | Mobile +1 985.249.0645 | Main +1 504.340.0770
rusty@cppumps.com | www.cppumps.com



This email and any files transmitted with it (the "Message") contain(s) information intended for a specific individual and purpose. Absent permission, the disclosure, replication, or distribution of this Message is forbidden. If you are not the intended recipient, you are required to delete it and notify sender of the error by return email. Unless otherwise stated, this Message does not form any contractual obligation on behalf of the sender or the sender's

Page 1 of 2

**SA0051**

employer. WARNING: Sender accepts no liability for damage caused by any virus transmitted by this Message.
REDUCE WASTE: Please do not create hardcopies unless it is absolutely necessary.

**SA0052**

ARCHIVE   Printed by: FICIMPORT   08/07/2016 01:31   Page   1   of   5

| KPD CRIME REPORT | Signal | Rep Area | Item # | Report Type | | Date | Time |
|---|---|---|---|---|---|---|---|
| ADM SEC ORI LA0260300 | 67 | 9797 | H-80071-16 | INITIAL | | 02-AUG-2016 | 1136 |

| ay of Wk. | Begin Date | Begin Time | End Date | End Time | Location of Offense |
|---|---|---|---|---|---|
| UE | 07-JUN-2016 | 2103 | 02-AUG-2016 | 1136 | 300 MIDDLE ACCESS RD KENNER 70062 |

H-80071-16 UCR

| eporting Officer | Responding Detective | | Supervisor | |
|---|---|---|---|---|
| CHARLES DONOVAN | | | | |
| R: KD5180    JP: K716 | PR: | JP: | PR: | JP: |
| rrived:   021136 | Notified: | | Notified: | |
| ompleted: 060931 | Arrived: | | Arrived: | |

REPORTING PERSON

| Name: KENNETH A MEYER | | Race: WHITE | Sex: MALE |
|---|---|---|---|
| DOB: | Age: 44 | Employer/School: FEDEX | |
| Address: 300 MIDDLE ACCESS RD | | Address: 300 MIDDLE ACCESS RD | |
| City/St/Zip: KENNER, LA 70062 | | City/St/Zip: KENNER, LA 70062 | |
| Phone: (504) 458-7955 | | Phone: (504) 472-3321 | |
| Identify Suspect? N | Voluntary Statement? N | | |

VICTIM

Victim Sequence Number: 1    Type: BUSINESS                    For Insurance Purposes?

Name:   CHECKPOINT PUMPS & SYSTEMS

Address: 21356 MARION LN

City/St/Zip: MANDEVILLE, LA 70471

Phone: (504) 985-2463    Ext: 142                                    Ext:

OFFENSE

Offense Sequence Number: 1    Victim: 1         Suspect:

R.S. Number: RS 14:69              Title: POSSESSION STOLEN THINGS

Attempted/Completed: COMPLETED   Location Type: OTHER / UNKNOWN        Number of Premises:

Criminal Activity 1:  OTHER                     Weapon/Force Type 1: NONE

SUSPECT

Suspect Sequence Number:    1

| Name: STEPHANIE J SCOTT | | Race: BLACK | Sex: FEMALE |
|---|---|---|---|
| DOB: | Age From: 31    To: | Ethnicity: NON-HISPANIC | Resident? |
| Height From:        To: | Weight From:        To: | Eye Color: UNKNOWN | |
| Hair Color: BLACK | Hair Length: | | |
| Address: 244 5TH AV Q253, FL2 | | City/St/Zip: NEW YORK, LA NEW YORK | |
| Alcohol Consumed? | Computer Used? | Drugs Used? | Gaming Motive?    Gang Related: |
| Armed: Other | | Hate/Bias: NONE | |

Can be Identified by Witness:

Identifiable Features:
Location:

Arrest Type: NONE        Voluntary Statement?    Local Check?    State Check?    NCIC Check?

Suspect Injury Codes:   NONE

**SA0053**

ARCHIVE      Printed by: FICIMPORT   08/07/2016 01:31      Page   2      of 5

Suspect Sequence Number:   2
Name:   TYRONE HOLMES                        Race: BLACK              Sex: MALE

DOB:                      Age From: 48      To:        Ethnicity: NON-HISPANIC      Resident?

Height From:  505      To:           Weight From: 130    To:        Eye Color: BROWN
Hair Color:  BLACK               Hair Length: EAR TO SHOULDER

Address:  85 MORELAND AV SE              City/St/Zip: ATLANTA, GA 30316
Alcohol Consumed?       Computer Used?        Drugs Used?     Gaming Motive?      Gang Related:

Armed:  Other                                     Hate/Bias: NONE

Can be Identified by Witness:

Identifiable Features:
Location:

Arrest Type:  NONE            Voluntary Statement?     Local Check?      State Check?      NCIC Check?

Suspect Injury Codes:   NONE

**ADDITIONAL WITNESS**

Witness Sequence Number:   1
Name:   RUSTY MAHONY                        DOB/PR:

Address:  21356 MARION LN               Under the Influence?      Can Witness ID Suspect?
City/St/Zip:  MANDEVILLE, LA 70471       Voluntary Statement?      Present During Incident?
Phone:  (504) 249-0645

**PROPERTY**

Property Owner or Property rcvd from:      VICTIM 1    Desc. Code:  07   –  COMPUTER HDW/SOFTWARE
Loss Type: 7   – STOLEN                              Quantity:  1     Value:  $1,983      Insured:
Owner-applied Number:                          Make: APPLE MACBOOK PRO
Model:  MLJQ2LL               Serial Number:  C02RQ1T3G8WN
Description:  15 INCH LAPTOP, 2.2 GHZ INTEL CORE I7 PROCESSOR,          Date Recovered:

**VEHICLE**
None

**CRIME SCENE**
None

**INVESTIGATION**

Type of Force Used:                         Security Device Installed?
Point of Entry:                            Security Device Activated?
Safe Job?      Gambling Devices on Premises?        Alcoholic Beverage Outlet?
Prior History of Domestic Violence?    Prior History Documented?     Number of Prior Cases:
Modus Operandi (MO):  COMPUTER WAS STOLEN, LAST SCANNED AT FEDEX, PERSONS OF INTEREST ARE
          IN POSSESSION, IT REP PINGS COMPUTER LOCATION OUT OF STATE

**INSURANCE**
None

**APPROVAL**

            Sergeant Viewed           Lieutenant Viewed          Dist. Cmdr. Viewed
User ID:  KPD_S7925
Date/Time:  06-AUG-2016 10:35

            User ID: KPD_S7925        Date/Time: 06-AUG-2016 10:35

H-80071-16

**SA0054**

ARCHIVE     Printed by:  FICIMPORT    08/07/2016 01:31     Page   3     of   5

FINAL APPROVAL

| | | | |
|---|---|---|---|
| Crime Prevention Officer Required? | Issued Complaint Slip? | 911 Notified? | Warrant? |
| Parade Related? | Crime Scene Required? | Report Status: | COMPLETED |
| Exceptional Clearance: | | Date: | |
| District Follow Up? | | | |
| Bureau Follow Up? | | | |

H-80071-1

ARCHIVE   Printed by: FICIMPORT   08/07/2016 01:31   Page   4     of   5

NARRATIVE

Time Stamp: 08/06/2016 09:31       Written By: CHARLES DONOVAN

ON AUGUST 2, 2016 AT APPROXIMATELY 1124 HOURS, OFFICER CHARLES DONOVAN OF THE KENNER POLICE DEPARTMENT WAS DISPATCHED TO THE FEDEX SHIPPING BUILDING LOCATED AT 300 MIDDLE ACCESS RD. KENNER LA, 70062 IN REFERENCE TO A THEFT.

UPON ARRIVAL AT APPROXIMATELY 1136 HOURS, OFFICER DONOVAN MET WITH THE REPORTING PERSON, MR. KENNETH MEYER. MR. MEYER IS EMPLOYED BY FEDEX AS A LOSS PREVENTION MANAGER. MR. MEYER EXPLAINED THAT HE WAS INVESTIGATING A THEFT OF A COMPUTER. MR. MEYER HAD BEEN IN CONTACT WITH INVOLVED PERSON MR. RUSTY MAHONY, THE IT MANAGER FOR CHECKPOINT PUMPS & SYSTEMS COMPANY LOCATED AT 21356 MARION LANE, MANDEVILLE, LA, 70471.

MR. MAHONY'S COMPANY PURCHASED A NEW COMPUTER AND HE DOWNLOADED ALL NECESSARY COMPANY DATA ON THE COMPUTER. MR. MAHONY THEN SHIPPED THE COMPUTER FROM MANDEVILLE ON JUNE 7, 2016 TO AN ADDRESS OUT OF THE COUNTRY, DUBAI CITY.

DURING THE COURSE OF SHIPPING THE COMPUTER FROM MANDEVILLE THE COMPUTER WAS SHIPPED TO 300 MIDDLE ACCESS ROAD, KENNER LOUISIANA PRIOR TO FURTHER SHIPMENT. THE COMPUTER WAS ALSO LAST SCANNED AT THE FEDEX LOCATION IN KENNER ON JUNE 7, 2016 AT 2103 HOURS.

SHORTLY AFTER THE COMPUTER WAS STOLEN, MR. MAHONY WAS ABLE TO ACCESS THE COMPUTER EACH TIME THE SUSPECT/USER LOGGED INTO AN INTERNET SERVICE. MR. MAHONY WAS ABLE TO DOWNLOAD MULTIPLE PHOTOGRAPHS, VIDEOS AND PERSONAL INFORMATION FROM THE USER.

BASED ON MR. MAHONY'S ABILITY TO ACCESS THE PERSONAL INFORMATION ON THE COMPUTER IT IS HIS BELIEF THE PERSON IN POSSESSION OF THE COMPUTER IS A BLACK FEMALE, STEPHANIE SCOTT. MR. MAHONY PROVIDED MR. MEYER WHO ULTIMATELY PROVIDED OFFICER DONOVAN WITH THE FOLLOWING COPIES OF SCOTT'S PERSONAL FORMS.

1. FEDERAL TAX FORM W-9
2. INDEPENDENT ASSOCIATE AGREEMENT TVC MARKETING ASSOCIATES, INC.
3. A UNITED STATES PASSPORT
4. CHASE BUSINESS DEBIT CARD
5. A PHOTOGRAPH OF WHAT IS BELIEVED TO BE SCOTT WEARING A WIG

IT SHOULD BE NOTED A PHOTOGRAPH OF A BLACK MALE'S GEORGIA'S DRIVER'S LICENSE WAS ALSO PROVIDED, TYRONE HOLMES.

ADDRESS PROVIDED FOR SCOTT WAS IN NEW YORK WHICH IS CONSISTENT WITH WHERE MR. MAHONY WAS ABLE TO DETERMINE THAT THE OPERATOR OF THE COMPUTER SIGNS INTO INTERNET SERVICE UNTIL RECENTLY, JULY 31, 2016 AT 1244 HOURS, WHEN THE COMPUTER WAS BEING USED IN ORLANDA FLORIDA.

OFFICER DONOVAN CONTACTED MR. MAHONY AND LEARNED THAT HE CAN PROVIDE MORE INFORMATION IF THE CASE IS INVESTIGATED FURTHER.

THE COMPUTER IS AS APPLE MACBOOK PRO MJLQ2LL/A-15-INCH LAPTOP. (2.2 GHZ INTEL CORE I7 PROCESSOR, 16GB, RAM, 256 GB HARD DRIVE, MAC OS X), SERIAL # (C02RQ1T3G8WN) WORTH $1,982.93.

IT SHOULD BE NOTED MR. MEYER WAS IN CONTACT WITH A OFFICER FROM NEW YORK POLICE DEPARTMENT WHO INFORMED MR. MEYER THAT IF HE HAD A ITEM NUMBER FROM A LAW ENFORCEMENT AGENCY FROM WHERE THE THEFT OCCURRED THE NEW YORK POLICE DEPARTMENT WOULD ASSIST IN THE INVESTIGATION.

**SA0056**

ARCHIVE          Printed by: FICIMPORT     08/07/2016 01:31     Page   5      of   5

OFFICER DONOVAN CONTACTED KPD NCIC OPERATOR 673 WHO LOGGED THE COMPUTER AS STOLEN IN THE NCIC DATABASE.

ALL DOCUMENTS PERTAINING TO THIS CASE WERE TURNED INTO KENNER POLICE RECORDS WITH THIS REPORT.

CASE SUSPENDED.

H-8007-1-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
TYRONE HOLMES,

                    Plaintiff,                          Case No. 1:17-cv-04557-ER

      *-against-*

APPLE INC., AMAZON.COM, LLC, and
CHECKPOINT FLUIDIC SYSTEMS
INTERNATIONAL, LTD.,

                    Defendants.
-------------------------------------------------------------X


# MEMORANDUM OF LAW OF
## DEFENDANT CHECKPOINT TO DISMISS
## <u>FOR LACK OF PERSONAL JURISDICTION</u>


Brian D. Graifman, Esq.
BORAH, GOLDSTEIN, ALTSCHULER,
  NAHINS & GOIDEL, P.C.
377 Broadway
New York, New York 10013
(212) 431-1300

*Attorneys for Defendant CheckPoint*
*Fluidic Systems International, Ltd.*

**TABLE OF CONTENTS**

Preliminary Statement........................................................................................1

Facts ....................................................................................................................1

ARGUMENT:

THE COURT LACK PERSONAL JURISDICTION OVER CHECKPOINT .........................4

A. No Jurisdiction Under the New York Law........................................................4

   1. There Is No N.Y. General Jurisdiction Over Checkpoint…………………..4

   2. There Is No N.Y. Long Arm Jurisdiction Over Checkpoint ……………… 5

B. Jurisdiction Would Violate Constitutional Due Process ...................................6

   1. There Is No General Jurisdiction Over Checkpoint Constitutionally…………..7

   2. There Is No Case-Specific Jurisdiction Over Checkpoint Constitutionally……7

CONCLUSION....................................................................................................10

Defendant CheckPoint Fluidic Systems International, Ltd. ("CheckPoint") submits this memorandum of law in support of its motion to dismiss for lack of jurisdiction.

## Preliminary Statement

CheckPoint's laptop computer loaded with its software and bearing its property sticker disappeared en route via FedEx from Lousiana to Dubai and somehow ended up under the control of plaintiff and/or his estranged wife in New York. CheckPoint reported the events to Fed-Ex in Louisiana, which contacted Louisiana police, which contacted the NYPD, which successfully recovered and returned it to CheckPoint.

This Court lacks personal jurisdiction over CheckPoint due to its insufficient contacts with New York. CheckPoint has no general contacts with New York. Nor does it have case-specific contacts: It did not target New York; rather it monitored information reported from its misappropriated computer to facilitate its return, which computer solely by reason of plaintiff and his cohort was harbored in New York. Contact for jurisdiction cannot be caused by plaintiff alone. Walden v. Fiore, 134 S. Ct. 1115 (2014). The action should be dismissed. Fed. R. Civ. P. 12(b)(2).

## Facts

The facts are set forth in the accompanying affidavits of Andrew C. Elliott (**"No Contacts Affidavit"**) (with exhibits A-B); Bobbi Jo Bridges (**"Timeline Affidavit"**); and Ruston Mahoney (addressing the laptop, FedEx and Kaseya software) (**"Laptop Affidavit"**) (with its exhibits A-H), each sworn to on October 4, 2017.

In short, CheckPoint is a Texas partnership with its principal place of business in Louisiana (Exh. A to No Contacts Aff.). It manufactures and services pump equipment (*see* No Contacts Aff. at pgs. 1-2, citing Compl. at pg. 3 introduction line 6; ECF Dco. 37 at 2). It has

**SA0060**

no general contacts with New York (No Contacts Aff. & exhibits) and no specific contacts other than plaintiff ending up with its misappropriated computer in the Bronx and Manhattan before NYPD returned it to CheckPoint.

CheckPoint purchased the computer from Amazon on June 2, 2016 (approximately a month prior to plaintiff's claimed purchase) (Laptop Aff. at 1 & Exh. A thereto).  Upon its arrival CheckPoint configured it with a computer name "Ewens-MBP.home"; and with Kaseya software, a cloud-based tool that allows CheckPoint's computer administrator to remotely manage each agent's computer, including remote control, remote file access, hardware and software auditing, anti-virus protection, and automated patch management (Laptop Aff. at 2-3). CheckPoint placed a "Property of CheckPoint Pumps" label on the bottom of it, taking a photograph of same (Laptop Aff. at 2 & Exh. B thereto).  CheckPoint repackaged the computer for shipping (Laptop Aff. at 2).[1]

CheckPoint then entrusted it to Fed-Ex in Louisiana on June 7, 2016, for delivery to Dubai (Laptop Aff. at 3 & Exhs. C-D).  It went missing while in Fed-Ex transit.[2]  CheckPoint contacted FedEx on June 15, 2016, for lost-package assistance (Timeline Aff. at 2).

On June 23, 2016, CheckPoint's IT officer/computer administrator utilizing the Kaseya console noticed that the missing "agent" was on-line, and took a screen-shot of the Kaseya agent information window (Laptop Aff. at 3 & Exh. E).  As the screenshot indicates, the Kaseya monitor reported, among other things, (a) an IP (internet protocol) address, displayed as a series of numbers: "192.168.1.3"; (b) the user as "Stephanie Scott"; (c) the computer name Ewens-

---

[1]     No bubble-wrap or shrink wrap was used (Laptop Aff. at 2) (as plaintiff stated at the Sept. 14 court conference was on his computer).

[2]     Laptop Aff. at Exh. D last pg. (sort location in Memphis) & Exh. F (email of theft report to Kenner PD made by Kenneth Meyer of FedEx, indicating at theft report pg. 2:  "LAST SCANNED AT FEDEX").

MBP. Home (the same name CheckPoint had configured on the missing computer) (Laptop Aff. at 3 & Exh. E).  A Google search on the IP address revealed it was registered to "Optimum Online" with service in Bronx, NY (Laptop Aff. at 3).  Later monitoring indicated use at other IP addresses when the computer was connected to the internet (Laptop Aff. at 4).

In the meantime, CheckPoint continued communicating with Fed-Ex in regard to the missing computer.  CheckPoint was contacted by a FedEx security member, who filed a theft report with City of Kenner (Louisiana) Police Department (without CheckPoint's involvement) (Laptop Aff. at 4 & Exh. F).  Kenner PD apparently contacted the NYPD (without CheckPoint's participation) (Laptop Aff. at 4).  The NYPD then contacted CheckPoint about its investigation (*id.*).  CheckPoint did not initiate nor make direct initial contact with the NYPD and was not involved in any contact, discussions, meetings, investigations or arrangements with the NYPD and Mr. Holmes (*id.*).

The computer was then recovered by the NYPD with CheckPoint's ownership sticker still adhered and returned it to CheckPoint (Laptop Aff. at 4 & Exhs. G & H).

Plaintiff now brings this action, claiming that he purchased the subject computer from Amazon.com on a later date than CheckPoint's purchase.[3]  Plaintiff alleges as against CheckPoint negligence, and seeks in excess of $75,000 in damages (Complaint 4th Cause of Action, ECF Doc. 1 at ¶¶ 92-96).

---

[3]  Plaintiff produces no document showing that the computer he purchased from Amazon.com is the same as CheckPoint's computer.  Plaintiff's shifty/shifting story in a prior version was that he purchased the computer directly from an Apple Store on the Upper West Side of New York City, providing a copy of the receipt (ECF Doc. 38-3).

3

**ARGUMENT**

**THE COURT LACKS PERSONAL
JURISDICTION OVER CHECKPOINT**

Personal jurisdiction in a diversity case

> is determined in accordance with the law of the forum in which the federal
> court sits.  Whitaker v. American Telecasting Inc., 261 F.3d 196, 208 (2d Cir.
> 2001) (*citing* Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997)).
> This determination involves a two-step analysis.  Chloé v. Queen Bee of
> Beverly Hills, LLC, 616 F.3d 158, 163 (2d Cir. 2010).  In New York, the
> Court must first determine whether personal jurisdiction is appropriate
> pursuant to the State's general jurisdiction statute, New York Civil Practice
> Law and Rules ("C.P.L.R.") § 301.  Plaintiffs . . . may also rely on the long-
> arm statute of the state in which the suit is filed, here, C.P.L.R. § 302(a).  If
> and only if the Court's exercise of personal jurisdiction is deemed appropriate
> according to New York law, the second step is an evaluation of whether the
> Court's exercise of personal jurisdiction comports with the Fifth Amendment
> Due Process Clause of the United States Constitution. Chloé, 616 F.3d at
> 164; Best Van Lines, Inc. v. Walker, 490 F.3d 239, 242 (2d Cir. 2007).

Mount Whitney Investments, LLLP v. Goldman Morgenstern & Partners Consulting, LLC, No.

15 Civ. 4479 (ER), 2017 WL 1102669, at *3 (S.D.N.Y. Mar. 23, 2017) (certain source citations

omitted or modified) (Edgardo Ramos, J.). [4]  Plaintiff bears the burden of establishing

jurisdiction.  Id.

Jurisdiction over CheckPoint fails under any of the tests.

**A.**    **No Jurisdiction Under New York Law**

   **1.**    **There is no N.Y. General Jurisdiction Over CheckPoint**

New York's general jurisdiction statute, CP LR § 301, reads:  "A court may exercise such

jurisdiction over persons, property, or status as might have been exercised heretofore."  With

respect to *in personam* jurisdiction, this section preserves four potential bases in view of the

---

[4]    The unpublished Mount Whitney decision is filed as ECF Doc. No. 35-2 in this case
(Local Civ. R. 7.2).

4

**SA0063**

advent of long arm jurisdiction under CPLR 302. Those bases are "presence, consent, domicile, [and] doing business . . . jurisdiction." Vincent C. Alexander, Practice Commentaries C301:1, N.Y. C.P.L.R. 301 (McKinney 2016).

As set forth in the accompanying No Contacts Affidavit, CheckPoint has no presence in New York; has not consented to jurisdiction in New York; is not domiciled in New York; and is not doing and has not done business in New York. There is therefore no basis for general jurisdiction over it. *See* <u>Mount Whitney</u>, *supra*, at *4.

**2.      There is no N.Y. Long Arm Jurisdiction Over CheckPoint**

New York's long arm jurisdiction is explained in <u>Mount Whitney</u>:

> Under Section 302(a), a court may exercise personal jurisdiction over any non-domiciliary who, either in person or through an agent: (1) "transacts any business within the state or contracts anywhere to supply goods or services in the state;" (2) "commits a tortious act within the state . . ." or (3) "commits a tortious act without the state causing injury to person or property within the state . . . [if he] (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or (4) owns, uses or possesses any real property situated within the state." C.P.L.R. § 302(a)(1)-(4).

<u>Mount Whitney</u>, *supra*, at *4. Personal jurisdiction under 302(a)(2) (commits tortious act within the state) "arises . . . only pursuant to actions taken while *physically within New York State*." <u>Mount Whitney</u> at *5 (emphasis in original).

As explained in the No Contacts Affidavit, CheckPoint does not transact business in the state or supply goods or services in the state (CPLR 302(a)(1)). Nor did it commit any tortious act and certainly not one while physically within the state (CPLR 302(a)(2)). Nor has it (i) regularly done or solicited business, or engaged in any other persistent course of conduct, or derived substantial revenue from goods used or consumed or services rendered, in the state; or

5

**SA0064**

(ii) expected or should reasonably have expected any act with regard to its computer being shipped via Fed-Ex from Louisiana to Dubai to have had consequences in the state (CPLR 302(a)(3)).  Nor has it owned, used or possessed any real property situated within the state (CPLR 302(a)(4)).

**B.    Jurisdiction Would Violate Constitutional Due Process**

When the Court finds that personal jurisdiction "is proscribed by the laws of New York, the Court need not engage in a due process analysis." Mount Whitney at *6.  Nonetheless, jurisdiction over CheckPoint would violate due process.

> Due process demands that defendants have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." International Shoe Co. v. Wash., 326 U.S. 310, 316 (1945) (internal citations omitted).  Where a non-domiciliary "avails itself of the benefits of the forum, has sufficient minimum contacts with it, and should reasonably expect to defend its actions there," the Court's exercise of personal jurisdiction will not offend due process.  Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 466, 527 N.Y.S.2d 195, 198 (1988).

Ikeda v. J. Sisters 57, Inc., No. 14-CV-3570 ER, 2015 WL 4096255, at *6 (S.D.N.Y. July 6, 2015) (citation modified) (Edgardo Ramos, J.).[5]

> There are two types of jurisdiction, general and specific.  General jurisdiction may only be asserted where the parties' contacts with the forum state are "continuous and systematic" and may apply "irrespective of whether the claim arises from or relates to the defendant's forum contacts." U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., 241 F.3d 135, 152 (2d Cir.2001)).  Alternatively, specific jurisdiction is implicated when "the claim arises out of, or relates to, the defendant's contacts with the forum" such that it can be said that it " 'purposefully availed' itself of the privilege of doing business in the forum and could foresee being 'haled into court' there." Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).

Ikeda, supra, at *6 (certain quotation source omitted & modified).

---

[5]    The unpublished Ikeda decision is filed as ECF Doc. No. 35-3 in this case (Local Civ. R. 7.2).

6

**SA0065**

1.     **There is No General Jurisdiction Over CheckPoint Constitutionally**

General jurisdiction is proper over a foreign entity where its affiliations with the State are so continuous and systematic as to render it "essentially at home in the forum State." Daimler AG v. Bauman, 134 S. Ct. 746, 761 (2014). CheckPoint has no contacts or affiliations within the state that would subject it to general jurisdiction.

2.     **There is No Case-Specific Jurisdiction Over CheckPoint Constitutionally**

In Walden v. Fiore, 134 Sup. Ct. 1115 (2014), a unanimous Supreme Court held that an airport police officer in Georgia who seized cash from airline passengers traveling back to Nevada lacked minimum contacts with Nevada, even if he knew that his allegedly tortious conduct in Georgia would delay return of funds to the passengers with connections to Nevada:

> First, the relationship must arise out of contacts that the "defendant *himself*" creates with the forum State. Due process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties. We have consistently rejected attempts to satisfy the defendant-focused "minimum contacts" inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State. *See* Helicopteros Nacionales de Colombia, *S.A. v. Hall*, 466 U.S. 408 (1984) ("[The] unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction"). . . . Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be "decisive in determining whether the defendant′s due process rights are violated."

Walden, 134 Sup. Ct. at 1122 (various source citations & parenthetical quotes omitted).

> Second, our "minimum contacts" analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there. . . .

> [T]he plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him. . . . [A] defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction. Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State,

not based on the "random, fortuitous, or attenuated" contacts he makes by interacting with other persons affiliated with the State.

<u>Walden</u>, 134 Sup. Ct. at 1122-23 (source citations & parenthetical quotes omitted).

These same principles apply when intentional torts are involved. In that context, it is likewise insufficient to rely on a defendant's "random, fortuitous, or attenuated contacts" or on the "unilateral activity" of a plaintiff. A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum.

<u>Walden</u>, 134 S. Ct. at 1123 (citation omitted).

Respondents emphasize that they suffered the "injury" caused by petitioner's allegedly tortious conduct (*i.e.,* the delayed return of their gambling funds) while they were residing in the forum. This emphasis is likewise misplaced. . . . The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.

Respondents' claimed injury does not evince a connection between petitioner and Nevada. Even if we consider the continuation of the seizure in Georgia to be a distinct injury, it is not the sort of effect that is tethered to Nevada in any meaningful way. Respondents (and only respondents) lacked access to their funds in Nevada not because anything independently occurred there, but because Nevada is where respondents chose to be at a time when they desired to use the funds seized by petitioner. Respondents would have experienced this same lack of access in California, Mississippi, or wherever else they might have traveled and found themselves wanting more money than they had. . . . [T]he effects of petitioner's conduct on respondents are not connected to the forum State in a way that makes those effects a proper basis for jurisdiction

<u>Walden</u>, 134 S. Ct. at 1125.

The Seventh Circuit has explained that "after Walden there can be no doubt that 'the plaintiff cannot be the only link between the defendant and the forum.' Any decision that implies otherwise can no longer be considered authoritative." <u>Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.</u>, 751 F.3d 796, 802 (7th Cir. 2014) (quoting <u>Walden</u>, 134 S. Ct. at 1122).

8

**SA0067**

Advanced Tactical is the only federal appellate decision we find that addresses Walden in the context of virtual contacts.  The Seventh Circuit, by a unanimous panel, held that defendant's sending of two allegedly misleading emails to a list of subscribers that included Indiana residents did not subject defendant to jurisdiction in Indiana (751 F.3d at 802):

> Such a relation would be entirely fortuitous, depending wholly on activities out of the defendant's control.  As a practical matter, email does not exist in any location at all; it bounces from one server to another, it starts wherever the account-holder is sitting when she clicks the "send" button, and it winds up wherever the recipient happens to be at that instant.  The connection between the place where an email is opened and a lawsuit is entirely fortuitous.  We note as well that it is exceedingly common in today's world for a company to allow consumers to sign up for an email list.  We are not prepared to hold that this alone demonstrates that a defendant made a substantial connection to each state (or country) associated with those persons' "snail mail" addresses.  It may be different if there were evidence that a defendant in some way targeted residents of a specific state, perhaps through geographically-restricted online ads.  But in such a case the focus would not be on the users who signed up, but instead on the deliberate actions by the defendant to target or direct itself toward the forum state.

Advanced Tactical, 751 F.3d at 803 (citations omiited).

Here, CheckPoint's computer being used in New York was solely the doing of plaintiff and his partner, and from CheckPoint's perspective fortuitous.  CheckPoint's Kaseya monitor initially reported the misappropriated computer being used at an IP address of "192.168.1.3" and later other IP addresses.  Only through a Google search of this virtual address, along with monitoring the computer's other activity, did information come to CheckPoint's attention that the computer was suspected of being in New York (Laptop Aff. at 3-4).  Similar to the email addresses in Advanced Tactical, the IP addresses were associated with New York solely due to the use by plaintiff and/or his estranged wife.  The connection to New York is even less so than the connection to Indiana in Advanced Tactcal.  While the defendant there arguably could have associated the email addresses with the state beforehand, that cannot be said of CheckPoint,

**SA0068**

which had no idea beforehand of where its computer was, nor any reason to know, nor any connection with plaintiff or his estranged wife other than their having ended up with its misappropriated computer.

CheckPoint's connection to the forum arises solely out of the unilateral activities of plaintiff and/or his estranged wife.  Under <u>Walden</u>, this is insufficient a basis to subject CheckPoint to jurisdiction in New York.

## **<u>CONCLUSION</u>**

The case should be dismissed as against CheckPoint for lack of personal jurisdiction.

Dated:  New York, New York
          October 9, 2017

By: _____/s_____
        Brian D. Graifman
        BORAH, GOLDSTEIN, ALTSCHULER,
        NAHINS & GOIDEL, P.C.
        377 Broadway
        New York, New York 10013
        (212) 431-1300
        bgraifman@borahgoldstein.com
        *Attorneys for Defendant CheckPoint*
        *Fluidic Systems International, Ltd.*

10

**SA0069**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

TYRONE HOLMES,

                  Plaintiff,

    - against -

APPLE, INC., AMAZON.COM, LLC, and
CHECKPOINT FLUIDIC SYSTEMS
INTERNATIONAL, LTD.,

                Defendants.

------------------------------------------------------- x

:   Case No. 17-cv-4557 (ER) (KNF)

:   **NOTICE OF MOTION**
:   **<u>FOR ENTRY OF JUDGMENT</u>**

     **TO:**

        Tyrone Holmes
        1465 Hammersley Avenue
        Bronx, NY 10469

        Apple, Inc.
        1 Infinite Loop
        Cupertino, CA 95014

        Checkpoint Fluidic Systems International, LTD.
        21356 Marion Lane
        Mandeville, LA 70471

    **PLEASE TAKE NOTICE** that the undersigned attorneys for the defendant

Amazon.com, LLC ("Amazon") will apply before the Honorable Judge Edgardo Ramos of the

Southern District of New York at Courtroom 619, 40 Foley Square, New York, New York, on a

date to be determined by the Court, for an Order (i) pursuant to Rule 68 of the Federal Rules of

Civil Procedure entering judgment against Amazon and in favor of the plaintiff *pro se* Tyrone

Holmes in the amount of $2,351.12, and, upon entry of said judgment, dismissing the First Cause

of Action asserted against Amazon as moot; (ii) pursuant to Rule 12(c) on the remaining Causes

of Action for failure to state a claim upon which relief may be granted; or, in the alternative, (iii)

pursuant to Rule 56 on all claims asserted against Amazon.  In support of this motion, Amazon

relies upon the accompanying Memorandum of Law, Declaration of Michael J. Goettig and attached Exhibits, Declaration of Jesse Jensen and attached Exhibits, and all other papers and proceedings heretofore had herein.

## Notice to Pro Se Litigant Who Opposes a Rule 12 Motion Supported by Matters Outside the Pleadings

The defendant in this case has moved to dismiss or for judgment on the pleadings pursuant to Rule 12(b) or 12(c) of the Federal Rules of Civil Procedure, and has submitted additional written materials. This means that the defendant has asked the Court to decide this case without a trial, based on these written materials. You are warned that the Court may treat this motion as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. For this reason, THE CLAIMS YOU ASSERT IN YOUR COMPLAINT MAY BE DISMISSED WITHOUT A TRIAL IF YOU DO NOT RESPOND TO THIS MOTION ON TIME by filing sworn affidavits as required by Rule 56(c) and/or other documents. The full text of Rule 56 of the Federal Rules of Civil Procedure is attached.

In short, Rule 56 provides that you may NOT oppose the defendant's motion simply by relying upon the allegations in your complaint. Rather, you must submit evidence, such as witness statements or documents, countering the facts asserted by the defendant and raising specific facts that support your claim. If you have proof of your claim, now is the time to submit it. Any witness statements must be in the form of affidavits. An affidavit is a sworn statement of fact based on personal knowledge stating facts that would be admissible in evidence at trial. You may submit your own affidavit and/or the affidavits of others. You may submit affidavits that were prepared specifically in response to defendant's motion.

If you do not respond to the motion on time with affidavits and/or documents contradicting the facts asserted by the defendant, the Court may accept defendant's facts as true. Your case may be dismissed and judgment may be entered in defendant's favor without a trial.

If you have any questions, you may direct them to the Pro Se Office.

Dated: New York, New York
       February 12, 2018

                                    Respectfully submitted,

                                    DAVIS WRIGHT TREMAINE LLP

                                    By: /s/ Michael J. Goettig
                                        Michael J. Goettig

                                        *Attorneys for Defendant*
                                        *Amazon.com, LLC*
                                    1251 Avenue of the Americas, 21st Floor
                                    New York, New York 10020
                                    (212) 489-8230

4823-8014-1402v.1 0051461-001311

**SA0072**

## Rule 56. Summary Judgment

(a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

(b) Time to File a Motion. Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.

(c) Procedures.

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

(4) *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

(d) When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

(e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or

(4) issue any other appropriate order.

(f) Judgment Independent of the Motion. After giving notice and a reasonable time to respond, the court may:

(1) grant summary judgment for a nonmovant;

(2) grant the motion on grounds not raised by a party; or

(3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

(g) Failing to Grant All the Requested Relief. If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case.

(h) Affidavit or Declaration Submitted in Bad Faith. If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court — after notice and a reasonable time to respond — may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

-------------------------------------------------------------x

TYRONE HOLMES,

                Plaintiff,

       - against -

APPLE, INC., AMAZON.COM, LLC, and
CHECKPOINT FLUIDIC SYSTEMS
INTERNATIONAL, LTD.,

             Defendants.

-------------------------------------------------------------x

Case No. 17-cv-4557 (ER) (KNF)


# MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT AMAZON.COM, LLC'S
## MOTION FOR ENTRY OF JUDGMENT
## <u>AND TO DISMISS THE COMPLAINT</u>

Michael J. Goettig
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21tst Floor
New York, New York 10020
(212) 489-8230

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 2

    A.    Allegations in the Complaint ............................................................... 2

    B.    The Parties' Agreement ...................................................................... 4

    C.    The Offer of Judgment and Deposit of Funds .................................... 6

    D.    Additional Facts ................................................................................. 7

            1.    The CheckPoint Laptop and the New Laptop ................................... 7

            2.    The NYPD's Recovery of the CheckPoint Laptop from Ms. Scott ................................................................................................. 8

ARGUMENT ......................................................................................................... 10

    A.    The Offer of Judgment Provides Plaintiff with Complete Relief Under the Contract ................................................................................ 10

            1.    At Most, Plaintiff is Entitled to a Refund of the Purchase Price. .... 11

            2.    The Court Should Enter Judgment Pursuant to the Terms of the Offer .................................................................................................. 14

    B.    The Remaining Causes of Action Fail to State Claims Upon Which Relief May Be Granted .................................................................................. 16

            1.    The Second and Third Causes of Action Must Be Dismissed ......... 17

            2.    The Fourth and Fifth Causes of Action Must Be Dismissed. .......... 19

            3.    The Sixth, Seventh and Eighth Causes of Action Sounding in Fraud Must Be Dismissed ................................................................. 21

    C.    Evidence Before the Court Compels Dismissal ................................ 22

CONCLUSION ...................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009) .......................................................17

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986) .........................................................23

*Architectural Aluminum Corp. v. Macarr, Inc.,*
 70 Misc. 2d 495 (Sup. Ct. N.Y. Cty. 1972) ...........................................................................19

*Bank v. Caribbean Cruise Line, Inc.,*
 606 F. App'x 30 (2d Cir. 2015) .............................................................................................15

*Bingham v. Blair LLC,*
 No. 10-5005, 2010 WL 1608881 (W.D. Wash. Apr. 19, 2010) ...............................................20

*Cabala v. Crowley,*
 736 F.3d 226 (2d Cir. 2013) ..................................................................................................15

*Campbell-Ewald Co. v. Gomez,*
 136 S.Ct. 663 (2016) .........................................................................................................1, 16

*Chambers v. Time Warner, Inc.,*
 282 F.3d 147 (2d Cir. 2002) ..................................................................................................17

*Clark-Fitzpatrick v. Long Isand R.R.,*
 70 N.Y.2d 382 (N.Y. 1987) ..................................................................................................20

*Contemporary Mission, Inc. v. U.S. Postal Serv.,*
 648 F.2d 97 (2d Cir. 1981) ....................................................................................................23

*Corwin v. NYC Bike Share, LLC,*
 238 F. Supp. 3d 475 (S.D.N.Y. 2017) ), *vacated in part*, 2017 WL 4075213
 (S.D.N.Y. Mar. 13, 2017) .....................................................................................................12

*Ekin v. Amazon Servs., LLC,*
 84 F. Supp. 3d 1172 (W.D. Wash. 2014) ...............................................................................12

*Filanto, SpA v. Chilewich Intern. Corp.,*
 789 F. Supp. 1229 (S.D.N.Y. 1992) .......................................................................................11

*Fincher v. County of Westchester,*
 979 F. Supp. 989 (S.D.N.Y. 1997) ........................................................................................24

ii

*Franco v. Allied Interstate LLC*,
No. 13-CV-4053 2015 WL 7758534 (S.D.N.Y. Nov. 30, 2015)...........................................16

*Geismann v. ZocDoc, Inc.*,
268 F. Supp. 3d 599 (S.D.N.Y. 2017)......................................................................15

*Global Network Commc'ns v. City of N.Y.*,
458 F.3d 150 (2d Cir. 2006)..................................................................................11

*Hayden v. Paterson*,
594 F.3d 150 (2d Cir. 2010)............................................................................16, 17

*Hepler v. Abercrombie & Fitch Co.*,
607 F. App'x 91 (2d Cir. 2015) .....................................................................1, 2, 15

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004).....................................................................11

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
62 F.3d 69 (2d Cir. 1995)......................................................................................17

*LeRoux, Inc. v. Burns*,
4 Wash. App. 165 (Wash. Ct. App. 1971) ..............................................................13

*Leyse v. Lifetime Entm't Servs.*,
171 F. Supp. 3d 153 (S.D.N.Y. 2016), *aff'd*, 679 F. App'x 44 (2d Cir. 2017)..................14, 16

*M.A. Mortenson Co. v. Timberline Software Corp.*,
140 Wash. 2d 564 (Sup. Ct. Wash. 2000)..............................................................19

*Maximo v. 140 Green Laundromat*,
No. 14 Civ. 6948, 2015 WL 4095248 (S.D.N.Y. July 7, 2015) ............................16

*McInnis & Co. v. W. Tractor Equip.Co.*,
63 Wash. 2d 652 (Sup. Ct. Wash. 1964).................................................................19

*McNally Wellman Co. v. N.Y.S. Elec. & Gas Corp.*,
63 F. 3d 1188 (2d Cir. 1995)..................................................................................13

*Meyer v. Uber Techs., Inc.*,
868 F. 3d 66 (2d Cir. 2017)....................................................................................12

*Peters v. Amazon Servs., LLC*,
2 F. Supp. 3d 1165 (W.D. Wash. 2013), *aff'd*, 669 F. App'x 487 (9th Cir.
2016) ..................................................................................................................12

*Rapoport v. Asia Elecs. Holding Co.*,
88 F. Supp. 2d 179 (S.D.N.Y. 2000)......................................................................11

iii

*RLS Assocs., LLC v. United Bank of Kuwait PLC*,
  464 F. Supp. 2d 206 (S.D.N.Y. 2006)..................................................................14

*Robinson v. Reed-Prentice*,
  49 N.Y. 2d 471 (N.Y 1980) ...............................................................................21

*Roth v. Jennings*,
  489 F. 3d 499 (2d Cir. 2007)..........................................................................21-22

*Seneca Beverage Corp. v. Healthnow N.Y., Inc.*,
  200 F. App'x 25 (2d Cir. 2006) ..........................................................................23

*Tanasi v. New Alliance Bank*,
  786 F.3d 195 (2d Cir. 2015).........................................................................14, 15

*Tennenbaum Capital Partners LLC v. Kennedy*,
  No. 07 Civ. 9695, 2009 WL 2913679 (S.D.N.Y. Sept. 11, 2009), *aff'd*, 372 F.
  App'x 180 (2d Cir. 2010)....................................................................................25

**Statutes**

N.Y. U.C.C. § 2-316(3)(a) ......................................................................................18

N.Y. U.C.C. § 2-719(1)...........................................................................................13

Wash. Rev. Code § 7.72.010(4) ........................................................................19, 20

Wash. Rev. Code § 62A.2-101, *et seq.* ...................................................................13

Wash. Rev. Code § 62A.2-719(1)...........................................................................13

Wash. Rev. Code § 62A.2-316(3)(a) ......................................................................18

**Other Authorities**

Fed. R. Civ. P. 9(b) .................................................................................................21

Fed. R. Civ. P. 12(c) ...........................................................................................2, 17

Fed. R. Civ. P. 12(b)(6).................................................................................16, 21-22

Fed. R. Civ. P. 56(a) ...............................................................................................23

Fed. R. Evid. 801(d)(2)(A) .....................................................................................24

iv

Defendant Amazon.com, LLC ("Amazon") respectfully submits this memorandum of law in support of its motion for entry of judgment against Amazon and in favor of plaintiff Tyrone Holmes ("Mr. Holmes" or "Plaintiff") in the amount of $2,351.12 and, upon entry of said judgment, dismissal of all claims in the Complaint asserted against Amazon as either moot or failing to state a claim upon which relief may be granted.  In the alternative, Amazon seeks entry of summary judgment in its favor on all claims asserted by Plaintiff as to Amazon.

## PRELIMINARY STATEMENT

This lawsuit concerns a laptop computer that the New York Police Department recovered from Plaintiff's estranged wife.  According to the allegations in the Complaint, that computer was delivered to Plaintiff by Amazon.  While Amazon disputes the provenance of the laptop that was recovered from Plaintiff's estranged wife, it has offered to reimburse Plaintiff the full price of the transaction in question.  Plaintiff has refused to "take 'yes' for an answer," thereby prompting this motion.  *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 683 (2016).

Amazon has served and Plaintiff has refused an offer of judgment in the amount of $2,351.12 under Federal Rule of Civil Procedure 68 ("Rule 68").  As a matter of law, this amount – which is equal to the purchase price of the computer and service plan at issue in this dispute – is the most that Plaintiff could recover in this lawsuit on his First Cause of Action sounding in breach of contract if he prevailed at trial.  Under established Second Circuit precedent, when an offer of judgment under Rule 68 provides for the complete relief to which a plaintiff is entitled in a lawsuit, the appropriate course of action is for the district court to enter judgment consistent with that offer, "with or without the plaintiff's consent."  *Hepler v. Abercrombie & Fitch Co.*, 607 F. App'x 91, 92 (2d Cir. 2015) (summary order).[1]  Thereafter, as

---

[1] Summary orders, unpublished decisions and docket entries cited herein are attached as exhibits to the accompanying Declaration of Michael Goettig ("Goettig Decl.").

1

Plaintiff will have attained the full recovery to which he could be entitled, there is no longer a live case or controversy between the parties. *See id.*

Plaintiff's various attempts to assert alternative causes of action sounding in breach of express and implied warranty (Second and Third Causes of Action), negligence, strict liability (Fourth and Fifth Causes of Action), and fraud and false advertising (Sixth through Eighth Causes of Action) either are contradicted by the agreement between the parties or fail to state a claim upon which relief may be granted and should be dismissed pursuant to Rule 12(c).

Out of an abundance of caution, Amazon further submits on this motion that no reasonable jury could find in Plaintiff's favor, and accordingly, in the event that any of Plaintiff's various causes of action withstand Amazon's motion for judgment pursuant to Rule 68 or on the pleadings, the Court should enter summary judgment in Amazon's favor under Rule 56 of the Federal Rules of Civil procedure.

## **BACKGROUND**

**A.    Allegations in the Complaint**

On or about June 22, 2016, Plaintiff purchased through Amazon's online services a new Macbook Pro laptop (the "New Laptop").  (Docket Doc. No. 1 ("Compl.") ¶ 21.)  Documentation submitted with the Complaint does not indicate the serial number of the New Laptop.  (Compl., Exhibit A.)  The New Laptop was delivered to Plaintiff's residence on June 23, 2016.  (Compl. ¶ 33.)

The Complaint further alleges that on or around September 9, 2016, Detective Rodrigo Caballero of the New York City Police Department Central Investigations Division ("Detective Caballero") contacted Plaintiff in an attempt to recover a Macbook Pro laptop (the "CheckPoint Laptop") that was the property of defendant CheckPoint Fluidic Systems International, Ltd. ("CheckPoint").  (Compl. ¶¶ 34-36.)  CheckPoint was able to locate the CheckPoint Laptop

2

through the use of software that it had installed on the device. (Compl. ¶¶ 44, 76.) According to the Complaint, on or around September 10, 2016, "Plaintiff informed Detective Caballero that he was not in possession of the computer because he had given it to his estranged wife, whose whereabouts were unknown to him." (Compl. ¶ 38.)

The Complaint alleges that from September 12, 2016, to September 21, 2016, "Plaintiff *attempted to* communicate with his estranged wife via phone and e-mail to facilitate the return of the computer" (Compl. ¶ 49, emphasis added), but nothing in the Complaint suggests that those attempts were successful. On September 22, 2016, Plaintiff told Detective Caballero that he would "attempt to make further efforts to locate his estranged wife and persuade her to return the device," and hired a private investigator that same day to locate her. (Compl. ¶¶ 53-54.) On September 27, 2016, Plaintiff's counsel explained to Detective Caballero that Plaintiff "was attempting to negotiate the return of the subject device by transporting his wife's sister up from Atlantic City, NJ to visit his wife on October 1, 2016 and persuade her to return the computer." (Compl. ¶ 56.)

The Complaint alleges "upon information and belief" that "on or about October 2, 2016, Plaintiff's wife's sister informed Plaintiff's counsel that after meeting with [P]laintiff's wife, Plaintiff's wife's sister confirmed that the subject device was in a storage unit controlled by Plaintiff's wife, but that she … refused to cooperate in the item's return." (Compl. ¶ 58.)

The Complaint further alleges "upon information and belief" that on October 3, 2016, the CheckPoint Laptop was ultimately recovered from a storage facility located at 626 West 28th Street, in New York. (Compl. ¶ 62.) According to the Complaint, Plaintiff was not present during that recovery. There is nothing in the Complaint to indicate that Plaintiff ever discussed with his estranged wife how the CheckPoint Laptop came to be in her possession – or that

3

Plaintiff ever saw the laptop that was recovered from the storage facility.  On the contrary, the
Complaint identifies only four people who were present at the storage facility when the
CheckPoint Laptop was recovered: Plaintiff's estranged wife, Plaintiff's attorney, Detective
Caballero, and Detective Caballero's partner.  (*Id.*)

 The Complaint alleges that this experience caused Plaintiff to miss "critical employment
opportunities" and rendered him "unable to fulfill many contractual obligations and
responsibilities."  (Compl. ¶ 66.)  On these grounds, the Complaint purports to assert eight
causes of action against Amazon: breach of contract (First Cause of Action), breach of express
and implied warranty (Second and Third Causes of Action), negligence (Fourth Cause of
Action), strict liability (Fifth Cause of Action), fraudulent concealment (Sixth Cause of Action),
fraud in the inducement and misrepresentation (Seventh Cause of Action) and false advertising
and unfair business practices (Eighth Cause of Action).

**B.** **The Parties' Agreement**

 Plaintiff created an Amazon account on January 26, 2010.  (Declaration of Jesse Jensen
("Jensen Decl."), ¶ 2.)  When he did so, he accepted the Conditions of Use (the "COUs") on
Amazon's account registration page.  *Id.*, Exhibit A.  Plaintiff also agreed to the COUs each time
he purchased an item from Amazon, including on June 22, 2016, when he purchased the New
Laptop.  *Id.*, ¶ 5.  Amazon's COUs have contained, among other things, a limitation of liability
and waiver of express and implied warranties since before January 2010.  *Id.*, ¶ 3, Exhibits B-C.

 Plaintiff purchased the New Laptop by placing it in Amazon's online Shopping Cart and
proceeding through Amazon's standard checkout page.  *Id.*, ¶ 5, Exhibit D.  In order to "check
out" and complete his purchase of the New Laptop, Plaintiff clicked on a "Place your order"
button accompanied by text explaining that "By placing your order, you agree to Amazon.com's
privacy notice and conditions of use."  *Id.*, at ¶¶ 5-6, Exhibit E.  The blue text denotes hyperlinks

<div align="center">4</div>

to the full contract terms. Plaintiff could not have placed the order for the New Laptop through Amazon's standard checkout page without affirmatively clicking on this button. Plaintiff could have canceled his purchase if he did not wish to accept the COUs or the limitation of liability and waiver of warranties contained therein, but he elected not to. *Id.*

When Plaintiff purchased the New Laptop, he expressly agreed and acknowledged that "Amazon does not warrant that product descriptions or other content of any Amazon Service is accurate, complete, reliable, current, or error-free." *Id.* Exhibit B, at "Product Descriptions." He also agreed that "If a product offered by Amazon itself is not as described, [Plaintiff's] sole remedy is to return it in unused condition." *Id.* However, "[a]t Amazon's discretion, a refund may be issued without requiring a return." *Id.*, at "Returns, Refunds and Title."

By using Amazon's online services to purchase the New Laptop, Plaintiff also agreed to Amazon's express disclaimer of warranties and limitation of liability in the COUs, which read in relevant part as follows:

> THE AMAZON SERVICES AND ALL INFORMATION, CONTENT, MATERIALS, PRODUCTS (INCLUDING SOFTWARE) AND OTHER SERVICES INCLUDED ON OR OTHERWISE MADE AVAILABLE TO YOU THROUGH THE AMAZON SERVICES ARE PROVIDED BY AMAZON ON AN "AS IS" AND "AS AVAILABLE" BASIS, UNLESS OTHERWISE SPECIFIED IN WRITING. AMAZON MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, AS TO THE OPERATION OF THE AMAZON SERVICES, OR THE INFORMATION, CONTENT, MATERIALS, PRODUCTS (INCLUDING SOFTWARE) OR OTHER SERVICES INCLUDED ON OR OTHERWISE MADE AVAILABLE TO YOU THROUGH THE AMAZON SERVICES, UNLESS OTHERWISE SPECIFIED IN WRITING. YOU EXPRESSLY AGREE THAT YOUR USE OF THE AMAZON SERVICES IS AT YOUR SOLE RISK.
>
> TO THE FULL EXTENT PERMISSIBLE BY APPLICABLE LAW, AMAZON DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND

5

> FITNESS FOR A PARTICULAR PURPOSE. AMAZON DOES
> NOT WARRANT THAT THE AMAZON SERVICES,
> INFORMATION, CONTENT, MATERIALS, PRODUCTS
> (INCLUDING SOFTWARE) OR OTHER SERVICES
> INCLUDED ON OR OTHERWISE MADE AVAILABLE TO
> YOU THROUGH THE AMAZON SERVICES, AMAZON'S
> SERVERS OR ELECTRONIC COMMUNICATIONS SENT
> FROM AMAZON ARE FREE OF VIRUSES OR OTHER
> HARMFUL COMPONENTS. AMAZON WILL NOT BE
> LIABLE FOR ANY DAMAGES OF ANY KIND ARISING
> FROM THE USE OF ANY AMAZON SERVICE, OR FROM
> ANY INFORMATION, CONTENT, MATERIALS, PRODUCTS
> (INCLUDING SOFTWARE) OR OTHER SERVICES
> INCLUDED ON OR OTHERWISE MADE AVAILABLE TO
> YOU THROUGH ANY AMAZON SERVICE, INCLUDING,
> BUT NOT LIMITED TO DIRECT, INDIRECT, INCIDENTAL,
> PUNITIVE, AND CONSEQUENTIAL DAMAGES, UNLESS
> OTHERWISE SPECIFIED IN WRITING.

Jensen Decl., Exhibit B (capital letters in original).

**C.      The Offer of Judgment and Deposit of Funds**

On December 29, 2017, Amazon tendered to Plaintiff an offer of judgment pursuant to

Rule 68 in the full amount of the price of the items he purchased through Amazon on June 22,

2016 (the "Offer of Judgment"). *See* Goettig Decl., Exhibit A (offer of judgment and

accompanying cover letter). Later that day, Plaintiff notified Amazon that its offer was "hear-by

[*sic*] rejected." *Id.*, Exhibit B.

On Friday, January 12, 2018, the Court entered an Order granting Amazon leave to

deposit with the Clerk of the United States District Court for the Southern District of New York

(the "Clerk") funds in the amount of $2,351.12 (Docket Doc. No. 83). This is the amount that

Plaintiff paid for the New Laptop and accompanying Apple Care service plan. (Compl., Exhibit

A.) On January 16, 2018, Amazon deposited funds in that amount with the Clerk. (Goettig

Decl., Exhibit C.)

6

**SA0085**

**D.      Additional Facts[2]**

**1.      The CheckPoint Laptop and the New Laptop**

CheckPoint purchased the CheckPoint Laptop from Amazon on June 2, 2016.  (Affidavit of Ruston Mahoney[3] ("Mahoney Affidavit"), page 1 of 5, Exhibit A.)  The CheckPoint Laptop was among a batch of new Mackbook Pro computers that Amazon sourced directly from the manufacturer, Apple.  (Jensen Decl., ¶ 10.)  The CheckPoint Laptop was packaged for delivery from Amazon's fulfillment center in Breinigsville, Pennsylvania and delivered to CheckPoint on or around June 7, 2016.  (Jensen Decl., ¶ 11, Mahoney Affidavit, Exhibit A.)  Upon receipt, CheckPoint's Information Technology Officer Ruston Mahoney ("Mr. Mahoney") designated the name of the CheckPoint Laptop as "Ewens-MBP.home," attached a sticker with a bar code indicating that it was the "Property of CheckPoint Pumps" to the bottom of the CheckPoint Laptop, and installed, among other things, "Kaseya" tracking software on the CheckPoint Laptop.  (Mahoney Affidavit, page 2 of 5, Exhibit B.)  CheckPoint then tendered the CheckPoint Laptop to FedEx for delivery to Dubai, UAE.  (*Id.*, page 2 of 5, Exhibit C.)  The device subsequently became lost in transit.  Mr. Mahoney filed a report reflecting that fact with FedEx on June 15, 2016.  (*Id.*, page 3 of 5.)

On June 22, 2016, Plaintiff purchased the New Laptop from Amazon.  (Compl. ¶ 21.)  The New Laptop was among a batch of new Macbook Pro computers that Amazon sourced directly from the manufacturer, co-defendant Apple.  (Jensen Decl., ¶ 7.)  The New Laptop was

---

[2] The arguments set forth in Sections A and B of the "Argument" portion below do not rely on any of these additional facts, and the Court may enter judgment without considering them.  They are submitted only in the event that the Court deems it necessary to consider the arguments set forth in Section C of the "Argument."

[3] CheckPoint submitted the Mahoney Affidavit in connection with its motion to dismiss on the grounds of personal jurisdiction.  For the Court's ease of reference, a copy of the Mahoney Affidavit and exhibits relevant to this motion are filed simultaneously herewith.

packaged for delivery to Plaintiff from its fulfillment center in Lewisberry, Pennsylvania. (*Id.*,

¶ 8.)  The New Laptop was delivered via UPS to Plaintiff at 9:35 AM on June 23, 2016.  Plaintiff

provided his signature as acknowledgment of delivery of the New Laptop at that time.  (*Id.*, ¶ 9,

Exhibit F.)  When Plaintiff received it, the New Laptop was shrink-wrapped and in new

condition.  (Transcript of September 14, 2017 Court Conference ("9.14.17 Tr."), at 3:19-3:22

(Goettig Decl., Exhibit D).)  Plaintiff also confirmed that "The computer [Plaintiff] had did not

have a sticker on it…. There was no sticker on the bottom of the computer [Plaintiff] had from

Apple." (Transcript of January 12, 2018 Court Conference ("1.12.18 Tr."), at 5:13, 17-18

(Goettig Decl. Exhibit E); see also 9.14.17 Tr., at 8-9.)

    Shortly after receiving the New Laptop, Plaintiff gave it to his estranged wife, Ms.

Stephanie Scott.  (9.14.17 Tr., at 5:9-16 ("I gave [the New Laptop] to my estranged wife….

That's the reason I bought it.").)

    At 6:30 PM on June 23, 2016, Mr. Mahoney learned through the Kaseya software that

Ms. Scott had created a user profile in her own name on the CheckPoint Laptop and was, at that

moment, using the device.  (Mahoney Affidavit, page 3 of 5, Exhibit E.)  He subsequently

provided additional information about Ms. Scott and the location of the CheckPoint Laptop

obtained from the Kaseya software to Mr. Kenneth Meyer, a loss prevention specialist with

FedEx.  (Mahoney Affidavit, page 4 of 5, Exhibit F.)  Mr. Meyer, in turn, filed a police report

with the Kenner, Louisiana, police department on August 2, 2016.  The police report identified

Ms. Scott as "the person in possession of the computer." *Id.*

### 2.    The NYPD's Recovery of the CheckPoint Laptop from Ms. Scott

    On or around August 16, 2016, the Kenner, Louisiana, Police Department contacted the

New York Police Department for its assistance in recovering the CheckPoint Laptop.  (Mahoney

Affidavit, page 4 of 5.)  Shortly thereafter, on or around September 8, 2016, Detective Caballero

visited Plaintiff's residence in an attempt to recover the CheckPoint Laptop.  (Compl., ¶¶ 34-35.)

On or around September 10, 2016, "Plaintiff informed Detective Caballero that he was not in

possession of the computer because he had given it to his estranged wife, whose whereabouts

were unknown to him."  (Compl. ¶ 38.)

Three days later, on September 13, 2016, Plaintiff's counsel sent a letter to CheckPoint

stating – erroneously – that Plaintiff had purchased the CheckPoint Laptop from the Apple Store

located at 1981 Broadway on the Upper West Side of Manhattan.  (Affidavit of Andrew C.

Elliott[4] ("Elliott Affidavit"), page 3, Exhibit C.)  In support of this claim, Plaintiff's counsel

submitted a cashier's receipt reflecting the purchase of a Macbook from the Apple Store on the

Upper West Side on June 5, 2016.  *Id.*  The CheckPoint Laptop is a 15-inch Macbook Pro, but

the computer that Plaintiff purchased on June 5, 2016 was a 13-inch Macbook Air.  (*Id.*; *see also*

Exhibit B.)  By Plaintiff's own estimate, he has owned more than 234 Macintosh computers.

(Docket #82, Goettig Decl., Exhibit F.)

It appears from the allegations in the Complaint and Plaintiff's various submissions to the

Court that as of September 9 he was no longer in direct communications with his wife, Ms. Scott,

the person to whom he had given the New Laptop and who was in possession of the CheckPoint

Laptop.  Rather, it appears that the only individuals who communicated with Ms. Scott directly

concerning the CheckPoint Laptop were Ms. Scott's sister (Compl. ¶¶ 58-59), Plaintiff's counsel,

and members of the NYPD (*Id.*, at ¶¶ 61-62).  As noted above, Plaintiff was *not* at the storage

facility at the time the CheckPoint Laptop was recovered on October 3, 2016, and he did not

have an opportunity to inspect the CheckPoint Laptop before it was returned to CheckPoint.

---

[4] CheckPoint submitted the Elliott Affidavit in connection with its motion to set aside its default
(Docket #38).  For the Court's ease of reference, a copy of the Elliott Affidavit, with exhibits
referenced herein, are filed simultaneously herewith.

9

(1.12.18 Tr., at 5:21-25 (Court: "I thought that the computer that was seized, if you will, by the NYPD at the warehouse facility did have a sticker on it."  Plaintiff: "I don't know.  I wasn't there.  I wasn't there.").)

The CheckPoint Laptop was returned to CheckPoint on October 17, 2016.  Mr. Mahony conducted a visual inspection of the CheckPoint Laptop upon its return and confirmed that the sticker indicating that it was "Property of CheckPoint Pumps" was still affixed to the bottom of the device.  (Mahony Aff., p. 4 of 5, Exhibits G-H.)

Plaintiff has recently acknowledged that he may have once again been mistaken about the provenance of the CheckPoint Laptop, and that it is possible that the CheckPoint Laptop was *not* the New Laptop that was delivered to his home on June 23, 2016.  In his January 5, 2018, correspondence to the Court, Plaintiff stated, "At this time, there could be two Apple computers involved – one that I bought and one that CheckPoint bought."  (Docket #81, Goettig Decl., Exhibit G.)  Amazon respectfully submits that these facts conclusively demonstrate that Plaintiff is mistaken in his conclusion that he purchased the CheckPoint Laptop from Amazon.

## ARGUMENT

### A.   The Offer of Judgment Provides Plaintiff with Complete Relief Under the Contract

Plaintiff's case is premised upon the mistaken presumption that the New Laptop and the CheckPoint Laptop are one and the same.  Nevertheless, rather than incur the expense and inconvenience attendant to disproving that presumption through discovery, Amazon has offered to Plaintiff the full amount available to him under the terms of the very contract that Plaintiff claims was breached by Amazon in the First Cause of Action.  This Offer of Judgment of $2,351.12 provides the full amount of relief to which Plaintiff may be entitled on this claim.

10

**SA0089**

1.      **At Most, Plaintiff is Entitled to a Refund of the Purchase Price.**

Amazon disputes that Plaintiff is entitled to *any* relief because 1) under the COUs,

Plaintiff was required to return the New Laptop in order to receive a refund, which he has failed

to do; and 2) the CheckPoint Laptop which was recovered by Detective Caballero is not the New

Laptop that was delivered to Plaintiff's home.  Be that as it may, and affording Plaintiff all

reasonable inferences on this motion, it remains the case that under the agreement between the

parties, the most that Plaintiff may recover in this action is the purchase price of the property in

question.

On this motion, "[t]he court need not accept as true an allegation that is contradicted by

documents on which the complaint relies." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp.

2d 549, 555 (S.D.N.Y.2004); *see also Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179,

184 (S.D.N.Y. 2000) ("if these documents contradict the allegations of the … complaint, the

documents control").  This ensures that Plaintiff may not avoid entry of judgment on his various

claims through artful pleading.

> In most instances where this exception [to the rule that a reviewing
> court is limited to the pleadings on a motion to dismiss] is
> recognized, the incorporated material is a contract or other legal
> document containing obligations upon which the plaintiff's
> complaint stands or falls, but which for some reason — usually
> because the document, read in its entirety, would undermine the
> legitimacy of the plaintiff's claim — was not attached to the
> complaint.

*Global Network Commc'ns v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006).  In other words,

Plaintiff "cannot have it both ways… [he] cannot [rely] on the contract, when it works to [his]

advantage, and repudiate it when it works to [his] disadvantage." *Filanto, SpA v. Chilewich*

*Intern. Corp.*, 789 F. Supp. 1229, 1240 (S.D.N.Y. 1992), quoting *Tepper Realty Co., v. Mosaic*

*Tile Co.*, 259 F. Supp. 688, 692 (S.D.N.Y. 1966).

11

**SA0090**

When Plaintiff created an Amazon customer account in January 2010, he accepted the COUs on Amazon's account registration page. On June 22, 2016, when Plaintiff purchased the New Laptop, he once again accepted the COUs on Amazon's checkout page. Plaintiff could not have created his account or purchased that item through Amazon's standard checkout page without having done so. In light of the fact that Plaintiff has asserted a claim that Amazon breached the contract that was formed by Plaintiff's unequivocal acceptance of Amazon's COUs, the Court should not entertain any argument by Plaintiff that he was somehow unaware of those terms, or that they are unenforceable as applied to this dispute.

Under Washington law,[5] contracts formed in Internet transactions, in which parties must click a button indicating they agree to the contract terms, are enforceable like any other contract. *Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172, 1175 n.5 (W.D. Wash. 2014) (recognizing the validity of Amazon's clickwrap agreement); *Peters v. Amazon Servs., LLC*, 2 F. Supp. 3d 1165, 1170 (W.D. Wash. 2013) *aff'd,*669 F. App'x 487 (9th Cir. 2016) (applying Washington law, enforcing Amazon clickwrap for sellers). Courts in this Circuit are in accord. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77 (2d Cir. 2017) (the terms of a clickwrap agreement are binding on the user where notice of the terms is reasonably conspicuous and the user's manifestation of assent to those terms is clear and unambiguous); *Corwin v. NYC Bike Share, LLC*, 238 F. Supp. 3d 475, 487, *et seq.* (S.D.N.Y. 2017), *vacated in parts not relevant here*, 2017 WL 4075213 (S.D.N.Y. Mar. 13, 2017) (enforcing terms of clickwrap agreement).

---

[5] In relevant part, the COUs contain a provision calling for the application of "applicable federal law, and the laws of the state of Washington" to "any dispute of any sort that might arise between [Plaintiff] and Amazon." Jensen Decl., Exhibit B, "Applicable Law." It is of no moment whether the Court applies New York law or Washington law to this controversy, as entry of judgment on the terms set forth herein is appropriate in either jurisdiction.

According to the Complaint, Amazon "contracted to provide Plaintiff, for valuable consideration, a suitable brand new Apple Macbook Pro MJLQ2LL/A 15-inch Laptop, free from defects, and to deliver said Laptop to the Plaintiff's residence." (Compl. ¶ 74.)  This is not so. As the COUs make clear, "Amazon attempts to be as accurate as possible [in its product descriptions].  However, Amazon does not warrant that product descriptions or other content of any Amazon Service is accurate, complete, reliable, current, or error-free.  If a product offered by Amazon itself is not as described, [Plaintiff's] sole remedy is to return it in unused condition," subject to Amazon's discretion to issue a refund even in the absence of return of the purchased product.  Jensen Decl., Exhibit B.  Furthermore, under the COUs, Plaintiff expressly agreed as follows:

> AMAZON WILL NOT BE LIABLE FOR DAMAGES OF ANY
> KIND ARISING FROM THE USE OF ANY AMAZON
> SERVICE, OR FROM ANY INFORMATION, CONTENT,
> MATERIALS, PRODUCTS (INCLUDING SOFTWARE) OR
> OTHER SERVICES INCLUDED ON OR OTHERWISE MADE
> AVAILABLE TO YOU THROUGH ANY AMAZON SERVICE,
> INCLUDING, BUT NOT LIMITED TO DIRECT, INDIRECT,
> INCIDENTAL, PUNITIVE, AND CONSEQUENTIAL
> DAMAGES, UNLESS OTHERWISE SPECIFIED IN WRITING.

*Id.*

"It is axiomatic that parties to a contract must remain free to allocate risks and shield themselves from liability." *McNally Wellman Co. v. N.Y.S. Elec. & Gas Corp.*, 63 F.3d 1188, 1195 (2d Cir. 1995) (citing N.Y. U.C.C. § 2-719 cmt. 1 (McKinney 1993), which reads in relevant part, "Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect)." Like New York, the state of Washington has incorporated the terms of the Uniform Commercial Code into its statutory law, and has interpreted UCC Section 2-719 in a manner consistent with courts sitting in New York. *See* Wash. Rev. Code § 62A.2-101, *et seq.*; *LeRoux, Inc. v. Burns*, 4

13

Wash. App. 165, 169 (Wash. Ct. App. 1971) ("As we read it, the Uniform Commercial Code leaves the parties free to shape their remedies according to their particular needs, within certain limits").  That is precisely what Plaintiff and Amazon have done: they have agreed that "[Plaintiff's] sole remedy is to return it in unused condition," a form of limited relief which is expressly contemplated by relevant law.  *See* Wash. Rev. Code § 62A.2-719(1)(a); N.Y. U.C.C. 2-719(1)(a) (parties may enter into an agreement "limiting the buyer's remedies to return of the goods and repayment of the price") and (b) (if a contractual remedy is "expressly agreed to be exclusive," it is the "sole remedy" available to the buyer).  Accordingly, even assuming for the sake of this motion that the New Laptop had CheckPoint's software on it (notwithstanding Plaintiff's own subsequent representations to the Court that the New Laptop was delivered to him shrink wrapped, in new condition, and without a sticker identifying it as the CheckPoint Laptop), Plaintiff's sole recourse under the parties' agreement was to return it for a refund – a refund which Amazon has already made available to him through its offer of confession of judgment.

### 2.  The Court Should Enter Judgment Pursuant to the Terms of the Offer.

"A case becomes moot pursuant to Article III's Case or Controversy Clause when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Tanasi v. New Alliance Bank*, 786 F.3d 195, 199 (2d Cir. 2015) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012)) (brackets and quotation marks omitted).  Although a mere unaccepted Rule 68 offer of judgment—even one that purports to offer complete relief— does not moot a case on its own, the Second Circuit[6] has held that such an offer, combined with

---

[6] Applicable federal law, rather than Washington State law, applies to procedural matters before the Court. *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 464 F.Supp.2d 206, 212 (S.D.N.Y. 2006) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)).

entry of judgment for complete relief against a defendant, *does* moot a plaintiff's claim. *See Leyse v. Lifetime Entm't Servs.*, 171 F. Supp. 3d 153, 156 (S.D.N.Y 2016), *aff'd* 679 F. App'x 44 (2d Cir. 2017) ("a defendant's deposit of a full settlement with the court, and consent to entry of judgment against it, will eliminate the live controversy before a court"); *Tanasi*, 786 F.3d at 200 ("*after* judgment is entered, the plaintiff's individual claims will become moot for purposes of Article III") (citing *ABN Amro Verzekeringen BV v. Geologistics Ams., Inc.,* 485 F.3d 85, 94 (2d Cir. 2007) ("Mootness, in the constitutional sense, occurs when the parties have no 'legally cognizable interest' or practical 'personal stake' in the dispute, and the court is therefore incapable of granting a judgment that will affect the legal rights as between the parties.")); *see also Hepler*, 607 F. App'x at 92 ("[T]he entry of judgment pursuant to th[e Rule 68] offer ... 'moots' the case.  Mootness, in the constitutional sense, would require dismissal for lack of subject matter jurisdiction.") (internal citation omitted); *Bank v. Caribbean Cruise Line, Inc.*, 606 F. App'x 30, 31 (2d Cir. 2015) (summary order affirming dismissal, holding that the plaintiff's "claims were mooted by the district court's entry of a judgment providing him with complete relief" after Rule 68 offer of judgment).

The Second Circuit has instructed that when an offer for judgment "tenders *complete* relief [to a plaintiff], the court should (absent additional procedural complications) enter judgment pursuant to the terms of that offer, *with or without the plaintiff's consent*."  *Hepler*, 607 F. App'x at 92 (second emphasis added) (citation omitted). *See Cabala v. Crowley*, 736 F.3d 226, 228 (2d Cir. 2013) (explaining that when a plaintiff does not accept an offer of judgment "for the full amount of damages owed," the "typically proper disposition ... is for the district court to enter judgment against the defendant for the proffered amount and to direct payment to the plaintiff consistent with the offer") (citing *McCauley v. Trans Union, LLC*, 402 F.3d 340, 342

15

**SA0094**

(2d Cir. 2005)).  Courts in this district follow that directive.  *See, e.g., Leyse*, 171 F. Supp. 3d at

155 ("once the defendant has furnished full relief, there is no basis for the plaintiff to object to

the entry of judgment in its favor"); *Geismann v. ZocDoc, Inc.*, 268 F. Supp. 3d 599, 603-05

(S.D.N.Y.  2017) (holding that an unaccepted offer of judgment, in conjunction with the deposit

of funds payable to the plaintiff, extinguishes any case or controversy that may be before the

court under the Supreme Court's precedent in *Campbell-Ewald Co. v. Gomez*, ___ U.S. ___, 136

S. Ct. 663 (2016)); *Maximo v. 140 Green Laundromat*, No. 14 Civ. 6948, 2015 WL 4095248, at

*3 (S.D.N.Y. July 7, 2015) (granting motion to enter judgment where there could be no dispute

that offer of judgment provided complete relief).  Accordingly, because Plaintiff is entitled to no

more than a refund of the price he paid on the transaction in question pursuant to the terms of the

contract under which he purports to assert the First Cause of Action, the Court should enter

judgment in that amount.

Because the Offer of Judgment here provides Plaintiff with all the relief that he is entitled

to recover on his claim sounding in breach of contract, entry of judgment consistent with that

offer eliminates any case or controversy between the parties on that claim.  It should thus be

dismissed as moot upon entry of judgment.*See, e.g., Leyse*, 171 F. Supp. 3d at 156; *Franco v.

Allied Interstate LLC*, No. 13 Civ. 4053, 2015 WL 7758534, at *3 (S.D.N.Y. Nov. 30, 2015);

*Maximo*, 2015 WL 4095248, at *4.

**B.    The Remaining Causes of Action Fail to State Claims Upon Which Relief May Be
       Granted**

On a motion for judgment on the pleadings, a reviewing court "employs the same

standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6)."  *Hayden v. Paterson*, 594

F.3d 150, 160 (2d Cir. 2010), *quoting Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009) (*per

curiam*).  "Thus, [the court] will accept all factual allegations in the complaint as true and draw

16

all reasonable inferences in [the plaintiff's] favor.  To survive a Rule 12(c) motion, [the plaintiff's] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hayden*. 594 F.3d at 160 (quoting *Johnson*, 569 F.3d at 43-44 and *Ashcroft v. Iqbal*, 556 U.S. 662, 677, 129 S. Ct. 1937, 1949, 173 L. Ed.2d 868 (2009)).

In this respect, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (*per curiam*) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)).  Moreover, "when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nonetheless consider that document on a motion pursuant to Rule 12(c), without converting the proceeding to one for summary judgment.  *Id.*  Here, the Complaint alleges, *inter alia*, that Amazon breached its contract with Plaintiff and the express warranty that it allegedly issued to him.  *See, e.g.,* Compl. ¶¶ 24, 27, 30, 74-75, 77-79, 81-86.  The Complaint also refers to certain representations that were made to Plaintiff, which Plaintiff alleges were false.  *See, e.g.,* Compl. ¶¶ 116-19.  Where, as here, the pleading is "replete with references to the contracts and requests judicial interpretation of their terms," a reviewing court may consider those terms without converting a motion for judgment on the pleadings into a motion for summary judgment pursuant to Rule 56. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 n.4 (2d Cir. 2002).

### 1.     The Second and Third Causes of Action Must Be Dismissed

The Second and Third Causes of Action purport to assert that Amazon breached the express and implied warranties that it issued to Plaintiff in connection with the sale of the New Laptop.  Because the COUs expressly disclaim both express and implied warranties, these two causes of action must be dismissed.

17

**SA0096**

In support of the Second Cause of Action, the Complaint alleges that Amazon "warranted and represented [to] the Plaintiff" that the New Laptop was "brand-new, …. [was] free from any and all spy software capable of tracking Plaintiff's activities, and that [Amazon] had good and marketable title" to the New Laptop.  (Compl., ¶ 81.)  In support of the Third Cause of Action, the Complaint alleges that Amazon "impliedly warranted" that the New Laptop was "merchantable, *i.e.*, fit for the ordinary purposes for which such electronics, computers, and related products are generally used."  (Compl., ¶ 88.)  These allegations are directly contradicted by the COUs, wherein Amazon stated prominently in all capital letters that "ALL PRODUCTS (INCLUDING SOFTWARE) … ARE PROVIDED BY AMAZON ON AN 'AS IS' AND 'AS AVAILABLE' BASIS, UNLESS OTHERWISE SPECIFIED IN WRITING."  Amazon further disclaimed "WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, AS TO THE OPERATION OF THE … PRODUCTS (INCLUDING SOFTWARE)[.]"  For the elimination of ambiguity, Amazon repeated that it "DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE."  It further specifically stated that "AMAZON DOES NOT WARRANT THAT THE … PRODUCTS (INCLUDING SOFTWARE) … ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS."

The Disclaimer satisfies all required elements of a valid and binding disclaimer of express and implied warranties.  Under Section 2-316 of the U.C.C., "all implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty."  Wash. Rev. Code § 62A.2-316(3)(a), N.Y. U.C.C. § 2-316(3)(a).

18

"The rule is well settled that no warranty, express or implied, will be found where, as here, the seller expressly refuses by merger and disclaimer clauses to give any warranties." *McInnis & Co. v. W. Tractor Equip. Co.*, 63 Wash. 2d 652, 656 (Sup. Ct. Wash. 1964). In light of the fact that Plaintiff specifically referred to both express and implied warranties in the Complaint, he cannot disavow knowledge of COUs now; in other words, Plaintiff "cannot claim to have relied upon a specific warranty which contained an express disclaimer as to merchantability and fitness and at the same time deny that [he] was aware of its existence." *Architectural Aluminum Corp. v. Macarr, Inc.*, 70 Misc. 2d 495, 498 (Sup. Ct. N.Y. Cty. 1972).

Accordingly, the Second and Third Causes of Action must be dismissed. *M.A. Mortenson Co. v. Timberline Software Corp.*, 140 Wash. 2d 568, 574-575 (Sup. Ct. Wash. 2000) (dismissing claims sounding in breach of express and implied warranties on the grounds that such warranties were disclaimed in the parties' agreement).

**2.    The Fourth and Fifth Causes of Action Must Be Dismissed.**

The Complaint purports to assert claims sounding in common-law negligence and strict products liability against Amazon. Both of these causes of action must be dismissed as preempted by the Washington Product Liability Act.

As set forth above, under the COUs, the parties agreed that the laws of the state of Washington would apply to "any dispute of any sort that might arise between [Plaintiff] and Amazon." Jensen Decl., Exhibit A. The Washington Product Liability Act (the "WPLA") preempts precisely the sort of common-law remedies that Plaintiff purports to assert against Amazon here. The WPLA defines a "product liability claim" as follows:

> any claim or action brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product. It includes, but is not limited to, any claim or action previously

19

> based on: Strict liability in tort; negligence; breach of express or
> implied warranty[7]; breach of, or failure to, discharge a duty to
> warn or instruct, whether negligent or innocent; misrepresentation,
> concealment, or nondisclosure, whether negligent or innocent; or
> other claim or action previously based on any other substantive
> legal theory except fraud, intentionally caused harm or a claim or
> action under the consumer protection act, chapter 19.86 RCW.

Wash. Rev. Code § 7.72.010(4).  "The WPLA is preemptive and the scope of WPLA is broadly

defined so as to include any claim or action brought for harm caused by the product.  The

purpose of the statute is to eliminate common law remedies and provide a single cause of

action."  *Bingham v. Blair LLC*, No. 10-5005, 2010 WL 1608881, at *2 (W.D. Wash. Apr. 19,

2010).  As Plaintiff's negligence and strict liability claims are preempted by the WPLA, they

must be dismissed.

  In the alternative, under New York law, Plaintiff's claim sounding in negligence must be

dismissed as duplicative of his claim sounding in breach of contract.  The *only* duty alleged in

the Fourth Cause of Action is identical to the one sounding in contract (a claim which fails for

reasons already stated).  Compare Complaint, ¶¶ 74, 76 and ¶ 93.  "It is a well-established

principle that a simple breach of contract is not to be considered a tort unless a legal duty

independent of the contract itself has been violated.  This legal duty must spring from

circumstances extraneous to, and not constituting elements of, the contract[.]"  *Clark-Fitzpatrick*

*v. Long Island R.R.*, 70 N.Y.2d 382, 389 (N.Y. 1987) (internal citations omitted).  Because the

Complaint identifies no such extraneous duty, the Fourth Cause of Action must be dismissed.

  The Fifth Cause of Action sounding in strict liability must be dismissed as a matter of

New York law because, according to the allegations in the Complaint, the "sensitive spy

---

[7] For this reason as well, the Court must dismiss the Second and Third Causes of Action.  Not
only did Amazon expressly disclaim any such warranties, but the WPLA precludes Plaintiff from
asserting those claims in this action.

software" on the CheckPoint Laptop was installed, not by its manufacturer Apple, but by CheckPoint. (Complaint, ¶ 76.) "Substantial modifications of a product from its original condition by a third party which render a safe product defective are not the responsibility of the manufacturer." *Robinson v. Reed-Prentice*, 49 N.Y.2d 471, 479 (N.Y. 1980) (citations omitted). On this point, Amazon also incorporates by reference those arguments set forth in Apple's memorandum of law in support of its motion to dismiss Plaintiff's claims against it.

For these reasons, the Fourth and Fifth Causes of Action should be dismissed.

### 3. The Sixth, Seventh and Eighth Causes of Action Sounding in Fraud Must Be Dismissed.

In order to adequately state a cause of action sounding in fraud, as the Sixth, Seventh and Eighth Causes of Action purport to do, "the circumstances constituting fraud ... [must] be stated with particularity." Fed. R. Civ. P. 9(b). Because the Complaint fails to identify with particularity any misrepresentations of fact made on the part of Amazon – and because any inference of fraud is conclusively rebutted by COUs – these causes of action must be dismissed for failure to state a cause of action.

On these claims, the Court may refer to the COUs on Amazon's motion seeking entry of judgment on the pleadings in order to evaluate whether the Complaint states a cause of action sounding in fraudulent concealment.

> When a complaint alleges, for example, that a document filed with the SEC failed to disclose certain facts, it is appropriate for the court, in considering a Rule 12(b)(6) motion, to examine the document to see whether or not those facts were disclosed. Or when the complaint alleges that such a document made a particular representation, the court may properly look at the document to see whether that representation was made. Consideration of such documents filed with the SEC is appropriate with respect to a nondisclosure or misrepresentation claim because no serious question as to their authenticity can exist, and because the court is to consider them on a Rule 12(b)(6) motion only to determine what the documents stated, and not to prove the truth of their contents.

21

**SA0100**

*Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007), citing *Kramer v. Time Warner Inc.*, 937 F.2d

767, 774 (2d Cir. 1991).  Such is the case here.  The Court may consider the statements made to

Plaintiff in the COUs to see whether the allegedly fraudulent representation was made to

Plaintiff.  On the contrary, the COUs expressly state that "Amazon does not warrant that product

descriptions or other content of any Amazon Service is accurate, complete, reliable, current, or

error-free."  (COUs, at "Product Descriptions.")  Where, as here, the Complaint fails to identify

any misrepresentations of fact made with the intent to deceive – and the operative agreement

between the parties expressly warns *against* relying on representations made in product

descriptions – no cause of action sounding in fraud will lie.

Amazon also incorporates by reference those arguments set forth in Apple's

memorandum of law in support of its motion to dismiss Plaintiff's Eighth Cause of Action.

Accordingly, the Sixth, Seventh and Eighth Causes of Action should be dismissed.

**C.      Evidence Before the Court Compels Dismissal**

Amazon's tender of an offer of judgment to Plaintiff and deposit of funds with the Court

moots the First Cause of Action sounding in breach of contract.  Also, as set forth more fully

above, Counts Two through Eight fail to state a cause of action upon which relief may be granted

against Amazon.  The Court need look no further in order to dispose of the claims asserted by

Plaintiff against Amazon.  But if the Court deems it necessary to look beyond the four corners of

the pleadings and the operative agreement between Plaintiff and Amazon, evidence already

before the Court compels the conclusion that this is a case of mistaken identity: the CheckPoint

Laptop that was recovered from the storage facility on or around October 3, 2016, was *not* the

New Laptop that was delivered to Plaintiff on June 23, 2016, and no amount of discovery will

change that fact.  Accordingly, and in the alternative, the Court should enter summary judgment

in Amazon's favor on all causes of action asserted against it (including the First Cause of Action

**SA0101**

sounding in breach of contract) because, even viewing all facts in the light most favorable to

Plaintiff, no reasonable jury could conclude that Amazon delivered the CheckPoint Laptop to

Plaintiff on June 23, 2016.

A movant is entitled to summary judgment if "there is no genuine issue as to any material

fact and … is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is

"material" for these purposes when it "might affect the outcome of the suit under the governing

law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 2d 202

(1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Id.* In the absence of a genuine issue as to a material fact,

the Court need not put the parties to the expense and inconvenience of additional discovery.

*Seneca Beverage Corp. v. Healthnow N.Y., Inc.*, 200 F. App'x 25, 27 (2d Cir. 2006) (summary

order) ("the party opposing summary judgment is not automatically entitled to discovery").

Moreover, "it is clear that a plaintiff cannot defeat a motion for summary judgment by

merely … amplifying [conclusory allegations in the complaint] only with speculation about what

discovery might uncover." *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107

(2d Cir. 1981) (affirming denial of Rule 56(f) motion and grant of summary judgment motion).

"An opposing party's mere hope that further evidence may develop prior to trial is an insufficient

basis upon which to justify the denial of the motion" for summary judgment. *Id.* at 107 (citation

omitted).

In his written and spoken representations[8] to the Court, Plaintiff has stated the following:

- The New Laptop was delivered to him in shrink wrapped, new condition;

---

[8] These statements are properly before the Court on this motion as party admissions. Fed. R. Evid. 801(d)(2)(A) (excluding from the hearsay rule a statement "offered against an opposing party" that "was made by the party in an individual or representative capacity"); *see also Fincher v. County of Westchester*, 979 F. Supp. 989, 1005 (S.D.N.Y. 1997).

- The New Laptop did not have a sticker indicating that it was the Property of
  CheckPoint;

- Plaintiff gave the New Laptop to his estranged wife, Stephanie Scott; and

- Plaintiff was not present when Detective Caballero recovered the CheckPoint Laptop
  from Ms. Scott at the storage facility.

Plaintiff's own representations to the Court, coupled with CheckPoint's testimony that the laptop
that Detective Caballero delivered to it on or around October 17, 2016 was, in fact, the
CheckPoint Laptop – with the sticker identifying it as the Property of CheckPoint *still affixed to
the bottom of the device* – compel the conclusion that the New Laptop that Amazon delivered to
Plaintiff on June 23, 2016 was *not* the CheckPoint Laptop.

Over the course of this litigation, Plaintiff has claimed that he is pursuing this lawsuit as a
means to "get to the bottom" of questions that he has about the provenance of the CheckPoint
Laptop and how that device came to be in the possession of his estranged wife. *See., e.g.,*
Docket Doc. 81 ("Until the facts become clear, we do not know exactly what happened…
everyone need[s] to stay put in this case, until we find out what happened, who and why").
Amazon respectfully submits in response that, first, federal litigation is an inappropriate vehicle
by which to embark upon a fishing expedition based on nothing more than rank speculation. *See,
e.g., Tennenbaum Capital Partners LLC v. Kennedy*, No. 07 Civ. 9695, 2009 WL 2913679, at *5
(S.D.N.Y. Sept. 11, 2009), *aff'd*, 372 F. App'x 180 (2d Cir. 2010) ("the Court will not permit
[nonmovant] to engage in a fishing expedition based on mere speculation"). And second, the
fact that Plaintiff has questions about how his estranged wife came to be in possession of the
CheckPoint Laptop does not give him license to continue this litigation against Amazon. In
order to sustain causes of action against Amazon, he must identify a genuine issue of material

24

**SA0103**

fact *as to Amazon's alleged liability to him*.  Because no amount of discovery will change what is already known – that Amazon delivered the New Laptop to Plaintiff and Detective Caballero retrieved the CheckPoint Laptop from Ms. Scott – the Court should dismiss all claims against Amazon and leave Plaintiff to pursue the answers to questions that he has concerning Ms. Scott and the CheckPoint Laptop in a more appropriate forum.

## **CONCLUSION**

For the reasons stated herein, Amazon respectfully requests that this Court enter judgment consistent with its Offer of Judgment and, upon entry of judgment, dismiss the First Cause of Action as moot and the remaining Causes of Action as failing to state a claim upon which relief may be granted or, in the alternative, enter summary judgment in favor of Amazon and against Plaintiff and dismiss all Causes of Action asserted against it with prejudice.

Dated:  New York, New York
        February 12, 2018

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By:____/s/ Michael J. Goettig_____
    Michael J. Goettig

1251 Avenue of the Americas, 21st Floor
New York, New York 10019
(212) 489-8230
*Attorneys for Defendant*
*Amazon.com, LLC*

25

**SA0104**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------------x

TYRONE HOLMES,                                        :     Case No. 17 Civ. 4557 (ER) (KNF)
                          Plaintiff,                  :
                                                      :     **DECLARATION OF**
              - against -                             :     **MICHAEL GOETTIG**
                                                      :
APPLE, INC., AMAZON.COM, LLC, and                     :
CHECKPOINT FLUIDIC SYSTEMS                            :
INTERNATIONAL, LTD.,                                  :
                                                      :
                          Defendants.                 :

------------------------------------------------------------x

**I, MICHAEL GOETTIG, STATE AS FOLLOWS:**

1.      I am an attorney with the law firm of Davis Wright Tremaine, LLP, counsel for
defendant Amazon.com, LLC ("Amazon").   I make this declaration in order to introduce
documents referenced in the accompanying memorandum of law in support of Amazon's motion
for entry of judgment.

2.      Attached as **Exhibit A** is a true and correct copy of the offer of judgment (the
"Offer") tendered by Amazon to plaintiff *pro se* Tyrone Holmes ("Plaintiff" or "Mr. Holmes"),
with accompanying cover letter, both dated December 29, 2017.

3.      Attached as **Exhibit B** is a true and correct copy of Plaintiff's December 29, 2017
written rejection of the Offer.

4.      Attached as **Exhibit C** is a true and correct copy of the cashier's receipt reflecting
Amazon's deposit of funds in the amount of $2,351.12 with the Clerk of the Court in connection
with this action.

5.      Attached as **Exhibit D** is a true and correct copy of the transcript of the
conference held before the Court in this matter on September 14, 2017.

4830-0826-6844v.1 0051461-001311

6.      Attached as **Exhibit E** is a true and correct copy of the transcript of the pre-motion conference held before the Court in this matter on January 12, 2018.

7.      Attached as **Exhibit F** is a true and correct copy of correspondence submitted by Plaintiff to the Court on January 9, 2018 (Docket No. 82).

8.      Attached as **Exhibit G** is a true and correct copy of correspondence submitted by Plaintiff to the Court on January 5, 2018 (Docket No. 81).

9.      Attached as **Exhibit H** is a true and correct copy of the summary order, *Hepler v. Abercrombie & Fitch Co.*, 607 F. App'x 91 (2d Cir. 2015).

10.     Attached as **Exhibit I** is a true and correct copy of the summary order, *Peters v. Amazon Servs., LLC*, 669 F. App'x 487 (9th Cir. 2016).

11.     Attached as **Exhibit J** is a true and correct copy of the unpublished decision, *Corwin v. NYC Bike Share, LLC*, 2017 WL 4075213 (S.D.N.Y. Mar. 13, 2017).

12.     Attached as **Exhibit K** is a true and correct copy of the summary order, *Bank v. Caribbean Cruise Line*, 606 F. App'x 30 (2d Cir. 2015).

13.     Attached as **Exhibit L** is a true and correct copy of the unpublished decision, *Maximo v. 140 Green Laundromat*, No. 14 Civ. 6948, 2015 WL 4095248 (S.D.N.Y. July 7, 2015).

14.     Attached as **Exhibit M** is a true and correct copy of the unpublished decision, *Franco v. Allied Interstate LLC*, No. 13 Civ. 4053, 2015 WL 7758534 (S.D.N.Y. Nov. 30, 2015).

15.     Attached as **Exhibit N** is a true and correct copy of the unpublished decision, *Bingham v. Blair LLC*, No. 10-5005, 2010 WL 1608881 (W.D. Wash. Apr. 19, 2010).

16.     Attached as **Exhibit O** is a true and correct copy of the summary order, *Seneca Beverage Corp. v. Healthnow N.Y., Inc.*, 200 Fed. Appx. 25 (2d Cir. 2006).

4830-0826-6844v.1 0051461-001311

17.     Attached as **Exhibit P** is a true and correct copy of the unpublished decision, *Tennenbaum Capital Partners LLC v. Kennedy*, No. 07 Civ. 9695(LTS), 2009 WL 2913679 (S.D.N.Y. Sept. 11, 2009).

18.     Attached as **Exhibit Q** is a true and correct copy of the summary order, *Tennenbaum Capital Partners LLC v. Kennedy*, aff'd, 372 Fed. Appx. 180 (2d Cir. 2010).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: New York, New York
       February 12, 2018

By: _____
       Michael Goettig

4830-0826-6844v.1 0051461-001311

# Goettig Exhibit A

 **DavisWright Tremaine** LLP

21st Floor
1251 Avenue of the Americas
New York, NY 10020-1104

**Michael Goettig**
(212) 603-6498 tel
(212) 379-5202 fax

michaelgoettig@dwt.com

December 29, 2017

**VIA CERTIFIED MAIL AND ELECTRONIC MAIL**

Tyrone Holmes
1465 Hammersley Avenue
Bronx, New York 10469
tymax@me.com

Re:    Holmes v. Apple, Inc., *et al.*, No. 17-cv-4557 (ER)

Dear Mr. Holmes:

    As you are aware, this firm represents Amazon.com, LLC ("Amazon"), one of the defendants in the above referenced action.  Pursuant to Rule 68 of the Federal Rules of Civil Procedure, Amazon hereby tenders an offer of judgment in the amount of Two Thousand Three Hundred Fifty One Dollars and Twelve Cents ($2,351.12).  This offer will expire in fourteen days.  If you wish to accept this offer of judgment, kindly countersign and return the enclosed offer of judgment to me, and I will arrange its filing with the Court.

    You are encouraged to seek independent legal advice concerning the effect of declining this offer.  Please be advised, however, that, if you were to proceed to trial and recover a judgment less than or equal to the amount of this offer, then you would be personally liable to Amazon for its legal costs from this point forward.

Very truly yours,

/s/ Michael Goettig

Michael Goettig

Enclosure

cc:    Hannah Y. Chanoine (via e-mail at hchanoine@omm.com)
       Brian Graifman (via e-mail at BGraifman@borahgoldstein.com)

4838-1415-1509v.1 0051461-001311

Anchorage          New York           Seattle
Bellevue           Portland           Shanghai
Los Angeles        San Francisco      Washington, D.C.                    www.dwt.com

**SA0109**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

TYRONE HOLMES,                        :

              Plaintiff,       :

                         :

       - against -       :

                         :

APPLE, INC., AMAZON.COM, LLC, and  :
CHECKPOINT FLUIDIC SYSTEMS
INTERNATIONAL, LTD.,          :

                         :

           Defendants.    :

------------------------------------------------------------ x

Case No. 17-cv-4557 (ER)

**RULE 68 OFFER OF JUDGMENT**

      Pursuant to Rule 68 of the Federal Rules of Civil Procedure, defendant Amazon.com,

LLC ("Amazon") hereby offers to allow plaintiff Tyrone Holmes ("Plaintiff") to take a judgment

against it in this action for the total sum of Two Thousand Three Hundred Fifty One Dollars and

Twelve Cents ($2,351.12).

      This judgment shall be in full satisfaction of all claims or rights that Plaintiff may have to

economic damages, noneconomic damages, punitive damages, attorney's fees, costs, and/or any

other form of relief, arising out of the alleged acts or omissions of Amazon, or any employee,

representative or agent, either past or present, of Amazon.

      This offer of judgment is made for the purposes specified in Rule 68 of the Federal Rules

of Civil Procedure and is not to be construed as an admission of liability by Amazon, nor is it an

admission that Plaintiff has suffered any damages.

      Acceptance of this offer of judgment will release and discharge Amazon, its successors or

assigns, and all past and present employees, representatives and agents of Amazon from any and

all claims that were or could have been alleged by Plaintiff in the above-referenced action.

4836-3602-4917v.1 0051461-001311

Pursuant to Rule 68 of the Federal Rules of Civil Procedure, if this offer is not accepted within 14 days, it is withdrawn by operation of law.  Failure to accept this offer carries with it the consequences set forth in Rule 68.

Evidence of this offer or of conduct or statements made relating to this offer is not admissible as evidence in any hearing to prove or disprove the validity or amount of Plaintiff's claim.  Fed. R. Evid. Rule 408.

Plaintiff may indicate acceptance of this offer by signing the statement to that effect below.

**ACCEPTED:**

By: _____
    Tyrone Holmes

Date: _____, 201_


Dated: New York, New York
       December 29, 2017

                                    DAVIS WRIGHT TREMAINE LLP

                                    By: /s/ Michael J. Goettig_____
                                        Michael J. Goettig

                                    *Attorneys for Defendant*
                                    *Amazon.com, LLC*
                                    1251 Avenue of the Americas, 21st Floor
                                    New York, New York 10020
                                    (212) 489-8230

**SA0111**

# Goettig Exhibit B

| | |
|---|---|
| **From:** | Ty Max <tymax@me.com> |
| **Sent:** | Friday, December 29, 2017 4:05 PM |
| **To:** | Goettig, Michael |
| **Cc:** | Brian Graifman; Hannah Y. Chanoine |
| **Subject:** | Re: Holmes v. Apple, et al |

Dear Michael,

Your offer is hear-by rejected. Apparently we are reading to different cases. You all destroyed my life and all that i had been working on. You simply can't make this up, to see the damage in realtime your companies caused. Why? What happened? How did i wind up with this DOD computer from a simple purchase from Amazon.com?

I see you and your client(s) as racist white men who hate black people and the black male in particular. That is the only reason how i can justify such an offer from Amazon, after Amazon knowingly:

1. Caused mental trauma, etc.
2. Caused financial hardship.
3. Caused the ending of a marriage.
4. Cause me to loose favor and standings, etc.
5. Caused me to miss crucial employment opportunities, etc. etc. etc.
6. Caused me to renege on contracts, commitments, and services, etc. etc. etc.
7. Caused my perfect credit score to be reduced to ruble, etc, etc etc etc.
8. Stopped development of Samuel's Temple Church Community Center on the 3529 Third Ave. etc, etc, etc.(proof of ads attached on 1010WINS, WLIB, WBLS)
9. Caused substantial investment loss with release of a top 10 Billboard Hit, etc, etc, etc. (proof up and down)

I could go on and on, and believe me it gets even more transparent with tons of witnesses, emails, audio, video, google searches, testimonies, church's, organizations, clients, angry clients, doctors, lawyers, pastors and bishops, that will testify to the effects of Amazon's et, al. negligence(s) they saw **first hand**. What will be obvious to the courts, Judge Ramos and the world at large is your disregard and distain for the life of a black male, to offer a refund in the amount of $2,351.12., after you destroyed his life and lifetime of outreach and achievements, and to Amazon, his life is worth  $2,351.12. I can't wait to show the NAACP this case, and more importantly this offer from the great Jeff Bezos's Amazon, who sold the Bad Apple, with AppleCare™.

However, In the interest of justice and in good faith, i make a counter offer settlement of $50,000,000.12. Make check payable to Samuel's Temple Church Community Center. This offer will expire in 7 days, after that, i will take the advice of advisors and settle for 100 million from each of the defendants, excluding FedEx, their damages are still being calculated.


Tyrone


On Dec 29, 2017, at 1:14 PM, Goettig, Michael <MichaelGoettig@dwt.com> wrote:

Dear Mr. Holmes,

Please see the attached.

Very truly yours,

Michael Goettig

**Michael Goettig |** Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st Floor | New York, NY 10020
Tel: (212) 603-6498 | Fax: (212) 379-5202
Email: michaelgoettig@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.
<image003.jpg>

<17.12.29 Letter to Tyrone Holmes.pdf><Amazon - Holmes Offer of Judgment.pdf>

# Goettig Exhibit C

Court Name: District Court
Division: 1
Receipt Number: 465401199765
Cashier ID: Aacevedo
Transaction Date: 01/16/2018
Payer Name: AMAZON
------------------------------------------------
TREASURY REGISTRY
 For: AMAZON
 Case/Party: D-NYS-1-17-CV-004557-001
 Amount:          $2,351.12
------------------------------------------------
CHECK
 Check/Money Order Num: 39
 Amt Tendered:   $2,351.12
------------------------------------------------
Total Due:        $2,351.12
Total Tendered:   $2,351.12
Change Amt:       $0.00

# Goettig Exhibit D

Case 1:17-cv-04557-ER   Document 54   Filed 10/18/17   Page 1 of 24          1

H9ETHOLC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    TYRONE HOLMES,

 4                    Plaintiff,

 5            v.                            17 CV 4557 (ER)

 6    APPLE INC., AMAZON.COM, LLC
      and CHECKPOINT FLUIDIC SYSTEM
 7    INTERNATIONAL, LTD.,

 8                    Defendants.

 9    ------------------------------x
                                          New York, N.Y.
10                                        September 14, 2017
                                          10:00 a.m.
11    Before:

12                        HON. EDGARDO RAMOS,

13                                          District Judge

14                          APPEARANCES

15    TYRONE HOLMES, PRO SE

16    O'MELVENY & MYERS
           Attorneys for Defendant Apple
17    BY:  EDWARD MOSS
           HANNAH CHANOINE
18
      DAVIS WRIGHT TREMAINE
19         Attorneys for Defendant Amazon.com
      BY:  MICHAEL GOETTIG
20
      BORAH GOLDSTEIN ALTSCHULER NAHINS & GOIDEL
21         Attorneys for Defendant Checkpoint
      BY:  BRIAN GRAIFMAN
22

23

24

25
```

**SA0118**

H9ETHOLC

```
 1            (In open court, case called)
 2            THE COURT:  Good morning to you all.
 3            This is on for an order to show cause with plaintiff,
 4    Mr. Holmes, seeking entry of default judgment against the
 5    defendants for their failure to timely answer the complaint.
 6    However, this is the first time that the parties are appearing
 7    before me.  So Mr. Holmes, I'm going to ask you to tell me in a
 8    nutshell what your case is about.
 9            You can remain seated.  Please move microphone closer
10    to you so we can hear you.
11            MR. HOLMES:  Yes, your Honor.  This claim is about the
12    negligent sale of a Department of Defense computer that caused
13    me harm in so many ways and from all three companies.  I filed
14    the complaint, none of them responded.  Prior to that I sent
15    the CEOs letters, phone calls, starting since September 16 of
16    2016.  No one responded.  That's when I filed the action.  All
17    of them responded after I filed the default, the judgment for
18    default.
19            THE COURT:  And I take it that the complaint does not
20    indicate the interactions that you just referred to, that you
21    contacted CEOs, that you made contact with each of the
22    companies.  Tell me a little bit about that.  What did you do?
23            MR. HOLMES:  I initially wrote to Tim and Jeff, the
24    CEOs of Apple and Amazon, explaining what happened.
25            THE COURT:  Tim and Jeff?
```

**SA0119**

H9ETHOLC

1              MR. HOLMES:  Yes, the CEOs of Amazon and Apple.

2              THE COURT:  Tim Cook and Jeff Bezos?

3              MR. HOLMES:  That's correct.  I explained to them what

4    happened, and that I was longtime customers of both Apple and

5    Amazon, and I wanted to take care of this without it going any

6    further.  They didn't reply.  They just didn't respond.

7              THE COURT:  Okay.

8              MR. HOLMES:  Then my lawyer reached out to them by way

9    of a letter.  They still doesn't reply or respond, except for

10   Amazon sent their law firm information back saying that they

11   would look into it, investigate, and get back to us in due

12   course.

13             THE COURT:  And did they?

14             MR. HOLMES:  Never.  Never.  Apple just ignored me

15   outright, downright completely.

16             Checkpoint was a little scary because they started out

17   intimidating me with the NYPD, so I didn't know exactly how to

18   respond to them, but I knew that I had bought the computer from

19   Amazon with AppleCare, and I knew that when the computer

20   arrived to my residence it was shrink wrapped.

21             THE COURT:  It was?

22             MR. HOLMES:  Shrink wrapped as new.

23             THE COURT:  Now you purchased a new computer from

24   Amazon?

25             MR. HOLMES:  Amazon.com with AppleCare.

H9ETHOLC

 1          THE COURT:  Okay.

 2          MR. HOLMES:  Which is reserved exclusively for new

 3   Apples.  They will not sell AppleCare if it's used.  I bought

 4   AppleCare, and it was delivered the next day.

 5          Three months later, I'm sitting in church playing for

 6   a funeral, the detective says come outside, you have computer

 7   that belongs to the Department -- a subcontractor of the

 8   Department of Defense.  I said officer, I'm not home.  The next

 9   day he called, we had to find which computer they was talking

10   about because I have several Apples.  I have been with Apple

11   since the original music program, which is called Logic, which

12   was Notator then.

13          THE COURT:  Called what?

14          MR. HOLMES:  Notator.  It was called Notator, now it's

15   called Logic Audio.

16          THE COURT:  Logic Audio.

17          MR. HOLMES:  Yes, transformed from the original

18   conception from program calls Notator, one of the first musical

19   sequences software on the Mac.

20          THE COURT:  So the computer in question here, you

21   received documentation from Amazon --

22          MR. HOLMES:  Yes.

23          THE COURT:  -- concerning that computer?

24          MR. HOLMES:  Yes.

25          THE COURT:  And it contained a serial number for that

**SA0121**

H9ETHOLC

1   computer, if you know?

2          MR. HOLMES:  Yeah, they sent a receipt and it has

3   all -- I have that information.  They sent a receipt, shipped

4   the next day.  As in the thousands of products that I bought

5   from Amazon prior to that incident, I order it, they send a

6   receipt, they deliver the next day, and life goes on.  But this

7   was a little different.  Three months later, cops are on me

8   saying find it or you are going to jail.

9          THE COURT:  Okay.  And what happened that night?  You

10  said you didn't have the computer in your possession at that

11  time?

12         MR. HOLMES:  No, sir, I gave it to my estranged wife.

13  Actually I bought it for a third computer for my video

14  production, but that was only once or twice a year that I would

15  use it for video production.  So I would let my wife use it to

16  keep her off mine.  That's the reason I bought it.

17         And they said give it back or you got to be arrested

18  for four years, criminal possession of stolen property.  I

19  thought it was a joke.  I thought they were teasing me.  I

20  didn't know what was going on.

21         After three or four days with the officer

22  corresponding with the lawyer, with me, he said yes.  In fact,

23  this is a computer we wanted by any means necessary.  We don't

24  care how you got it.  And I have this on tape with the officer

25  saying we don't care how you got it, all we know is we want it

H9ETHOLC

1    back.  We don't care about your receipt, we don't care about

2    anything, but we want it back, and if we don't get it back you

3    are going to turn yourself in tomorrow at 1:00 p.m. at the 47th

4    Precinct.

5             I was -- my mind still hasn't healed from the trauma,

6    because Judge, I'm not into the criminal system or anything

7    like that, I'm a church boy.  And so when I'm faced to have to

8    check in every day to go to prison for a computer that I bought

9    off of Amazon, brand new took the shrink wrap off, that -- I

10   will never be the same, never.

11            After 28 days of constant checking in to see if I have

12   to turn myself in, because I had to locate my estranged wife,

13   we had to hire a private investigator, hire lawyers to talk to

14   the police officer every day to stop me from going to checking

15   in for the 47th Precinct at one o'clock.

16            THE COURT:  Okay.  Let me turn to the defendants.

17            Let me start with Mr. Graifman.  Tell me what happened

18   from your perspective, if you can.

19            MR. GRAIFMAN:  Sure, your Honor, Brian Graifman again

20   for Checkpoint.

21            THE COURT:  You can also remain seated.

22            MR. GRAIFMAN:  Thank you, your Honor.

23            Well, Checkpoint had a computer which it purchased new

24   about a month before any events with Mr. Holmes arising, took

25   the new computer, loaded it with software for its salespeople

H9ETHOLC

1   in Dubai.  Checkpoint is Louisiana.  Checkpoint has no contacts

2   with New York.  Checkpoint put its software on the computer,

3   including software that could be monitored by it's IT

4   department, put a sticker on the bottom of it that says

5   property of Checkpoint pumps.

6            I suspect Mr. Holmes never saw the computer because he

7   said that he gave the other computer to his wife, and I know,

8   because I spoke to the detective who he said he wasn't there

9   when it was recovered from a storage unit.  I don't know why he

10  thinks it's the same computer that he bought, which is

11  something that your Honor may wish to raise and he may want to

12  withdraw this lawsuit.

13           But anyway, Checkpoint took its computer and gave it

14  to Fed Ex.  Fed Ex -- in the theft report that we put in our

15  papers, the police investigation -- sorry, let me say something

16  else.  Checkpoint -- the computer never got to its destination,

17  so Checkpoint contacted Fed Ex.  The Fed Ex investigator

18  contacts the Louisiana police department in Kenner, Louisiana.

19  The police department -- sorry, then it goes further.

20  Checkpoint notices the computer being used, and they're able to

21  locate it's used in New York and they're able to access that

22  whoever is using it is turns out to be Mr. Holmes' estranged

23  wife, and there's information on it.

24           THE COURT:  So did you make a determination that it

25  was Mr. Holmes' estrange wife that was using it?

H9ETHOLC

1          MR. GRAIFMAN:  No, there was no determination.  I

2    wasn't involved myself.  They reported that between Fed Ex and

3    the Kenner Police Department in Louisiana.

4          THE COURT:  So what did Fed Ex say happened to that

5    package?

6          MR. GRAIFMAN:  It made it to the airport.  According

7    to the theft report, which I read, it made it to the airport.

8    That's as far as -- my understanding is that then it

9    disappeared somewhere in transit.

10          THE COURT:  And when, approximately?

11          MR. GRAIFMAN:  On June 7, I believe.

12          THE COURT:  So prior to Mr. Holmes' purchase.

13          MR. GRAIFMAN:  Yes.  It was noticed a month later that

14    in July, I believe, if I could pull out my timeline.  And there

15    was activity on the computer, so they reengaged with Fed Ex,

16    reengaged with the local police, and contacted the New York

17    City Police.  They just wanted their computer back.  It had

18    sales -- their proprietary information on it.

19          And eventually it was recovered from Mr. Holmes'

20    estranged wife.  I don't know why he thinks it's the same

21    computer that he bought.  Apple makes millions of computers, I

22    understand.  He didn't see the computer after he gave it to

23    her, as far as I know, but maybe he could tell us something

24    otherwise, but it had a Checkpoint sticker on it, anyone would

25    have noticed it.  So when it was recovered, they got their

H9ETHOLC

1     computer back and they were hunky-dory until this lawsuit came.

2          THE COURT:  What can you tell me about the software

3     that allowed your client to locate the computer in New York?

4     How close can you get me to the computer if you know that it's

5     being used somewhere in New York?

6          MR. GRAIFMAN:  I don't know the answer to that, but I

7     know that IT in even law firms they're able to monitor what

8     computers are doing and they have access to computers.

9          THE COURT:  How did they identify Mr. Holmes?

10          MR. GRAIFMAN:  Because there were pictures -- he

11     mentioned he orders thousands of products from Amazon, that's a

12     lot of products.  There were pictures of labels of many

13     products and other personal information that was --

14          THE COURT:  So you were able to go into the computer

15     and access the computer itself.

16          MR. GRAIFMAN:  They could see pictures of things,

17     that's how.

18          THE COURT:  Pictures of what?

19          MR. GRAIFMAN:  Of labels of boxes and other

20     information identified in the theft report, I believe,

21     somewhere in here, or maybe it's on my timeline that I filed.

22     There were other personal documents that were on it.

23          THE COURT:  Okay.  And those documents were

24     Mr. Holmes' documents or his estranged wife's?

25          MR. GRAIFMAN:  His estranged wife, but there may have

H9ETHOLC

1    been some that had his information on them.  I haven't seen the

2    actual documents and pictures.  I was only retained like a week

3    ago I think or something.  So that's what I understand from

4    the --

5              THE COURT:  So tell me why you're in default.

6              MR. GRAIFMAN:  Well, they received something, and

7    they're a pump service company, so I know at one point there

8    was a little confusion about --

9              First, there are two registered agents in Louisiana

10   for service, Mr. Elliot, Andrew Elliot who gives an affidavit

11   here, and one other gentlemen who actually runs out of the

12   Texas office but sometimes it's Louisiana, and it wasn't

13   brought to his attention.  It went to the front desk and it

14   went to someone else.  It was originally described as I'm from

15   service, that's what they do, they service pumps.  So I think

16   there was a little misunderstand from the start there, but it

17   never came to his attention or he would have gone on it right

18   away.

19             THE COURT:  I'm sorry?

20             MR. GRAIFMAN:  Mr. Elliot, it never went to his

21   attention until the default application came, then they

22   immediately reached out for New York counsel, which they

23   eventually found me, and I wrote to your Honor right away.

24             THE COURT:  But there's no dispute that it was served

25   on your client's headquarters in Louisiana.

H9ETHOLC

1          MR. GRAIFMAN:  There was service but not to a

2    registered agent that is accessible to see who the registered

3    agents are for service of process in Louisiana.

4          THE COURT:  Is that improper service, your company

5    served at its headquarters?

6          MR. GRAIFMAN:  I can't say that because I haven't

7    looked at it, actually.  Assuming for the moment it is,

8    Checkpoint's lack of jurisdiction -- has no contact with New

9    York, and in my memorandum of law that I filed, document number

10   39, a default judgment of a party over which the Court does not

11   have personal jurisdiction due to lack of contacts with New

12   York is required to vacate a default.  That's the argument in

13   the papers.  The Court also has discretion under other grounds

14   like meritorious defenses, but the delay was 27 days.  Their

15   answer would have been due 27 days before I wrote to the Court

16   for the premotion conference letter to make the motion to

17   dismiss.

18         THE COURT:  But again, I want to make sure that I have

19   the facts right concerning service.  So it was personally

20   served by a process server at your client's headquarters and

21   service was received at that time?

22         MR. GRAIFMAN:  Papers were received but it wasn't

23   understood by whoever received it the gravity of it.  It was

24   originally described as service, and that's what they do,

25   service, that's what they do.

H9ETHOLC

1              THE COURT:  It wasn't a pump that was being delivered,

2      it was papers.

3              MR. GRAIFMAN:  Correct.

4              THE COURT:  Mr. Goettig, is it?

5              MR. GOETTIG:  That's correct.

6              THE COURT:  Let me start with this, what happened from

7      your perspective?

8              MR. GOETTIG:  Your Honor, there are many facts here

9      which are not in the dispute, but ultimately this is a case of

10     mistaken identity.

11             Mr. Holmes is under the impression that the computer

12     that was Checkpoint's computer was the computer that was

13     delivered to him by Amazon, and that's not so.  You heard

14     Mr. Holmes mention just a moment ago that the computer that was

15     delivered to him was shrink wrapped, it was a new computer.

16     Amazon has tracking.  It has a UPS tracking code indicating

17     that a new computer was delivered to Mr. Holmes.

18             The computer at issue here was not new, it was not

19     delivered by Amazon.  Amazon, by the way, used UPS to deliver

20     the computer to Mr. Holmes.  The computer at issue was dropped

21     into a Fed Ex box, so there's not even a chance that there

22     could have been a mix up at the sorting facility.  There were

23     two different carriers involved here.  So this is a case of

24     mistaken identity.

25             THE COURT:  Now Mr. Holmes indicates that he reached

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SA0129**

H9ETHOLC

1     out to you all and that there was some communications,

2     including communications from your law firm, is that correct?

3             MR. GOETTIG:  There were communications from a

4     colleague on the West Coast.

5             THE COURT:  And as I recall, he indicated that he

6     would look into the matter and get back Mr. Holmes, is that

7     right?

8             MR. GOETTIG:  That's correct.

9             THE COURT:  And what happened?

10            MR. GOETTIG:  Mr. Holmes filed this lawsuit.

11            THE COURT:  Did your colleague get back to him?

12            MR. GOETTIG:  Not to my knowledge.

13            THE COURT:  And that was over some six or seven

14     months, correct, that elapsed between the time that he said

15     that he would look into it and get back to Mr. Holmes or

16     Mr. Holmes' lawyer?

17            MR. GOETTIG:  I think that's correct, your Honor.

18            Also I should note Mr. Holmes also placed a number --

19     placed calls to Amazon's customer service line and described

20     the events at issue here, and Amazon's customer service

21     representative told him basically what I'm telling your Honor,

22     this is not the computer that -- we can't do anything for you.

23            THE COURT:  Now tell me why you're in default.

24            MR. GOETTIG:  As the papers indicate, the papers were

25     served on a security -- a third-party security person at

H9ETHOLC

1    Amazon's headquarters in Washington.  Due to an administrative

2    oversight --

3              THE COURT:  I'm sorry, it was served on who?

4              MR. GOETTIG:  A security personnel not employed by

5    Amazon, a security guard standing at the front, and that person

6    was served with the papers.

7              THE COURT:  In Washington State.

8              MR. GOETTIG:  That's correct.

9              THE COURT:  And he accepted service?

10             MR. GOETTIG:  She accepted service.

11             THE COURT:  She accepted service?

12             MR. GOETTIG:  She took the documents, that's right.

13             THE COURT:  Okay.  Then what?

14             MR. GOETTIG:  And due to an administrative lag --

15   Mr. Holmes was very proactive in seeking entry of default and

16   moving this Court for entry of default judgment, but that

17   administrative lag I would respectfully submit was very brief

18   and prejudices no one in this case.

19             THE COURT:  Okay.  And Apple, tell me what happened

20   from your perspective.

21             MR. MOSS:  Good morning, your Honor.  From our

22   perspective we think the story is quite a bit shorter.

23             We sold a new computer to Amazon on May 10, 2016.  We

24   shipped it on May 19, and delivery was confirmed on May 25th.

25   And that is pretty much our side of the story as far as the

H9ETHOLC

1    computer itself goes.

2         Now fast forward to December, we do -- Mr. Holmes is

3    quite right, he does have an attorney, they do contact us.  And

4    the attorney responsible for the case is Ms. Kaso-Howard.  She

5    has flown here from California to be here.  Apple is taking

6    this matter very seriously, your Honor.

7         And she engaged in communications with his lawyer.

8    There were two phone calls.  It was discussed that there was a

9    case here.  We said we did not think that there was a case.

10   And he said well, I'm going to talk to my client and call you

11   back.  That never happened.

12        The next thing we know, your Honor, is that we are

13   getting served personally, not through a registered agent, but

14   we're not contesting service, in July of 2017.  We routed

15   through our normal procedures.  We had a legal specialist take

16   the complaint in.  Then it goes to another individual, an

17   administrative assistant who is responsible for logging

18   documents.

19        It's identified in our internal records as a subpoena.

20   Ms. Kaso-Howard does see it.  She sees the entry and she thinks

21   to herself there is no case here, there's no active lawsuit,

22   because I was talking to his lawyer and I thought I convinced

23   him not to file a lawsuit against us, but if he did, he was

24   going to call me back, so I didn't think there was anything

25   here.  It was misidentified as a subpoena.

1          Ms. Kaso-Howard deals with hundreds of cases a year,

2    probably thousands of filings, and often times there are pro se

3    filings that are mislabeled.  And frankly, she thought that

4    this was a filing filed by a pro se plaintiff who no longer had

5    a lawyer, the lawyer said he wasn't going to file a complaint

6    without calling, that was a mislabeled document.  So we did not

7    know that it was a complaint until we saw the motion for

8    default, and we responded very promptly.

9          In fact, your Honor, for a case filed over the summer,

10   we would frankly have requested probably a 30-day extension to

11   evaluate our basis for our motion to dismiss, which I think

12   there are strong ones here, and I think that that probably

13   would have been agreed to or granted.  We didn't do that.  We

14   answered, and we answered five days before we would have filed

15   the motion to dismiss had there been a reasonable agreed

16   extension.

17         THE COURT:  So you're saying you were more diligent

18   than you were required to be?

19         MR. MOSS:  Your Honor, I'm not certainly saying we

20   were more diligent, I'm saying the case, by virtue of this

21   mistake, is probably proceeding at a faster pace than -- as to

22   us, than it would have had the mistake not been made.

23         THE COURT:  Do you know the identification number,

24   serial number of the computer, that was sent to Mr. Holmes?

25         MR. MOSS:  Well, I know the serial number of the

H9ETHOLC

1    computer that we sent, and I understand from correspondence I

2    have seen that that matches the serial number of the computer

3    that was at issue.

4         THE COURT:  So from your perspective, based on what

5    you know and the paperwork that has been presented to you, you

6    sent a particular computer to Amazon on a particular day and

7    confirmed receipt by Amazon prior to Amazon shipping said

8    computer to Mr. Holmes?

9         MR. MOSS:  Well, I don't know what Amazon did -- I

10   don't what the date of shipping was, I just know that the date

11   that they -- we have delivery confirmation notice on May 25th

12   from us to Amazon.

13        THE COURT:  So you confirmed delivery on May 25?

14        MR. MOSS:  Yes, your Honor.

15        THE COURT:  And now let me ask you again, and

16   perhaps -- I don't know whether it's you or Mr. Goettig who

17   would be the appropriate person to ask, or maybe both.

18        So you sell a computer to Amazon, and then Amazon

19   sells the computer to someone, are you out of that transaction

20   at that point?

21        MR. MOSS:  My understanding is that we are out of the

22   transaction, but there's a separate product that is sold, which

23   is the AppleCare product, and we're not out of that.  I think

24   they -- the AppleCare is sold by Amazon as well, but that

25   creates a relationship, obviously, between us and the computer

1    holder to service the computer.  I don't think it has anything

2    to do with anything that happened, but yes, we do have that at

3    that.

4              THE COURT:  So let me ask you about that, and I will

5    show in a spectacular fashion my ignorance of these things.

6    AppleCare, is that software that is put onto the computer?

7              MR. MOSS:  No, my understanding -- and your Honor I'm

8    not as well versed as perhaps I should be, but I think that is

9    essentially a warranty.

10             THE COURT:  Like an insurance policy?

11             MR. MOSS:  Yeah.

12             THE COURT:  So AppleCare is still in effect for the

13   computer that you sold to Amazon, or does it attach to a

14   particular product?

15             MR. MOSS:  No, so I think AppleCare is a separate

16   product that Amazon or that we, but in this case, Amazon sold

17   separately to Mr. Holmes.  So he purchased the computer from

18   Amazon and he also purchased AppleCare from Amazon, but

19   AppleCare is our warranty program.

20             THE COURT:  Okay.  So what does that mean?  He says he

21   has several Apple products.  He bought AppleCare in connection

22   with the purchase or at the same time as the purchase of that

23   computer, he alleges, can he bring any Apple product that he

24   previously purchased and say:  I have AppleCare, fix this?

25             MR. MOSS:  No, I believe, it's on a per product basis.

H9ETHOLC

1          MR. GRAIFMAN:  Your Honor, may I clarify something?

2          THE COURT:  Sure.

3          MR. GRAIFMAN:  Checkpoint also purchased its computer

4    from Amazon, so when the Apple attorney said we sold that

5    computer to Amazon, we purchased from Amazon on June 2nd, 2016.

6    Mr. Holmes claims he purchased his computer on June 22nd, 2016.

7    I didn't want the impression to be left that the computer that

8    Apple sold to Amazon was the same one that went to Mr. Holmes,

9    we bought ours from Amazon first.

10         THE COURT:  I understand that.  But I guess

11   Mr. Holmes' theory is that the computer that you bought from

12   Amazon made its way back into the stream of commerce and was

13   the self-same computer that Amazon therefore sent him as a

14   purported new Mac product.

15         Am I right about that, Mr. Holmes?

16         MR. HOLMES:  Yes, your Honor, you're right.

17         THE COURT:  So there we have it.

18         Okay.  With respect to -- well, I will deem the

19   papers, if they're not designated as such, as motions on behalf

20   of all of the three defendants to set aside the entry of

21   default.  And I will set aside the entry of default under Rule

22   55(c).  While vacating entry of default in the discretion of a

23   district court, there is a preference for resolving disputes on

24   the merits.  Defaults generally are disfavored and are reserved

25   for rare occasions.  Accordingly, all that must be resolved in

1    favor of the party seeking relief from the default in order to

2    ensure that, to the extent possible, the disputes are resolved

3    on the merits.

4            When determining whether there is good cause to vacate

5    entry of default under Federal Rule of Civil Procedure 55(c),

6    the district court considers three factors:  One, the

7    willfulness of the default; two, the existence of a meritorious

8    defense to the default it claims; and three, prejudice to the

9    non-defaulting party should relief be granted.  I'm citing

10   *Pecarsky v. Galaxyworld.com Limited*, 249 F.3d 167.

11           In this case, amazingly as it may seem, two of the

12   largest companies in the world and one company which is not so

13   large -- and I apologize, Mr. Graifman, but I never heard of

14   your client -- all managed to default on a very straightforward

15   case.

16           However, it is the Court's view, based on the papers

17   that have been submitted and the representations of counsel

18   here this morning, that that default was not willful.  And

19   based on our discussion, it does appear that the parties do

20   have meritorious defenses.  And in the case of the Louisiana

21   company, CheckPoint, I think it's called, may have a valid

22   jurisdictional argument to make as well.  As the parties have

23   indicated, this case has just recently been filed, and I can

24   discern no prejudice that would befall Mr. Holmes by vacating

25   the default, and therefore it is vacated.

H9ETHOLC

1              Now who has answered?

2              MR. GOETTIG:  Amazon.

3              MR. MOSS:  Apple also.

4              THE COURT:  Amazon answered?

5              MR. GOETTIG:  Yes, we filed an answer yesterday.

6              THE COURT:  And Mr. Graifman, you want to make a

7    motion to dismiss for lack of jurisdiction?

8              MR. GRAIFMAN:  Yes, your Honor.

9              THE COURT:  Okay, that application is granted.  When

10   can you get your papers?

11             MR. GRAIFMAN:  Well, I probably could -- maybe -- the

12   problem is I have -- is it possible to do it in three weeks?

13             THE COURT:  That's fine.

14             MR. GRAIFMAN:  I'm away the week of --

15             THE COURT:  Three weeks is fine.

16             MR. GRAIFMAN:  I'm away the week of September 25th.

17   I'm out in California at a legal conference part of that week.

18   If I could -- I guess turning my phone back on to look at my

19   calendar, if you bear with me, it is an Apple phone, that's a

20   coincidence.

21             What's the first -- the first Monday in October?

22             DEPUTY CLERK:  October 2nd.

23             MR. GRAIFMAN:  My calendar is up now.  Is it

24   possible -- I may be able to do it earlier, but is it possible

25   to extend it to October 9?

H9ETHOLC

1           THE COURT:  October 9 is a holiday, but sure,

2    October 10.

3           MR. GRAIFMAN:  Apologize.  Great.  October 10.

4           THE COURT:  Mr. Holmes, do you want 30 days to

5    respond?

6           MR. HOLMES:  Yes.

7           THE COURT:  30 days to respond.

8           Two weeks to reply?

9           MR. GRAIFMAN:  Two weeks, great.  Your Honor, if I

10   have the motion ready earlier, I may --

11          THE COURT:  Feel free.

12          DEPUTY CLERK:  The motion is due October 10,

13   Mr. Holmes' response is due November 10, and the reply is due

14   November 27 because the Court is closed on the 24th for

15   holiday.

16          THE COURT:  Okay.  Now I take it that the parties have

17   not spoken with Mr. Holmes concerning the discovery schedule.

18          MR. GOETTIG:  That's correct, your Honor.

19          MR. MOSS:  That's correct, your Honor.

20          THE COURT:  So why don't you do that, since you're all

21   here, take the time after we adjourn and discuss with him a

22   discovery schedule.  And there's a form that I have on the

23   website that you can use for that purpose, and assuming there

24   is substantial agreement, submit that to chambers and I will

25   take a look at it and so order it if it looks reasonable.

H9ETHOLC

1          MR. MOSS:  Your Honor, if I may, we are evaluating

2    whether or not we'll be making or requesting a premotion

3    conference to make a motion for judgment on the pleadings, and

4    I just request that that be built into the schedule.

5          THE COURT:  That's fine.

6          MR. MOSS:  Thank you.

7          MR. GRAIFMAN:  And I assume, because we're making that

8    jurisdictional motion, that we're excused from discovery?

9          THE COURT:  Correct.

10          Mr. Holmes, anything else that we need to do from your

11    perspective?

12          MR. HOLMES:  Your Honor, I did file today before I

13    came to these proceedings a memorandum of law and reply to

14    defendant Checkpoint in further support of the default

15    judgment, and I also filed an affidavit in reply to Checkpoint.

16          Also I wanted to say Bobbi Jo, she's the vice

17    president of CheckPoint, she's the same one who wrote the

18    letter saying get it back or I will get you locked up.  That's

19    the one what received service.  That's the one that received

20    process of the complaint.

21          And as far as Amazon, Amazon's representative has told

22    me from day one that they got the computer at time of the

23    purchase from Apple.  They went to Apple's warehouse and got it

24    at that exact time and not before.  Amazon is saying the

25    opposite of Apple, so I don't know who to believe.

**SA0140**

Case 22-1745, Document 104, 03/02/2023, 3477328, Page147 of 284

Case 1:17-cv-04557-RA   Document 93-4   Filed 02/12/18   Page 25 of 25
Case 1:17-cv-04557-ER   Document 54   Filed 10/18/17   Page 24 of 24          24

H9ETHOLC

1              THE COURT:  Well, we're not at that point, Mr. Holmes.

2       I mean all this will get -- it will all shake out as we go

3       through this process.  What appears to be happening now is that

4       Apple is going to make a motion also or intends to make a

5       motion to dismiss your action.  And again, we'll take it one

6       step at a time.

7              But with respect to -- and I appreciate your

8       frustration in terms of the servicing process, no one is

9       alleging that the process was improper.  And as I indicated, I

10      appreciate your frustration in that three sophisticated

11      organizations like this all in one case would default on a

12      fairly straightforward matter.  Okay?

13             MR. HOLMES:  Yes, sir.

14             THE COURT:  Anything else?

15             MR. HOLMES:  No, sir.

16             THE COURT:  From the back?

17             MR. MOSS:  No, your Honor, thank you.

18             THE COURT:  We're adjourned.

19                              o0o

20

21

22

23

24

25

**SA0141**

# Goettig Exhibit E

1

```
I1cdholc
```

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  TYRONE HOLMES,

4            Plaintiff,              New York, N.Y.

5        v.                          17 Civ. 4557(ER)

6  APPLE INC., AMAZON.COM, LLC,
   and CHECKPOINT FLUIDIC SYSTEMS
7  INTERNATIONAL, LTD.,

8            Defendants.

9  ------------------------------x

10                                  January 12, 2018
                                    2:46 p.m.
11
   Before:
12
                        HON. EDGARDO RAMOS,
13
                                        District Judge
14
                        APPEARANCES
15
   TYRONE HOLMES
16      Plaintiff Pro Se

17 O'MELVENY & MYERS, LLP
        Attorneys  for Defendant Apple Inc.
18 BY:  DAVID R. EBERHART
        HANNAH YAEL SHAY CHANOINE
19      JESSE JON KOEHLER

20 DAVIS WRIGHT TREMAINE LLP
        Attorneys for Defendant Amazon.com, LLC
21 BY:  MICHAEL JOHN GOETTIG

22 GUSRAE, KAPLAN, NUSBAUM, PLLC
        Attorneys for Defendant
23      Checkpoint Fluidic Systems Int'l., Ltd.
   BY:  BRIAN DALE GRAIFMAN
24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

**SA0143**

2

I1cdholc

1          THE CLERK:  In the matter of Holmes versus Apple, et
2   al.
3          All counsel, please state your name -- all parties,
4   please state your name for the record.
5          MR. HOLMES:  Tyrone Holmes.
6          MR. GOETTIG:  Michael Goettig, of Davis Wright
7   Tremaine, on behalf of Amazon.
8          MR. EBERHART:  David Eberhart, on behalf of Apple, and
9   with me, your Honor, are my colleagues Hannah Chanoine and
10  Jesse Koehler.
11         MR. GRAIFMAN:  And Brian Graifman for Checkpoint, the
12  defendant.
13         THE COURT:  And good afternoon to you all.  This
14  matter is on for premotion conference.
15         Both Apple and Amazon seek leave to move.  So, let's
16  begin with Amazon.  Tell me why I should grant you leave to
17  make this motion.
18         You can remain seated.  Just speak directly into the
19  microphone.
20         MR. GOETTIG:  Certainly.
21         Your Honor, I trust the Court is familiar with the
22  matter at hand.
23         THE COURT:  Yes.
24         MR. GOETTIG:  This involves a laptop that Amazon
25  delivered to Mr. Holmes.  Mr. Holmes claims that that laptop

**SA0144**

3

Ilcdholc

 1    was actually the property of codefendant Checkpoint.  There is

 2    no dispute that Mr. Holmes purchased a laptop through Amazon,

 3    and by doing so he agreed to Amazon's terms of use.  And those

 4    terms of use expressly disclaim precisely the causes of action

 5    that Mr. Holmes is asserting today.  The terms of use specify

 6    that if Mr. Holmes is dissatisfied in any way with his

 7    purchase, his sole recourse is to return the property in

 8    exchange for a full refund.

 9            Now, here, Amazon is willing to waive the return of

10    the property and is willing to issue to Mr. Holmes a full

11    refund, and on December 29th Amazon extended that offer to

12    Mr. Holmes in the form of a confession of judgment pursuant to

13    Rule 68.  Mr. Holmes rejected that offer.  So, now Amazon seeks

14    leave to deposit funds in the amount of the purchase price with

15    the Clerk of the Court to be followed by a motion for judgment.

16            THE COURT:  Mr. Holmes.

17            MR. HOLMES:  Yes, sir.

18            THE COURT:  Why won't you take the price that you paid

19    for the computer?

20            MR. HOLMES:  Because there was so much harm caused

21    from the sale of that computer.  And then he says if I wasn't

22    satisfied.  It wasn't that I was an unsatisfied customer, the

23    NYPD came after me for FedEx and Checkpoint.  It wasn't a

24    dissatisfactory.  They sill have some liability as to -- to say

25    their disclaimer trumps a sale of a computer with national

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SA0145**

4

I1cdholc

1    security information on it, with having the NYPD to illegally,

2    warrantlessly come after a regular consumer, they broke all

3    kind of laws.  I think it is absurd that they would use their

4    disclaimer to give me back a refund after all this time knowing

5    the damage that they caused, with all the filings that I had

6    put in.

7            THE COURT:  And so, Mr. Goettig, how does it work when

8    Mr. Holmes is seeking damages above and beyond the actual

9    computer itself?  You are saying that according to your

10   agreement with him, that that's all he is entitled to?

11           MR. GOETTIG:  That is correct, your Honor.  The terms

12   of use are very explicit.  Mr. Holmes asserts a claim, for

13   example, of breach of warranty.  There is no warranty.

14   Amazon's terms of use make that clear.  The products are sold

15   as is.

16           THE COURT:  Was this a new computer?

17           MR. GOETTIG:  Yes, it was a new computer.

18           There is a point of contention here.  Mr. Holmes'

19   theory of this case -- and I trust that he will correct me if I

20   am wrong about any of this -- is that the computer that was

21   delivered to him by Amazon was in fact the property of

22   Checkpoint.  Amazon respectfully submits that that is not the

23   case.  Mr. Holmes has already -- in letters from counsel as

24   well as in the submissions to the Court, Mr. Holmes has

25   represented that the computer delivered to him by UPS was in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SA0146**

5

I1cdholc

1   new, shrinkwrapped condition.  The computer at issue with the

2   NYPD had a sticker on the bottom indicating that it was the

3   property of Checkpoint.  These are two separate computers.  The

4   computer at issue was not the one that was delivered to

5   Mr. Holmes by Amazon.

6           THE COURT:  Mr. Holmes.

7           MR. HOLMES:  There -- it's almost absurd to hear

8   Amazon say this, but there is no way we can get to the bottom

9   of this without going through discovery.  I had a new computer

10  from Amazon.  The computer I got from Amazon was the computer

11  in fact in question.  The evidence that Checkpoint submitted to

12  the courts, that could have been any computer with a sticker on

13  it.  The computer I had did not have a sticker on it.  That's

14  why I say it is better to get the computer back so at least we

15  know what is going on as evidence.  They they're saying -- he

16  is alleging that Checkpoint had a sticker on the bottom of

17  their computer that said "Checkpoint."  There was no sticker on

18  the bottom of the computer I had from Apple.  To that end,

19  Apple --

20          THE COURT:  I'm sorry.  I thought that that was not in

21  dispute.  I thought that the computer that was seized, if you

22  will, by the NYPD at the warehouse facility did have a sticker

23  on it.

24          MR. HOLMES:  I don't know.  I wasn't there.  I wasn't

25  there.  And then -- and he didn't take a picture there.  That

6

I1cdholc

1    was not taken there.  That was taken someplace else.  They're

2    trying to defraud the Court or make it seem something as if it

3    were it is not.  That picture that they put in the proceedings

4    to the Court, that picture was not taken at the Chelsea mini

5    storage.  That was a computer that Checkpoint got from

6    somewhere, cooked up, and submitted that as evidence as if that

7    was the computer that they retrieved from the Chelsea mini

8    storage.

9           THE COURT:  OK.  Mr. Goettig, did you want to refresh

10   my recollection about the computer that was seized?

11          MR. GOETTIG:  Well, actually, Mr. Gravamen is counsel

12   for Checkpoint, so I trust that he will correct me if I make

13   any inaccuracies in this.  But according to Checkpoint's

14   submissions, the computer retrieved from that facility did have

15   a sticker on it, and that is submitted to the Court and as in

16   the form of admissible evidence.

17          THE COURT:  OK.

18          MR. HOLMES:  May I say one other thing?

19          THE COURT:  Absolutely.

20          MR. HOLMES:  For me to purchase a brand new laptop

21   from Amazon and for Amazon to say this is not the computer I

22   bought, this is almost insane.  But there's no way we get to

23   the bottom of this without every last defendant in this action

24   staying in this action until we find out exactly what happened.

25          THE COURT:  But the way the federal rules are written,

7

I1cdholc

1    Mr. Holmes, Amazon does have the right to make a motion under
2    these circumstances where they are going to rely solely on the
3    agreement between you and them as to what you are legally
4    entitled to.  So they have the right to make that legal
5    argument.
6             MR. HOLMES:  Yes.
7             THE COURT:  OK.  And I'm going to let them make that
8    argument.  So they will be making a motion, and we'll set a
9    schedule and you will have the opportunity to respond.  And
10   then I'll make the determination.  OK?
11            Mr. Goettig, how much time?
12            MR. GOETTIG:  A couple of administrative matters.  I'm
13   not sure if the proposed order that we submitted to the Orders
14   and Judgments Clerk has made its way to your Honor.
15            THE COURT:  I do have it.  I have not entered it.
16            MR. GOETTIG:  OK.  Assuming the Court enters that, we
17   will deposit the funds next week, and we ask for 30 days after
18   deposit of the funds.
19            THE COURT:  30 days to make the motion?
20            MR. GOETTIG:  That is correct.
21            THE COURT:  OK.  Mr. Holmes, 30 days after that you
22   will respond.
23            MR. HOLMES:  Yes, sir.
24            THE COURT:  And two weeks after that you will reply.
25   OK.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SA0149**

8

I1cdholc

1           MR. GOETTIG:  Very good, your Honor.

2           THE COURT:  Very well.

3           MR. HOLMES:  Your Honor.

4           THE COURT:  Yes, sir.

5           MR. HOLMES:  If I may?  Didn't I respond back to their

6    motion for this conference to make that motion to dismiss,

7    didn't I respond back to that, to their points that they was

8    making in their paperwork, in their moving papers?

9           THE COURT:  I'm sorry?

10          MR. HOLMES:  In their moving papers, didn't I respond

11   back to their -- the reason why I believe I feel the Court

12   should not grant them --

13          THE COURT:  Yes.  Absolutely.  That will be your

14   opportunity to respond.

15          MR. HOLMES:  OK.

16          THE COURT:  OK?

17          MR. HOLMES:  Yes.

18          THE COURT:  OK.  Anything more, Mr. Goettig?

19          MR. GOETTIG:  No, your Honor.

20          THE COURT:  OK.  Mr. Eberhart.

21          MR. EBERHART:  Yes, your Honor.

22          Apple seeks leave to file its motion for judgment on

23   the pleadings or, in the alternative, for summary judgment

24   because Apple was involved only at the very outset of this

25   case.  It is undisputed.  Apple manufactured a computer.  Apple

**SA0150**

9

I1cdholc

1    sold that computer to Amazon.  And Apple delivered that

2    computer to Amazon.  After that point in time, Apple is not

3    involved with the allegations that are set forth in the

4    complaint.

5         And although at times Mr. Holmes seems to indicate

6    that he thinks he has a contract with Apple, it's very clear

7    from the receipt that he attaches to his complaint that he

8    bought the computer from Amazon, his contract is with Amazon,

9    and he does not have a contract with Apple.  And so the breach

10   of contract claim fails because there is no contract with Apple

11   on which he can base his claim of breach of contract.

12        Now, Mr. Holmes has raised in his opposition the issue

13   of the Apple Care Plus Agreement.  First of all, Mr. Holmes

14   does not allege any breach of that agreement in his complaint,

15   so there is not a viable breach of the agreement.

16        Second of all, Mr. Holmes has not alleged that he has

17   a contract with Apple under the Apple Care Plus Plan.  I don't

18   think that is a mistake.  What he alleges is he purchased it

19   from Amazon.  So the way that this process works is just as

20   with the computer, Apple allows certain resellers, such as

21   Amazon, to resell the Apple Care Plus warranty package.  That's

22   what happened here.  Mr. Holmes is not the person who

23   ultimately activated that warranty coverage.  So he has not

24   alleged, and we believe he cannot allege, that he has a

25   contract with Apple for Apple Care Plus for the computer that

10

I1cdholc

1    is at issue.

2        THE COURT:  I'm sorry, you said that -- walk me

3    through that again.

4        MR. EBERHART:  Sure.

5        THE COURT:  I am constantly confused by this

6    transaction.  So he has an Apple Care contract?

7        MR. EBERHART:  No.  So, your Honor, there is a boxed

8    Apple Care Plus contract.  It is an actual physical box that

9    gets sold.  Apple sells --

10       THE COURT:  What is in the box?

11       MR. EBERHART:  It's basically like a coupon to redeem

12    the warranty coverage is essentially what it is.

13       THE COURT:  What does that mean?

14       MR. EBERHART:  It means that the person who calls in

15    to activate the warranty coverage can then enter into the

16    agreement with Apple.  So it has been prepaid by purchase of

17    that box, but it doesn't actually come into effect until

18    someone calls in and activates the warranty.

19       THE COURT:  And did someone do that?

20       MR. EBERHART:  They did.

21       THE COURT:  And who was that?

22       MR. EBERHART:  Not Mr. Holmes, a woman named Stephanie

23    Scott.

24       THE COURT:  Mr. Holmes, is that your wife or ex-wife?

25       MR. HOLMES:  Yes.  Yes, sir, that's my wife.  And she

**SA0152**

11

I1cdholc

1   called, and so did I several times.  I even submitted to the

2   Court the Apple Care that I submitted -- that I had with Apple.

3          I would also like to add, your Honor, Apple is being

4   disingenuous.  They know good and well Apple Care is not only

5   software but it is also hardware.  Apple Care has the ability

6   to look in any computer.  They have the ability to mirror not

7   only computers but iPhones.  So to say that they don't have a

8   contract with me is disingenuous, when I spoke to them several

9   times, when I have had a contract with them since Apple Care

10  had started.

11         THE COURT:  So if, Mr. Eberhart, it was Mr. Holmes

12  that purchased the computer and Mr. Holmes' wife that activated

13  the Apple Care contract, is it your position that he still does

14  not have standing to assert a breach or --

15         MR. EBERHART:  It is, your Honor.  And, moreover, it's

16  our position that there is no breach of the Apple Care contract

17  that is alleged or could be alleged.

18         MR. HOLMES:  Excuse me, your Honor.  I'm sorry.  Is he

19  saying that my wife is the actual recipient of the Apple Care?

20         THE COURT:  I think he's saying that your wife is the

21  one who activated it.

22         MR. EBERHART:  That is the person who activated it,

23  yes.  That is the person who activated the Apple Care coverage.

24         MR. HOLMES:  OK.  Then I would ask why would you allow

25  me to call in -- does it matter?  The Apple Care follows the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SA0153**

                                                                   12

       I1cdholc

1    computer, not the person.  They're trying to bluff you, your

2    Honor.  They're trying -- they know that you may not be privy

3    to all the Apple Care and rules, but Apple Care follows the

4    computer, not the person.

5            THE COURT:  Has any discovery been taken with respect

6    to this issue, Mr. Eberhart?

7            MR. EBERHART:  No, your Honor.

8            THE COURT:  This is what is going to happen with

9    respect to that, Mr. Holmes.  I am going to let them make their

10   motion as well, and you will have an opportunity to respond.

11           Will you be making the motion pursuant to 12(c) or --

12           MR. EBERHART:  12(c) and in the alternative 56, your

13   Honor.

14           THE COURT:  OK.  So you will have an opportunity to

15   respond.  If I determine that it should be ruled under Rule 56

16   of the Federal Rules of Civil Procedure, it may be the case

17   that you are entitled to some discovery.  So, we'll see.

18           MR. HOLMES:  Yes, sir.

19           THE COURT:  So when do you want to make your -- 30

20   days to make your motion, Mr. Eberhart?

21           MR. EBERHART:  That is fine your Honor.  We are

22   prepared to make it earlier, but I believe it does make sense

23   to coordinate with Amazon.

24           THE COURT:  So 30 days.  30 days to respond,

25   Mr. Holmes, and two weeks to reply.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300


                            **SA0154**

13

I1cdholc

1           MR. HOLMES:  Yes, sir.

2           THE COURT:  So let's get the dates.

3           MR. GOETTIG:  Your Honor, out of an abundance of

4    caution, I would submit that Amazon also anticipates making

5    this motion under 12(c) but also reserves the right to make

6    that motion in the alternative under Rule 56, to the extent

7    that the Court considers the offer of judgment outside the

8    pleadings.

9           THE COURT:  Very well.

10          MR. HOLMES:  I have a question, your Honor.

11          THE COURT:  Sure.

12          MR. HOLMES:  Is there any way the federal courts can

13   assist me in getting some outside help?  Because this involves

14   more than just the damages they caused me, this involves all

15   kinds of laws and wrongs that they broke -- FICA, espionage,

16   cyber security.  I mean, it's so technical here.  And it seems

17   like -- it seems like they're trying to get off on

18   technicalities when this is so straightforward -- as we say,

19   this is a straightforward case.  I was sold a bad Apple, and

20   there is a train that follows that Apple.  We can find out what

21   happened.

22          You know, I didn't steal the computer.  I don't know

23   why Amazon would allege, after being a faithful customer, that

24   the computer in question is not the computer that this case is

25   about.  But we can surely find out.  We can find out what

14

I1cdholc

1    happened.  And the only way to find out is if you make -- if

2    you allow us -- if you rule that we make this happen.  If you

3    don't, they are going to get away with it, your Honor.

4           THE COURT:  To answer your question, the only thing

5    that I can do for you, Mr. Holmes, is I can refer you, as I

6    believe I have on a prior occasion, to the *pro se* clinic.

7           MR. HOLMES:  I went there, your Honor.  It was a joke.

8    I need to say that on the record.  I went there and if that's

9    what people -- if that's their last resort, I feel sorry for

10   them.  I went there.  I went there.  I was early.  I'm on-time

11   musician.  Today was a little extreme because of the delay and

12   the fire trucks kept me -- prohibited me from entering the

13   block.  But people at the end of their rope, if they have to

14   rely on the *pro se* clinic, your Honor, that needs to be

15   revamped, because it was awful.  It was awful.  They didn't

16   help me.  They barely gave me three minutes.  I waited all day.

17   And when they did arrive, it wasn't a help.

18           You know, at that point it seemed like -- it seemed

19   like I knew more than one of the -- I wasn't coming off that

20   way and I was playing like, you know, just tell me what I need

21   to know, what can I do, but it seemed to me that I know more

22   than the lawyer that was there.

23           THE COURT:  Well, again, as a judge, I have to be

24   neutral, and I can't help one side as against the other.  I can

25   again refer you to that clinic.  Other than that, you can try

**SA0156**

15

I1cdholc

1   to find legal counsel on your own.

2          MR. HOLMES:  Everybody is scared because they have

3   endless money, your Honor.  They have endless money.  I went to

4   every firm, every lawyer.  They are all ascared because they

5   know Apple and Amazon have unlimited resources, and I'm saying

6   I come to the federal Court.  Somebody stole their computer

7   that destroyed my life and lives around me.

8          How do we get this out in the open?  How do we have

9   discovery?  I mean, I don't know where else to go, what else to

10  do?  It is almost like I am in the twilight zone, seeing this

11  happen in slow motion, and it seems like no one really cares.

12  They have 1700-plus lawyers -- each one of them.  It is just

13  me.  I wasn't into doing bad things or doing something.  I was

14  into doing positive stuff, into community, into activism, into

15  production, and these guys ruined it all.  Lucky for me, it was

16  caught in realtime because I do stuff in church, I do stuff in

17  the community or in video, and there is a trail -- there is a

18  trail that can show you what I was doing before I knew that

19  NYPD would say come outside, you have a computer that belongs

20  to the Department of Defense.  Right up to that point, I can

21  show you what I was doing.  I can show the Court.  I can't make

22  that up.  It's all in the email.

23          So for them to know this -- for the courts to know

24  that this was an innocent bystander that got caught in a

25  Department of Defense mess, a corporate screwup mess, why can't

**SA0157**

16

I1cdholc

1    we help this young man get his life back together?  These guys

2    surely screwed it up.  I don't know, some defendants may have

3    more liability than others, but certainly all four of them are

4    involved, every last -- Apple, Amazon, Checkpoint and FedEx.

5              THE COURT:  FedEx is not involved in this case.

6              MR. HOLMES:  Right.  Well, I amended the complaint to

7    add them.  And then -- I'm sorry, to that end, Apple

8    submitted -- in their last moving papers, Apple submitted to

9    the Court that they agree with me that Amazon and XYZ -- that

10   Checkpoint did XYZ, that FedEx did XY -- so if they're agreeing

11   with me, that should give cause to at least investigating

12   further.  Something tragic happened.  Something tragic

13   happened.  And then Amazon -- I mean Apple, in their moving

14   papers, now they say they agree with me on certain points.

15   Does that account for anything?

16             THE COURT:  I don't know.

17             Mr. Eberhart, what do you agree with him on?

18             MR. EBERHART:  Your Honor, what he is referring to, I

19   believe, is in our premotion letter.  We note that it was

20   either Checkpoint or FedEx who communicated with the NYPD and

21   it wasn't Apple.  We don't know which it was, but we know it

22   wasn't us.  And the complaint makes it clear it was not Apple

23   that made that report to the NYPD.

24             MR. HOLMES:  They agreed on four points.  That was

25   just one of the points.  They agreed that I bought the computer

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SA0158**

17

I1cdholc

1    from Amazon.  They agreed that it was delivered.  They agreed

2    that Checkpoint and FedEx called the police on me.

3              THE COURT:  I think he is saying that he doesn't know

4    who called the police.

5              MR. EBERHART:  I don't know who called the police.

6              What we're saying, your Honor, is that it is clear

7    from the pleadings that these are all actions alleged to have

8    been taken by persons other than Apple, and that's the basis --

9              THE COURT:  OK.

10             MR. GOETTIG:  And, your Honor, if I may?

11             THE COURT:  Sure.

12             MR. GOETTIG:  I hear Mr. Holmes' frustration.  He

13   wants to get to the bottom of this.  I would respectfully

14   submit that he is looking in the wrong places to get to the

15   bottom of this.  It is undisputed that Amazon delivered a new

16   laptop to Mr. Holmes.  It is also undisputed -- well, it is --

17   it has been demonstrated through admissible evidence, which is

18   before the Court on Checkpoint's motion, that the laptop

19   recovered from the facility had a sticker on it.  Somewhere

20   there is a disconnect, but it does not involve Amazon.  I would

21   submit --

22             MR. HOLMES:  I will also submit, Apple, if we have a

23   computer -- if your Honor has an iPhone, if I have an iPhone,

24   Apple can check and track where we were at the alleged time

25   Checkpoint is saying I went to Louisiana, flew to the airport,

**SA0159**

18

Ilcdholc

1   and stole a computer.  Apple can know where I was at that
2   precise minute, everyone in this courtroom.  Apple also can
3   track our computers, our Apple computers.  It can track our
4   movement.  They can track where we are with computers.  Not
5   only can they track it, they can mirror it.  So Apple is
6   significantly staying in this case, in addition to their
7   liability issues, in addition to the causes I got for them
8   being liable for some of the things that transpired since I was
9   sold this new computer that Amazon said they didn't sell me.
10  That alone should give credence to finding out, well, where is
11  the computer Mr. Holmes bought?  Where did it come from?  How
12  did the computer Mr. Holmes bought happen to wind up belonging
13  to Checkpoint with preinstalled software?  Why did they wait
14  three -- why did they monitor him for two months?  Why did they
15  monitor him?  Did they think I was part of a terrorist plot?
16  Why did they monitor me for two-and-a-half months before they
17  came and sent the NYPD to me?  These are questions that we need
18  to find out.
19          THE COURT:  We may or may not get there ultimately,
20  Mr. Holmes.  The only thing that I can tell you, the only offer
21  that I can make is that I will make sure that I will do
22  everything to the best of my ability to apply the Federal Rules
23  of Civil Procedure as best as I can and to make sure, to the
24  best of my ability, that you gets a fair hearing.
25          MR. HOLMES:  Fair enough.

**SA0160**

19

I1cdholc

```
 1          THE COURT:  OK?
 2          MR. HOLMES:  Yes, your Honor.
 3          THE COURT:  Beyond that, that is about all that I can
 4   do for you, unfortunately.  OK?
 5          MR. HOLMES:  Yes, sir.
 6          THE COURT:  OK.  Anything else that we need to do
 7   today, Mr. Goettig?
 8          MR. GOETTIG:  We negotiated -- we have a scheduling
 9   order.
10          THE COURT:  OK.
11          MR. GOETTIG:  Which is pegged to -- with regard to
12   discovery, it is pegged to the Court's disposition of these
13   motions.  So I'm not sure how much sense it makes at this point
14   to submit it to the Court but --
15          THE COURT:  I have it.
16          MR. GOETTIG:  Oh, it has been submitted.  Oh, I
17   apologize.
18          THE COURT:  Yes.  And, Mr. Holmes, did you sign off on
19   these dates as well?
20          MR. HOLMES:  Yes.  I spoke with Hanna yesterday and
21   David, and, yes, we agreed on that schedule.
22          THE COURT:  OK.  I mean, I haven't reviewed it.  I
23   will take a look at it.  And if it seems OK, I'll go ahead and
24   enter it.
25          MR. EBERHART:  And, your Honor, we will be submitting
```

**SA0161**

20

I1cdholc

1    a form of protective order to the Court that would cover

2    obviously any discovery.  There may also be some aspects of our

3    filing that will need to be under seal.  So we'll deal with

4    that.  It might prove -- I don't know if the Court has a

5    preferred form of protective order.  We have looked.  We didn't

6    see it.

7             THE COURT:  No, I don't have one at this point.

8             MR. EBERHART:  So we will work together to submit

9    something.  And, you know, it may be worth, you know, for

10   Mr. Holmes' benefit having him have some understanding of that.

11   It is based, obviously, to cover confidentiality of our

12   materials that are submitted in the case.

13            THE COURT:  Now, Mr. Holmes, it is not unusual in

14   cases for courts to enter protective orders.  And what that

15   means is that there are very strict limits on how you can use

16   the information that you obtain from either Amazon or Apple or

17   any other party.  Then you would be under an obligation if you

18   were to become signatory to that protective order to make sure

19   that you do not misuse those materials.  Obviously you will be

20   able to use it -- to use those materials to prosecute your

21   case.

22            MR. HOLMES:  Right.

23            THE COURT:  But you would not be able to publicize

24   those materials or share them with other people.

25            MR. HOLMES:  Yes, your Honor.

21

I1cdholc

1          THE COURT:  OK?

2          MR. HOLMES:  Yes.

3          THE COURT:  That will be all spelled out in the order.

4      And you should also be aware that the courts are, you

5      know, very serious about enforcing those orders, and you can

6      get yourself into a lot of trouble if you violate any of the

7      terms of that order.  And I'm saying this to you not because I

8      believe that you will violate it but just because this is not

9      what you do for a living and it is a very, very serious aspect

10     of litigation.

11         MR. HOLMES:  OK.  Your Honor, can I just say one more

12     thing?

13         THE COURT:  Sure.

14         MR. HOLMES:  And I hope I'm not running the Court.

15     I can get in trouble, and meanwhile my information is

16     in a bind somewhere in a foreign nation.  And I can get in

17     trouble for -- you know, it is just something is, is -- I don't

18     know what to say.  This is crazy.

19         THE COURT:  Well, this aspect of it -- again, this is

20     a very common aspect of litigation.  It is not unusual to enter

21     protective orders in cases.  Again, the only thing that you

22     need to do is be very careful about only using the information

23     that you receive pursuant to that protective order for purposes

24     of litigation.

25         MR. HOLMES:  Yes, sir.

**SA0163**

22

I1cdholc

```
 1              THE COURT:  OK?

 2              MR. HOLMES:  Got it.

 3              THE COURT:  Very well.  Anything further?

 4              MR. EBERHART:  No, your Honor.

 5              MR. GOETTIG:  No, your Honor.

 6              THE COURT:  Mr. Holmes?

 7              MR. HOLMES:  No, sir.

 8              THE COURT:  OK.  So -- and, again, please do engage

 9      when you get contacted by the attorneys for any reason, do

10      respond to them.  And if you are going to need any additional

11      time responding to the motions, just contact chambers.  I try

12      to get their consent.  And in any event, contact chambers to

13      request any adjournment.  OK?

14              MR. HOLMES:  OK.

15              THE COURT:  Very well.  Unless there is anything

16      else -- oh, the dates.  I'm sorry.

17              THE CLERK:  The motions are due February 12, 2018.

18      The oppositions are due March 12, 2018, and the reply is due

19      March 26, 2018.

20              THE COURT:  OK.  So your response is due March 12,

21      Mr. Holmes.

22              MR. HOLMES:  Your Honor, is she going to send

23      something out on the docket that reflects what you just said?

24              THE COURT:  Yes.

25              MR. HOLMES:  OK.
```

**SA0164**

23

Ilcdholc

1          THE COURT:  That will be on the docket, that schedule.
2     OK?
3          MR. HOLMES:  Yes, your Honor.
4          THE COURT:  Very well.  We are adjourned.  Have a good
5     weekend everyone.
6          ALL COUNSEL:  Thank you, your Honor.
7          THE CLERK:  All rise.
8
9                              -  -   -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SA0165**

# Goettig Exhibit F



January 9, 2017

**VIA HAND DELIVERED**

The Honorable Edgardo Ramos
United Stated District Court of SDNY
40 Foley Square
New York, New York 10007

**Re: *Holmes v. Apple, Inc., et al.,* Case No. 17-CV-4557-ER**

Dear Judge Ramos,

Plaintiff has submitted to the courts solid evidence as it relates to **all** the defendants involvement, and addressed their latest letters. Until discovery is over, we won't have a clearer picture as to liability.

Todays letter I wanted to address Amazon being unethical sending your Honor our correspondence email's about the insulting settlement offer they initiated. My thought process was, if Amazon had the audacity to offer as a settlement, a **refund**, with them knowing at least the basics of what transpired and the harm caused, then I had the audacity to ask for 50-100 million dollars.

**Undisputed Fact Pattern**

I have been with Apple since 1991 and personally owned over 234 macs.  I have been with Amazon since 2010 and have purchased hundreds and hundreds of items. To that end, I wrote Tim Scott and Jeff Bezos, a heart felt detailed letter on **December 5, 2016**. Amazon replied with the infamous "**In due course**" letter in which they never responded, and Apple said to go to hell.

The above facts, coupled with the **default**, **face to face interaction**, yes, I believe they are pure racist… Further, had I been caucasian, this whole situation would have been handled differently **from the very start…** Why is Amazon, Apple and CheckPoint attempting to evade discovery? Why would these mega defendants not want to know what happened in their product distribution business that led to a duplicate sale with **tragic results**, involving **national security** equipment, that was sold "as new" on Amazon.com with **AppleCare™**, to an **unwitting consumer?**



**Being Hunted Down by the NYPD, from an Amazon.com New Apple Sale in 2016.**

I wanted to also address one other thing concerning Amazon's letter. Amazon _doesn't see the 16 minute NYPD call as shocking and frightening_. I wonder why? On planet earth, they will **never know** what it feels like to be in black skin, hunted down, and in an environment where getting shot at a traffic stop, in that particular month of September 2016, was the norm. I will suffer from the effects of this **corporate screw-up,** for the rest of my life.


**Amazon and Apple Still has not Apologized, while trying to Evade Responsibility.**

Lastly, Amazon is so detached from reality, they don't even realize that _16 minute NYPD phone_ call was the **beginning of the 30 day trauma cycle.** This sole incident has caused my demise. Unfortunately, for these defendants, Plaintiff was not some lazy negro on welfare sitting at home on his but all day, or hanging out on the corner with a 40 oz. Plaintiff was an innovator, digital engineer, audio editor, producer, organist, executive pastor, tuned in father of (5), focused, dedicated, determined and a community activist. Busy, busy, busy doing what he loved, helping people, doing productions and building better communities. These insensitive companies ruined everything, **and we need to find out why, who and what**.

I have attached a few articles, so defendant Amazon can see why the 16 minute NYPD call was **shocking** and **frightening** to Plaintiff, a black male in the Bronx, in 2016, with **no prior criminal history**, about to go to prison for (4) years, if, not accidentally shot first, and all from an innocent purchase of a **Bad Apple, off of Amazon.com**.


Prayerfully Submitted,

Tyrone Holmes



Case 22-1745, Document 104, 03/02/2023, 3477328, Page175 of 284

Case 1:17-cv-04557-RA    Document 93-6    Filed 02/12/18    Page 4 of 4
Case 1:17-cv-04557-ER    Document 82    Filed 01/09/18    Page 3 of 3





# Goettig Exhibit G

Case 22-1745, Document 104, 03/02/2023, 3477328, Page177 of 284

Case 1:17-cv-04557-RA    Document 93-7    Filed 02/12/18    Page 2 of 5
Case 1:17-cv-04557-ER    Document 81    Filed 01/05/18    Page 1 of 4

**VIA HAND DELIVERED**

**The Honorable Edgardo Ramos**
**United States District Court for the SDNY**
**40 Foley Square**
**New York, New York 10007**

**Re: Holmes v. Apple Inc., et al.,**

Dear Judge Ramos,

Regarding Apple's letter dated January 4, 2018 (Doc 77)   ᥴ ∪ ‑ ⁊ ‑ Ꮞ ꜱ ꜱ ⁊

There is still a claim(s) against Apple and they should be kept in the case. I do have a contract with Apple,  a service contract and/or warranty contract for AppleCare™. Apple has liability under that claim. (I have attached a few call-ins to AppleCare™ while in possession of Apple MBP w/ AppleCare)

This case is still a mystery **until discovery is over**. Until the facts become clear, we do not know what exactly happened. At this time, there could be two Apple computers involved - one that I bought and one that Checkpoint bought. Maybe Checkpoint received my computer, or vis-a-versa, and perhaps it was defective from the start. Or maybe it wasn't defective, but I should have been notified by AppleCare™ that the product was modified or there was a problem with it, **especially while communicating with them**. Therefore, I may have a negligence and product liability claim as well. Nobody knows for sure "exactly" how AppleCare™ works, but Apple. Nobody knows what happened to the computer I bought, whether there are two computers with the same serial number, or one computer with two serial numbers, or exactly how this whole mess happened.

Lastly, I appreciate Apple trying to shed light on a few **undisputed facts**, while leaving out AppleCare™ and its attachment to this case… However, **everyone** need to stay put in this case, until we find out what happened, who and why. **Discovery has to happen to sort it out, shake it out…** After that, all parties should have a clearer picture as to liability.

Sincerely,

Tyrone Holmes

JAN 0 5 2018

P.S. Your Honor, I'm a little concerned that my response to Amazon's letter for a pre-motion conference was granted before my response letter showed up on the docket I filed January 2nd, and your Honor did not have a chance to review it, prior to the request being granted. I called your Honors chambers to alert that I had a reply letter filed and it wasn't reaching the docket system for some reason or another. There should be no more motions until **after discovery**. Amazons 1700+ lawyers against me is a bit much, however none of the defendants have a defense for what happened to me and their negligence. Until we find out what, who, and how, how can we allow anyone out?

All defendants can afford to make motion after motion and keep this going until we all retire, is this fair to me, when all I did was be a model citizen of the United States of America, while trying to help people? I had a meticulous reply to Amazon's letter for pre-conference and had addressed all that they were saying, however in the reply I submitted on January 2nd, I just dealt with the legal aspects of it. I will address Amazons letter in detail on or before the 9th as instructed by the courts.

Thank you your Honor for taking the time to read my letter.

**From:** Apple noreply@email.apple.com
**Subject:** Thanks for contacting Apple Support.
**Date:** July 28, 2016 at 9:00 AM
**To:** tymax@mac.com



# Thanks for contacting us.

Hi Tyrone,

Your support Advisor has a follow-up message for you.

Here is your case number, in case you have any questions or concerns about the issue
the call. Again, my name is Jackie. Thank you for calling please return call if any questi

If you need to reopen this case, click the link below.

Case: 1182679576

We are here to help. At Apple Support, you can learn more about your product, downlo
the latest software updates, and share tips and solutions with other users. You can als
find out the best way to contact us.

Thanks,
Apple Support

TM and copyright © 2016
All Rights Reserved / Privacy Policy / Support / Give us feedback

From: **Apple Support** AppleSupport@InsideApple.apple.com
Subject: **Your Recent AppleCare Professional Support Experience**
Date: July 6, 2016 at 12:48 PM
To: tymax@mac.com



# We'd like to hear from you.

You recently contacted AppleCare Professional Support.
We'd love to hear about the experience.

Your Advisor: Sergey
Your Case ID: 1167928921
Your Product: Final Cut



Thanks for taking the time to share your thoughts.

Sincerely,
AppleCare Professional Support

The survey will be available for a limited time. We hope you can provide us feedback to improve our support program.

We are here to help. At Apple Support, you can learn more about your product, download the latest software updates and solutions with other users. You can also find out the best way to contact us, Contact Apple Support.

TM and copyright © 2016
All Rights Reserved / Privacy Policy / Apple Support / Unsubscribe from future surveys

# Goettig Exhibit H

Hepler v. Abercrombie & Fitch Co., 607 Fed.Appx. 91 (2015)

24 Wage & Hour Cas.2d (BNA) 1704

KeyCite Yellow Flag - Negative Treatment

Not Followed on State Law Grounds Zeitlin v. New York Islanders
Hockey Club, L.P., N.Y.Sup., July 1, 2015

607 Fed.Appx. 91

This case was not selected for
publication in West's Federal Reporter.

RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL.

United States Court of Appeals,
Second Circuit.

Veronique HEPLER, individually and on behalf
of all others similarly situated, Dominique
Marceau, Hillary Gibbs, Shurika Roberts–
Crawford, Reed Hoffman, Cynthia Chan, Caitlyn
Angelidis, Patrick O'Connell, Holly Adriaansen,
Katherine Blau, Jenny Sam, Plaintiffs–Appellants,
v.
ABERCROMBIE & FITCH CO., Abercrombie

Fitch Stores, Inc., Defendants–Appellees. *

\*    The Clerk of Court is respectfully directed to amend
the official caption in this case to conform with the
caption above.

No. 14–4113–cv.
|
June 22, 2015.

Appeal from a judgment of the United States District
Court for the Eastern District of New York (Wexler, J.).
**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED AND DECREED** that the
judgment of the district court be **VACATED** and that this
matter be **REMANDED.**

**Attorneys and Law Firms**

**\*92** Seth R. Lesser (Fran L. Rudich, Klafter Olsen &
Lesser LLP, Rye Brook, NY, Bradley L. Berger, Berger
Attorney P.C., New York, NY, on the brief); Klafter
Olsen & Lesser LLP, Rye Brook, NY, for Appellants.

Daren S. Garcia (Mark A. Kneuve, Michael J. Ball
& Natalie M. McLaughlin, on the brief), Vorys, Sater,
Seymour and Pease LLP, Columbus, OH, for Appellees.

PRESENT: DENNIS JACOBS, ROSEMARY S.
POOLER, and PETER W. HALL, Circuit Judges.

*SUMMARY ORDER*

Plaintiffs appeal from the judgment of the United States
District Court for the Eastern District of New York
(Wexler, J.), dismissing as moot their claims against
Abercrombie & Fitch Co. and Abercrombie & Fitch
Stores, Inc. (collectively, "Abercrombie"). We assume
the parties' familiarity with the underlying facts, the
procedural history, and the issues presented for review.

On appeal from a judgment of dismissal for lack of subject
matter jurisdiction, we review factual findings for clear
error and legal conclusions *de novo. Makarova v. United
States,* 201 F.3d 110, 113 (2d Cir.2000).

**1.** The following analysis applies to offers of judgment: [1]

[1]    The offer need not comply with the requirements of
Federal Rule of Civil Procedure 68. *Doyle v. Midland
Credit Mgmt., Inc.,* 722 F.3d 78, 79 (2d Cir.2013) (*per
curiam*). It must, however, be an offer of *judgment,* not
simply an offer of settlement. *Cabala v. Crowley,* 736
F.3d 226, 228–29 (2d Cir.2013) (*per curiam* ).

(a) If the offer tenders *less than complete* relief, the plaintiff
is free to accept or not. If such an offer is accepted, the
court must enter judgment accordingly and terminate the
case; if such an offer is not accepted, the case proceeds
as usual. *Tanasi v. New Alliance Bank,* 786 F.3d 195 (2d
Cir.2015). Under certain circumstances, an unaccepted
offer may shift costs to the offeree. *See* Fed.R.Civ.P.
68(d).

(b) If the offer tenders *complete* relief, the court
should (absent additional procedural complications) enter

**SA0176**

Hepler v. Abercrombie & Fitch Co., 607 Fed.Appx. 91 (2015)

24 Wage & Hour Cas.2d (BNA) 1704

judgment pursuant to the terms of that offer, with or without the plaintiff's consent. *McCauley v. Trans Union, L.L.C.,* 402 F.3d 340, 341 (2d Cir.2005); *Cabala v. Crowley,* 736 F.3d 226, 228 (2d Cir.2013) (*per curiam* ); *accord Tanasi,* 786 F.3d at 200. A defendant offering judgment for complete relief is, in essence, submitting to the entry of default judgment. *Abrams v. Interco Inc.,* 719 F.2d 23, 32 (2d Cir.1983) (Friendly, *J.*). Just as a defendant may end the litigation by allowing default judgment, a defendant may always end the litigation by offering judgment for all the relief that is sought. *Id.; McCauley,* 402 F.3d at 342.

We have described an offer of judgment for complete relief as "mooting" the case. However, the *offer* by itself does not moot anything, *Tanasi,* 786 F.3d at 200, since an offer cannot bind the defendant to provide relief, *McCauley,* 402 F.3d at 342. It is the entry of *judgment* pursuant to that offer that "moots" the case. *Tanasi,* 786 F.3d at 200; *McCauley,* 402 F.3d at 342. Mootness, in the constitutional sense, would require dismissal for lack of subject matter jurisdiction. An unaccepted offer of judgment, however, does not impair subject matter jurisdiction: the court retains jurisdiction to either enter judgment in favor of the plaintiff (if the offer tenders complete relief) or allow the case to proceed (if the offer does not).

**\*93 2.** In light of the foregoing, the district court erred by dismissing the case for lack of subject matter jurisdiction

based on Abercrombie's unaccepted offers of judgment to Hepler and Marceau. Accordingly, we vacate and remand for further proceedings consistent with this summary order.

Abercrombie's offers of judgment have, by now, lapsed. Should Abercrombie renew those offers on remand, the court should consider the following:

(a) We have previously addressed the appropriate course of action when a court rules that certain relief is unavailable, and the defendant subsequently makes an offer of judgment for the remaining relief. *ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.,* 485 F.3d 85, 92–93, 95 (2d Cir.2007); *Abrams,* 719 F.2d at 32.

(b) As to the state law claims, the complaint alleges not only supplemental jurisdiction, 28 U.S.C. § 1367, but also original federal jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

For the foregoing reasons, and finding no merit in Abercrombie's other arguments, we hereby **VACATE** the judgment of the district court and **REMAND** for further proceedings consistent with this summary order.

**All Citations**

607 Fed.Appx. 91, 24 Wage & Hour Cas.2d (BNA) 1704

---

End of Document                     © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Goettig Exhibit I

Peters v. Amazon Services, LLC, 669 Fed.Appx. 487 (2016)

669 Fed.Appx. 487 (Mem)
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 9th Cir. Rule 36-3.
United States Court of Appeals,
Ninth Circuit.

Jo Ellen PETERS and Ken Kane, on
behalf of themselves and all others
similarly situated, Plaintiffs–Appellants,
v.
AMAZON SERVICES, LLC, Defendant–Appellee.

No. 14-35294
|
Argued and Submitted September
1, 2016 Seattle, Washington
|
Filed October 13, 2016

Appeal from the United States District Court for
the Western District of Washington, *488 Marsha J.
Pechman, District Judge, Presiding, D.C. No. 2:13–cv–
00480–MJP

**Attorneys and Law Firms**

Britton D. Monts, Attorney, The Monts Firm, Austin,
TX, Jennifer Rust Murray, Attorney, Beth Ellen Terrell,
Attorney, Terrell Marshall Law Group PLLC, Seattle,
WA, for Plaintiffs–Appellants

James Harlan Corning, Attorney, John A. Goldmark, I,
Esquire, James Grant, Attorney, Davis Wright Tremaine
LLP, Seattle, WA, for Defendant–Appellee

Before: SCHROEDER, McKEOWN, and DAVIS,[*]
Circuit Judges.

[*]    The Honorable Andre M. Davis, United States
Circuit Judge for the U.S. Court of Appeals for the
Fourth Circuit, sitting by designation.

MEMORANDUM[**]

[**]    This disposition is not appropriate for publication
and is not precedent except as provided by Ninth
Circuit Rule 36–3.

Jo Ellen Peters and Ken Lane appeal the district court's
order compelling arbitration of their claims against
Amazon Services LLC ("Amazon"). We have jurisdiction
under 9 U.S.C. § 16(a)(3). We review de novo the district
court's order compelling arbitration. *Circuit City Stores,
Inc. v. Mantor*, 417 F.3d 1060, 1063 (9th Cir. 2005).

The district court did not err in concluding that Lane and
Peters agreed to arbitrate their disputes with Amazon.
The Federal Arbitration Act ("FAA") provides that
arbitration agreements "shall be valid, irrevocable, and
enforceable," 9 U.S.C. § 2, and the FAA mandates
that courts compel arbitration as to issues encompassed
by valid arbitration agreements, *Dean Witter Reynolds,
Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 84
L.Ed.2d 158 (1985). Lane and Peters agreed to Amazon's
Business Solutions Agreement ("BSA"), which contains
an unambiguous agreement to arbitrate "[a]ny dispute ...
or claim relating in any way" to the BSA or use of
Amazon's services. The BSA, as "a contract evidencing a
transaction involving commerce," is subject to the FAA
and must be enforced. *See* 9 U.S.C. § 2.

Lane and Peters counter that Amazon's Marketplace
Participation Agreement ("MPA"), which contains
a forum selection clause, mandates litigation, not
arbitration. They argue that the MPA, as one of Amazon's
"Program Policies," takes precedence over the BSA
and makes the arbitration clause unenforceable. This
argument fails because the MPA falls within the BSA's
definition of a "Seller Agreement," and therefore does not
constitute one of Amazon's separately defined "Program
Policies."

Lane also argues that, regardless of what happens to
Peters or the purported class, his individual claims are
governed exclusively by the MPA because they arise out of
an account formed prior to the BSA's existence. However,
Lane did sign the BSA, which represents the parties'
"entire agreement" and supersedes all prior agreements,
and the BSA's broad arbitration clause covers "[a]ny
dispute ... or claim" and is not limited to prospective
disagreements.

Accordingly, the district court did not err when it
compelled arbitration.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.                1

Peters v. Amazon Services, LLC, 669 Fed.Appx. 487 (2016)

**AFFIRMED.**

**All Citations**

669 Fed.Appx. 487 (Mem)

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Goettig Exhibit J

Corwin v. NYC Bike Share LLC, Slip Copy (2017)

2017 WL 4075213
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ronald D. CORWIN, et al., Plaintiffs,
v.
NYC BIKE SHARE LLC, et al., Defendants.

14-CV-1285 (SN)
|
Signed 03/13/2017

**Attorneys and Law Firms**

Martin William Edelman, Edelman & Edelman, P.C., New York, NY, Michael K. O'Donnell, Law Office of Michael K. O'Donnell, Greenwich, CT, Neil R. Finkston, Law Office of Neil R. Finkston, Great Neck, NY, for Plaintiffs.

### ORDER

SARAH NETBURN, United States Magistrate Judge

**\*1** A review of the Notice of Motion for Summary Judgment filed by cross-defendants Alta Planning + Design, Inc. and Alta Planning + Architecture + Design of New York, PLLC (jointly, "APD") indicates that APD sought summary judgment on and dismissal of all cross-claims. Despite the voluminous briefing in this case, cross-claiming defendants did not oppose APD's motion and APD made only passing reference to its entitlement to

summary judgment as to the cross-claims against it in its briefing papers.

In its March 1, 2017 Opinion and Order, the Court inadvertently overlooked APD's cross-claims, granted APD's motion "in its entirety" and dismissed APD from the case. This was in error, as no substantial briefing was filed in opposition to APD's motion as it pertained to the cross-claims. Therefore, the Court VACATES that portion of the March 1, 2017 Opinion and Order which granted APD's motion as it pertains to cross-claimants' claims.

A fair resolution of this case demands both that the remainder of APD's summary judgment motion be adjudicated on the merits and that the cross-claiming defendants be granted a fair opportunity to oppose this motion before trial. Accordingly, the cross-claiming defendants may file opposition briefs of no more than 10 pages by Friday, March 24, 2017. Cross-claimants shall respond to APD's motion and its March 13, 2017 letter. APD may file a reply brief not to exceed 10 pages by Monday, April 3, 2017. Given the extensive briefing conducted in support of defendants' and in opposition to plaintiffs' motions for summary judgment, the Court expects that the parties will make reference to documents already presented to the Court, rather than presenting additional declarations with new exhibits.

**SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 4075213

# Goettig Exhibit K

Bank v. Carribean Cruise Line, Inc., 606 Fed.Appx. 30 (2015)

606 Fed.Appx. 30
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals,
Second Circuit.

Todd C. BANK, Individually and on Behalf of All
Others Similarly Situated, Plaintiff–Appellant,
v.
CARIBBEAN CRUISE LINE,
INC., Defendant–Appellee.

No. 14–4720.
|
July 10, 2015.

Appeal from a judgment of the United States District
Court for the Eastern District of New York (Gleeson, J.).

**Attorneys and Law Firms**

**\*31** Todd C. Bank, pro se, Kew Gardens, NY, for
Plaintiff–Appellant.

John H. Pelzer, Greenspoon Marder, P.A., Fort
Lauderdale, FL, for Defendant–Appellee.

Present: ROSEMARY S. POOLER, RAYMOND J.
LOHIER, JR. and CHRISTOPHER F. DRONEY,
Circuit Judges.

*SUMMARY ORDER*

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment is **AFFIRMED.**

Todd C. Bank, an attorney proceeding pro se, appeals
from the consent judgment entered on November 26,
2014 and the November 24, 2014 order, which dismissed
as moot his claims against Caribbean Cruise Line, LLC
("CCL") under the Telephone Consumer Protection Act
("TCPA"), 47 U.S.C. § 227(b), after CCL made an offer
of judgment pursuant to Rule 68 of the Federal Rules of
Civil Procedure. We assume the parties' familiarity with
the underlying facts, procedural history of the case, and
issues on appeal.

"We review de novo a district court's decision concerning
Article III subject matter jurisdiction insofar as that
decision is based solely on conclusions of law." *Tanasi v.
New Alliance Bank,* 786 F.3d 195, 198 (2d Cir.2015).

Bank argues that the district court erred in dismissing his
complaint, because CCL's unaccepted Rule 68 offer did
not moot his claims. Bank is correct that "under the law
of our Circuit, an unaccepted Rule 68 offer alone does not
render a plaintiff's individual claims moot *before the entry
of judgment* against the defendant[ ]." *Id.* at 197 (emphasis
added). Rather, where there is an unaccepted offer of
judgment that would afford the plaintiff complete relief,
we have held that "the typically proper disposition in
such a situation is for the district court to enter judgment
against the defendant for the proffered amount and to
direct payment to the plaintiff consistent with the offer."
*Cabala v. Crowley,* 736 F.3d 226, 228 (2d Cir.2013) (citing
*McCauley v. Trans Union, L.L.C.,* 402 F.3d 340, 342 (2d
Cir.2005)); *see also Tanasi,* 786 F.3d at 200 (explaining
that if the parties do not "agree that a judgment should be
entered against the defendant, ... the district court should
not enter judgment against the defendant if it does not
provide complete relief"). Only after the entry of judgment
in the plaintiff's favor "is the controversy resolved such
that the court lacks further jurisdiction." *Cabala,* 736 F.3d
at 228.

That is precisely what happened in the present case. The
district court entered a judgment on November 26, 2014,
which, consistent with CCL's Rule 68 offer, held CCL
liable to Bank in the total sum of $3,000 in statutory
damages with recoverable costs, and enjoined CCL from
calling Bank's residential telephone number in a manner

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                                1

Bank v. Carribean Cruise Line, Inc., 606 Fed.Appx. 30 (2015)

that violates the TCPA. Bank does not contest that this judgment afforded him all the relief he sought. Nor does he deny that the district court's dismissal of his claim as moot was premised on the entry of a consent judgment in his favor. Accordingly, it was not the unaccepted Rule 68 offer that rendered his claims moot. Rather, his claims were mooted by the district court's entry of a judgment providing him with complete relief. *See Tanasi,* 786 F.3d at 200 ("Then, *after* judgment is entered, the plaintiff's individual claims will become moot for purposes of Article III."); *see also ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.,* 485 F.3d 85, 94 (2d Cir.2007)

("Mootness, **\*32** in the constitutional sense, occurs when the parties have no 'legally cognizable interest' or practical 'personal stake' in the dispute, and the court is therefore incapable of granting a judgment that will affect the legal rights as between the parties.").

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

**All Citations**

606 Fed.Appx. 30

End of Document                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**SA0185**

# Goettig Exhibit L

Maximo v. 140 Green Laundromat, Not Reported in F.Supp.3d (2015)

2015 WL 4095248, 2015 Wage & Hour Cas.2d (BNA) 217,074

---

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Kirkland v. Speedway LLC, N.D.N.Y., May 18, 2017

2015 WL 4095248
United States District Court,
S.D. New York.

Socorro MAXIMO, individually and on behalf
of all other persons similarly situated, Plaintiff,
v.
140 GREEN LAUNDROMAT, et al., Defendants.

No. 14 Civ. 6948(KPF).
|
Signed July 7, 2015.

*OPINION AND ORDER*

KATHERINE POLK FAILLA, District Judge.

**\*1** Plaintiff Socorro Maximo brings this action, individually and on behalf of those similarly situated, against 140 Green Laundromat, Inc., 824 Green Laundromat, Inc., Green Laundromat, Inc., and Jae J. Kim (collectively, "Defendants"). Plaintiff alleges violations of provisions of the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201–219, and the New York Labor Law (the "NYLL") concerning unpaid or underpaid overtime compensation and various notice requirements. Pending before the Court are Plaintiff's motion to conditionally certify a collective action under FLSA, Defendants' motion to dismiss this case as moot, and Defendants' motion for entry of judgment. Consideration of the instant motions raises the hot-button issue of the effect of making an offer of judgment pursuant to Federal Rule of Civil Procedure 68 to a named plaintiff in a collective action. For the reasons that follow,

Defendants' motion for entry of judgment is granted, and all other motions are denied.

**BACKGROUND** [1]

[1]    The facts set forth here are drawn primarily from the Complaint (Dkt.# 1) ("Compl."), and from various affidavits submitted by the parties and their attorneys

in support of their various motions ("[Name] Aff."). For convenience, Plaintiff's opening brief shall be referred to as "Pl. Br."; Defendants' opposition and cross-motion as "Def. Opp."; Plaintiff's reply as "Pl. Reply"; Plaintiff's affirmation in opposition to Defendants' cross-motion as "Pl. Opp."; and Defendants' reply affirmation as "Def. Reply."

Plaintiff was employed as a laundress by Defendants for approximately one year. (Compl. ¶¶ 21, 23; Kim Aff. ¶ 3; Pl. Opp. ¶ 3). During this time, Plaintiff alleges, some weeks she worked five days a week, for 40 hours total, and other weeks she worked seven days a week, for 56 hours total. (Compl. 1 24). She claims she was paid approximately $7.25 per hour until January 2014; thereafter she was paid $8.00 per hour, always in cash. (*Id.* at ¶¶ 25–26). Plaintiff asserts that in the weeks she worked overtime, she was never paid overtime compensation. (*Id.* at ¶ 27).

Plaintiff alleges that there are other laundresses who also sometimes worked overtime for Defendants; based on conversations with these individuals, she claims these other laundresses were also not paid overtime compensation. (Maximo Aff. ¶ ¶¶ 9–12). In her affidavit in support of her motion for conditional certification, Plaintiff identifies only the first names of ten of these laundresses, while suggesting there may be other, unnamed individuals also similarly situated. (*Id.*). No one other than Plaintiff has opted in to the collective action as of the date of this Opinion. No putative collective action member other than Plaintiff has submitted an affidavit in support of the motion for conditional certification. In addition to the unpaid overtime allegations, Plaintiff further claims that Defendants failed to provide or post required notices or statements under state law, and failed to maintain accurate and sufficient records. (*See* Compl. ¶¶ 28–31).

Plaintiff filed the Complaint in this action on August 26, 2014. (*See* Dkt. # 1). Defendants failed to answer in time, and certificates of default were entered on October 29, 2014. (Dkt.# 12–15). On November 4, 2014, at the request of Defendants and on consent of Plaintiff, the Court vacated the certificates (Dkt .# 17), and on November 12, 2014, Defendants answered the Complaint (Dkt. # 19). On December 17, 2014, the Court set a discovery schedule and a briefing schedule for Plaintiff's proposed motion for conditional collective action certification. (Dkt.# 21). On

Maximo v. 140 Green Laundromat, Not Reported in F.Supp.3d (2015)

2015 WL 4095248, 2015 Wage & Hour Cas.2d (BNA) 217,074

January 9, 2015, Plaintiff filed her motion for conditional collective action certification. (Dkt.# 22–24).

**\*2** On January 22, 2015, Defendants' counsel made a firm settlement proposal in writing to Plaintiff's counsel of $6,000.00, inclusive of costs and attorney's fees. (Kim Aff. Ex. B). In that offer, Defendants set forth what they characterized as a "grossly overstated" estimate of the overtime due to Plaintiff. (*Id.*).[2] Specifically, they estimated that if Plaintiff worked seven days per week for eight hours each day for half of the yearlong period in which she worked for Defendants (i.e., for 26 weeks) at an $8.00 per hour salary, then she was owed $1,664.00 in overtime pay. (*Id.*).[3] The $6,000.00 figure was intended to cover liquidated damages under federal and state law, in addition to costs and attorney's fees. (*Id.*). Plaintiff's counsel did not accept this settlement offer. (*Id.* at ¶ 8; *see generally* Pl. Opp.). On February 2, 2015, the same day they filed their cross-motion to dismiss and for entry of judgment (Dkt.# 28–31), Defendants made the same $6,000.00 offer in the form of a Rule 68 offer of judgment (rather than as a settlement offer, as before), again inclusive of costs and attorney's fees (Kim Aff. Ex. A). Plaintiff did not accept this offer of judgment before it expired under Rule 68.

[2]   Defendants did not believe that Plaintiff had worked this much overtime, and used her hourly salary after she obtained her raise in January 2014 to calculate overtime for the entire yearlong period. (*See* Kim Aff. Ex. B).

[3]   Defendants came to this figure by noting that under a law she would be owed an additional $4.00 per hour for each of the 16 hours of overtime she worked each week, or $64.00 per week. Multiplied by 26 weeks, this comes to $1,664.00. (Kim Aff. Ex. B).

On February 13, 2015, Plaintiff filed a reply memorandum in support of her motion for conditional certification. (Dkt.# 32). On February 17, 2015, she filed an affirmation in opposition to Defendants' motion to dismiss and for entry of judgment. (Dkt.# 33). In that opposition, Plaintiff stipulated that she was due $1,664.00 in overtime pay, but argued that Defendants had largely underestimated the amount she was entitled to under state law. (Pl.Opp.¶¶ 3–11). On February 26, 2015, Defendants filed a reply affirmation in support of their cross-motion to dismiss and for entry of judgment. (Dkt.# 34).[4] In reaction to Plaintiff's stipulation that she was owed $1,664.00 in

overtime pay, Defendants requested that if the Court did not dismiss the action as moot, that it enter judgment against them on Plaintiff's FLSA claims for $3,328 .00 and decline supplemental jurisdiction over Plaintiff's remaining state-law claims. (Def. Reply ¶ 6).

[4]   The next day, on February 27, 2015, Plaintiff filed a motion to strike Defendants' February 26 affirmation as untimely by two days. (Dkt.# 35–36). Defendants opposed, seeking an extension *nunc pro tunc,* on March 2, 2015. (Dkt.# 37). The Court finds Plaintiff's arguments that a two-day delay caused her prejudice unconvincing. Though the reasons that Defendants set forth for their lateness—that the parties were discussing potential settlement and that Defendants' counsel was out of the office—are not compelling, they are sufficient to justify the minor delay at issue here. Accordingly, and despite the Court's distaste for eleventh(or, worse yet, thirteenth-) hour extension requests, Plaintiff's motion is denied and Defendants' application for an extension is granted. Defendants' reply affirmation shall be deemed timely as filed.

## DISCUSSION

### A. Applicable Law

In the collective action and class action contexts, the Courts of Appeals are divided as to whether an offer of judgment under Rule 68 for complete relief moots a named plaintiff's claim, and as to the related issue of whether such a plaintiff can continue to litigate on behalf of the putative class.[5] Following the law in this Circuit, however, the way forward in this case is clear: this Court should exercise its discretion to enter judgment against Defendants, thus disposing of the federal claim.

[5]   *See, e.g., Gomez v. Campbell–Ewald Co.,* 768 F.3d 871, 874–75 (9th Cir.2014) (concluding that neither individual claims nor class action claims are rendered moot by an unaccepted Rule 68 offer), *cert. granted,* 135 S.Ct. 2311 (2015); *Stein v. Buccaneers Ltd. P'ship,* 772 F.3d 698, 704–09 (11th Cir.2014) (same); *Warren v. Sessoms & Rogers, P.A.,* 676 F.3d 365, 371 (4th Cir.2012) ("When a Rule 68 offer unequivocally offers a plaintiff all of the relief she sought to obtain, the offer renders the plaintiff's action moot." (internal quotation marks and citation omitted)); *O'Brien v. Ed Donnelly Enterprises, Inc.,* 575 F.3d 567, 574 (6th Cir.2009) ("We agree with the Seventh Circuit's view that an offer of judgment that satisfies a plaintiff's

Maximo v. 140 Green Laundromat, Not Reported in F.Supp.3d (2015)

2015 WL 4095248, 2015 Wage & Hour Cas.2d (BNA) 217,074

entire demand moots the case[.]" (citing *Greisz* v. *Household Bank (Ill.), N.A.,* 176 F.3d 1012 (7th Cir.1999)); *see generally Civil Procedure—Rule 68 of the Federal Rules of Civil Procedure—Ninth Circuit Holds that Unaccepted Rule 68 Offer Does Not Moot Plaintiff's Individual Claim—Diaz v. First American Home Buyers Protection Corp.,* 127 Harv. L.Rev. 1260 (2014).

Rule 68 of the Federal Rules of Civil Procedure allows a defendant to make an offer of judgment to a plaintiff. Fed.R.Civ.P. 68. The offer "need not comply with Rule 68" in order to be effective. *Doyle* v. *Midland Credit Mgmt., Inc.,* 722 F.3d 78, 79, 81 (2d Cir.2013) (per curiam) (finding oral offer of judgment made during motion hearing before district court sufficient). It must, however, be an offer of judgment, not simply an offer of settlement. *Cabala* v. *Crowley,* 736 F.3d 226, 228–29 (2d Cir.2013) (per curiam). [6]

[6]    Under certain circumstances, an unaccepted offer may shift costs to the offeree. *See* Fed.R.Civ.P. 68(d).

**\*3** If the offer tenders less than complete relief, the plaintiff is free to accept or not. If such an offer is accepted, the court must enter judgment accordingly and terminate the case; if such an offer is not accepted, the case proceeds as usual. *Hepler* v. *Abercrombie & Fitch Co.,* No. 14–4113–cv, —— F. App'x ——, 2015 WL 3823883, at \*1 (2d Cir. June 22, 2015) (summary order) (citing *Tanasi* v. *New Alliance Bank,* 786 F.3d 195, 200–01 (2d Cir.2015)).

"If the offer tenders complete relief, the court should (absent additional procedural complications) enter judgment pursuant to the terms of that offer, with or without the plaintiff's consent." *Hepler,* —— F. App'x ——, 2015 WL 3823883, at \*1; *accord Tanasi,* 786 F.3d at 200–01; *Cabala,* 736 F.3d at 228; *McCauley* v. *Trans Union, L.L.C.,* 402 F.3d 340, 341–42 (2d Cir.2005). At bottom, a defendant offering judgment for complete relief is submitting to the entry of a default judgment. *Hepler,* —— F. App'x ——, 2015 WL 3823883, at \*1 (citing *Abrams* v. *Interco Inc.,* 719 F.2d 23, 32 (2d Cir.1983) (Friendly, J.)). "Just as a defendant may end the litigation by allowing default judgment, a defendant may always end the litigation by offering judgment for all the relief that is sought." *Id.; accord McCauley,* 402 F.3d at 342.

**B. Analysis**

The FLSA mandates that employers pay time-and-a-half per hour when employees work more than 40 hours per week. 29 U.S.C. § 207(a). Here, Plaintiff claims that, in the approximately 52 weeks that she worked for Defendants, during many weeks she logged 56, and not 40, hours, at an hourly rate of $7.25 to $8.00. In hopes of resolving this matter, Defendants have made an offer of judgment based on Plaintiff having worked 56 hours for 26 weeks of her 52–week tenure, at a rate of $8.00 per hour and $12.00 per hour overtime. Pursuant to Defendants' calculations, Plaintiff is owed $1,664.00 in overtime pay. Plaintiff stipulated for the purposes of the instant motions that this amount is correct, meaning the parties are in agreement as to the amount of overtime owed. The FLSA provides for 100% liquidated damages, 29 U.S.C. § 216(b); accordingly, Defendants have made an offer of judgment of $3,328.00, double the amount of overtime due to Plaintiff. [7]

[7]    The fact that this offer was made for the first time in Defendants' reply is of no moment where Plaintiff stipulated for the first time to the monetary amount in her opposition to Defendants' motion to dismiss.

Given that Plaintiff has stipulated that the $1,664.00 figure is correct, this is a complete offer of relief under the FLSA. Defendants have asked that judgment be entered against them in this amount. [8] Because the parties agree on the amount owed to Plaintiff, and because no other putative collective plaintiffs have opted into this action, there are no "additional procedural complications," *Hepler,* —— F. App'x ——, 2015 WL 3823883, at \*1, that prevent the entry of judgment on Plaintiff's FLSA claim. Accordingly, this Court "should ... enter judgment pursuant to the terms of that offer, with or without the plaintiff's consent." *Id.; cf. Gonyer* v. *Vane Line Bunkering, Inc.,* 32 F.Supp.3d 514, 517 (S.D.N.Y.2014) ("[E]ven an accepted offer of judgment does not terminate a case unless it satisfies all damages for all plaintiffs.... Thus, courts refuse to allow Rule 68 offers of judgment to moot actions where additional plaintiffs have opted in to the FLSA collective action, but have not been made offers of judgment by defendant." (internal quotation marks, alterations, and citations omitted)).

[8]    In the alternative, Defendants request that the Court find that their prior unaccepted offer of judgment of $6,000.00 renders this entire action moot, and dismiss the case for lack of subject matter jurisdiction. However, following *Tanasi,* the law in this Circuit is

**SA0189**

Maximo v. 140 Green Laundromat, Not Reported in F.Supp.3d (2015)

2015 WL 4095248, 2015 Wage & Hour Cas.2d (BNA) 217,074

clear: "a rejected settlement offer under Rule 68, by itself, cannot render moot a case." 786 F.3d at 200 (internal quotation marks and alterations omitted). If the parties agreed that the $6,000.00 figure covered all of Plaintiff's claims, inclusive (by the terms of the offer) of federal and state claims, attorney's fees, and costs, then the Court might be empowered to enter judgment in that amount. *See id.* But in no case does an offer of judgment alone moot anything, "since an offer cannot bind the defendant to provide relief." *Hepler,* — F. App'x ——, 2015 WL 3823883, at *1 (citing *Tanasi,* 786 F.3d at 200; *McCauley,* 402 F.3d at 342). Indeed, in *Hepler,* the Second Circuit vacated and remanded where the district court had done precisely what Defendants seek to have this Court do here: it had dismissed the case for lack of subject matter jurisdiction based on defendant's unaccepted offer of judgment to plaintiffs. *Id.* Moreover, unlike with the $3,328.00 figure in relation to Plaintiff's FLSA claims, there are clear factual and legal disputes as to whether the $6,000.00 figure actually covers all of Plaintiff's claims, including attorney's fees and costs. Accordingly, Defendants' motion to dismiss is denied.

**\*4** Having entered judgment on Plaintiff's federal FLSA claims, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims. *See Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan* v. *Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 727 (2d Cir.2013) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." (citation and quotation marks omitted)); *In re Merrill Lynch Ltd. P'ships Litig.,* 154 F.3d 56, 61 (2d Cir.1998) ("[W]hen the federal claims are dismissed the 'state claims should be dismissed as well.' " (quoting *United Mine Workers of Am.* v. *Gibbs,* 383 U.S. 715, 726 (1966))). This case is not yet at an advanced stage, and New York state courts are in a better position than this Court to determine any remaining relief to which Plaintiff may be entitled under the NYLL.

Finally, unlike their first offer of judgment, Defendants' offer of judgment of $3,328.00 does not include attorney's

fees and costs. As a prevailing party under the FLSA, Plaintiff is entitled to same. *See* 29 U.S.C. § 216(b) ("Any employer who violates the [FLSA] shall be liable to the employee or employees affected.... The court in such action shall ... allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."). Accordingly, Plaintiff shall be permitted to put in an application for fees and costs related only to her FLSA claim. *See Black* v. *Nunwood, Inc.,* No. 13 Civ. 7207(GHW), 2015 WL 1958917, at *2–4 (S.D.N.Y. Apr. 30, 2015) (permitting plaintiff to submit application for attorney's fees after having accepted a Rule 68 offer of judgment in satisfaction of, *inter alia,* FLSA claims that did not include such fees by its terms).

### CONCLUSION

For the foregoing reasons, Plaintiff's motion to conditionally certify a collective action is DENIED as moot; Plaintiff's motion to strike Defendants' reply affirmation is DENIED; Defendants' motion to dismiss is DENIED; and Defendants' motion for entry of judgment on Plaintiff's FLSA claim is

GRANTED. All of Plaintiff's state-law claims are DISMISSED, without prejudice to refiling in state court. Plaintiff may submit an application for attorney's fees and costs related to her FLSA claim on or before **July 28, 2015;** Defendants shall submit any opposition on or before **August 18, 2015;** and Plaintiff shall submit a reply, if any, on or before **August 28, 2015.** Once the Court has determined the appropriate amount of attorney's fees and costs to be awarded in addition to the $3,328.00 judgment, the Court will enter judgment against Defendants in the total amount. The Clerk of Court is directed to terminate the motions pending at docket entries 22, 28, and 35.

**\*5** SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4095248, 2015 Wage & Hour Cas.2d (BNA) 217,074

End of Document                                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Goettig Exhibit M

Franco v. Allied Interstate LLC, Not Reported in F.Supp.3d (2015)

2015 WL 7758534
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Gilberto Franco, on behalf of himself and
all others similarly situated, Plaintiff,
v.
Allied Interstate LLC, Defendant.

13-cv-4053 (KBF)
|
Signed 11/30/**2015**

**Attorneys and Law Firms**

Andrew T. Thomasson, Thomasson Law, LLC, Jersey
City, NJ William Franklin Horn, Law Office Of William
F. Horn, Fresh Meadows, NY, Craig Thor Kimmel,
Kimmel & Silverman, Ambler, PA for Plaintiff.

Casey Devin Laffey, Nana Japaridze, Reed Smith, New
York, NY, for Defendant.

OPINION & ORDER

KATHERINE B. FORREST, District Judge

Plaintiff brings this action against defendant, a national
debt collection agency, alleging that defendant's collection
practices violate the Fair Debt Collection Practices Act, 15
U.S.C. §§ 1692, et seq. ("FDCPA"). (Am. Compl. ¶ 1, 2, 9.)
This Court previously dismissed the Amended Complaint
on the basis that defendant's offer of judgment to plaintiff
pursuant to Federal Rule of Civil Procedure 68—which
exceeded the maximum damages award available to him
under the FDCPA and which plaintiff rejected—rendered
plaintiff's claim moot. (Mem. Decision & Order, Apr. 2,
2014, ECF No. 78 ("4/2/14 Op.") at 9.)

Plaintiff appealed. The Second Circuit held that in light
of Tanasi v. New Alliance Bank, 786 F.3d 195 (2d. Cir.
**2015**) (as amended May 21, **2015**), plaintiff's "individual
claim was not mooted by the Rule 68 offer, which did not
result in the entry of any judgment against the defendant."
Franco v. Allied Interstate LLC, 602 F. App'x 40, 41 (2d
Cir. **2015**) (summ. order) (emphasis added). The Court

of Appeals did not reach the action of whether the class
action would have also been moot. Id.

Defendant has now offered judgment referencing
"unconditional surrender" [1] and affording complete relief
to plaintiff. Accordingly, judgment shall be entered
against defendants under Rule 68. This entry of judgment
moots plaintiff's individual claim. There is therefore no
longer any named plaintiff with an interest in the litigation
to proceed with a claim on behalf of a class. Plaintiff
Franco cannot nominally continue in some capacity as
class representative as he would definitionally be atypical
and not an adequate representative.

[1]    Defendant's [Proposed] Judgments cites this language
from Tanasi before that opinion was amended, and
the Court understands defendant to mean that it does
"totally surrender" as to plaintiff's claim. That the
Tanasi opinion as amended no longer contains the
"totally surrender" language is irrelevant. Compare
Tanasi, 786 F.3d at 200, with Decl. Casey B. Laffey
in Support of Def.'s Mot. for Entry of J. Ex. 2, ECF
No. 83-2 (attaching opinion prior to amendment).

I. BACKGROUND

    A. Prior Proceedings
On June 13, 2013, plaintiff Gilberto Franco brought this
action against defendant Allied Interstate, LLC. (ECF
No. 1.) [2] Plaintiff alleges that defendant violated FDCPA
when it used false, deceptive, and misleading practices in
its attempts to collect alleged debts from plaintiffs and
other consumers in Massachusetts. (Amended Compl. ¶
1, 25-32.) Specifically, plaintiff alleges that defendant's
written communications warned debtors that they may be
subject to wage garnishment of 15% of their pay. (Id. ¶¶
21-24, 32.) Plaintiff claims that defendant disseminated
this communication in violation of §§ 1692e and 1692f
of the FDCPA because the law only allows wage
garnishment up to 15% of disposable income. (Id. ¶ 25.)

[2]    For the purposes of this Memorandum Opinion &
Order, the Court cites to the Amended Complaint,
which was filed on January 28, 2014. Plaintiff moved
for leave to add a defendant (a corporate entity
related to defendant) and to limit the class definition
to consumers in Massachusetts. The Court allowed
plaintiff to amend only as to the class definition.
(Mem. Decision & Order, Jan. 10, 2014, ECF No.

**SA0192**

Franco v. Allied Interstate LLC, Not Reported in F.Supp.3d (2015)

62.) All other allegations in the Complaint remains substantially similar.

**\*2** The FDCPA's statutory damages provision permits individual plaintiffs to recover "any actual damages sustained" as a result of defendant's violation of the statute and "such additional damages as the court may allow, but not exceeding $1,000." 15 U.SC. § 1692k(a)(2)(A). The FDCPA also permits recovery for "the costs of the action, together with a reasonable attorney's fee determined by the court." Id. Plaintiff alleges only statutory damages in his complaint and seeks no actual damages. (Am. Compl. ¶ 49A.)

On September 10, 2013, defendant offered judgment to plaintiff pursuant to Federal Rule of Civil Procedure 68 in the amount of $1,501.00 plus reasonable attorney's fees and costs to be determined by the Court. (Def.'s Mem. of L. in Support of Mot. to Dismiss ("MTD") Ex. B, ECF No. 65-2.) The offer did not include any reservation of rights or avoidance of a finding of liability. (Id.) Plaintiff did not accept that offer of judgment, and the offer expired on September 24, 2013. (MTD Ex. B.) On December 2, 2013, plaintiff moved for class certification. On January 24, 2014, defendant moved to dismiss the action for lack of subject matter jurisdiction arguing that because plaintiff offered judgment in complete satisfaction of statutory damages he could have recovered if he were to prevail on his claims, the action is rendered moot. (MTD at 1, 6-7.)

On April 2, 2014, this Court granted defendant's motion to dismiss. (4/2/14 Op. at 9-10.) The Second Circuit vacated the dismissal on the grounds that plaintiff's "individual claim was not mooted by the Rule 68 offer," which itself "did not result in the entry of any judgment against the defendant," and remanded the case for further proceedings pursuant to its holding in Tanasi. Franco v. Allied Interstate LLC, No. 14-1464-cv (2d Cir. Jun. 11, **2015**) (summ. order) (emphasis added). The instant motion practice followed.

B. The Renewed Motion

On May 18, **2015**, defendant moved for entry of judgment for plaintiff and filed a [Proposed] Judgment requiring defendant to pay $1,501 to plaintiff within thirty days of entry of judgment and reasonable attorney's fees and costs as determined by the court within thirty days of the Court order setting the amount. Defendant also moved to dismiss the action in light of such judgment and payments

rendering plaintiff's claim moot. Plaintiff has advanced two arguments in opposition. First, that the [Proposed] Judgment does not provide complete relief because: (1) it does not provide relief to the class, (2) it does not allow the Court from awarding the statutory attorney's fees or costs that that plaintiff sought in his Complaint, and (3) it postpones plaintiff's rights by giving defendant thirty days to after entry of judgment to make payment; and second, that in any event the class claims should survive.

II. LEGAL PRINCIPLES

Rule 68 of the Federal Rules of Civil Procedure allows a defendant "serve on an opposing party an offer to allow judgment on specified terms." If the opposing party "serves written notice accepting the offer ... [t]he clerk must then enter judgment." On the other hand, if plaintiff does not accept the offer, then plaintiff "must pay the costs incurred after the offer was made" if the "judgment that [plaintiff] finally obtains is not more favorable than the unaccepted offer." Fed. R. Civ. P. 68. "The purpose of Rule 68 according to the Supreme Court is 'to encourage settlement and avoid litigation.' " Tanasi, 786 F.3d at 198 (quoting Marek v. Chesny, 473 U.S. 1, 5 (1985)).

A. Entering Judgment Pursuant to Rule 68

**\*3** Here, parties disagree as to whether judgment should be entered. In such situations, the Court should determine if offer provides plaintiff complete satisfaction of the relief he seeks in his Complaint. If so, the Court "should (absent additional procedural complications) enter judgment pursuant to the terms of that offer, with or without the plaintiff's consent." Hepler v. Abercrombie & Fitch Co., 607 F. App'x 91, 92 (2d Cir. **2015**). This is because "[a] defendant offering judgment for complete relief is, in essence, submitting to the entry of default judgment. Just as a defendant may end the litigation by allowing default judgment, a defendant may always end the litigation by offering judgment for all the relief that is sought." Id.

B. Mootness Following Entry of Judgment

An entry of judgment for plaintiff following a Rule 68 offer moots the plaintiff's claim. The Second Circuit held in Tanasi that "a rejected settlement offer under Rule 68, by itself, cannot render moot a case." 786 F.3d at 199-200. Instead, it is the "district court's entry of judgment providing [plaintiff] with complete relief" that renders a

**SA0193**

Franco v. Allied Interstate LLC, Not Reported in F.Supp.3d (2015)

plaintiff's claims moot. Bank v. Caribbean Cruise Line, Inc., 606 F. App'x 30, 31 (2d Cir. 2015) (citing Tanasi).

If a matter is rendered moot, there is no actual case or controversy, and thus federal courts may not entertain it. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc., 528 U.S. 167, 189 (2000); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." Knox v. Svcs. Empl. Int'l Union, 132 S. Ct. 2277, 2287 (2012).

C. Mootness of Class Claims

A plaintiff whose action is moot no longer has any claim before the court. In a putative class action, there is a theoretical issue as to whether such a plaintiff may nonetheless prosecute the action on behalf of a class. Put otherwise, does the fact of a class claim itself "provide an independent basis for justiciability" when no class has been certified? Tanasi, 786 F.3d at 200. The Court of Appeals has not ruled on this issue. Id. "[I]n general, if the claims of the named plaintiffs become moot prior to class certification, the entire action becomes moot." Comer v. Cisneros, 37 F.3d 775, 798 (2d Cir. 1994) (emphasis added). Moreover, a plaintiff without a cognizable claim is definitionally atypical of individuals with claims, and for similar reasons, inadequate to represent the class. See Fed. R. Civ. P. 23(a). This procedural posture is different from a case in which a court has already granted class certification. Sosna v. Iowa, 419 U.S. 393, 394 (1975). [3]

[3]    It is also distinct from a case in which a court denies class certification on the merits, plaintiff notices an appeal, and then the named plaintiff's claim expires. U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 393-94 (1980). In Geraghty, the Court specifically stated, "Our holding is limited to the appeal of the denial of the class certification motion." Id., 445 U.S. at 404. See also supra n. 5.

III. DISCUSSION

A. Completeness of Relief as to Plaintiff's Individual Claims

Plaintiff's arguments in support of his claim of incomplete relief as to his individual claim are unpersuasive. Defendant's offer is a complete satisfaction of the relief plaintiff sought in his Complaint. See Hepler, 607 F. App'x at 92. The entry of judgment against defendant therefore

"provide[s] complete relief" to Franco, Tanasi, 786 F.3d at 200, and renders his claim moot. Knox, 132 S. Ct. at 2287; Bank, 606 F. App'x at 30.

1. Attorney's Fees and Costs

Defendant's [Proposed] Judgment also fully addresses plaintiff's request for attorney's fees and costs. Plaintiff argues that this Court "lacks the legal footing to award attorney's fees or costs—even if the Court were to conclude that Defendant's [Proposed] Judgment achieved the desired results albeit without a judgment on the merits." (Pl.'s Br. at 11.) This is incorrect. The Court of Appeals has held, "As a prevailing party under the FDCPA," a plaintiff who received a settlement offer for the maximum statutory amount (albeit not under Rule 68) was "presumptively entitled to an award of reasonable attorney's fees." Cabala v. Crowley, 736 F.3d 226, 228 (2d Cir. 2013). Furthermore, "As long as the [Rule 68] offer does not implicitly or explicitly provide that the judgment not include costs, a timely offer will be valid." Marek, 473 U.S. at 6 (emphasis original). Finally, and alone dispositive, is defendant's own concession that this Court may enter such an award.

*4    Plaintiff incorrectly cites both Buckhannon Bd. & Care Home, Inc. v. W. Va Dep't of Health & Human Res., 532 U.S. 598 (2001) and Emanuel v. Am. Credit Exch., 870 F.2d 805, 809 (2d Cir. 1989), for the proposition that the Court cannot award attorney's fees and costs without adjudication on the merits. Buckhannon holds that voluntary changes in defendant's conduct—absent a judgment on the merits or a consent decree—cannot form the basis for awarding attorney's fees and costs. 532 U.S. at 604. The Buckhannon Court specifically stated, "In addition to judgments on the merits, we have held that settlement agreements enforced through a consent decree may serve as the basis for an award of attorney's fees." Id. In Emanuel, the Second Circuit held that defendants in FDCPA actions cannot obtain attorneys' fees unless plaintiff brought the action in bad faith, and that plaintiffs may receive attorney's fees even in the absence of actual damages. 870 F.2d at 809.

Nothing in the text of the FDCPA prevents a court from awarding attorney's fees when it enters judgment for plaintiff, even if judgment is entered by way of a Rule 68 offer. The FDCPA provides that "any debt collector who

Franco v. Allied Interstate LLC, Not Reported in F.Supp.3d (2015)

fails to comply with any provision of the subchapter ... is liable ... in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court." 15 U.S.C. § 1692k(a). Judgment entered in plaintiff's favor fulfills the requirements.

### 2. Post-judgment Interest

Plaintiff also contends that the [Proposed] Judgment does not provide him with full relief because it allows defendant thirty days to pay the judgment to plaintiff and deprives him of post-judgment interest for those thirty days. This argument is specious. Post-judgment interest from the date of entry of judgment is mandatory regardless of whether it is specifically enumerated in the [Proposed] Judgment. See 28 U.S.C. § 1961(a); Lewis v. Whelan, 99 F.3d 542, 545 (2d Cir. 1996). [4]

[4]    Even if for some reason post-judgment interest were not awarded, the [Proposed] Judgment nevertheless affords full relief to plaintiff because the offered amount exceeds plaintiff's maximum statutory damages by over 50 percent. Any post-judgment interest within 30 days would be far less than the $501.00 in excess of the $1,000 maximum statutory penalty that plaintiff would receive under the [Proposed] Judgment.

### B. Mootness of Class Claims

The Second Circuit did not address the question of whether, upon entry of judgment that renders moot plaintiff's individual claim, the class action is also moot. Franco, 602 F. App'x at 41. The Court sees no reason to disturb its determination on April 2, 2014 that when "the claims of the named plaintiffs become moot prior to class certification, the entire action becomes moot." (4/2/14 Order, at 7 (quoting Comer, 37 F.3d at 798).) [5] Other potential plaintiffs—who seek only statutory damages and not injunctive relief—remain "free to vindicate their rights in their own suits ... even if a class action proves untenable." (Id. at 8.) In FDCPA actions—with recoverable fees for successful plaintiffs—issues with being financially able to pursue claims are not prominent.

[5]    Plaintiff is also confused about the status of his class certification motion. Plaintiff states that "[h]ere, class certification has already been denied," asks the Court

to "reconsider the class claims," and argues that pursuant to Geraghty, 445 U.S. 388, the Court should allow the class claims to proceed even if the individual claims are moot. (Pl.'s Br. at 6, 13.)

Once the Court dismissed plaintiff's claims, there was no action left to certify. (4/2/14 Order at 9-10) (citing Swan v. Stoneman, 635 F.2d 97, 102 (2d Cir. 1980).) The Court did not adjudicate the merits of the motion for class certification at that time (a fact that plaintiff concedes), although it noted the obvious—which is that as plaintiff no longer has a claim, he is no longer an appropriate class representative. (4/2/14 Order at 9-10). As discussed in Footnote 3 above, Geraghty involved a plaintiff whose individual claim became moot via expiration rather than entry of judgment, and who sought to appeal a prior denial of class certification on the merits. 445 U.S. at 401, 404. Neither situation applies to plaintiff in this case.

Even if this Court's prior decision was construed as a ruling on the merits of class certification, plaintiff is foreclosed from challenging it as he did not pursue this on appeal. (See Br. of Appellant-Plaintiff, Franco v. Allied Interstate LLC., 2014 **WL** 4049932, at *40 (2d Cir. 2014).) Plaintiff's request for "reconsideration" also comes far too late, and without basis. See Local Rule 6.3; Fed. R. Civ. P. 59(e); Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995) (requiring parties seeking reconsideration to "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court").

**\*5** Finally, the Court makes an additional observation. Although there had been proposed amendments "to make Rule 68 inapplicable to class actions ... they were rejected both times." Weiss v. Regal Collections, 385 F.3d 337, 344 (3d Cir. 2004), as amended (Oct. 22, 2004) (citing 98 F.R.D. at 363, 102 F.R.D. at 433). Although this Court recognizes the underlying policy debate, it follows the intentions of the drafters of the Federal Rules, that "Rule 68 [is] to have a uniform, consistent application in *all* proceedings in federal court." Marek, 473 U.S. at 23.

### IV. CONCLUSION

For the reasons set forth above, defendant's motion to enter judgment is GRANTED. The Clerk of Court is directed to enter judgment in favor of plaintiff Gilberto Franco in the amount of $1,501.00, plus any post-judgment interest, against defendant Allied Interstate LLC. Payment shall be rendered to plaintiff within thirty

**SA0195**

Franco v. Allied Interstate LLC, Not Reported in F.Supp.3d (2015)

days of this Order. Parties shall confer as to reasonable attorney's fees and costs, and submit a motion to this Court.

The Clerk of Court is directed to close the motion at ECF Nos. 82 and 85 and to terminate this action.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 7758534

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

**SA0196**

# Goettig Exhibit N

2010 WL 1608881

2010 WL 1608881
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court, W.D. Washington, at Tacoma.

Patti BINGHAM, Cody Bingham, Plaintiffs,

v.

BLAIR LLC, Blair Corporation; Appleseeds Topco, Inc.; Orchard Brands Corporation; Orchard Brands Topco, LLC; Catalog Holdings, LLC, Susan D. Carlson, Defendants.

No. C10–5005 RBL.
|
April 19, 2010.

**Attorneys and Law Firms**

Noel W. Spaid, Law Offices of Noel W. Spaid, Del Mar, CA, John W. Ladenburg, Jr., Ladenburg Law PLLC, Tacoma, WA, for Plaintiffs.

D. Patterson Gloor, Jori L. Young, Stephen P. Ellenbecker, Steven M. Shear, Gloor Law Group LLC, Chicago, IL, Mark Carl Dean, Law Offices Of Mark C. Dean, Seattle, WA, for Defendants.

ORDER DENYING DEFENDANT BLAIR LLC'S MOTION TO DISMISS AND REQUIRING PLAINTIFFS TO FILE AN AMENDED COMPLAINT

RONALD B. LEIGHTON, District Judge.

**\*1** This matter comes before the Court on Defendant Blair LLC's Motion to Dismiss Plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b). The Court, having reviewed the motion, response and the record herein, is fully informed and **DENIES** the motion for the reasons stated herein. The Court, however, **ORDERS PLAINTIFFS** to **FILE AN AMENDED COMPLAINT** properly setting forth their causes of action under applicable law.

**Introduction and Background**

Plaintiffs filed the instant lawsuit seeking damages arising from an incident where an allegedly defective bathrobe caught fire resulting in injuries to Plaintiffs, Patti and Cody Bingham. Defendant Blair allegedly manufactured and/or sold the robe in question and is allegedly liable to Plaintiffs for injuries sustained when the robe caught fire. Plaintiffs' eight count complaint purports to state a variety of claims against Defendant Blair, including claims for negligence, breach of warranty, product liability, violation of the Federal Flammable Fabrics Act, bystander liability, and intentional infliction of emotional distress. Plaintiffs also seek an award of punitive damages.

Defendant Blair seeks dismissal of Counts 1 through 4 and Count 6 on the basis that these claims alleging common law negligence, strict liability and breach of warranty claims are preempted by the Washington Product Liability Act (WPLA), RCW 7.72.010, *et seq.* Defendant Blair seeks dismissal of Count 5 to the extent it alleges violation of the Federal Flammable Fabrics Act ("FFFA"), 15 U.S.C. § 1192, on the ground that the FFFA does not expressly or impliedly create a private right of action. Defendant Blair further seeks to dismiss Counts 7 and 8 because they fail to allege sufficient facts to support an inference of liability against them for bystander liability and intentional infliction of emotional distress. Defendant Blair seeks dismissal of Plaintiffs' claim for punitive damages as such damages are not available under Washington law.

Plaintiffs respond that they have pled facts sufficient to sustain causes of action against Defendants and have pled the relevant elements contained in Washington Product Liability Act (WPLA) in separate causes of action. More specifically, Plaintiffs assert that Count 1, Product Liability, sets forth the elements of a WPLA claim as codified in RCW 7.72.010(1) through (5). Count 2, Failure to warn, contains the elements of a WPLA cause of action as codified in RCW 7.72.010(4). Plaintiffs concede that Count 3, Defective Design, is repetitive of Count 1 and is subsumed by the first cause of action. Count 4, Breach of Warranty, is encompassed in the WPLA at RCW 7.72.010(4). Plaintiffs acknowledge that there is no private cause of action for violation of the Federal Flammable Fabrics Act (FFFA), 15 U.S.C. § 1192). Nonetheless, Plaintiffs cite RCW 7.72.030(1) and

Bingham v. Blair LLC, Not Reported in F.Supp.2d (2010)

2010 WL 1608881

RCW7.72.050 for the assertion that Count 5, Violation of Statute, states a cause of action under the WPLA for violation of the FFFA. Plaintiffs acknowledge that Count 6, Negligence, is redundant and should be stricken. Plaintiffs state that Count 7, Bystander Liability, and Count 8, Intentional Infliction of Emotional Distress, are sufficiently plead to withstand a Fed.R.Civ.P. 12(b) challenge to the sufficiency of the pleadings. Plaintiffs argue that the claim for punitive damages involves a choice of law question that cannot be resolved at this stage of the proceedings.

### Sufficiency of Pleadings

*2 The Washington Product Liability Act (WPLA), RCW 7.72 et seq., is the exclusive remedy for product liability claims in Washington. *Washington Water Power Co. v. Graybar Elec.* Co., 112 Wash.2d 847, 853, 774 P.2d 1199 (1989). The WPLA is preemptive and the scope of WPLA is broadly defined so as to include any claim or action brought for harm caused by the product. *Id.* The purpose of the statute is to eliminate common law remedies and provide a single cause of action. *Id.* at 854, 774 P.2d 1199. The WPLA creates a single cause of action for product-related harm with specified statutory requirements for proof. *Stanton v. Bayliner Marine Corp. .,* 123 Wash.2d 64, 71, 866 P.2d 15 (1993). See also *Washington State Physicians Ins. Exchange & Ass'n v. Fisons Corp.,* 122 Wash.2d 299, 858 P.2d 1054 (1993) (WPLA creates a single cause of action for product-related harms, and supplants previously existing common law remedies, including common law actions for negligence).

The Court finds that Plaintiffs have sufficiently plead a cause of action pursuant to the WPLA to withstand Defendant Blair's motion to dismiss the complaint.

Plaintiffs concede that Counts 3 and 6 are duplicative and subject to dismissal. The WPLA does not provide for a separate cause of action for violation of statute. Count 5 is subject to dismissal. The remaining allegations contained in Counts 1, 2, and 4 state a cause of action that is encompassed by the WPLA. The Plaintiffs should be permitted to amend Counts 1, 2, and 4 of their complaint to fashion one cause of action pursuant to the WPLA.

Regarding the claims for negligent and intentional infliction of emotional distress, Counts 6 and 7, the Court finds the allegations sufficient to withstand a motion to dismiss pursuant to Fed.R.Civ.P. 12(b). The Court also finds it inappropriate at this stage of the proceedings to entertain the issue of punitive damages. This issue involves a choice of law question that will require further development of the record. Dismissal of these claims are denied without prejudice to further renew.

### Conclusion

For the above stated reasons, Defendant Blair LLC's motion to dismiss is denied.

ACCORDINGLY;

IT IS ORDERED:

Defendant Blair LLC's Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) [Dkt. # 11] is **DENIED.** Plaintiff is **ORDERED** to file an **AMENDED COMPLAINT** that complies with this Order no later than May 7, 2010.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 1608881

---

End of Document                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**SA0199**

# Goettig Exhibit O

Seneca Beverage Corp. v. Healthnow New York, Inc., 200 Fed.Appx. 25 (2006)
39 Employee Benefits Cas. 1165

KeyCite Yellow Flag - Negative Treatment
Distinguished by Halebian v. Berv, S.D.N.Y., July 23, 2012

200 Fed.Appx. 25
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

SENECA BEVERAGE
CORPORATION, Plaintiff-Appellant,

v.

HEALTHNOW NEW YORK, INC.,
RMTS Associations, LLC, and Trustmark
Ins. Co., Defendants-Appellees.

No. 05-4594-cv.
|
Sept. 26, 2006.

**Synopsis**
**Background:** Employer brought action in state court
against provider of administrative services to its self-
funded employee benefit plan, alleging claims for
breach of contract and breach of fiduciary duty
under the Employee Retirement Income Security Act
(ERISA). Following removal, provider moved for
summary judgment, and employer moved for discovery.
The United States District Court for the Western District
of New York, 383 F.Supp.2d 413, Charles J. Siragusa,
J., granted summary judgment for provider. Employer
appealed.

**Holdings:** The Court of Appeals held that:

[1] ERISA did not allow for the recovery of monetary
damages for employer's own out-of-pocket loss; but

[2] employer was entitled to additional discovery
regarding possible oral modification of contract with
provider before grant of summary judgment on breach of
contract claim.

Affirmed in part, reversed in part, and remanded.

West Headnotes (2)

[1]     **Labor and Employment**
        ⊶ Damages

        Employer that was not a participant or
        beneficiary of self-funded employee benefit
        plan could not recover monetary damages
        for its own out-of-pocket loss under ERISA
        from provider of administrative services to
        plan that allegedly breached its fiduciary duty.
        Employee Retirement Income Security Act of
        1974, § 502(a)(2, 3), 29 U.S.C.A. § 1132(a)(2,
        3).

        Cases that cite this headnote

[2]     **Federal Civil Procedure**
        ⊶ Time for Consideration of Motion

        Employer was entitled to additional discovery
        before grant of summary judgment on
        its breach of contract claim against
        provider of administrative services to its
        self-funded employee benefit plan, where
        two witnesses testified to the existence
        of further negotiations between employer
        and provider regarding responsibility for
        providing required stop loss reports to insurer,
        pointing to potential facts that might raise
        an issue of material fact regarding a possible
        oral modification of the contract. Fed.Rules
        Civ.Proc.Rule 56(f), 28 U.S.C.A.

        3 Cases that cite this headnote

**\*25** Appeal from a final decision of the United States
District Court for the Western District of New York
(Charles J. Siragusa, Judge).
**\*26** AFTER ARGUMENT AND UPON DUE
CONSIDERATION, IT IS HEREBY ORDERED,
ADJUDGED AND DECREED that the judgment of
the District Court is AFFIRMED IN PART and
REVERSED IN PART, and REMANDED.

**SA0201**

Seneca Beverage Corp. v. Healthnow New York, Inc., 200 Fed.Appx. 25 (2006)
39 Employee Benefits Cas. 1165

**Attorneys and Law Firms**

Scott D. Moore, Moore, Woodhouse and Pawlak LLP, Elmira, NY, for Appellant.

Michael P. McClaren, Webster Szanyi LLP (Jeremy A. Colby, on the brief), Buffalo, NY, for Appellees.

PRESENT: Hon. RICHARD J. CARDAMONE, Hon. ROGER J. MINER and Hon. CHESTER J. STRAUB, Circuit Judges.

**SUMMARY ORDER**

**\*1** Plaintiff-Appellant Seneca Beverage Corporation ("Seneca") appeals the judgment of the District Court for the Western District of New York (Charles J. Siragusa *Judge* ), granting summary judgment in favor of defendant HealthNow New York, Inc. ("HealthNow") and dismissing Seneca's claims under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et. seq.,* and for breach of contract. For the following reasons, we affirm the District Court's dismissal of Seneca's ERISA claim, but we reverse and remand for further proceedings with respect to the District Court's dismissal of Seneca's contract claim.

We assume the parties' familiarity with the facts and arguments on appeal. Briefly stated, the facts are as follows. Seneca entered into an Administrative Services Agreement ("ASA") with HealthNow, pursuant to which HealthNow would act as claims processor for Seneca's self-insured health plan. At the same time, Seneca, apparently acting on HealthNow's advice, entered into a stop-loss insurance contract ("the Stop Loss Contract") with a third party, Trustmark Ins. Co. ("Trustmark"), pursuant to which Trustmark would cover extraordinary medical expenses incurred by Seneca's employees. HealthNow was not a party to the Stop-Loss Contract.

The ASA places the duty of providing Trustmark with "accurate information required or necessary for the underwriting of any [stop-loss] insurance" on Seneca. The Stop Loss Contract, however, states that HealthNow would provide Trustmark with the information it required. Seneca claims to have understood that HealthNow had assumed the obligation of notifying Trustmark; HealthNow denies that it assumed any such obligation. When an employee of Seneca was hospitalized for cancer treatment, Seneca asked HealthNow to submit a stop-loss claim to Trustmark, and HealthNow did so. Trustmark denied the claim because it had not timely been reported. Seneca brought suit alleging violations of ERISA and breach of contract. The District Court denied Seneca's request for discovery pursuant to Federal Rule of Civil Procedure 56(f), and granted summary judgment for HealthNow without discovery.

We review the District Court's grant of summary judgment de novo. *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004). "To justify summary judgment, the defendants must show that 'there is no genuine issue as to any material fact' and that they are 'entitled to a judgment as a matter of law.' " *Id.* (quoting Fed.R.Civ.P. 56(c)). We resolve all ambiguities, and credit all rational factual inferences, in favor of the non-moving party. *Id.*

"Fed.R.Civ.P. 56(f) provides, as interpreted by court opinions, that when a party facing an adversary's motion for summary judgment reasonably advises the court that it needs discovery to be able to present facts needed to defend the motion, the court should defer decision of the motion until the party has had the opportunity **\*27** to take discovery and rebut the motion." *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.,* 271 F.3d 374, 386 (2d Cir.2001). "[O]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Trammell v. Keane,* 338 F.3d 155, 161 n. 2 (2d Cir.2003); *accord Trebor Sportswear Co. v. The Ltd. Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989) ("Under Rule 56(f), summary judgment may be inappropriate where the party opposing it shows ... that he cannot at the time present facts essential to justify his opposition. The nonmoving party should not be 'railroaded' into its offer of proof in opposition to summary judgment. The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment." (internal quotations and citations omitted)).

**\*2** However, the party opposing summary judgment is not automatically entitled to discovery; to be entitled to discovery under Rule 56(f), "a party must file an affidavit describing: (1) what facts are sought and how they are to

**SA0202**

Seneca Beverage Corp. v. Healthnow New York, Inc., 200 Fed.Appx. 25 (2006)
39 Employee Benefits Cas. 1165

be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." *Gualandi v. Adams,* 385 F.3d 236, 244-245 (2d Cir.2004) (citations omitted). "Even where a Rule 56(f) motion is properly supported, a district court may refuse to allow additional discovery if it deems the request to be based on speculation as to what potentially could be discovered'-that is, a mere fishing expedition. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Cos.,* 265 F.3d 97, 117 (2d Cir.2001). We review the District Court's denial of discovery under the abuse of discretion standard. *Id.*

[1]   We think that the District Court appropriately dismissed Seneca's ERISA claim. Seneca never clearly identified any particular provision of ERISA under which it claimed relief, and we can see no provision under which it can prevail.

Section 502 of ERISA authorizes civil suits by beneficiaries or participants for a number of specific forms of relief, none of which are applicable here. Section 502(a)(2) of ERISA allows plan participants and beneficiaries to bring actions against plan fiduciaries for breaches of fiduciary duty. But such claims may not be made for individual relief, but instead are "brought in a representative capacity on behalf of the plan." *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 142 n. 9, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985); *see also Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir.1993) (concluding that *Russell* "bars plaintiffs from suing under [s]ection 502(a)(2) because plaintiffs are seeking damages on their own behalf, not on behalf of the Plan"). Section 502(a)(3) of ERISA permits a beneficiary or participant to sue a plan fiduciary to obtain "appropriate equitable relief" to remedy violations of ERISA. In *Burkhart,* 991 F.2d at 1011, we held that this section does not allow a suit for money damages.

Seneca alleges no facts to show that it (Seneca) is a plan participant or beneficiary, and it seeks monetary damages on its own behalf for its own out-of-pocket loss. *Russell* and *Burkhart* therefore bar any possible claim under either § 502(a)(2) or (3); and, as we have recently held, "the limited text of ERISA's civil remedies is inconsistent with judicial discovery of new liabilities." *Gerosa v. Savasta & Co.,* 329 F.3d 317, 323 n. 6 (2d Cir.2003). We therefore affirm the District Court's dismissal of Seneca's ERISA

claim. However, we find that the District Court erred in granting summary judgment on the contract claim in the absence of discovery.

*28  As the District Court observed, HealthNow was not a party to the Stop-Loss Contract, and the ASA, to which HealthNow was a party, clearly places the burden of notification on Seneca. Moreover, both the Stop-Loss Contract and the ASA contain provisions prohibiting oral modification. Notwithstanding those provisions, Seneca argues that HealthNow, through oral statements or through conduct, modified the parties' contractual relationship so as to assume that obligation. The District Court concluded that "neither [contract] *could* be orally modified." *Seneca Bev. Corp. v. HealthNow N.Y., Inc.,* 383 F.Supp.2d 413, 421 (S.D.N.Y.2005) (emphasis added). This is an over-broad statement of New York law. It is true that New York generally "does not permit oral modification when the original written agreement provides that modifications must be in writing and signed." *John Street Leasehold LLC v. FDIC,* 196 F.3d 379, 382 (2d Cir.1999). However, "even where it is provided that modifications must be in writing and signed, New York will enforce oral modifications in two circumstances-where there has been (1) partial performance or (2) reliance-but only where the subsequent performance or reliance is unequivocally referable to the modification." *Id.* (internal quotation and citation omitted).

**3  Assuming *arguendo* that oral modification of the contracts was possible, and reasoning that if any such oral statement had been made, it would have been within Seneca's knowledge, the District Court asked Seneca's counsel to produce an affidavit testifying to the existence of such a statement. Seneca produced three affidavits. The District Court found these affidavits insufficient to show the existence of a genuine issue of fact on this point, and granted summary judgment accordingly.

[2]   We think that Seneca met its burden under Rule 56(f). Seneca employee Debra Maurey testified to the existence of negotiations between Seneca and HealthNow during which Seneca indicated that it "would rely on HealthNow to perform all necessary administrative functions," and "based on statements and indications, HealthNow assumed the responsibility of providing the required stop loss reports." Seneca's counsel, Scott Moore, testified to his own conversations with HealthNow

**SA0203**

Seneca Beverage Corp. v. Healthnow New York, Inc., 200 Fed.Appx. 25 (2006)

39 Employee Benefits Cas. 1165

employee Jerry Kraus, who was unwilling voluntarily to sign an affidavit, but "recall[ed] that Seneca Beverage wanted HealthNow to provide a service so that Seneca Beverage did not have to get into the middle of the claims process and the coordination of information to [Trustmark]," and that "there were internal discussions at HealthNow about how to provide the information."

In order to justify discovery under Rule 56(f), all that is required is for Seneca to point to potential facts that might raise an issue of material fact, that it has been unable to obtain without discovery. Seneca's affidavits meet this standard. Further discovery as to HealthNow's recollection of the negotiations may clarify the facts of this case, may refresh the recollections of Seneca's employees, and may lead to the discovery of relevant statements. Additionally, further discovery as to HealthNow's subsequent actions under the ASA-whether known to Seneca at the time or not-may illuminate the parties' contemporaneous understanding of that contract, and any surrounding negotiations. Maurey and Moore's testimony are sufficient to show that Seneca's requested discovery is no mere fishing expedition.

We therefore reverse the District Court's grant of summary judgment dismissing Seneca's common-law contract claim, without prejudice to subsequent renewal of the motion by HealthNow, and remand for further proceedings. Before **29** going further with discovery, the District Court should consider whether, Seneca's ERISA claim having been dismissed, it is appropriate to retain jurisdiction over this case.

For the foregoing reasons, and having considered all of the parties' arguments, we affirm the District Court's judgment as to Seneca's ERISA claim, we reverse the District Court's judgment as to Seneca's common-law contract claim, and the case is remanded for further proceedings consistent with this order.

**All Citations**

200 Fed.Appx. 25, 2006 WL 2787454, 39 Employee Benefits Cas. 1165

End of Document    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

SA0204

# Goettig Exhibit P

Tennenbaum Capital Partners LLC v. Kennedy, Not Reported in F.Supp.2d (2009)
2009 WL 2913679, 74 Fed.R.Serv.3d 723

2009 WL 2913679
United States District Court,
S.D. New York.

TENNENBAUM CAPITAL
PARTNERS LLC, Plaintiff,
v.
Michael T. KENNEDY, Defendant.

No. 07 Civ. 9695(LTS)(DCF).
|
Sept. 11, 2009.

West KeySummary

1    **Federal Civil Procedure**
      ⬅ Time for Consideration of Motion

      A debtor's mere assertion that a debt may
      have been reduced or that a creditor may
      no longer hold the debt was insufficient
      to warrant discovery instead of summary
      judgment. The debtor asserted in opposition
      to the creditor's summary judgment motion
      that a $10 million guaranty agreement he
      signed for a loan could have been sold
      to another, paid or substantially reduced.
      However, the debtor proffered no facts or
      allegations indicative of a likelihood that
      discovery would produce evidence of any
      such circumstances. Fed.Rules Civ.Proc.Rule
      56(f), 28 U.S.C.A.

      Cases that cite this headnote

***AMENDED MEMORANDUM
OPINION AND ORDER***[1]

[1]    This Amended Memorandum Opinion and Order is
       substantially identical to the Memorandum Opinion
       and Order of August 14, 2009, with the following two
       exceptions: in the Background section, (1) a reference
       to August 17, 2009, has been changed to accurately
       reflect the date of August 17, 2006, and (2) a reference

to August 21, 2009, has been changed to accurately
reflect the date of August 21, 2006.

LAURA TAYLOR SWAIN, District Judge.

*1   Plaintiff Tennenbaum Capital Partners LLC
("Tennenbaum" or "Plaintiff") brings this breach of
contract action against Defendant Michael T. Kennedy
("Kennedy" or "Defendant") alleging that Defendant
has failed to pay Plaintiff $10 million owed under
a guaranty agreement. Plaintiff moves the Court for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure. Defendant opposes Plaintiff's
motion, arguing, *inter alia,* that he is entitled to discovery
under Rule 56(f), and moving to compel discovery by way
of a letter motion directed to Magistrate Judge Freeman.
The Court has jurisdiction of this action pursuant to
28 U.S.C. § 1332. The Court has considered carefully
all of the parties' submissions. For the reasons stated
below, Defendant's Rule 56(f) application is denied and
Plaintiff's motion for summary judgment is granted as to
Defendant's liability for principal, interest and attorneys'
fees. Defendant's letter motion to compel discovery is
denied as moot.

*BACKGROUND*

The following material facts are undisputed. Defendant
is a citizen of Pennsylvania. (Def's 56.1 ¶ 2; Pl's 56.1 ¶
2.) Defendant was the CEO and majority shareholder
of Radnor Holdings Corporation ("Radnor"). (Kennedy
Decl. ¶ 2.) Pursuant to a Credit Agreement dated
December 1, 2005 (the "Credit Agreement"), certain
lenders (the "Lenders") loaned Radnor $95 million. The
two secured loans making up the $95 million loan were
referred to as Tranches A and B. (Def's 56.1 ¶ 5; Pl's 56.1
¶ 5; Credit Agreement dated December 1, 2005 (Ex. 3
to the Hollander Decl.).) Under the Credit Agreement,
Plaintiff is designated the Agent and Collateral Agent
for the Lenders, with the power to act on behalf of the
Lenders. (Def's 56.1 ¶ 6; Pl's 56.1 ¶ 6.) On or about April
4, 2006, the Lenders made an additional loan to Radnor
in the principal amount of $23.5 million, referred to as
the Tranche C Loan, pursuant to Amendment No. 1
to the Credit Agreement. (Def's 56.1 ¶ 7; Pl's 56.1 ¶ 7.)
Plaintiff continued as the Agent and Collateral Agent for
the Lenders under the amendment. (Hollander Decl. ¶
6.) In connection with the Tranche C Loan, Defendant

**SA0206**

Tennenbaum Capital Partners LLC v. Kennedy, Not Reported in F.Supp.2d (2009)

2009 WL 2913679, 74 Fed.R.Serv.3d 723

executed a Guaranty and Negative Pledge Agreement (the "Guaranty"), pursuant to which Defendant guaranteed repayment of not more than $10 million of the principal amount of the Tranche C Loan. (Def's 56.1 ¶ 8; Hollander Decl., Ex. 5.) [2]

[2]     Relevant provisions of the Guaranty provide that "[s]ubject to the limitations set forth in Section 11 hereof, Guarantor hereby irrevocably guarantees to each Lender and the Agent, as a primary obligor and not merely as a surety the prompt payment in full, in Dollars, when due ... of the principal and interest on the Tranche C Loans," *see* Hollander Decl., Ex. 5, Section 1, that "[n]otwithstanding anything to the contrary contained in this Guaranty, (A) the liability of the Guarantor hereunder for the Guaranteed Obligations shall not exceed the principal amount of Ten Million Dollars ($10,000,000) thereof at any time outstanding, plus interest thereon from the date demand on this Guaranty is made by any Lender Party ... and costs, expenses and other charges (including, but not limited to, reasonable attorneys' fees and legal expenses) incurred by Agent after such date of demand," *id* at Section 11, and that the "Guarantor acknowledges that the obligations undertaken by him under the Credit Agreement involve the guarantee of obligations of Persons other than himself and that the obligations of the Guarantor under *Section 1* are absolute and unconditional," *id.* at Section 2.

Radnor defaulted on payment of the Tranche A, B and C Loans. (Hollander Decl. ¶ 8; Pl's 56.1 ¶ 9.) By letter dated August 17, 2006, Plaintiff demanded payment from Defendant under the Guaranty. (Pl's 56.1 at ¶ 11; Hollander Decl., Ex. 6.) On August 21, 2006, Radnor and certain of its affiliates (collectively "Radnor") filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware. (Def's 56.1 ¶ 13; Pl's 56.1 ¶ 13.) In the course of the Chapter 11 proceedings, the Bankruptcy Court determined that the Plaintiff and the Lenders had an allowed secured claim of approximately $128.8 million and that the only competent evidence of record showed that the collateral securing the claim, consisting of substantially all of Radnor's assets, was valued at more than $132 million. (*See* Kennedy Decl., Ex. 1, *In Re Radnor Holdings Corp.,* 353 B.R. 820, 846–47 (Bank.D.Del.2006).) The bankruptcy court authorized the holder of the allowed $128.8 million claim to credit bid "any or all" of the claim "at any sale of property of [Radnor] that is subject to a lien that secures such Allowed Claim, and [to] offset any or all of such amounts against the purchase price of such property." (Judgment in Favor of Defendant on All Counts, dated Nov. 16, 2006, in *Official Committee of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners LLC (In Re Radnor Holdings Corp.),* Adv. Pro. No. 06–50909, Chap. 11 Case No. 06–10894 PJW. (Ex. 1 to Def's Br. In Opp.) ("Judgment").)

*2 In a September 22, 2006, order, the bankruptcy court approved bidding procedures for a sale of substantially all of Radnor's assets. (*See* Nov. 21, 2006, Order (1) Approving Sale of Substantially all of Debtors' Assets Free and Clear of all Liens, Claims, Interests and Encumbrances; (2) Approving Assumption and Assignment of Certain Contracts and Leases; and (3) Granting Related Relief, in *In re Radnor Holdings Corp.* ("Sale Order") (Ex. 7 to Hollander Decl.), at 2; *see also* Pl's 56.1 ¶ 15.) Plaintiff formed TR Acquisitions Co., LLC ("TRAC"), an affiliate, to be the entity that would, if necessary, bid for and acquire the Radnor assets. (Def's 56.1 ¶ 16; Pl's 56.1 ¶ 16.) The court's November 21, 2006, Sale Order approving the sale of substantially all of Radnor's assets to TRAC under an Amended and Restated Asset Purchase Agreement (the "APA") and pursuant to, *inter alia,* sections 105 and 363 of the Bankruptcy Code (11 USC §§ 105, 363) found that "Purchaser [TRAC] holds an allowed claim ... in the amount of $128,835,557.26 ... and was authorized [under the Judgment] to credit bid any or all of such Allowed Claim" at the auction. (Sale Order at ¶ Q.) The bankruptcy court held that the credit bid portion of TRAC's consideration for the sale was "a valid and proper offer pursuant to the Bid Procedures and Bankruptcy Code Sections 363(b) and 363(k)." (Sale Order at ¶ Q.) According to the APA, the "Credit Bid Amount" offered as part of the aggregate consideration for the assets, includes "$95,000,000, plus the amount of any accrued and unpaid interest payable to the lenders under Tranches A and B of the Tennenbaum Credit Agreement (the *"Tennenbaum Lenders"*) through the Auction Date." (*Id.,* Ex. A, APA at 3.1(a)(ii).) As previously noted, $95 million was the principal amount of the Tranche A and B loans. The APA makes no reference to the $23.5 million Tranche C loan. The bankruptcy court found that the total consideration bid by TRAC was "the highest and best offer received by Debtors" and approved the sale of Radnor's assets to TRAC "free and clear of all

**SA0207**

Tennenbaum Capital Partners LLC v. Kennedy, Not Reported in F.Supp.2d (2009)
2009 WL 2913679, 74 Fed.R.Serv.3d 723

Liens, Claims, Interests and Encumbrances, because, with respect to each creditor asserting a Lien, Claim or Interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied." (Sale Order ¶¶ R, T.)

The Sale Order provides that it is binding on, among others, "all creditors and equityholders of any of the Debtors." (*Id.* at ¶ 25; *see also* fn. 1 (identifying debtors).)

## DISCUSSION

Summary judgment in favor of a moving party is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material "if it 'might affect the outcome of the suit under the governing law,' " and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury can return a verdict for the nonmoving party.' " *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 69 (2d Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (alteration in original)). The opposing party's facts "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, or mere suspicions." *Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97, 107 n. 14 (2d Cir.1981) (quotation marks omitted); *see also Cifarelli v. Vill. of Babylon,* 93 F.3d 47, 51 (2d Cir.1996) (holding that "mere conclusory allegations, speculation or conjecture" will not provide a sufficient basis for a non-moving party to resist summary judgment). The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Rubens v. Mason,* 527 F.3d 252, 254 (2d Cir.2008).

**\*3** Rule 56(f) provides that, "[i]f a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the

court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order." Fed.R.Civ.P. 56(f). The party seeking discovery pursuant to Rule 56(f) must file an affidavit explaining "the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts; and why those efforts were unsuccessful." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994). However, a party is not automatically entitled to discovery under 56(f); "[e]ven where a Rule 56(f) motion is properly supported, a district court may refuse to allow additional discovery if it deems the request to be based on speculation as to what potentially could be discovered." *National Union Fire Insurance Company of Pittsburgh v. Stroh Companies, Inc.,* 265 F.3d 97, 117 (2d Cir.2001). Rule 56(f) is not a shield against all summary judgment motions and a "bare assertion" that evidence supporting a party's allegations lies in the hands of the opposing party is insufficient to justify denying a summary judgment motion. *Paddington,* 34 F.3d at 1138.

Defendant's arguments in opposition to Plaintiff's motion for summary judgment focus principally on his asserted need for discovery in order to determine (i) Plaintiff's citizenship and the basis of this Court's subject matter jurisdiction; (ii) whether Plaintiff's claim against Radnor, if it did not credit bid the Tranche C Loan amount, has been sold to another, paid or substantially reduced; and (iii) whether Plaintiff has been made whole because the assets purchased were worth more than Plaintiff paid for them. Defendant has, however, failed to proffer anything more than speculative assertions in support of his Rule 56(f) application and, with respect to the merits, the materiality of the information he claims he needs and, thus, has failed to demonstrate the need for further discovery prior to resolution of the merits of Plaintiff's summary judgment motion.

### Jurisdiction

Plaintiff has proffered, in response to an order to show cause issued by the Court, the Declaration of Attorney Leonard Benowich, detailing the citizenship of Plaintiff. (*See* Docket Entries No. 3, 5.) Under penalty of perjury and based on personal knowledge, Benowich declares that Tennenbaum is a limited liability company organized under the laws of the state of Delaware consisting of

**SA0208**

Tennenbaum Capital Partners LLC v. Kennedy, Not Reported in F.Supp.2d (2009)

2009 WL 2913679, 74 Fed.R.Serv.3d 723

twelve members. (*See* Docket Entry No. 5, at ¶¶ 3, 5.) Each of these members is a citizen of the State of California and none is a citizen of the State of Pennsylvania. (*Id.* at ¶ 5.) Benowich and David Hollander, Plaintiff's Managing Director, have also provided declarations in support of Plaintiff's motion for summary judgment. In Hollander's Reply Declaration, under penalty of perjury and based on personal knowledge, Hollander again states that each of Plaintiff's members is a citizen of California and that none is a citizen of Pennsylvania. (*See* Hollander Reply Decl. ¶ 2.) Hollander also states that the identity of Plaintiff's members is proprietary and extremely confidential and is not even shared with all of the other senior employees of the Plaintiff. (*Id.* at ¶ 3.) [3]

[3]    Plaintiffs' affidavits include evidence that Plaintiff offered to reveal the identities of its members to defense counsel on condition that counsel not share the information with anyone, including Defendant, and that Defendant refused to agree to the limitation. (*See* Hollander Reply Decl. ¶ 4; Benowich Reply Decl. ¶¶ 9–12, Ex. 9.) According to the declarations submitted for *in camera* inspection Plaintiff did, at Magistrate Judge Freeman's direction, provide information about the the names and addresses of each of the Plaintiff's members as the commencement of this action, for counsel's eyes only.

**\*4** Notwithstanding Defendant's failure to proffer any factual basis for an inference of lack of subject matter jurisdiction the Court, mindful of its obligation to determine that it is acting in a matter of which it has jurisdiction, *see E.R. Squibb & Sons v. Accident & Cas. Ins. Co.,* 160 F.3d 925, 929 (2d Cir.1998) ("Since subject matter jurisdiction is an unwaivable *sine qua non* for the exercise of federal judicial power [the Court] must consider whether there is diversity jurisdiction in this action" (internal quotations and citations omitted)), has examined *in camera* the declarations from Benowich and Hollander proffering that all of Plaintiff's members were citizens of California as of the time this action was commenced, as well as a list of Plaintiff's members at the time the action was commenced. The Court finds that Plaintiff's proffers regarding its citizenship are sufficient to establish that the Court has diversity jurisdiction of this action. The materials submitted for the Court's *in camera* review will remain sealed based on Plaintiff's affidavits attesting to the commercial sensitivity of the entity membership information included therein.

Defendant asserts that he continues to lack information sufficient to confirm or deny Plaintiff's jurisdictional allegations, speculates that other companies allegedly controlled by Plaintiff might be alter egos of Plaintiff and that their citizenship might destroy diversity were they joined here, and complains of Plaintiff's refusal to reveal the citizenship information absent a confidentiality condition. (*See* note 2.) Defendant, however, provides no factual basis for his contention that the Court may lack subject matter jurisdiction. In the face of Plaintiff's proffered evidence, including repeated declarations made under penalty of perjury regarding Plaintiff's citizenship, Defendant offers only speculation and bare assertion that discovery of the members' identities or those of their affiliates might reveal a lack of subject matter jurisdiction. Defendant has not satisfied his burden under Rule 56(f) with respect to the jurisdictional issue.

*Breach of Guaranty Claims*

In order to succeed on a claim for breach of contract under New York law, a plaintiff must show "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994) (citation omitted). "For a plaintiff to establish a prima facie case that it is entitled to recover on a guarantee under New York law, it must show: (1) that it is owed a debt from a third party; (2) that the defendant made a guarantee of payment of the debt; and (3) that the debt has not been paid by either the third party or the defendant." *Chemical Bank v. Haseotes,* 13 F.3d 569, 573 (2d Cir.1994); *Dolphin Direct Equity Partners, LP v. Interactive Motorsports and Entertainment Corp.,* No. 08 Civ. 1558, 2009 WL 577916, at \*4 (S.D.N.Y. Mar.2, 2009) (same).

**\*5** Defendant does not dispute that he executed and delivered a personal guaranty of the payment, up to $10 million plus interest, of the Tranche C loan. He contends, however, that he should be allowed discovery pursuant to Rule 56(f) as to whether Plaintiff's interest in the Tranche C loan has been sold to another, paid or substantially reduced. Defendant proffers no facts or allegations indicative of a likelihood that discovery would produce evidence of any such circumstances.

Plaintiff, on the other hand, proffers evidence that no part of the Tranche C indebtedness—the indebtedness forming the basis of Plaintiff's claim for Defendant's breach of the Guaranty—has been paid. In his declaration filed in

**SA0209**

Tennenbaum Capital Partners LLC v. Kennedy, Not Reported in F.Supp.2d (2009)

2009 WL 2913679, 74 Fed.R.Serv.3d 723

support of the motion for summary judgment, Hollander states under penalty of perjury that the Tranche C debt remains entirely due, owing, and unpaid, that neither Radnor nor Kennedy nor any third party has paid any portion of the Tranche C loans and that Kennedy has not made any payments in respect of the sums due under the Guaranty. (Hollander Decl. ¶¶ 10, 25.) In his reply declaration, Hollander reiterates that no payments have been made in respect of the Tranche C debt. (Hollander Reply Decl. ¶ 6.) He further declares that Plaintiff has not assigned its interest in or to the Guaranty, that Plaintiff is still the Agent under the Guaranty, that none of the Lenders has assigned its interest to any third party for which Plaintiff is not the Agent, and that neither Plaintiff nor any of the Lenders has sold its interest in the Tranche C Loan (other than transfers to the current lenders, which are under the control of the Plaintiff), this Guaranty or the Allowed Claim in the *Radnor* Bankruptcy. (*Id.* at ¶ 8.) Hollander further proffers that neither the claim asserted in the current action, nor the Allowed Claim, has been reduced or satisfied by any payment. (*Id.*) Finally, Hollander declares that Plaintiff has no records that these claims "may have been sold to another, paid or substantially reduced" because the Tranche C debt has not been sold, paid or reduced in any manner whatsoever. (*Id.* at ¶ 10 (*quoting* Defendant's Opp. Mem., at 12–13).)

In the face of such evidence, Defendant's mere assertion that Plaintiff may no longer hold the debt and that the debt may have been reduced, is insufficient to warrant the discovery that Defendant requests. Defendant proffers no good faith basis for belief that discovery would produce any information contrary to Plaintiff's declarations and the Court will not permit Defendant to engage in a fishing expedition based on mere speculation. *Contemporary Mission,* 648 F.2d at 107 ("Rule 56(f) cannot be relied upon to defeat a summary judgment motion 'where the result of a continuance to obtain further information would be wholly speculative.' " (citation omitted).)

Defendant also opposes the motion on legal grounds, arguing that, because the bankruptcy court found that the total value of the assets securing Plaintiff's claims under the Tranche A, B and C loans in the Radnor bankruptcy exceeded the value of those claims as of the petition date and TRAC received all of those assets in return for the credit bid in the bankruptcy sale, Plaintiff's allowed secured claim has necessarily been satisfied in full and it is not entitled to recover on the Guaranty.

Defendant's argument is inconsistent with the governing bankruptcy court orders and the APA and is therefore rejected. His contention that summary judgment should be denied because he is entitled to discovery as to, *inter alia,* the value of the assets transferred, fails as well.

**\*6** Defendant asserts conclusorily that the value of the assets received by Plaintiff in the bankruptcy court-approved transaction is relevant and the proper subject of discovery because Plaintiff was required to apply "any realization on the sale of collateral to satisfaction of both the Tranche A and C Loan." (Def's Opp. at 6; see also *id.* at 14 (arguing that Plaintiff has been made whole if it "recovered far more in value than the debt obligation and purchase price combined").) Defendant appears to allude to section 5.08 of the Tranche A Security Agreement which, as amended in connection with the extension of the Tranche C loan, provides for the application of proceeds of "any collection, sale or other realization of all or any part of the" collateral. (*See* Ex. E to Kennedy Decl.). Defendant's reliance on this provision is, however, misplaced, because it is undisputed that Plaintiff acquired Radnor's assets not by way of realization on the collateral security for the loans but, rather, pursuant to a bankruptcy court-approved sale of those assets free and clear of all liens, including those created by the Tranche A Security Agreement, in return for consideration that included a portion of its allowed secured bankruptcy claim.

The bankruptcy court's judgment determining that Plaintiff had an allowed secured claim in the amount of $128.8 million against Radnor's estate expressly permitted Plaintiff to credit bid "any or all of such Allowed claim (plus all post-petition accrued and unpaid interest, fees and expenses) at any sale of property of [Radnor and its affiliates] that is subject to a lien that secures such Allowed Claim, and [further permitted Plaintiff to] offset any or all of such amounts against the purchase price of such property."[4] In its Sale Order the bankruptcy court found, following an auction and Sale Hearing pursuant to court-approved bidding procedures, that the sale of assets to Plaintiff pursuant to section 363 of the Bankruptcy Code constituted "the highest and best offer for the Purchased Assets." (Sale Order at 2 and ¶¶ E, R.) The APA expressly provided that the credit bid portion of the consideration for the assets consisted of $95 million (the principal amount of the Tranche A and B loans[5]) "plus the amount of any accrued and unpaid interest payable to

**SA0210**

Tennenbaum Capital Partners LLC v. Kennedy, Not Reported in F.Supp.2d (2009)

2009 WL 2913679, 74 Fed.R.Serv.3d 723

the lenders under Tranches A and B of the Tennenbaum Credit Agreement ... through the Auction Date." Any issue as to the relationship between the value of the assets sold pursuant to the court-approved APA and the amount of the credit bid is immaterial to Plaintiff's guaranty claim here because it was the court-approved credit bid, rather than the collateral value, that quantified the portion of Plaintiff's allowed secured claim that was satisfied in connection with the sale. Defendant thus has identified no genuine issue of fact as to whether the Tranche C indebtedness has been satisfied in whole or in part.

4      Judgment at 2.

5      *See* Credit Agreement dated December 1, 2005, Ex. 3 to Hollander Decl.

Plaintiff has met its burden with respect to its breach of guaranty claim against Defendant. Plaintiff's evidence establishes the existence of an unpaid debt arising from the Tranche C loans, the existence of the Guaranty, and that neither Defendant, Radnor, nor any other party has paid the outstanding debt. Additionally, Plaintiff has provided evidence of demand for payment under the Guaranty and has identified its damages—the $10 million dollars (plus interest and attorneys' fees) that is owed under the Guaranty. Plaintiff has made out a prima facie case for a breach of guaranty claim and Defendant has not proffered any evidence that a genuine issue of material fact exists that would warrant denial of Plaintiff's motion. Nor has Defendant proffered a sufficient basis for granting his Rule 56(f) application. Thus, the Court finds that Plaintiff is entitled to summary judgment as to Defendant's liability under the Guaranty.

### CONCLUSION

*7  For the foregoing reasons, Plaintiff's motion for summary judgment is granted as to Defendant's liability to it under the Guaranty for $10 million principal, plus interest and attorneys' fees. Defendant's letter motion to compel discovery is denied as moot.

Plaintiff is directed to file, with a courtesy copy provided for Chambers, no later than **August 31, 2009,** an affidavit setting forth the amounts it contends are owing as interest and attorneys' fees, and identifying the basis for its calculations, together with a proposed judgment. Defendant shall file any opposition or counter-proposal, with appropriate evidentiary support and courtesy copies provided for Chambers, by **September 8, 2009;** Plaintiff shall file and provide courtesy copies of any reply submission by **September 15, 2009.** The Clerk of Court is respectfully requested to terminate Docket Entry No. 25. The final pre-trial conference scheduled for September 11, 2009, is marked off the calendar in light of this decision.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2913679, 74 Fed.R.Serv.3d 723

---

End of Document      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**SA0211**

# Goettig Exhibit Q

Tennenbaum Capital Partners L.L.C. v. Kennedy, 372 Fed.Appx. 180 (2010)

372 Fed.Appx. 180
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

TENNENBAUM CAPITAL
PARTNERS L.L.C., Plaintiff-Appellee,
v.
Michael T. KENNEDY, Defendant-Appellant.

No. 09-3881-cv.
|
April 20, 2010.

**Synopsis**
**Background:** Plaintiff filed motion for summary judgment.
The United States District Court, Southern District of
New York, Swain, J., granted the motion and denied
defendant's application for further discovery. Defendant
appealed.

**Holding:** The Court of Appeals, Second Circuit, held that
court would decline to construe purported excess value
of assets acquired in bankruptcy sale pursuant to "credit bid"
of amount owed on two loans as satisfying third loan also.

Affirmed.

West Headnotes (1)

**[1]**    **Bankruptcy**
          Manner and Terms
          **Bankruptcy**
          Rights and liabilities of purchasers, and
          right to purchase
          Court would decline to exercise equitable
          power and construe purported excess value
          of substantially all of debtor's assets, which
          secured creditor acquired pursuant to "credit
          bid" of amount owed on two loans, over the
          amount owed on the two loans, as having
          satisfied third loan also to thereby preclude
          guarantor's liability for that third loan under

guaranty agreement; bid was the high bid
during the bankruptcy sale, and bankruptcy
court found sale to be substantively and
procedurally fair. 11 U.S.C.A. § 363(k).

3 Cases that cite this headnote

**\*181** Appeal from the United States District Court for
the Southern District of New York (Swain, J.).
**ON CONSIDERATION WHEREOF,** it is hereby
**ORDERED, ADJUDGED,** and **DECREED** that the
judgment of the district court entered September 11, 2009,
is **AFFIRMED.**

**Attorneys and Law Firms**

Leonard Benowich, Benowich Law LLP, White Plains,
NY, for Plaintiff-Appellee.

Richard S. Last, Foreht Last Landau & Katz LLP, New
York, NY, for Defendant-Appellant.

Present:  PIERRE  N.  LEVAL,  ROBERT  A.
KATZMANN, B.D. PARKER, Circuit Judges.

**SUMMARY ORDER**

**\*\*1** Defendant-Appellant Michael T. Kennedy appeals
from a judgment of the United States District Court
for the Southern District of New York (Swain, *J.*),
entered September 11, 2009, granting the motion of
Plaintiff-Appellee Tennenbaum Capital Partners L.L.C.
("Tennenbaum") for summary judgment and denying
Kennedy's application under Federal Rule of Civil
Procedure 56(f) for further discovery. We assume the
parties' familiarity with the facts, procedural history, and
specification of issues on appeal.

Kennedy does not dispute that the $95 million that
Tennenbaum "credit bid" under 11 U.S.C. § 363(k) to
acquire substantially all of Radnor's assets represented
Tennenbaum's valid claims for repayment of the Tranche
A and B Loans. Nor has Kennedy controverted the
evidence introduced below to show that neither Radnor,
Kennedy, nor any other party has made any payment
of the amounts due under the Tranche C Loan. Rather,
Kennedy argues that this Court should exercise its
equitable power and construe the purported excess value

Tennenbaum Capital Partners L.L.C. v. Kennedy, 372 Fed.Appx. 180 (2010)

of the Radnor assets over the amount of the Tranche A and B Loans as having satisfied the Tranche C Loan as well, so that he is not liable under the guaranty agreement.

We find no occasion to do so. Despite efforts under the supervision of the bankruptcy court, conducted with full notice to Kennedy, to find buyers willing to pay more for Radnor's assets than Tennenbaum's bid of $95 million, no better offer was found. The bankruptcy court found the sale to be substantively and procedurally fair. There is no reason for this Court to override the contractually specified understanding of the parties, the conclusions of the bankruptcy court, and the market's valuation of Radnor's assets at the time of the sale by finding that the credit bid somehow acquitted Radnor of the additional Tranche C debt.

Nor would further discovery have yielded any potentially relevant facts. As the district court correctly noted, because Tennenbaum received the assets pursuant to the credit bid procedure rather than as collateral

in satisfaction of Radnor's debts, the amount of Tennenbaum's secured claim that was satisfied is appropriately determined by reference to the sale price. Evidence pertaining to the alleged post-sale value of Radnor's assets, therefore, is immaterial as a matter of law. *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1139 (2d Cir.1994) (noting that a **\*182** Rule 56(f) application is appropriately denied when the party seeking further discovery has failed to show "how the facts sought were reasonably expected to create a genuine issue of material fact relating to any issue raised in the litigation"). Summary judgment in favor of Tennenbaum was therefore appropriate.

We have considered Kennedy's other arguments and find them to be without merit. For the foregoing reasons, we **AFFIRM** the judgment of the district court.

**All Citations**

372 Fed.Appx. 180, 2010 WL 1563685

---

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**SA0214**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------------ x

TYRONE HOLMES,                                        :        Case No. 17 Civ. 4557 (ER) (KNF)

                     Plaintiff,               :        **DECLARATION OF**
                                                :        **JESSE JENSEN**

      - against -                                    :

APPLE, INC., AMAZON.COM, LLC, and                     :
CHECKPOINT FLUIDIC SYSTEMS                            :
INTERNATIONAL, LTD.,                                  :
                                              :

                   Defendants.                :

------------------------------------------------------------ x

**I, JESSE JENSEN, STATE AS FOLLOWS:**

    1.    I am a Litigation Paralegal in the Litigation and Regulatory group at Amazon.com, LLC ("Amazon"). My responsibilities include investigating, responding to, and managing lawsuits and other legal matters involving Amazon and its affiliates. Based on my review of Amazon's business records, I am familiar with the agreement and customer histories discussed in this declaration. I make this declaration based on the best of my personal knowledge, my review of Amazon's records kept in the ordinary course of business, and documents and information obtained by other Amazon personnel in the course of their duties. I am competent to testify to the matters stated here.

    2.    Tyrone Holmes ("Plaintiff" or "Mr. Holmes") created an Amazon customer account on January 26, 2010. When doing so, he accepted the Conditions of Use (the "COUs") on Amazon's account registration page, a true and correct copy of which is shown in **Exhibit A**. He could not have created his account without doing so.

    3.    Amazon's COUs have contained a limitation of liability and waiver of express and implied warranties since before January 2010. Attached as **Exhibit B** is a true and correct

copy of the current COUs in effect as of June 21, 2016.  Attached as **Exhibit C** is a true and correct copy of the COUs in effect as of January 26, 2010, the date on which Mr. Holmes created his account.  The limitation of liability and waiver of express and implied warranties in the COUs then, and in all subsequent versions of the COUs, have contained substantially similar language.

4.    On June 22, 2016, Mr. Holmes bought a 15-Inch Macbook Pro (the "New Laptop") by placing the product in Amazon's online Shopping Cart and proceeding through Amazon's standard checkout page.  Attached as **Exhibit D** is an order confirmation for the New Laptop indicating that the "Order Method" for Mr. Holmes's purchase of the New Laptop was via "Shopping Cart."

5.    When making purchases using the standard Amazon checkout page, customers have the opportunity to review and confirm their orders and, to complete their orders, must accept the Amazon COUs.  Attached as **Exhibit E** is a true and correct copy of an example of the checkout page. It shows that, in order to complete a purchase, customers must click on a "Place your order" button accompanied by text explaining that "By placing your order, you agree to Amazon.com's privacy notice and conditions of use." *Id.*  The blue text denotes hyperlinks to the full contract terms.  A customer cannot place an order through Amazon's standard checkout page without affirmatively clicking on this button.  A customer who does not wish to accept the COUs or the limitation of liability and waiver of warranties contained in them may cancel his or her purchase transaction.

6.    By placing his order, Plaintiff again accepted the COUs on Amazon's checkout page.  See **Exhibit E**.  Mr. Holmes could not have purchased that item through Amazon's standard checkout page without having done so.

-2-

4850-6777-7115v.1 0051461-001311

7.    The New Laptop was among a batch of new Macbook Pro computers that Amazon sourced directly from the manufacturer, Apple.

8.    The New Laptop was packaged for delivery to Mr. Holmes from Amazon's fulfillment center in Lewisberry, Pennsylvania.

9.    The New Laptop was delivered via UPS to Plaintiff at 9:35 AM on June 23, 2016. Mr. Holmes provided his signature as acknowledgment of delivery of the New Laptop at that time. Attached as **Exhibit F** is a screenshot of the UPS tracking information for the package containing the New Computer.

10.    On June 2, 2016, Amazon received Order #105-5281827-669144 for a new 15-inch Macbook Pro (the "Checkpoint Laptop"). The Checkpoint Laptop was also among a batch of new Macbook Pro computers that Amazon sourced directly from the manufacturer, Apple.

11.    The Checkpoint Laptop was packaged for delivery from Amazon's fulfillment center in Breinigsville, Pennsylvania.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated: Seattle, Washington
       February 9, 2018

                                    By: _____
                                        Jesse Jensen
                                        Legal Assistant, Litigation and Regulatory
                                        Amazon.com, LLC

-3-

**SA0217**

# Jensen Exhibit A

# Create account

**Your name**

**Email**

**Password**

at least 6 characters

**Password again**

Create your Amazon account

By creating an account, you agree to Amazon's Conditions of Use and Privacy Notice.

Already have an account? Sign in

Conditions of Use     Privacy Notice     Help

© 1996-2016, Amazon.com, Inc. or its affiliates

**SA0219**

# Jensen Exhibit B



Try Prime

All ⌄

Departments ⌄    Your Amazon.com    Today's Deals    Gift Cards & Registry      Hello. Sign in Your Account ⌄   Try Prime ⌄   Lists ⌄    Cart

## Help & Customer Service

Search Help    **Go**

‹ All Help Topics

### Security & Privacy

E-mails from Amazon.com
Supply Chain Standards
Amazon.com Privacy Notice
**Conditions of Use**
Choose a Strong Password
Protect Your System
Public PGP Key
Report a Security Issue
Supported Browsers
Document Requests

### Quick solutions

 **Your Orders**
Track or cancel orders

 **Returns & Refunds**
Exchange or return items

 **Manage Prime**
Cancel or view benefits

 **Payment Settings**
Add or edit payment methods

 **Carrier Info**
Shipping carrier information

 **Account Settings**
Change email or password

Ask the Help Community
Ask the Kindle Help Community

Contact Us

Security & Privacy ›

# Conditions of Use

### Last updated: June 21, 2016

Welcome to Amazon.com. Amazon.com Services LLC and/or its affiliates ("Amazon") provide website features and other products and services to you when you visit or shop at Amazon.com, use Amazon products or services, use Amazon applications for mobile, or use software provided by Amazon in connection with any of the foregoing (collectively, "Amazon Services"). Amazon provides the Amazon Services subject to the following conditions.

**By using Amazon Services, you agree to these conditions. Please read them carefully.**

We offer a wide range of Amazon Services, and sometimes additional terms may apply. When you use an Amazon Service (for example, Your Profile, Gift Cards, Amazon Video, Your Media Library, or Amazon applications for mobile) you also will be subject to the guidelines, terms and agreements applicable to that Amazon Service ("Service Terms"). If these Conditions of Use are inconsistent with the Service Terms, those Service Terms will control.

### PRIVACY

Please review our Privacy Notice, which also governs your use of Amazon Services, to understand our practices.

### ELECTRONIC COMMUNICATIONS

When you use any Amazon Service, or send e-mails, text messages, and other communications from your desktop or mobile device to us, you are communicating with us electronically. You consent to receive communications from us electronically, such as e-mails, texts, mobile push notices, or notices and messages on this site or through the other Amazon Services, such as our Message Center, and you can retain copies of these communications for your records. You agree that all agreements, notices, disclosures, and other communications that we provide to you electronically satisfy any legal requirement that such communications be in writing.

### COPYRIGHT

All content included in or made available through any Amazon Service, such as text, graphics, logos, button icons, images, audio clips, digital downloads, data compilations, and software is the property of Amazon or its content suppliers and protected by United States and international copyright laws. The compilation of all content included in or made available through any Amazon Service is the exclusive property of Amazon and protected by U.S. and international copyright laws.

### TRADEMARKS

Click here to see a non-exhaustive list of Amazon trademarks. In addition, graphics, logos, page headers, button icons, scripts, and service names included in or made available through any Amazon Service are trademarks or trade dress of Amazon in the U.S. and other countries. Amazon's trademarks and trade dress may not be used in connection with any product or service that is not Amazon's, in any manner that is likely to cause confusion among customers, or in any manner that disparages or discredits Amazon. All other trademarks not owned by Amazon that appear in any Amazon Service are the property of their respective owners, who may or may not be affiliated with, connected to, or sponsored by Amazon.

### PATENTS

One or more patents owned by Amazon apply to the Amazon Services and to the features and services accessible via the Amazon Services. Portions of the Amazon Services operate under license of one or more patents. Click here to see a non-exhaustive list of applicable Amazon patents and applicable licensed patents.

### LICENSE AND ACCESS

Subject to your compliance with these Conditions of Use and your payment of any applicable fees, Amazon or its content providers grant you a limited, non-exclusive, non-transferable, non-sublicensable license to access and make personal and non-commercial use of the Amazon Services. This license does not include any resale or commercial use of any Amazon Service, or its contents; any collection and use of any product listings, descriptions, or prices; any derivative use of any Amazon Service or its contents; any downloading, copying, or other use of account information for the benefit of any third party; or any use of data mining, robots, or similar data gathering and extraction tools. All rights not

expressly granted to you in these Conditions of Use or any Service Terms are reserved and retained by Amazon or its licensors, suppliers, publishers, rightsholders, or other content providers. No Amazon Service, nor any part of any Amazon Service, may be reproduced, duplicated, copied, sold, resold, visited, or otherwise exploited for any commercial purpose without express written consent of Amazon. You may not frame or utilize framing techniques to enclose any trademark, logo, or other proprietary information (including images, text, page layout, or form) of Amazon without express written consent. You may not use any meta tags or any other "hidden text" utilizing Amazon's name or trademarks without the express written consent of Amazon. You may not misuse the Amazon Services. You may use the Amazon Services only as permitted by law. The licenses granted by Amazon terminate if you do not comply with these Conditions of Use or any Service Terms.

**YOUR ACCOUNT**

If you use any Amazon Service, you are responsible for maintaining the confidentiality of your account and password and for restricting access to your computer, and you agree to accept responsibility for all activities that occur under your account or password. Amazon does sell products for children, but it sells them to adults, who can purchase with a credit card or other permitted payment method. If you are under 18, you may use the Amazon Services only with involvement of a parent or guardian. Alcohol listings on Amazon are intended for adults. You must be at least 21 years of age to purchase alcohol, or use any site functionality related to alcohol. Amazon reserves the right to refuse service, terminate accounts, remove or edit content, or cancel orders in its sole discretion.

**REVIEWS, COMMENTS, COMMUNICATIONS, AND OTHER CONTENT**

Visitors may post reviews, comments, photos, videos, and other content; send e-cards and other communications; and submit suggestions, ideas, comments, questions, or other information, so long as the content is not illegal, obscene, threatening, defamatory, invasive of privacy, infringing of intellectual property rights (including publicity rights), or otherwise injurious to third parties or objectionable, and does not consist of or contain software viruses, political campaigning, commercial solicitation, chain letters, mass mailings, or any form of "spam" or unsolicited commercial electronic messages. You may not use a false e-mail address, impersonate any person or entity, or otherwise mislead as to the origin of a card or other content. Amazon reserves the right (but not the obligation) to remove or edit such content, but does not regularly review posted content.

If you do post content or submit material, and unless we indicate otherwise, you grant Amazon a nonexclusive, royalty-free, perpetual, irrevocable, and fully sublicensable right to use, reproduce, modify, adapt, publish, perform, translate, create derivative works from, distribute, and display such content throughout the world in any media. You grant Amazon and sublicensees the right to use the name that you submit in connection with such content, if they choose. You represent and warrant that you own or otherwise control all of the rights to the content that you post; that the content is accurate; that use of the content you supply does not violate this policy and will not cause injury to any person or entity; and that you will indemnify Amazon for all claims resulting from content you supply. Amazon has the right but not the obligation to monitor and edit or remove any activity or content. Amazon takes no responsibility and assumes no liability for any content posted by you or any third party.

**COPYRIGHT COMPLAINS**

Amazon respects the intellectual property of others. If you believe that your work has been copied in a way that constitutes copyright infringement, please follow our Notice and Procedure for Making Claims of Copyright Infringement.

**RISK OF LOSS**

All items purchased from Amazon are made pursuant to a shipment contract. This means that the risk of loss and title for such items pass to you upon our delivery to the carrier.

**RETURNS, REFUNDS AND TITLE**

Amazon does not take title to returned items until the item arrives at our fulfillment center. At our discretion, a refund may be issued without requiring a return. In this situation, Amazon does not take title to the refunded item. For more information about our returns and refunds, please see our Returns Center.

**PRODUCT DESCRIPTIONS**

Amazon attempts to be as accurate as possible. However, Amazon does not warrant that product descriptions or other content of any Amazon Service is accurate, complete, reliable, current, or error-free. If a product offered by Amazon itself is not as described, your sole remedy is to return it in unused condition.

**PRICING**

"List Price" means the suggested retail price of a product as provided by a manufacturer, supplier, or seller. We regularly check List Prices against prices recently found on Amazon and other retailers. Certain products may have a "Was Price" displayed, which is determined using recent price history of the product on Amazon.

With respect to items sold by Amazon, we cannot confirm the price of an item until you order. Despite our best efforts, a small number of the items in our catalog may be mispriced. If the correct price of an

item sold by Amazon is higher than our stated price, we will, at our discretion, either contact you for instructions before shipping or cancel your order and notify you of such cancellation. Other merchants may follow different policies in the event of a mispriced item.

We generally do not charge your credit card until after your order has entered the shipping process or, for digital products, until we make the digital product available to you.

### APP PERMISSIONS

When you use apps created by Amazon, such as the Amazon App, Amazon Shopping App, or Amazon Kindle App, you may grant certain permissions to us for your device. Most mobile devices provide you with information about these permissions. To learn more about these permissions, click here.

### AMAZON SOFTWARE TERMS

In addition to these Conditions of Use, the terms found here apply to any software (including any updates or upgrades to the software and any related documentation) that we make available to you from time to time for your use in connection with Amazon Services (the "Amazon Software").

### OTHER BUSINESSES

Parties other than Amazon operate stores, provide services, or sell product lines through the Amazon Services. In addition, we provide links to the sites of affiliated companies and certain other businesses. We are not responsible for examining or evaluating, and we do not warrant the offerings of, any of these businesses or individuals or the content of their Web sites. Amazon does not assume any responsibility or liability for the actions, product, and content of all these and any other third parties. You should carefully review their privacy statements and other conditions of use.

### DISCLAIMER OF WARRANTIES AND LIMITATION OF LIABILITY

THE AMAZON SERVICES AND ALL INFORMATION, CONTENT, MATERIALS, PRODUCTS (INCLUDING SOFTWARE) AND OTHER SERVICES INCLUDED ON OR OTHERWISE MADE AVAILABLE TO YOU THROUGH THE AMAZON SERVICES ARE PROVIDED BY AMAZON ON AN "AS IS" AND "AS AVAILABLE" BASIS, UNLESS OTHERWISE SPECIFIED IN WRITING. AMAZON MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, AS TO THE OPERATION OF THE AMAZON SERVICES, OR THE INFORMATION, CONTENT, MATERIALS, PRODUCTS (INCLUDING SOFTWARE) OR OTHER SERVICES INCLUDED ON OR OTHERWISE MADE AVAILABLE TO YOU THROUGH THE AMAZON SERVICES, UNLESS OTHERWISE SPECIFIED IN WRITING. YOU EXPRESSLY AGREE THAT YOUR USE OF THE AMAZON SERVICES IS AT YOUR SOLE RISK.

TO THE FULL EXTENT PERMISSIBLE BY APPLICABLE LAW, AMAZON DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. AMAZON DOES NOT WARRANT THAT THE AMAZON SERVICES, INFORMATION, CONTENT, MATERIALS, PRODUCTS (INCLUDING SOFTWARE) OR OTHER SERVICES INCLUDED ON OR OTHERWISE MADE AVAILABLE TO YOU THROUGH THE AMAZON SERVICES, AMAZON'S SERVERS OR ELECTRONIC COMMUNICATIONS SENT FROM AMAZON ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. AMAZON WILL NOT BE LIABLE FOR ANY DAMAGES OF ANY KIND ARISING FROM THE USE OF ANY AMAZON SERVICE, OR FROM ANY INFORMATION, CONTENT, MATERIALS, PRODUCTS (INCLUDING SOFTWARE) OR OTHER SERVICES INCLUDED ON OR OTHERWISE MADE AVAILABLE TO YOU THROUGH ANY AMAZON SERVICE, INCLUDING, BUT NOT LIMITED TO DIRECT, INDIRECT, INCIDENTAL, PUNITIVE, AND CONSEQUENTIAL DAMAGES, UNLESS OTHERWISE SPECIFIED IN WRITING.

CERTAIN STATE LAWS DO NOT ALLOW LIMITATIONS ON IMPLIED WARRANTIES OR THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES. IF THESE LAWS APPLY TO YOU, SOME OR ALL OF THE ABOVE DISCLAIMERS, EXCLUSIONS, OR LIMITATIONS MAY NOT APPLY TO YOU, AND YOU MIGHT HAVE ADDITIONAL RIGHTS.

### DISPUTES

**Any dispute or claim relating in any way to your use of any Amazon Service, or to any products or services sold or distributed by Amazon or through Amazon.com will be resolved by binding arbitration, rather than in court,** except that you may assert claims in small claims court if your claims qualify. The Federal Arbitration Act and federal arbitration law apply to this agreement.

**There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow the terms of these Conditions of Use as a court would.**

To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to our registered agent Corporation Service Company, 300 Deschutes Way SW, Suite 304, Tumwater, WA 98501. The arbitration will be conducted by the American Arbitration Association (AAA) under its rules, including the AAA's Supplementary Procedures for Consumer-Related Disputes. The AAA's rules are available at www.adr.org or by calling 1-800-778-7879. Payment of all filing, administration and arbitration fees will be governed by the AAA's rules. We will reimburse those fees for claims totaling less than $10,000 unless the arbitrator determines the claims are frivolous. Likewise,

Amazon will not seek attorneys' fees and costs in arbitration unless the arbitrator determines the claims are frivolous. You may choose to have the arbitration conducted by telephone, based on written submissions, or in person in the county where you live or at another mutually agreed location.

**We each agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action.** If for any reason a claim proceeds in court rather than in arbitration **we each waive any right to a jury trial**. We also both agree that you or we may bring suit in court to enjoin infringement or other misuse of intellectual property rights.

**APPLICABLE LAW**

By using any Amazon Service, you agree that the Federal Arbitration Act, applicable federal law, and the laws of the state of Washington, without regard to principles of conflict of laws, will govern these Conditions of Use and any dispute of any sort that might arise between you and Amazon.

**SITE POLICIES, MODIFICATION, AND SEVERABILITY**

Please review our other policies, such as our pricing policy, posted on this site. These policies also govern your use of Amazon Services. We reserve the right to make changes to our site, policies, Service Terms, and these Conditions of Use at any time. If any of these conditions shall be deemed invalid, void, or for any reason unenforceable, that condition shall be deemed severable and shall not affect the validity and enforceability of any remaining condition.

**OUR ADDRESS**

```
Amazon.com, Inc.
P.O. Box 81226
Seattle, WA 98108-1226
```
https://www.amazon.com

**How to Serve a Subpoena**

If you have a subpoena to serve on Amazon, please note that Amazon does not accept service via e-mail or fax and will not respond to the subpoena. All subpoenas must be properly served on Amazon.com, preferably by mailing the subpoena to Corporation Service Company (CSC), Amazon's national registered agent. Please find below the Washington address for CSC (the CSC office in your jurisdiction may be located through the Secretary of State's website):

```
Amazon.com, Inc.
Corporation Service Company
300 Deschutes Way SW, Suite 304
Tumwater, WA 98501
Attn: Legal Department - Subpoena
```

Please note also that providing detailed and accurate information at the outset will facilitate efficient processing of your request. That information will include, for example, e-mail and/or credit card number used to make purchases for retail purchase information; the name, e-mail, and physical address of a seller for seller information; Kindle serial number for Kindle information (please note we do not have GPS location information); and IP address and complete time stamp for AWS information.

**Notice and Procedure for Making Claims of Copyright Infringement**

If you believe that your work has been copied in a way that constitutes copyright infringement, please submit your complaint using our online form . We respond quickly to the concerns of rights owners about any alleged infringement.

If you prefer to submit a report in writing, please provide us with this information:

- A physical signature of the person authorized to act on behalf of the owner of the copyright interest;
- A description of the copyrighted work that you claim has been infringed upon;
- A description of where the material that you claim is infringing is located on the site;
- Your address, telephone number, and e-mail address;
- A statement by you that you have a good-faith belief that the disputed use is not authorized by the copyright owner, its agent, or the law;
- A statement by you, made under penalty of perjury, that the above information in your notice is accurate and that you are the copyright owner or authorized to act on the copyright owner's behalf.

Amazon's Copyright Agent for notice of claims of copyright infringement on its site can be reached as follows:

```
Copyright Agent
Amazon.com Legal Department
P.O. Box 81226
Seattle, WA 98108
phone: (206) 266-4064
fax: (206) 266-7010
e-mail: copyright@amazon.com
Courier address:
Copyright Agent
```

```
Amazon.com Legal Department
2021 7th Avenue
Seattle, WA 98121
USA
```

Please note that this procedure is exclusively for notifying Amazon that your copyrighted material has been infringed.

**Additional Amazon Software Terms**

1. **Use of the Amazon Software.** You may use Amazon Software solely for purposes of enabling you to use and enjoy the Amazon Services as provided by Amazon, and as permitted by the Conditions of Use, these Software Terms and any Service Terms. You may not incorporate any portion of the Amazon Software into your own programs or compile any portion of it in combination with your own programs, transfer it for use with another service, or sell, rent, lease, lend, loan, distribute or sub-license the Amazon Software or otherwise assign any rights to the Amazon Software in whole or in part. You may not use the Amazon Software for any illegal purpose. We may cease providing any Amazon Software and we may terminate your right to use any Amazon Software at any time. Your rights to use the Amazon Software will automatically terminate without notice from us if you fail to comply with any of these Software Terms, the Conditions of Use or any other Service Terms. Additional third party terms contained within or distributed with certain Amazon Software that are specifically identified in related documentation may apply to that Amazon Software (or software incorporated with the Amazon Software) and will govern the use of such software in the event of a conflict with these Conditions of Use. All software used in any Amazon Service is the property of Amazon or its software suppliers and protected by United States and international copyright laws.

2. **Use of Third Party Services.** When you use the Amazon Software, you may also be using the services of one or more third parties, such as a wireless carrier or a mobile platform provider. Your use of these third party services may be subject to the separate policies, terms of use, and fees of these third parties.

3. **No Reverse Engineering.** You may not, and you will not encourage, assist or authorize any other person to copy, modify, reverse engineer, decompile or disassemble, or otherwise tamper with, the Amazon Software, whether in whole or in part, or create any derivative works from or of the Amazon Software.

4. **Updates.** In order to keep the Amazon Software up-to-date, we may offer automatic or manual updates at any time and without notice to you.

5. **Export Regulations; Government End Users.** You must comply with all export and re-export restrictions and regulations of the Department of Commerce and other United States agencies and authorities that may apply to the Amazon Software. If you are a U.S. Government end user, we are licensing the Amazon Software to you as a "Commercial Item" as that term is defined in the U.S. Code of Federal Regulations (see 48 C.F.R. § 2.101), and the rights we grant you to the Amazon Software are the same as the rights we grant to all others under these Conditions of Use.

Was this information helpful?

| Yes | No |

---

| Search Help | **Go** |

Back to top

| Get to Know Us | Make Money with Us | Amazon Payment Products | Let Us Help You |
|---|---|---|---|
| Careers | Sell on Amazon | Amazon.com Rewards Visa Card | Your Account |
| About Amazon | Sell Your Services on Amazon | Amazon.com Store Card | Your Orders |
| Investor Relations | Sell on Amazon Business | Amazon.com Corporate Credit Line | Shipping Rates & Policies |
| Amazon Devices | Sell Your Apps on Amazon | Shop with Points | Amazon Prime |
| | Become an Affiliate | Credit Card Marketplace | Returns & Replacements |
| | Advertise Your Products | Reload Your Balance | Manage Your Content and Devices |
| | Self-Publish with Us | Amazon Currency Converter | Amazon Assistant |

**SA0225**

Become an Amazon Vendor                                                    Help

› See all

amazon.com

Australia   Brazil   Canada   China   France   Germany   India   Italy   Japan   Mexico   Netherlands   Spain   United Kingdom

| | | | | | |
|---|---|---|---|---|---|
| Amazon Drive<br>Unlimited Cloud Storage<br>From Amazon | 6pm<br>Score deals<br>on fashion brands | AbeBooks<br>Rare Books<br>& Textbooks | ACX<br>Audiobook Publishing<br>Made Easy | Alexa<br>Actionable Analytics<br>for the Web | Amazon Business<br>Everything For<br>Your Business |
| AmazonFresh<br>Groceries & More<br>Right To Your Door | AmazonGlobal<br>Ship Orders<br>Internationally | Home Services<br>Handpicked Pros<br>Happiness Guarantee | Amazon Inspire<br>Free Digital Educational<br>Resources | Amazon Video Direct<br>Video Distribution<br>Made Easy | Amazon Web Services<br>Scalable Cloud<br>Computing Services |
| Audible<br>Download<br>Audio Books | BeautyBar.com<br>Prestige Beauty<br>Delivered | Book Depository<br>Books With Free<br>Delivery Worldwide | Casa.com<br>Kitchen, Storage<br>& Everything Home | ComiXology<br>Thousands of<br>Digital Comics | CreateSpace<br>Indie Print Publishing<br>Made Easy |
| Diapers.com<br>Everything<br>But The Baby | DPReview<br>Digital<br>Photography | East Dane<br>Designer Men's<br>Fashion | Fabric<br>Sewing, Quilting<br>& Knitting | Goodreads<br>Book reviews<br>& recommendations | IMDb<br>Movies, TV<br>& Celebrities |
| Junglee.com<br>Shop Online<br>in India | Kindle Direct Publishing<br>Indie Digital Publishing<br>Made Easy | Prime Now<br>FREE 2-Hour Delivery<br>on Everyday Items | Shopbop<br>Designer<br>Fashion Brands | Soap.com<br>Health, Beauty &<br>Home Essentials | TenMarks.com<br>Math Activities<br>for Kids & Schools |
| Wag.com<br>Everything<br>For Your Pet | Warehouse Deals<br>Open-Box<br>Discounts | Whispercast<br>Discover & Distribute<br>Digital Content | Woot!<br>Discounts and<br>Shenanigans | Yoyo.com<br>A Happy Place<br>To Shop For Toys | Zappos<br>Shoes &<br>Clothing |

Conditions of Use   Privacy Notice   Interest-Based Ads   © 1996-2016, Amazon.com, Inc. or its affiliates

**SA0226**

# Jensen Exhibit C

Get Black Friday Deals All Week
New Deals Every Day
Presented by American Express

**Hello.** Sign in to get personalized recommendations. New customer? Start here.

**Your Amazon.com** | Today's Deals | Gifts & Wish Lists | Gift Cards          Free Shipping | Your Account | Help

**Shop All Departments**    Search   All Departments    [                    ]    Cart    Wish List

Help > Privacy, Security & Accessibility > Conditions of Use

**Topics**

Privacy, Security & Accessibility

- Privacy Notice
- Conditions of Use
- Amazon Accessibility Resources
- Safety and Security Tips
- Our Efforts to Stop Spoofing
- Your Amazon.com Bill of Rights
- A-to-Z Guarantee Protection
- Identifying Phishing or Spoofed E-mails
- Phishing or Spoofed E-mails

Shipping & Delivery
Tracking Packages
U.S. Shipping Rates and Times
International Shipping
FREE Super Saver Shipping
Christmas Ordering Deadlines
Packaging Feedback
More...
Returns and Refunds
Return Policy
Gift Returns
Exchanging a Broken or Incorrect Item
Packing and Sending Your Return
Returns to Amazon Merchants
More...
Using Your Account
Reviewing & Changing Your Orders
Problem with an Order?
Changing Address or Payment for an Order
Canceling Orders
Combining Orders
More...
Digital Products
Amazon Kindle
Amazon Video On Demand
Amazon MP3 Music Downloads
Games & Software Downloads
More...
Privacy, Security & Accessibility
A-to-Z Guarantee Protection
Identifying Phishing E-Mails
Safety & Security Tips
Credit Card Security
Privacy Notice
More...
Ordering from Amazon.com
New Customers
Mobile Shopping
Amazon Merchants
1-Click Ordering
Product Recalls
More...
Payment, Pricing & Promotions
Payment Methods We Accept
Gift Cards
Rebates
Promotional Offers
More...
Gifts, Gift Cards & Gift Registries
Sending Gifts
Wish Lists
Baby Registry
Gift Cards
More...
Amazon.com Site Features
Your Content
Advanced Shopping Features
Your Media Library
RSS Feeds
More...
Selling at Amazon.com
Introduction to Selling
Quick Start Guide
Seller Account and Settings
Policies and Agreements
More...
Publisher & Vendor Guides
List and Sell Books
List and Sell DVDs
On-Demand Publishing
More...
Business Opportunities
Amazon Payments
Advantage
Associates

[Search Help button]

## Conditions of Use

Welcome to Amazon.com. Amazon Services LLC and/or its affiliates ("Amazon") provide website features to you subject to the following conditions. **If you visit or shop at Amazon.com, you accept these conditions.** Please read them carefully. In addition, when you use any current or future Amazon service or business (e.g., Your Profile, Gift Cards, Unbox, or Your Media Library) you also will be subject to the guidelines, terms and agreements ("Terms") applicable to such service or business. If these conditions are inconsistent with such Terms, the Terms will control.

**PRIVACY**

Please review our Privacy Notice, which also governs your visit to Amazon.com, to understand our practices.

**ELECTRONIC COMMUNICATIONS**

When you visit Amazon.com or send e-mails to us, you are communicating with us electronically. You consent to receive communications from us electronically. We will communicate with you by e-mail or by posting notices on this site. You agree that all agreements, notices, disclosures and other communications that we provide to you electronically satisfy any legal requirement that such communications be in writing.

**COPYRIGHT**

All content included on this site, such as text, graphics, logos, button icons, images, audio clips, digital downloads, data compilations, and software, is the property of Amazon or its content suppliers and protected by United States and international copyright laws. The compilation of all content on this site is the exclusive property of Amazon and protected by U.S. and international copyright laws. All software used on this site is the property of Amazon or its software suppliers and protected by United States and international copyright laws.

**TRADEMARKS**

AMAZON, AMAZON.COM, AMAZON.COM & Design, AMAZON.COM ANYWHERE, AMAZON.COM AUCTIONS, AMAZON.COM BOOKS, AMAZON.COM OUTLET, AMAZONFRESH, AMAZONFRESH & Design, AMAZON.CA, AMAZON.CO.JP, AMAZON.CO.UK, AMAZON.DE, AMAZON.FR, JOYO, JOYO.COM/AMAZON.CN, AMAZONCONNECT, AMAZON HONOR SYSTEM, AMAZON PRIME, AMAZON SERVICES, AMAPEDIA, AMAZON LINKS & Design, AMAZON FLEXIBLE PAYMENT SERVICE, AMAZON PFS, AMAZON VINE, AMAZONUNBOX & Design, AMAZON WIRE PODCAST & Design, A in a Box Design, A with Radish Design, AMAZON SIMPLE QUEUE SERVICE, AMAZON WEB SERVICES, AWS, AMAZON S3, AMAZON EC2, ELASTIC COMPUTE CLOUD, AMAZON SQS, ASKVILLE, FULFILLMENT BY AMAZON, WEBSTORE BY AMAZON, EASYSELL, ASSOCIATES CENTRAL, A2Z, ASTORE Design, BETTER TOGETHER, BIBLEFINDER, BIBLIOFIND, BOTTOM OF THE PAGE, BOOKSURGE, CREATESPACE, CUSTOMFLIX, DENALI, DROP SHIP CENTRAL, EARTH'S BIGGEST BOOKSTORE, EARTH'S BIGGEST SELECTION, ENDLESS, FUTURE-PROOF ARCHIVE, GOLD BOX, LISTMANIA, LOOK INSIDE and Design, MECHANICAL TURK, MTURK, MOBIPOCKET, NEW FOR YOU, NOWNOW, 1-CLICK, 1-CLICK COMPARE, PAYPAGE, PINZON, PLANETALL, PRIME, PURCHASE CIRCLES, QUESTVILLE, SEARCH INSIDE!, SEARCH INSIDE THE BOOK, SELLER CENTRAL, SMALL PARTS & Design, SMILE LOGO, SHARE THE LOVE, STRATHWOOD, UNPAY, UNBOX, UNSPUN, VENDOR CENTRAL, zSHOPS, and other Amazon.com graphics, logos, page headers, button icons, scripts, and service names are trademarks, registered trademarks or trade dress of Amazon in the U.S. and/or other countries. Amazon's trademarks and trade dress may not be used in connection with any product or service that is not Amazon's, in any manner that is likely to cause confusion among customers, or in any manner that disparages or discredits Amazon. All other trademarks not owned by Amazon that appear on this site are the property of their respective owners, who may or may not be affiliated with, connected to, or sponsored by Amazon.

**PATENTS**

One or more patents owned by Amazon apply to this site and to the features and services accessible via the site. Portions of this site operate under license of one or more patents. Click here to see a non-exhaustive list of applicable Amazon patents and applicable licensed patents.

**LICENSE AND SITE ACCESS**

Amazon grants you a limited license to access and make personal use of this site and not to download (other than page caching) or modify it, or any portion of it, except with express written consent of Amazon. This license does not include any resale or commercial use of this site or its contents; any collection and use of any product listings, descriptions, or prices; any derivative use of this site or its contents; any downloading or copying of account information for the benefit of another merchant; or any use of data mining, robots, or similar data gathering and extraction tools. This site or any portion of this site may not be reproduced, duplicated, copied, sold, resold, visited, or otherwise exploited for any commercial purpose without express written consent of Amazon. You may not frame or utilize framing techniques to enclose any trademark, logo, or other proprietary information (including images, text, page layout, or form) of Amazon without express written consent. You may not use any meta tags or any other "hidden text" utilizing Amazon's name or trademarks without the express written consent of Amazon. Any unauthorized use terminates the permission or license granted by Amazon. You are granted a limited, revocable, and nonexclusive right to create a hyperlink to the home page of Amazon.com so long as the link does not portray Amazon, or its products or services in a false, misleading, derogatory, or otherwise offensive matter. You may not use any Amazon logo or other proprietary graphic or trademark as part of the link without express written permission.

**YOUR ACCOUNT**

If you use this site, you are responsible for maintaining the confidentiality of your account and password and for restricting access to your computer, and you agree to accept responsibility for all activities that occur under your account or password. Amazon does sell products for children, but it sells them to adults, who can purchase with a credit card or other permitted payment method. If you are under 18, you may use Amazon.com only with involvement of a parent or guardian. Amazon reserves the right to refuse service, terminate accounts, remove or edit content, or cancel orders in their sole discretion.

**REVIEWS, COMMENTS, COMMUNICATIONS, AND OTHER CONTENT**

Visitors may post reviews, comments, photos, and other content; send e-cards and other communications; and submit suggestions, ideas, comments, questions, or other information, so long as the content is not illegal, obscene, threatening, defamatory, invasive of privacy, infringing of intellectual property rights, or otherwise injurious to third parties or objectionable and does not consist of or contain software viruses, political campaigning, commercial solicitation, chain letters, mass mailings, or any form of "spam." You may not use a false e-mail address, impersonate any person or entity, or otherwise mislead as to the origin of a card or other content. Amazon reserves the right (but

### Self-Service

**Most Popular**

- Track or Manage Purchases
- Manage Payment Options
- Return Items
- Change Name, E-mail, or Password
- Manage Address Book

**Other Self-Service**

Account Profile

- Change Name, E-mail, or Password
- Manage Prime Membership
- Update E-mail Communication Preferences
- Amazon Alerts E-mails
- Special Occasion Reminders

Billing & Addresses

- Manage Payment Options
- Manage Address Book

Ordering Settings

- Update 1-Click Settings
- Subscribe & Save Settings

Lists

- Shopping List
- Wish List
- Baby Registry
- Wedding Registry

Your Content

- Your Media Library
- Your Browsing History
- Recommended for You
- Improve Your Recommendations

Get Express customer service or contact us by e-mail or phone.

[Contact Us button]

**Digital Downloads**

  

amazon MP3    GO
amazon video on demand    GO
amazon kindle    GO

**Did This Info Help?**

Yes, I found the information I needed
No, I wasn't able to find the information I needed

**SA0228**

Web Services
Mechanical Turk
WebStore by Amazon
More...

not the obligation) to remove or edit such content, but does not regularly review posted content.

If you do post content or submit material, and unless we indicate otherwise, you grant Amazon a nonexclusive, royalty-free, perpetual, irrevocable, and fully sublicensable right to use, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, and display such content throughout the world in any media. You grant Amazon and sublicensees the right to use the name that you submit in connection with such content, if they choose. You represent and warrant that you own or otherwise control all of the rights to the content that you post; that the content is accurate; that use of the content you supply does not violate this policy and will not cause injury to any person or entity; and that you will indemnify Amazon for all claims resulting from content you supply. Amazon has the right but not the obligation to monitor and edit or remove any activity or content. Amazon takes no responsibility and assumes no liability for any content posted by you or any third party.

**COPYRIGHT COMPLAINTS**

Amazon respects the intellectual property of others. If you believe that your work has been copied in a way that constitutes copyright infringement, please follow our Notice and Procedure for Making Claims of Copyright Infringement.

**RISK OF LOSS**

All items purchased from Amazon are made pursuant to a shipment contract. This means that the risk of loss and title for such items pass to you upon our delivery to the carrier.

**PRODUCT DESCRIPTIONS**

Amazon attempts to be as accurate as possible. However, Amazon does not warrant that product descriptions or other content of this site is accurate, complete, reliable, current, or error-free. If a product offered by Amazon itself is not as described, your sole remedy is to return it in unused condition.

**PRICING**

Except where noted otherwise, the List Price displayed for products on our website represents the full retail price listed on the product itself, suggested by the manufacturer or supplier, or estimated in accordance with standard industry practice; or the estimated retail value for a comparably featured item offered elsewhere. The List Price is a comparative price estimate and may or may not represent the prevailing price in every area on any particular day. For certain items that are offered as a set, the List Price may represent "open-stock" prices, which means the aggregate of the manufacturer's estimated or suggested retail price for each of the items included in the set. Where an item is offered for sale by one of our merchants, the List Price may be provided by the merchant.

With respect to items sold by Amazon, we cannot confirm the price of an item until you order; however, we do NOT charge your credit card until after your order has entered the shipping process. Despite our best efforts, a small number of the items in our catalog may be mispriced. If an item's correct price is higher than our stated price, we will, at our discretion, either contact you for instructions before shipping or cancel your order and notify you of such cancellation.

Please note that this policy applies only to products sold and shipped by Amazon. Your purchases from third-party sellers are charged at the time you place your order, and third-party sellers may follow different policies in the event of a mispriced item.

**OTHER BUSINESSES**

Parties other than Amazon operate stores, provide services, or sell product lines on this site. For example, Shutterfly offers Photo Services in our Camera and Photo store, and other businesses and individuals offer products in Auctions. In addition, we provide links to the sites of affiliated companies and certain other businesses. We are not responsible for examining or evaluating, and we do not warrant the offerings of, any of these businesses or individuals or the content of their Web sites. Amazon does not assume any responsibility or liability for the actions, product, and content of all these and any other third parties. You should carefully review their privacy statements and other conditions of use.

**DISCLAIMER OF WARRANTIES AND LIMITATION OF LIABILITY**

THIS SITE AND ALL INFORMATION, CONTENT, MATERIALS, PRODUCTS (INCLUDING SOFTWARE) AND SERVICES INCLUDED ON OR OTHERWISE MADE AVAILABLE TO YOU THROUGH THIS SITE ARE PROVIDED BY AMAZON ON AN "AS IS" AND "AS AVAILABLE" BASIS, UNLESS OTHERWISE SPECIFIED IN WRITING. AMAZON MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, AS TO THE OPERATION OF THIS SITE OR THE INFORMATION, CONTENT, MATERIALS, PRODUCTS (INCLUDING SOFTWARE) OR SERVICES INCLUDED ON OR OTHERWISE MADE AVAILABLE TO YOU THROUGH THIS SITE, UNLESS OTHERWISE SPECIFIED IN WRITING. YOU EXPRESSLY AGREE THAT YOUR USE OF THIS SITE IS AT YOUR SOLE RISK.

TO THE FULL EXTENT PERMISSIBLE BY APPLICABLE LAW, AMAZON DISCLAIM ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. AMAZON DOES NOT WARRANT THAT THIS SITE; INFORMATION, CONTENT, MATERIALS, PRODUCTS (INCLUDING SOFTWARE) OR SERVICES INCLUDED ON OR OTHERWISE MADE AVAILABLE TO YOU THROUGH THIS SITE; THEIR SERVERS; OR E-MAIL SENT FROM AMAZON ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. AMAZON WILL NOT BE LIABLE FOR ANY DAMAGES OF ANY KIND ARISING FROM THE USE OF THIS SITE OR FROM ANY INFORMATION, CONTENT, MATERIALS, PRODUCTS (INCLUDING SOFTWARE) OR SERVICES INCLUDED ON OR OTHERWISE MADE AVAILABLE TO YOU THROUGH THIS SITE, INCLUDING, BUT NOT LIMITED TO DIRECT, INDIRECT, INCIDENTAL, PUNITIVE, AND CONSEQUENTIAL DAMAGES, UNLESS OTHERWISE SPECIFIED IN WRITING.

CERTAIN STATE LAWS DO NOT ALLOW LIMITATIONS ON IMPLIED WARRANTIES OR THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES. IF THESE LAWS APPLY TO YOU, SOME OR ALL OF THE ABOVE DISCLAIMERS, EXCLUSIONS, OR LIMITATIONS MAY NOT APPLY TO YOU, AND YOU MIGHT HAVE ADDITIONAL RIGHTS.

**APPLICABLE LAW**

By visiting Amazon.com, you agree that the laws of the state of Washington, without regard to principles of conflict of laws, will govern these Conditions of Use and any dispute of any sort that might arise between you and Amazon.

**DISPUTES**

Any dispute relating in any way to your visit to Amazon.com or to products or services sold or distributed by Amazon or through Amazon.com in which the aggregate total claim for relief sought on behalf of one or more parties exceeds $7,500 shall be adjudicated in any state or federal court in King County, Washington, and you consent to exclusive jurisdiction and venue in such courts.

**SITE POLICIES, MODIFICATION, AND SEVERABILITY**

Please review our other policies, such as our pricing policy, posted on this site. These policies also govern your visit to Amazon.com. We reserve the right to make changes to our site, policies, and these Conditions of Use at any time. If any of these conditions shall be deemed invalid, void, or for any reason unenforceable, that condition shall be deemed severable and shall not affect the validity and enforceability of any remaining condition.

**OUR ADDRESS**

Amazon.com, Inc.
P.O. Box 81226
Seattle, WA 98108-1226
http://www.amazon.com

**SA0229**

### Notice and Procedure for Making Claims of Copyright Infringement

If you believe that your work has been copied in a way that constitutes copyright infringement, please provide Amazon.com's copyright agent the written information specified below. Please note that this procedure is exclusively for notifying Amazon that your copyrighted material has been infringed.

- An electronic or physical signature of the person authorized to act on behalf of the owner of the copyright interest;
- A description of the copyrighted work that you claim has been infringed upon;
- A description of where the material that you claim is infringing is located on the site, including the auction ID number, if applicable;
- Your address, telephone number, and e-mail address;
- A statement by you that you have a good-faith belief that the disputed use is not authorized by the copyright owner, its agent, or the law;
- A statement by you, made under penalty of perjury, that the above information in your notice is accurate and that you are the copyright owner or authorized to act on the copyright owner's behalf.

Amazon.com's Copyright Agent for notice of claims of copyright infringement on its site can be reached as follows:

Copyright Agent
Amazon.com Legal Department
P.O. Box 81226
Seattle, WA 98108
phone: (206) 266-4064
fax: (206) 266-7010
e-mail: copyright@amazon.com

Courier address:
Copyright Agent
Amazon.com Legal Department
1200 12th Avenue South, Suite 1200
Seattle, WA 98144-2734
USA

**Get to Know Us**

Careers

Investor Relations

Press Releases

Amazon and Our Planet

**Make Money with Us**

Sell on Amazon

Join Associates

Self-publish with Us

› See all

**Let Us Help You**

Shipping Rates & Policies

Amazon Prime

Returns

Help

**amazon**.com®

Canada | China | France | Germany | Japan | United Kingdom

And don't forget: Amazon Windowshop | AmazonWireless | Askville | Audible | DPReview | Endless | IMDb | Shopbop | SoundUnwound | Warehouse Deals by Amazon | Zappos

Conditions of Use | Privacy Notice  ï¿½ 1996-2009, Amazon.com, Inc. or its affiliates

**SA0230**

# Jensen Exhibit D



Order ID: 114-4339387-0045844

Name: Tyrone
E-mail: tyronetv@gmail.com
Order Placed: Wednesday, June 22, 2016 8:15 AM (PDT)
Order Method: Shopping Cart

Actions: --- Select ---

**Order Status: Complete**
**Order Total: $2,351.12**

Recipient: tyronetv@gmail.com

**2 Order Related Contacts**

Shipment #1   **1 item shipped** on Wednesday, June 22, 2016
Shipment #2   **1 item shipped** on Wednesday, June 22, 2016

| Shipments & Items | Annotations | Payments & Transactions | Returns & Refunds | Concessions | Forms |

---

**Shipment #1 : 1 item shipped** on Wednesday, June 22, 2016    Troubleshoot
**Delivered on: Thursday, June 23, 2016**    **Shipped via:** UPS Ground
On Guaranteed Delivery Date    **Tracking:** 1Z163800310081839
**Signed by: TYRONE**    Carrier Feedback Form

Shipping To:
+ **RESTRICTED INFORMATION**

Shipping Information:
One-Day Shipping
Ship items as they become available
Printable Shipment Receipt

**Shipment #1:** Select all none

| | | |
|---|---|---|
| Item Qty: 1 Personal Computer | **AppleCare Protection Plan for Mac Laptops 15 Inches and Above (NEWEST VERSION)** ASIN: B004R6NWBC Current Website Availability: Usually ships in 1 to 2 months Sold by: Amazon.com Fulfilled by: Amazon Condition: New - New Return Window: Expired on Sunday, July 24, 2016 | **Item Price: $345.50** |

Subtotal: $345.50
Shipping & Handling: $3.99
Tax: $31.01
**Shipment #1 Total: $380.50**

---

**Shipment #2 : 1 item shipped** on Wednesday, June 22, 2016    Troubleshoot
**Delivered on: Thursday, June 23, 2016**    **Shipped via:** UPS Ground
On Guaranteed Delivery Date    **Tracking:** 1ZW2258W4242144130
**Signed by: TYRONE**    Carrier Feedback Form

Shipping To:
+ **RESTRICTED INFORMATION**

Shipping Information:
One-Day Shipping
Ship items as they become available
Printable Shipment Receipt

**Shipment #2:** Select all none

| | | |
|---|---|---|
| Item Qty: 1 Personal Computer | **Apple Macbook Pro MJLQ2LL/A 15-inch Laptop (2.2 GHz Intel Core i7 Processor, 16GB RAM, 256 GB Hard Drive, Mac OS X)** ASIN: B00XZGMBVC Current Website Availability: In Stock Sold by: Amazon.com Fulfilled by: Amazon Condition: New - New Return Window: Expired on Sunday, July 24, 2016 | **Item Price: $1,799.99** |

Subtotal: $1,799.99
Shipping & Handling: $9.99
Tax: $160.64
**Shipment #2 Total: $1,970.62**

---

Order Actions

**Promotional Details:**
No promotions were applied to this order.

View possible promotions

**Financial Offer:**

**Order Total:**
Subtotal: $2,145.49
Shipping & Handling: $13.98
Tax: $191.65

**Order Total: $2,351.12**

# Jensen Exhibit E



# Checkout (2 items)

**1   Shipping address**                                                          Change

**2   Payment method**   [MasterCard] MasterCard ending in ▮▮
Billing address: ▮▮▮▮▮▮

**Add a gift card or promotion code**

[Enter code]   [Apply]

▮▮▮▮▮▮▮

**3   Review items and shipping**

> **Signature required at time of delivery.**
> Please ensure someone will be available to sign for this delivery. Details

Want to save time on your next order and go directly to this step when checking out?
☐ Check this box to save your delivery and billing preferences.

**Save $5 on Beauty by selecting "FREE No-Rush Shipping" below**
Choose from a wide selection of Beauty products shipped and sold by Amazon.

**Guaranteed delivery date: Feb. 7, 2018**
Items shipped from Amazon.com

| | |
|---|---|
| **Apple Macbook Pro MJLQ2LL/A 15-inch Laptop (2.2 GHz Intel Core i7 Processor, 16GB RAM, 256 GB Hard Drive, Mac OS X)** **$1,480.00** Qty: 1 Sold by: CTMA Electronics **Only 1 left in stock.** Condition: Used - Very Good [Add a gift receipt] and see other gift options | **Choose your Prime delivery option:** ○ **Monday, Feb. 5** $9.99 - One-Day Shipping ○ **Wednesday, Feb. 7** FREE Two-Day Shipping ○ **Tuesday, Feb. 13** FREE No-Rush Shipping Get a $5 reward towards your next Beauty purchase. Details |

[VISA] **Get a $50 Amazon.com Gift Card instantly**
upon approval for the Amazon Rewards Visa Card. [Apply now]

**Estimated delivery: Feb. 9, 2018 - Feb. 16, 2018**
Items shipped from Oki Data Pros

| | |
|---|---|
| **AppleCare Protection Plan for Mac Laptops 13 Inches and Below (NEWEST VERSION)** **$319.99** Qty: 1 Sold by: Oki Data Pros **Only 12 left in stock.** 🎁 Gift options not available. | **Choose a delivery option:** ○ **Tuesday, Feb. 6 - Thursday, Feb. 8** $100.20 - Expedited Shipping ○ **Thursday, Feb. 8 - Tuesday, Feb. 13** $12.00 - Standard Shipping ● **Friday, Feb. 9 - Friday, Feb. 16** FREE Economy Shipping |

---

[ Place your order ]

By placing your order, you agree to Amazon's privacy notice and conditions of use.

**Order Summary**

| | |
|---|---|
| Items (2): | $1,799.99 |
| Shipping & handling: | $0.00 |
| Total before tax: | $1,799.99 |
| Estimated tax to be collected:* | $0.00 |
| **Order total:** | **$1,799.99** |

How are shipping costs calculated?

Prime shipping benefits have been applied to your order. (Why aren't all my items eligible?)

**SA0234**



**Place your order**

By placing your order, you agree to Amazon's
privacy notice and conditions of use.

## Order Summary

Items (2):                                    $1,799.99
Shipping & handling:                              $0.00

Total before tax:                             $1,799.99
Estimated tax to be collected:*                   $0.00

**Order total:**                              **$1,799.99**

How are shipping costs calculated?

Prime shipping benefits have been applied to your
order. (Why aren't all my items eligible?)

# Jensen Exhibit F



Case 22-1745, Document 104, 03/02/2023, 3477328, Page244 of 284

Case 1:17-cv-04557-RA   Document 95   Filed 02/12/18   Page 1 of 4
Case 1:17-cv-04557-ER   Document 38   Filed 09/11/17   Page 1 of 4

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TYRONE HOLMES | 17 – CV - 4557 |
| VS. | JUDGE RAMOS |
| CHECKPOINT FLUIDIC SYSTEMS ET AL | |
| Filed:_____ | _____ |
| | Deputy Clerk |

### AFFIDAVIT AS TO "TIMELINE OF EVENTS"

STATE OF LOUISIANA

PARISH OF ST. TAMMANY

PERSONALLY CAME AND APPEARED, Andrew C. Elliott, who after being duly sworn, did depose and state:

That affiant is the Chief Executive Officer ("CEO")/Managing Member of Checkpoint Fluidic Systems International, Ltd. (hereinafter "CheckPoint"; see attached Exhibit "A") since its inception in 1993, and

That affiant is personally and professionally familiar with any and all business conducted by, on behalf of and through CheckPoint at all times, and

That after a review of the file and associated pleadings, at all times material hereto and to the best of affiant's knowledge and belief, below is the chronological timeline of events related to the laptop computer in question:

06/02/2016     – MacBook Pro (MBP) purchased from Amazon **by CheckPoint** – order number 105-5281827-6691444 – **Apple Macbook Pro MJLQ2LL/A 15-inch laptop, Serial Number C02RQ1T3G8WN**. See Exhibit "B"

06/05/2016     - Holmes purchases "new computer" - **receipt of Apple Store purchase @ 1981 Broadway (supplied by Tyrone Holmes' attorney** on September 13, 2016) - See Exhibit "C"

06/07/2016     – MBP configured with standard software suite, including Kaseya Agent.

06/07/2016     - Asset sticker attached "Property of CheckPoint Pumps" on bottom of computer before pick-up by FedEx. See Exhibit "D"

1

Case 22-1745, Document 104, 03/02/2023, 3477328, Page245 of 284

Case 1:17-cv-04557-RA   Document 95   Filed 02/12/18   Page 2 of 4
Case 1:17-cv-04557-ER   Document 38   Filed 09/11/17   Page 2 of 4

| | |
|---|---|
| 06/07/2016 | – MBP boxed and shipped via FedEx, intended destination: Dubai, UAE. Tracking number: 776466222796.  See Exhibit "E" |
| 06/07/2016 | - FedEx picks up box in St. Tammany Parish from CheckPoint, delivers Kenner, Louisiana @ airport terminal station |
| 06/15/2016 | – Contact between Checkpoint and FedEx for assistance with lost package |
| **06/22/2016** | **- Holmes asserts Paragraph #22 (Original Complaint) purchased Apple Macbook Pro MJLQ2LL/A 15-inch laptop with serial number C02RQ1T3G8WN as "brand new"** |
| 06/22/2016 | **-Holmes asserts Paragraphs #22 and #74 (Original Complaint) purchased AppleCare Protection Plan for Macbook Pro MJLQ2LL/A 15-inch laptop with serial number C02RQ1T3G8WN (see Exhibit "F")** |
| 06/23/2016 | **- Holmes asserts Paragraph #33 (Original Complaint) Apple Macbook Pro MJLQ2LL/A 15-inch laptop with serial number C02RQ1T3G8WN is "delivered to Plaintiff's residence"** |
| 07/23/2016 | – CheckPoint notice that MBP was online via Kaseya console. |
| 07/28/2016 | – CheckPoint contacts Chris Patteson – Director of IT for FedEx – via LinkedIn for assistance |
| 08/01/2016 | – Kenneth Meyer – Security Team Member for FedEx – telephones CheckPoint. Checkpoint provide Kaseya contact information |
| 08/02/2016 | – FedEx, through Security Team Member Kenneth Meyer, filed a theft report with Kenner Police Department – Report: H-80071-16 (See attached Exhibit "G") |
| 08/16/2016 | – Kenner Police Department (through Sgt. Jeffrey Adams) contacts New York Police Department ("NYPD") |
| 08/18/2016 | - Detective Ralph Cilento (with NYPD) as referred by Kenneth Meyer (with FedEx) and Sgt. Jeffrey Adams (with Kenner Police Department) directly contacts CheckPoint |
| 08/18/2016 | – NYPD Investigator/Detective Rodrigo "Rico" Caballero directly contacts CheckPoint - starts investigation |
| 09/08/2016 | **- Holmes asserts Paragraph #34 (Original Complaint) that NYPD arrive at Plaintiff's residence** |

2

**SA0239**

Case 22-1745, Document 104, 03/02/2023, 3477328, Page246 of 284

Case 1:17-cv-04557-RA   Document 95   Filed 02/12/18   Page 3 of 4
Case 1:17-cv-04557-ER   Document 38   Filed 09/11/17   Page 3 of 4

09/09 through 09/13/2016 - **Holmes asserts in Paragraphs #36, 37, 38, 39, 40 and 48 (Original Complaint) that NYPD and Holmes engage in telephonic contact** concerning return of "laptop"

09/13/2016       **- Holmes attorney, Jeffrey Garfin, provides "proof of purchase" on June 5, 2016 from "The Apple Store" located at 1981 Broadway, New York (See Exhibit "C")**

10/04/2016       **- Paragraph #65 (Original Complaint) Apple Macbook Pro MJLQ2LL/A 15-inch laptop with serial number C02RQ1T3G8WN received by NYPD by receipt prepared by Holmes' attorney Garfin. See Exhibit "H"**

10/11/2016       – NYPD Caballero shipped MBP back to CheckPoint

10/17/2016       – CheckPoint receives MBP with "Property of CheckPoint Pumps" sticker still in place on the bottom of the computer ***as originally placed***. See Exhibit "I"

_____
Andrew C. Elliott (Managing Member/Chief Executive Officer)
CheckPoint Fluidic Systems International, Ltd.


Sworn to and subscribed before me,
this 10th day of September, 2017

_____
Robert A. Barnett LSBA #2778
Notary Public for Life


ROBERT A. BARNETT
Attorney & Notary Public
Bar #2778
My Commission Is For Life

3

**SA0240**

Case 22-1745, Document 104, 03/02/2023, 3477328, Page247 of 284

Case 1:17-cv-04557-RA   Document 95   Filed 02/12/18   Page 4 of 4
Case 1:17-cv-04557-ER   Document 38   Filed 09/11/17   Page 4 of 4

# Elliott Exhibit B

amazon.com

Final Details for Order #105-5281827-6691444
Print this page for your records.

**Order Placed:** June 2, 2016
**Amazon.com order number:** 105-5281827-6691444
**Order Total: $1,982.93**

### Shipped on June 2, 2016

| Items Ordered | Price |
|---|---|
| 1 of: *Microsoft Office Home and Business 2016 for Mac | Mac Key Card* <br> Sold by: Amazon.com LLC <br><br> Condition: New | $189.95 |
| 1 of: *Apple Macbook Pro MJLQ2LL/A 15-inch Laptop (2.2 GHz Intel Core i7 Processor, 16GB RAM, 256 GB Hard Drive, Mac OS X)* <br> Sold by: Amazon.com LLC <br><br> Condition: New | $1,799.00 |

**Shipping Address:**
Rusty Mahony
21356 MARION LN
MANDEVILLE, LA 70471-7797
United States

**Shipping Speed:**
One-Day Shipping

| | |
|---|---|
| Item(s) Subtotal: | $1,988.95 |
| Shipping & Handling: | $13.98 |
| Office Promotion: | -$20.00 |
| | ----- |
| Total before tax: | $1,982.93 |
| Sales Tax: | $0.00 |
| | ----- |
| **Total for This Shipment:** | **$1,982.93** |
| | ----- |

### Payment information

**Payment Method:**
American Express | Last digits: 2071

**Billing address**
Rusty Mahony
21356 MARION LN
MANDEVILLE, LA 70471-7797
United States

| | |
|---|---|
| Item(s) Subtotal: | $1,988.95 |
| Shipping & Handling: | $13.98 |
| Office Promotion: | -$20.00 |
| | ----- |
| Total before tax: | $1,982.93 |
| Estimated tax to be collected: | $0.00 |
| | ----- |
| **Grand Total:** | **$1,982.93** |

**Credit Card transactions**    American Express ending in 2071: June 2, 2016: $1,982.93

To view the status of your order, return to Order Summary.

B

Conditions of Use | Privacy Notice © 1996-2016, Amazon.com, Inc. or its affiliates

# Elliott Exhibit C

Case 22-1745, Document 104, 03/02/2023, 3477328, Page251 of 284

Case 1:17-cv-04557-RA   Document 95-2   Filed 02/12/18   Page 2 of 5
Case 1:17-cv-04557-ER   Document 38-3   Filed 09/11/17   Page 1 of 4

## LAW OFFICES OF JEFFREY D. GARFIN, LLC

1811 Quentin Rd., Suite 1H
Brooklyn, NY 11229
Tel:   718 360-4660
Fax:   718-504-7982
garfinlaw@gmail.com

136-20 38th Ave, Suite 3G
Flushing, NY 11354
(By Appointment only)
Tel:718-889-6396

*Licensed to practice in NY, CT & MA*

September 13, 2016

Bobbi Jo Bridges
VP Operations
Checkpoint Pumps and Systems
21356 Marion Lane
Mandeville, LA 70471

Dear Ms. Bridges:

Please be advised that I represent Tyrone Holmes regarding a certain Apple notebook computer and any alleged impropriety regarding its possession. Attached please find a receipt from the "The Apple Store" located at 1981 Broadway, New York, NY 10023, where my client lawfully purchased this item directly from Apple at this store location in the normal course of business. As Mr. Holmes has done absolutely nothing wrong with regard to this product, I see no reason for your assurance to refrain from the pursuit of "further legal action".

Quite simply, my client has committed no wrongdoing.  Yet despite this, his possession of this computer has caused his every move to be physically tracked for months, his personal and private information to be taken from him without his consent and has resulted in Detectives from the New York Police Department appearing at his front door.  I can only surmise that whatever he unwittingly purchased was highly classified in nature and that the consequences of his association with this equipment may extend far beyond the mere return of the item.   For this reason, I cannot promise to withhold information from my client concerning the name of your organization, for by doing so, I would in effect be betraying his confidences and only adding to the fears he already has about a situation he has asked me to resolve and from which he's sought my protection.  I believe it is in his best interest that he knows whatever he can, so he can appreciate any resulting risk.

That being said, before we arrange for the return of the item, please indicate what specific personal information has been taken from him,  who has access to such information and whether he will continue to be subject to monitoring of any kind by your company or any third party as a result of his possession of this device.  Also, as you have indicated, you have tracked the device since leaving your facility. I trust that the information you have gathered along with my client's purchase receipt leaves no doubt that my client merely purchased this laptop



Case 22-1745, Document 104, 03/02/2023, 3477328, Page252 of 284

Case 1:17-cv-04557-RA   Document 95-2   Filed 02/12/18   Page 3 of 5
Case 1:17-cv-04557-ER   Document 38-3   Filed 09/11/17   Page 2 of 4

directly from Apple at the Apple Store in the regular course of business and has committed no wrongdoing in this regard.  I would ask that you confirm this in writing as well.  I look forward to your responding accordingly and to resolving this matter expeditiously.

Very Truly Yours,

Jeffrey D. Garfin, Esq.

JDG/ly:
Enclosure: Receipt Apple Store

Case 22-1745, Document 104, 03/02/2023, 3477328, Page253 of 284

Case 1:17-cv-04557-RA   Document 95-2   Filed 02/12/18   Page 4 of 5
Case 1:17-cv-04557-ER   Document 38-3   Filed 09/11/17   Page 3 of 4



**Apple Store, Upper West Side**
1981 Broadway
New York, NY 10023
upperwestside@apple.com
212-209-3400
DCA License #1336254 & 1336251

www.apple.com/retail/upperwestside

June 05, 2016 03:08 PM

| | |
|---|---|
| **MBAIR 13.3/1.6GHZ/8GB/256GB**<br>Part Number: MMGG2LL/A<br>Serial Number: C1MRP66HH3QF<br>Return Date: Jun. 19, 2016<br>For Support, Visit: www.apple.com/support | $ 1,199.00 |
| **APP FOR MACBOOK AIR/13" MACBOOK PRO**<br>Part Number: S3191LL/A<br>Agreement Number: 970251016020920<br>Plan End Date: Jun. 05, 2019<br>Sales Associate ID : 973572504<br>Serial Number: C1MRP66HH3QF<br><br>This plan is registered automatically.<br>Verify your coverage at<br>apple.com/support/applecare/ww/<br><br>Terms & Conditions:<br>apple.com/legal/applecare/terms<br>For Support, Visit:<br>www.apple.com/support | $ 249.00 |
| **Apple Wired Mouse**<br>Part Number: MB112LL/B<br>Return Date: Jun. 19, 2016<br>For Support, Visit: APPLE.COM/SUPPORT | $ 49.00 |
| **MAGIC MOUSE 2**<br>Part Number: MLA02LL/A<br>Return Date: Jun. 19, 2016<br>For Support, Visit: www.apple.com/support | $ 79.00 |
| **MAGIC MOUSE 2**<br>Part Number: MLA02LL/A<br>Return Date: Jun. 19, 2016<br>For Support, Visit: www.apple.com/support | $ 79.00 |
| **Microsoft Office 365 Home**<br>Part Number: HB917LL/A<br>Return Date: Jun. 19, 2016<br>For Support: support.microsoft.com | $ 99.95 |
| **Incase Hardshell MBA13 Blk**<br>Part Number: HHPY2ZM/A<br>Return Date: Jun. 19, 2016<br>For Support: customersupport@goincase.com | $ 49.95 |

**Incase Neoprene Classic Slv MBP13 Blk**               $ 39.95
Part Number: HGDR2ZM/A
Return Date: Jun. 19, 2016
For Support: customersupport@goincase.com

|                              |              |
|------------------------------|--------------|
| Sub-Total                    | $ 1,844.85   |
| Tax@8.875%                   | $ 163.73     |
| **Total**                    | **$ 2,008.58** |
| Amount Paid Via Visa Bus (S) | $ 2,008.58   |
| xxxxxxxxxxxxx5528            |              |
| 020815                       |              |



*R 2 5 1 7 1 9 6 1 5 0*

Please debit my account xxxxxxxxxxxx5528 by $ 2,008.58 (Sale)
Terminal ID: xxxx0063
Merchant ID: xxxxxxx57696
Application PAN Sequence Number: 0
Verified by PIN

http://apple.com/legal/sales-support/sales-policies/retail.html
Tell us about your experience at the Apple Store.
Visit www.apple.com/feedback/retail.html

Case 22-1745, Document 104, 03/02/2023, 3477328, Page255 of 284

Case 1:17-cv-04557-RA    Document 96    Filed 02/12/18    Page 1 of 5
Case 1:17-cv-04557-ER    Document 51    Filed 10/09/17    Page 1 of 5

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

TYRONE HOLMES                                    17 – CV - 4557

VS.                                              JUDGE RAMOS

CHECKPOINT FLUIDIC SYSTEMS ET AL

Filed:_____        _____
                                              Deputy Clerk

## AFFIDAVIT AS TO THE "LAPTOP", "FEDEX" AND "KASEYA"

STATE OF LOUISIANA

PARISH OF ST. TAMMANY

PERSONALLY CAME AND APPEARED, Ruston Mahony, who after being duly sworn, did depose and state:

That affiant is the Information Technology Officer ("IT Officer") of Checkpoint Fluidic Systems International, Ltd. (hereinafter "CheckPoint") since 2011, and

That affiant is personally and professionally familiar with any and all information and technology affairs conducted by, on behalf of and through CheckPoint at all times, and

That after a review of the file and associated pleadings, at all times material hereto and to the best of affiant's knowledge and belief, below is the history of events related to the laptop computer (hereinafter "laptop") in question, and

"THE LAPTOP"

That affiant is the administrator of all computer equipment at CheckPoint at all times material hereto, including the "laptop", and

That with respect to the laptop in question, affiant selected and placed the purchase order of the laptop, and

That on June 2, 2016, the MacBook Pro (MBP) was purchased from Amazon by CheckPoint – order number 105-5281827-6691444 – Apple MacBook Pro MJLQ2LL/A 15-inch laptop, Serial Number C02RQ1T3G8WN. See Exhibit "A", and

That the laptop was delivered directly from Amazon to CheckPoint on or about June 7, 2016, and

**SA0249**

Case 22-1745, Document 104, 03/02/2023, 3477328, Page256 of 284

Case 1:17-cv-04557-RA   Document 96   Filed 02/12/18   Page 2 of 5
Case 1:17-cv-04557-ER   Document 51   Filed 10/09/17   Page 2 of 5

That affiant took or is aware of the following actions:

- received the laptop in its original shipment box from Amazon on June 6, 2016
- opened the original shipment box, removed plastic "shrink wrap" as originally applied by Apple and removed laptop from the box to examine the laptop
- turned on and activated the laptop
- the computer name was established and installed as "Ewens-MBP.home" (indicating that the computer was, in fact, the laptop to send to Ewen Bremner in Dubai, UAE.)
- installed standard software suite including Microsoft Office for Mac, Microsoft Remote Desktop Client, Kaseya Agent and antivirus software
- attached asset sticker "Property of CheckPoint Pumps" on bottom of computer before pick-up by FedEx
- took a photograph of the asset sticker after placement on laptop (See Exhibit "B")
- placed the laptop into original Apple packaging and Amazon shipping box for shipment to Dubai
- did not "bubble wrap" nor "shrink wrap" the laptop or any packaging in the shipping box
- delivered package to CheckPoint shipping clerk who contacted FedEx for pick-up services
- shipping clerk released the laptop for shipment to FedEx on June 7, 2016
- boxed and shipped via FedEx, intended destination: Dubai, UAE. Tracking number: 776466222796.  See Exhibit "C"

"KASEYA"

That affiant installed, on June 7, 2016, "Kaseya Essentials Bundle Agent" on the laptop, and

That CheckPoint subscribes to the "Kaseya Essentials Bundle" – a cloud-based computer systems and asset management tool.  The software requires a locally-installed agent on each computer it manages.  This agent gives affiant, as the CheckPoint administrator, the ability, through the cloud-based administrative console, to remotely manage each connected agent computer including remote control, remote file access, hardware and software auditing, anti-virus protection, and automated patch management.

That the Kaseya console also provides to affiant, as the administrator, all information for each asset, including but not limited to the laptop involved in this matter.  Included in that information is the computer manufacturer, product name (model) and version, and serial number of the computer.

That Kaseya also reports the current public IP address of the connected agent or the most recent public IP address of a disconnected agent and

Case 22-1745, Document 104, 03/02/2023, 3477328, Page257 of 284

Case 1:17-cv-04557-RA   Document 96   Filed 02/12/18   Page 3 of 5
Case 1:17-cv-04557-ER   Document 51   Filed 10/09/17   Page 3 of 5

That the Kaseya default view of the console shows which agents are connected to the management server and which are 'off-line', and

That as a result of this litigation, affiant has made a search of CheckPoint computer equipment and finds no computer activity use or user from within the State of New York since the laptop was returned to Checkpoint, and

### "FEDEX"

That on June 7, 2016, with affiant's consent, a CheckPoint shipping clerk contacted FedEx for pick-up shipment to Dubai, and

That FedEx picked up the laptop (see Exhibit "C"), and

That the laptop shipment was lost in transit and that affiant reported the missing FedEx shipment to FedEx on June 15, 2016 (See Exhibit "D"), and

That between June 15 and June 23, 2016, CheckPoint was not involved FedEx's own internal investigation of 'missing' or 'lost' packages.

### "KASEYA" NOTIFICATION

That on the evening of June 23, 2016, affiant was configuring a new MacBook to replace the laptop lost in shipping by FedEx, and

That when affiant logged in to the Kaseya console to install the agent on the new computer, affiant noticed that the missing agent was 'on-line' at that time on June 23, 2016, and

That affiant then immediately prepared and sent himself a screenshot of the agent information window from the new computer at 6:30 pm. (see attachment "E"), and

That affiant immediately reported to CheckPoint Operations personnel that the laptop was 'on-line', and

That immediately, affiant initiated a Google search on the public IP address shown in the Kaseya console, and

That the IP address was registered to "Optimum Online" and indicated service in Bronx, NY, and

That in addition to the public IP address, Kaseya reported the current user as "Stephanie Scott" with the computer name "Ewens-MBP.home" (indicating that the computer was, in fact, the laptop purchased to send to Ewen Bremner in Dubai, UAE.), and

That affiant immediately created an alert in the Kaseya console to notify affiant, via email, when and if the laptop was online, and

Case 22-1745, Document 104, 03/02/2023, 3477328, Page258 of 284

Case 1:17-cv-04557-RA   Document 96   Filed 02/12/18   Page 4 of 5
Case 1:17-cv-04557-ER   Document 51   Filed 10/09/17   Page 4 of 5

That thereafter, affiant was able to confirm several IP addresses indicating the approximate locations of the computer when it was connected to the Internet, and

That affiant collected information from the laptop that would assist or help to identify the user, location and hopeful recovery of the laptop for use to FedEx support personnel, and

### "FEDEX" AND THE NEW YORK POLICE DEPARTMENT

That on July 28, 2016, CheckPoint contacted Chris Patteson (IT Director, FedEx) for update, and

That on August 1, 2016, FedEx Kenneth Meyer (Security Team Member for FedEx) initiated a telephone call to CheckPoint about Kaseya information, and

That on August 2, 2016, FedEx, through Security Team Member Kenneth Meyer, initiated and directly filed a theft report with City of Kenner Police Department – Report: H-80071-16 (See attached attachment "F"), all without CheckPoint involvement, and

That upon information and belief and without action by CheckPoint, on or about August 16, 2016, Kenner Police Department (through Sgt. Jeffrey Adams) directly contacted New York Police Department ("NYPD"), and

That on August 18, 2016, Detective Ralph Cilento (with NYPD) as referred by Kenneth Meyer (with FedEx) and Sgt. Jeffrey Adams (with Kenner Police Department) initiates and directly contacted CheckPoint, and

That on August 18, 2016, NYPD Investigator/Detective Rodrigo "Rico" Caballero initiated and directly contacted CheckPoint about its own NYPD investigation, and

That CheckPoint did not initiate nor make direct initial contact with the New York Police Department ("NYPD"), and

That CheckPoint was not involved in any contact, discussions, meetings, investigations or arrangements with NYPD and Mr. Holmes.

### "LAPTOP" WAS RETURNED

That on or about October 17, 2016, affiant was the recipient of the laptop returned to CheckPoint by NYPD (attachment "G"), and

That the same laptop purchased by CheckPoint on June 2, 2016 was returned by NYPD directly to CheckPoint, and

The laptop was received with the same "CheckPoint" ownership sticker/label as placed by affiant on June 7, 2016 (see attachment "H"), and

**SA0252**

Case 22-1745, Document 104, 03/02/2023, 3477328, Page259 of 284

Case 1:17-cv-04557-RA   Document 96   Filed 02/12/18   Page 5 of 5
Case 1:17-cv-04557-ER   Document 51   Filed 10/09/17   Page 5 of 5

That affiant confirmed that it was the same laptop with the same serial number and same user name, and

That upon the return of the laptop, affiant evaluated the condition of the computer/laptop hardware and software, determined that the laptop was in working order, and created a new login profile for CheckPoint.

Ruston Mahony
Information Technology Manager, CheckPoint

Sworn to and subscribed before me.
Notary public, this 4th day of October, 2017

Robert A. Barnett #2778

Exhibit "A" – Purchase Order - Serial Number C02RQ1T3G8WN
Exhibit "B" - asset sticker "Property of CheckPoint Pumps"
Exhibit "C" - tracking number: 776466222796
Exhibit "D" - FedEx history
Exhibit "E" – screenshot
Exhibit "F" – Kenner Police Department – Report: H-80071-16
Exhibit "G" - October 17, 2016/NYPD
Exhibit "H"- asset sticker "Property of CheckPoint"

# Mahony Exhibit A

amazon.com

## Final Details for Order #105-5281827-6691444
Print this page for your records.

**Order Placed:** June 2, 2016
**Amazon.com order number:** 105-5281827-6691444
**Order Total: $1,982.93**

### Shipped on June 2, 2016

| Items Ordered | Price |
|---|---|
| 1 of: *Microsoft Office Home and Business 2016 for Mac | Mac Key Card*<br>Sold by: Amazon.com LLC<br><br>Condition: New | $189.95 |
| 1 of: *Apple Macbook Pro MJLQ2LL/A 15-inch Laptop (2.2 GHz Intel Core i7 Processor, 16GB RAM, 256 GB Hard Drive, Mac OS X)*<br>Sold by: Amazon.com LLC<br><br>Condition: New | $1,799.00 |

**Shipping Address:**
Rusty Mahony
21356 MARION LN
MANDEVILLE, LA 70471-7797
United States

**Shipping Speed:**
One-Day Shipping

| | |
|---|---|
| Item(s) Subtotal: | $1,988.95 |
| Shipping & Handling: | $13.98 |
| Office Promotion: | -$20.00 |
| | ----- |
| Total before tax: | $1,982.93 |
| Sales Tax: | $0.00 |
| | ----- |
| **Total for This Shipment:** | **$1,982.93** |
| | ----- |

### Payment information

**Payment Method:**
American Express | Last digits: 2071

**Billing address**
Rusty Mahony
21356 MARION LN
MANDEVILLE, LA 70471-7797
United States

| | |
|---|---|
| Item(s) Subtotal: | $1,988.95 |
| Shipping & Handling: | $13.98 |
| Office Promotion: | -$20.00 |
| | ----- |
| Total before tax: | $1,982.93 |
| Estimated tax to be collected: | $0.00 |
| | ----- |
| **Grand Total:** | **$1,982.93** |

**Credit Card transactions**    American Express ending in 2071: June 2, 2016: $1,982.93

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2017, Amazon.com, Inc. or its affiliates



# Mahony Exhibit B

Case 22-1745, Document 104, 03/02/2023, 3477328, Page263 of 284

Case 1:17-cv-04557-RA   Document 96-2   Filed 02/12/18   Page 2 of 4

Case 1:17-cv-04557-ER   Document 51-2   Filed 10/09/17   Page 1 of 3
Wednesday, October 4, 2017 at 11:55:42 AM Central Daylight Time

| Subject: | Screenshots |
|---|---|
| Date: | Thursday, September 7, 2017 at 11:27:51 AM Central Daylight Time |
| From: | Rusty Mahony |
| To: | Rob Barnett |
| CC: | Bobbi Jo Bridges |
| Attachments: | IMG_7941.PNG, IMG_7942.PNG |

Attaching screenshots to show date stamps of photos.









# Mahony Exhibit C

Case 22-1745, Document 104, 03/02/2023, 3477328, Page267 of 284

Case 1:17-cv-04557-RA    Document 96-3    Filed 02/12/18    Page 2 of 3
Case 1:17-cv-04557-ER    Document 51-3    Filed 10/09/17    Page 1 of 2

Wednesday, September 6, 2017 at 10:06:06 AM Central Daylight Time

**Subject:** FedEx Shipment Notification
**Date:** Tuesday, June 7, 2016 at 4:03:15 PM Central Daylight Time
**From:** trackingupdates@fedex.com
**To:** ewen@cppumps.com

# This shipment is scheduled to be sent on 06/07/2016.

See "Preparing for Delivery" for helpful tips

Tracking # 776466222796

Anticipated ship date:
Tue, 6/7/2016

DUANE LEISSINGER
CHECKPOINT PUMPS
MANDEVILLE, LA 70471
US



Initiated

Scheduled delivery:
Thu, 6/9/2016 by 11:59 pm

EWAN BREMNER
CP PUMPS & SYSTEMS
FZCO
BLUE SHEDS FZS1-BL0807
JEBEL ALI WHSE LIC. # 7700
DUBAI CITY,
AE

## Shipment Facts

| | |
|---|---|
| Tracking number: | 776466222796 |
| Service type: | FedEx International Priority |
| Packaging type: | Your Packaging |
| Number of pieces: | 1 |
| Weight: | 10.00 lb. |
| Special handling/Services: | Deliver Weekday |

## Preparing for Delivery

To help ensure successful delivery of your shipment, please review the below.

## Won't be in?

You may be able to hold your delivery at a convenient FedEx World Service Center or FedEx Office location for pick up. Track your shipment to determine Hold at FedEx location availability.

 Please do not respond to this message. This email was sent from an unattended mailbox. This re...



Page 1 of 2

**SA0261**

Case 22-1745, Document 104, 03/02/2023, 3477328, Page268 of 284

Case 1:17-cv-04557-RA   Document 96-3   Filed 02/12/18   Page 3 of 3
Case 1:17-cv-04557-ER   Document 51-3   Filed 10/09/17   Page 2 of 2

approximately 4:03 PM CDT on 06/07/2018.

To learn more about FedEx Express, please go to fedex.com.

All weights are estimated.

The shipment is scheduled for delivery on or before the scheduled delivery displayed above. FedEx does not determine money back guarantee or delay claim requests based on the scheduled delivery. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx customer support representative.

To track the latest status of your shipment, click on the tracking number above, or go to fedex.com.

This tracking update has been sent to you by FedEx at your request. FedEx does not validate the authenticity of the requestor and does not validate, guarantee or warrant the authenticity of the request, the requestor's message, or the accuracy of this tracking update. For tracking results and terms of use, go to fedex.com.

Thank you for your business.

Page 2 of 2

**SA0262**

# Mahony Exhibit E

Case 22-1745, Document 104, 03/02/2023, 3477328, Page270 of 284

Case 1:17-cv-04557-RA   Document 96-4   Filed 02/12/18   Page 2 of 2
Case 1:17-cv-04557-ER   Document 51-5   Filed 10/09/17   Page 1 of 1
Wednesday, October 4, 2017 at 12:10:45 PM Central Daylight Time

**Subject:** Screenshots
**Date:** Thursday, June 23, 2016 at 6:30:26 PM Central Daylight Time
**From:** Ewen Bremner
**To:** Rusty Mahony
**Category:** Employee
**Attachments:** image001.png, image002.png



# Mahony Exhibit F

Case 22-1745, Document 104, 03/02/2023, 3477328, Page272 of 284

Case 1:17-cv-04557-RA   Document 96-5   Filed 02/12/18   Page 2 of 8
Case 1:17-cv-04557-ER   Document 51-6   Filed 10/09/17   Page 1 of 7
Wednesday, October 4, 2017 at 12:13:39 PM Central Daylight Time

**Subject:** 776466222796-Checkpoint Missing Mac
**Date:** Tuesday, August 2, 2016 at 12:10:51 PM Central Daylight Time
**From:** Kenneth Meyer
**To:** Rusty Mahony
**CC:** David Twiford, John McCaffrey, Laurie High

A theft report was just filed with Kenner Police Department(Kenner, LA)

Police report-H-80071-16
Ofc. Charles Donovan.

Kenner Police Detective Bureau may be reaching out to Rusty Mahony for further details and to coordinate ping location.

FEDEX EV-939489

Thanks,

Ken

Kenneth A. Meyer
FedEx Express
200 Crofton Road
Kenner, LA 70062
C-504-458-7955
O-504-472-3321

**From:** Rusty Mahony [mailto:rusty@cppumps.com]
**Sent:** Monday, August 01, 2016 2:42 PM
**To:** Kenneth Meyer
**Subject:** Photos

Here are the photos I sent in the first message.  I resized them to keep the message size low but have the originals if higher resolution is necessary.

Thanks again,

Rusty Mahony
IT Manager
CheckPoint Pumps & Systems®
21356 Marion Lane | Mandeville, LA 70471
Direct +1 985.246.3142 | Mobile +1 985.249.0645 | Main +1 504.340.0770
rusty@cppumps.com | www.cppumps.com



This email and any files transmitted with it (the "Message") contain(s) information intended for a specific individual and purpose. Absent permission, the disclosure, replication, or distribution of this Message is forbidden. If you are not the intended recipient, you are required to delete it and notify sender of the error by return email. Unless otherwise stated, this Message does not form any contractual obligation on behalf of the sender or the sender's

Page 1 of 2

**SA0266**

Case 22-1745, Document 104, 03/02/2023, 3477328, Page273 of 284

Case 1:17-cv-04557-RA   Document 96-5   Filed 02/12/18   Page 3 of 8
Case 1:17-cv-04557-ER   Document 51-6   Filed 10/09/17   Page 2 of 7

employer. WARNING: Sender accepts no liability for damage caused by any virus transmitted by this Message.
REDUCE WASTE: Please do not create hardcopies unless it is absolutely necessary.

SA0267

Archive    Printed by: PIC IMPORT    08/07/2016 01:31    Page 1    of 5

| KPD CRIME REPORT | Signal | Rep Area | Item # | Report Type | Date | Time |
|---|---|---|---|---|---|---|
| ADM SEC OR1LA0260300 | 67 | 9797 | H-80071-16 | INITIAL | 02-AUG-2016 | 1136 |

| Day of Wk. | Begin Date | Begin Time | End Date | End Time | Location of Offense | |
|---|---|---|---|---|---|---|
| TUE | 07-JUN-2016 | 2103 | 02-AUG-2016 | 1136 | 300 MIDDLE ACCESS RD KENNER 70062 | |

H-80071-16 UCR

Reporting Officer: CHARLES DONOVAN    Responding Detective:    Supervisor:

R: KD5180    JP: K716    PR:    JP:    PR:    JP:

Arrived: 021136    Notified:    Notified:

Completed: 060931    Arrived:    Arrived:

## REPORTING PERSON

Name: KENNETH A MEYER    Race: WHITE    Sex: MALE

DOB: 24-NOV-1971    Age: 44    Employer/School: FEDEX

Address: 300 MIDDLE ACCESS RD    Address: 300 MIDDLE ACCESS RD

City/St/Zip: KENNER, LA 70062    City/St/Zip: KENNER, LA 70062

Phone: (504) 458-7955    Phone: (504) 472-3321

Identify Suspect? N    Voluntary Statement? N

## VICTIM

Victim Sequence Number: 1    Type: BUSINESS    For Insurance Purposes?

Name: CHECKPOINT PUMPS & SYSTEMS

Address: 21356 MARION LN

City/St/Zip: MANDEVILLE, LA 70471

Phone: (504) 985-2463    Ext: 142    Ext:

## OFFENSE

Offense Sequence Number: 1    Victim: 1    Suspect:

R.S. Number: RS 14:69    Title: POSSESSION STOLEN THINGS

Attempted/Completed: COMPLETED    Location Type: OTHER / UNKNOWN    Number of Premises:

Criminal Activity 1: OTHER    Weapon/Force Type 1: NONE

## SUSPECT

Suspect Sequence Number: 1

Name: STEPHANIE J SCOTT    Race: BLACK    Sex: FEMALE

DOB: 07-APR-1985    Age From: 31    To:    Ethnicity: NON-HISPANIC    Resident?

Height From:    To:    Weight From:    To:    Eye Color: UNKNOWN

Hair Color: BLACK    Hair Length:

Address: 244 5TH AV Q253, FL2    City/St/Zip: NEW YORK, LA NEW YORK

Alcohol Consumed?    Computer Used?    Drugs Used?    Gaming Motive?    Gang Related:

Armed: Other    Hate/Bias: NONE

Can be Identified by Witness:

Identifiable Features:

Location:

Arrest Type: NONE    Voluntary Statement?    Local Check?    State Check?    NCIC Check?

Suspect Injury Codes: NONE

**SA0268**

**Suspect Sequence Number:**   2

Name:  TYRONE  HOLMES                    Race: BLACK                    Sex: MALE

DOB:  09-SEP-1967      Age From: 48      To:        Ethnicity: NON-HISPANIC      Resident?

Height From:  505      To:         Weight From:  130      To:        Eye Color: BROWN

Hair Color:  BLACK                     Hair Length:  EAR TO SHOULDER

Address:  85 MORELAND AV SE            City/St/Zip: ATLANTA, GA 30316

Alcohol Consumed?    Computer Used?    Drugs Used?    Gaming Motive?    Gang Related:

Armed:  Other                          Hate/Bias: NONE

Can be Identified by Witness:

Identifiable Features:

Location:

Arrest Type:  NONE         Voluntary Statement?    Local Check?    State Check?    NCIC Check?

Suspect Injury Codes:   NONE

## ADDITIONAL WITNESS

Witness Sequence Number:  1

Name:  RUSTY MAHONY                    DOB/PR:  02251974

Address:  21356 MARION LN             Under the Influence?    Can Witness ID Suspect?

City/St/Zip:  MANDEVILLE, LA 70471    Voluntary Statement?    Present During Incident?

Phone:  (504) 249-0645

## PROPERTY

Property Owner or Property recvd from:   VICTIM 1   Desc. Code: 07  -- COMPUTER HDW/SOFTWARE

Loss Type: 7  -- STOLEN                    Quantity:  1    Value:  $1,983    Insured:

Owner-applied Number:              Make: APPLE MACBOOK PRO

Model:  MLJQ2LL              Serial Number:  C02RQ1T3G8WN

Description:  15 INCH LAPTOP, 2.2 GHZ INTEL CORE I7 PROCESSOR,              Date Recovered:

## VEHICLE

None

## CRIME SCENE

None

## INVESTIGATION

Type of Force Used:                    Security Device Installed?

Point of Entry:                        Security Device Activated?

Safe Job?        Gambling Devices on Premises?        Alcoholic Beverage Outlet?

Prior History of Domestic Violence?    Prior History Documented?    Number of Prior Cases:

Modus Operandi (MO): COMPUTER WAS STOLEN, LAST SCANNED AT FEDEX, PERSONS OF INTEREST ARE
IN POSSESSION, IT REP PINGS COMPUTER LOCATION OUT OF STATE

## INSURANCE

None

## APPROVAL

                Sergeant Viewed         Lieutenant Viewed         Dist. Cmdr. Viewed

User ID:    KPD_S7925

Date/Time:   06-AUG-2016 10:35

            User ID: KPD_S7925          Date/Time: 06-AUG-2016 10:35

**SA0269**

FINAL APPROVAL

| | | | |
|---|---|---|---|
| Crime Prevention Officer Required? | Issued Complaint Slip? | 911 Notified? | Warrant? |
| Parade Related? | Crime Scene Required? | Report Status: | COMPLETED |
| Exceptional Clearance: | Date: | | |
| District Follow Up? | | | |
| Bureau Follow Up? | | | |

ARCHIVE   Printed By: PICIMPORT   08/07/2016 01:31   Page  4   of  5

NARRATIVE

Time Stamp: 08/06/2016 09:31        Written By:  CHARLES DONOVAN

ON AUGUST 2, 2016 AT APPROXIMATELY 1124 HOURS, OFFICER CHARLES DONOVAN OF THE KENNER POLICE DEPARTMENT WAS DISPATCHED TO THE FEDEX SHIPPING BUILDING LOCATED AT 300 MIDDLE ACCESS RD, KENNER LA, 70062 IN REFERENCE TO A THEFT.

UPON ARRIVAL AT APPROXIMATELY 1136 HOURS, OFFICER DONOVAN MET WITH THE REPORTING PERSON, MR. KENNETH MEYER. MR. MEYER IS EMPLOYED BY FEDEX AS A LOSS PREVENTION MANAGER. MR. MEYER EXPLAINED THAT HE WAS INVESTIGATING A THEFT OF A COMPUTER. MR. MEYER HAD BEEN IN CONTACT WITH INVOLVED PERSON MR. RUSTY MAHONY, THE IT MANAGER FOR CHECKPOINT PUMPS & SYSTEMS COMPANY LOCATED AT 21356 MARION LANE, MANDEVILLE, LA, 70471.

MR. MAHONY'S COMPANY PURCHASED A NEW COMPUTER AND HE DOWNLOADED ALL NECESSARY COMPANY DATA ON THE COMPUTER. MR. MAHONY THEN SHIPPED THE COMPUTER FROM MANDEVILLE ON JUNE 7, 2016 TO AN ADDRESS OUT OF THE COUNTRY, DUBAI CITY.

DURING THE COURSE OF SHIPPING THE COMPUTER FROM MANDEVILLE THE COMPUTER WAS SHIPPED TO 300 MIDDLE ACCESS ROAD, KENNER LOUISIANA PRIOR TO FURTHER SHIPMENT. THE COMPUTER WAS ALSO LAST SCANNED AT THE FEDEX LOCATION IN KENNER ON JUNE 7, 2016 AT 2103 HOURS.

SHORTLY AFTER THE COMPUTER WAS STOLEN, MR. MAHONY WAS ABLE TO ACCESS THE COMPUTER EACH TIME THE SUSPECT/USER LOGGED INTO AN INTERNET SERVICE. MR. MAHONY WAS ABLE TO DOWNLOAD MULTIPLE PHOTOGRAPHS, VIDEOS AND PERSONAL INFORMATION FROM THE USER.

BASED ON MR. MAHONY'S ABILITY TO ACCESS THE PERSONAL INFORMATION ON THE COMPUTER IT IS HIS BELIEF THE PERSON IN POSSESSION OF THE COMPUTER IS A BLACK FEMALE, STEPHANIE SCOTT. MR. MAHONY PROVIDED MR. MEYER WHO ULTIMATELY PROVIDED OFFICER DONOVAN WITH THE FOLLOWING COPIES OF SCOTT'S PERSONAL FORMS.

1. FEDERAL TAX FORM W-9
2. INDEPENDENT ASSOCIATE AGREEMENT TVC MARKETING ASSOCIATES, INC.
3. A UNITED STATES PASSPORT
4. CHASE BUSINESS DEBIT CARD
5. A PHOTOGRAPH OF WHAT IS BELIEVED TO BE SCOTT WEARING A WIG

IT SHOULD BE NOTED A PHOTOGRAPH OF A BLACK MALE'S GEORGIA'S DRIVER'S LICENSE WAS ALSO PROVIDED, TYRONE HOLMES.

ADDRESS PROVIDED FOR SCOTT WAS IN NEW YORK WHICH IS CONSISTENT WITH WHERE MR. MAHONY WAS ABLE TO DETERMINE THAT THE OPERATOR OF THE COMPUTER SIGNS INTO INTERNET SERVICE UNTIL RECENTLY, JULY 31, 2016 AT 1244 HOURS, WHEN THE COMPUTER WAS BEING USED IN ORLANDO FLORIDA.

OFFICER DONOVAN CONTACTED MR. MAHONY AND LEARNED THAT HE CAN PROVIDE MORE INFORMATION IF THE CASE IS INVESTIGATED FURTHER.

THE COMPUTER IS AS APPLE MACBOOK PRO MJLQ2LL/A-15-INCH LAPTOP, (2.2 GHZ INTEL CORE I7 PROCESSOR, 16GB, RAM, 256 GB HARD DRIVE, MAC OS X), SERIAL # (C02RQ1T3G8WN) WORTH $1,982.93.

IT SHOULD BE NOTED MR. MEYER WAS IN CONTACT WITH A OFFICER FROM NEW YORK POLICE DEPARTMENT WHO INFORMED MR. MEYER THAT IF HE HAD A ITEM NUMBER FROM A LAW ENFORCEMENT AGENCY FROM WHERE THE THEFT OCCURRED THE NEW YORK POLICE DEPARTMENT WOULD ASSIST IN THE INVESTIGATION.

**SA0271**

ARCHIVE     Printed by: Fic IMPORT     08/07/2016 01:31     Page 5     of 5

OFFICER DONOVAN CONTACTED KPD NCIC OPERATOR 673 WHO LOGGED THE COMPUTER AS STOLEN IN THE NCIC DATABASE.

ALL DOCUMENTS PERTAINING TO THIS CASE WERE TURNED INTO KENNER POLICE RECORDS WITH THIS REPORT.

CASE SUSPENDED.

H-800714

# Mahony Exhibit G

Case 22-1745, Document 104, 03/02/2023, 3477328, Page280 of 284

Case 1:17-cv-04557-RA   Document 96-6   Filed 02/12/18   Page 2 of 2
Case 1:17-cv-04557-ER   Document 51-7   Filed 10/09/17   Page 1 of 1
Wednesday, October 4, 2017 at 12:15:53 PM Central Daylight Time

**Subject:** Re: UPS receipt and tracking info
**Date:** Monday, October 17, 2016 at 10:03:23 AM Central Daylight Time
**From:** Rusty Mahony
**To:** CABALLERO, RODRIGO
**CC:** Bobbi Jo Bridges

Rico,

I received the machine this morning. I couldn't help but laugh when I flipped the computer over to see the asset tag sticker still intact! "Property of CheckPoint Pumps" As slick as these folks were, to think they'd have left that on the computer was pretty amazing.

Once again, I'd like to thank you and your team for your time and efforts. If I can be of any assistance to you in the future, please don't hesitate to ask.

Stay safe out there,

Rusty Mahony
IT Manager
CheckPoint Pumps & Systems
21356 Marion Lane | Mandeville, LA 70471
Direct +1 985.246.3142 | Mobile +1 985.249.0645 | Main +1 504.340.0770
rusty@cppumps.com | www.cppumps.com

**From:** "CABALLERO, RODRIGO"
**Date:** Tuesday, October 11, 2016 at 9:19 PM
**To:** Ruston Mahony
**Cc:** Bobbi Jo Bridges
**Subject:** UPS receipt and tracking info

Hey Rusty,

Hope all is well. I mailed the laptop this afternoon. Attached is a copy of the tracking info. I think that pretty much wraps it up on my end, I'm glad it worked out. Keep my contact info in the event you guys ever need anything from my end. Have a good night, take care. Rico.



**SA0274**

# Mahony Exhibit H



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

TYRONE HOLMES,

                        Plaintiff,

        v.

APPLE INC., AMAZON.COM, LLC, and
CHECKPOINT FLUIDIC SYSTEMS
INTERNATIONAL, LTD.,

                        Defendants.

Civil Action No. 1:17-cv-04557-ER

**NOTICE OF DEFENDANT APPLE INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, SUMMARY JUDGMENT**

      **PLEASE TAKE NOTICE** that defendant Apple Inc. ("Apple"), by its undersigned counsel, pursuant to the Court's January 29, 2018 minute entry and ruling at the January 12, 2018 pre-motion conference, hereby moves this Court, at 40 Foley Square, Courtroom 619, New York, New York, 100007, on a date to be set by the Court, for an Order granting judgment in Apple's favor on all of Plaintiff's asserted claims against Apple pursuant to Rule 12(c), or in the alternative Rule 56, and accordingly dismissing Apple from this action. For its motion, Apple relies on the accompanying statement of material facts; declaration of Tim O'Neil (with exhibits A-G), which is filed under seal; memorandum of law; and all matters before this Court and of which the Court may take judicial notice.

      **PLEASE TAKE FURTHER NOTICE** that pursuant to the Court's prior ruling, opposition papers, if any, must be filed by March 12, 2018, and any reply by March 26, 2018.

**SA0277**

Date:  February 12, 2018
       New York, New York

Respectfully submitted,

O'MELVENY & MYERS LLP

By:  */s/ Hannah Y. Chanoine*

Edward N. Moss
Hannah Y. Chanoine
Times Square Tower
7 Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061
hchanoine@omm.com
emoss@omm.com

David R. Eberhart
(*pro hac vice*)
Jesse J. Koehler
(*pro hac vice*)
Two Embarcadero Center, 28th Floor
San Francisco, California 94111
Telephone:  (415) 984-8700
Facsimile:  (415) 984-8701
deberhart@omm.com
jkoehler@omm.com

*Attorneys for Defendant Apple Inc.*